UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

| | |
|---|---|
| LEON J. FEINERMAN *et al.*,      ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.08-759 (RBW) |
| ) | |
| ROY A. BERNARDI, in his official capacity as ) | |
| Acting Secretary and Head of the ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN DEVELOPMENT ) | |
| 451 Seventh Street, S.W. ) | |
| Washington, D.C. 20410, ) | |
| ) | |
| Defendant. ) | |
| ————————————————————) | |

**PLAINTIFFS' AMENDED APPLICATION FOR PRELIMINARY INJUNCTION
AND REQUEST FOR EXPEDITED RULING**

Plaintiffs Leon J. Feinerman, Earl L. Harris, and Constance Buxton, through counsel,

hereby move this Court for an order pursuant to 5 U.S.C. § 705, or Rule 65 of the Federal Rules

of Civil Procedure and Local Rule 65.1, staying or enjoining their debarments by the United

States Department of Housing and Urban Development, pending a final decision on the merits of

their Complaint.

Plaintiffs first filed their application for a preliminary injunction with their Complaint, on

May 1, 2008. At the time it was presented for filing, plaintiffs' original application was

accompanied by a certificate of service by hand-delivery to Jeffrey Taylor, the United States

Attorney for the District of Columbia. At the direction of the Clerk's office, however, plaintiffs'

counsel removed the certificate of service. Counsel were instructed that certificates of services

may not be filed with motions which accompany complaints because such motions are served

with summonses.

On May 2, 2008, plaintiffs hand-delivered the summons, Complaint, their original Application for Preliminary Injunction, the memorandum in support thereof, and the accompanying exhibits, to Mr. Taylor, the United States Attorney.[1]  On May 5, 2008, the first day that electronic filing became available for this case, Plaintiffs' counsel then filed a return of service for the United States Attorney.[2]

By order dated May 6, 2006, the Court denied plaintiffs' original application for a preliminary injunction, without prejudice, on the grounds that they had failed to submit proof of service of their motion.  Although the United States Attorney was served with that application in accordance with the instructions of the Clerk's office, this amended application corrects the failure to provide proper proof of that service.[3]

Accordingly, plaintiffs hereby renew their request for an expedited ruling which stays or enjoins their debarments and preserves the status quo until their challenges to the debarments can be resolved on the merits.

As set forth in the accompanying memorandum of points and authorities and supporting exhibits, plaintiffs have demonstrated (1) they are likely to prevail on the merits of their

---

[1] Pursuant to Rule 4 of the Federal Rules of Civil Procedure, the summonses, Complaints, and Plaintiffs' accompanying filings were sent by certified mail to the Attorney General of the United States and Acting Secretary Bernardi on May 2, 2008.  Proof of that service has not yet been received by Plaintiffs' counsel from the postal service.

[2] Pursuant to Local Civil Rule 65.1(c), an opposition to an application for a preliminary injunction is due to be filed and served within five days of service of the application.  Based on the date of service of plaintiffs' original application on the United States Attorney, Defendant's opposition to Plaintiffs' application was thus due to be filed on May 9, 2008.

[3] Local Civil Rule 5.3 provides that "[f]ailure to make proof of service does not affect the validity of service."  Further, "[t]he Court may at any time allow the proof to be amended or supplied, unless to do so would prejudice a party." *Id*.

challenge; (2) they will suffer irreparable injury if the injunction is not granted; (3) there will be

no substantial injury to other interested parties; and (4) the public interest would be served by the

injunction.  Plaintiffs have also demonstrated that expedition is essential.

Respectfully submitted,

/s/Mona Lyons,  DC Bar No. 914234
Peter Butcher, DC Bar No. 441692
Law Office of Mona Lyons
1666 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20009
(202) 387-7000

Lee P. Reno, DC Bar No. 152256
Sarah L. Molseed, DC Bar No. 975677
Reno & Cavanaugh
1250 Eye Street, NW
Suite 900
Washington, D.C.  20005
(202) 783-2800

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiffs' Amended Application for Preliminary Injunction and

Expedited Ruling, the Memorandum of Points and Authorities in Support thereof, and all

supporting exhibits, were served by hand delivery on this 7th  day of May 2008, on:

Jeffrey A. Taylor
United States Attorney for the District of Columbia
Civil Division
4th Floor
501 Third Street, NW
Washington, DC 20530
Washington, D.C. 20530

/s/Mona Lyons

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEON J. FEINERMAN *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-759 (RBW) |
| | ) | |
| ROY A. BERNARDI, in his official capacity as | ) | |
| Acting Secretary and Head of the | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN DEVELOPMENT | ) | |
| 451 Seventh Street, S.W. | ) | |
| Washington, D.C.  20410, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S AMENDED APPLICATION FOR PRELIMINARY INJUNCTION
AND REQUEST FOR EXPEDITED RULING**

This action seeks review under the Administrative Procedures Act (APA) of a

determination by the United States Department of Housing and Urban Development (HUD)

which debarred three unpaid commissioners of a Pennsylvania public housing authority from

participation in transactions with the federal government.  HUD's determination is factually and

legally flawed, and based on findings and conclusions which are arbitrary, capricious, an abuse of

discretion, and otherwise not in accordance with law.  HUD's determination is thus invalid and

should be set aside.

The debarment determination misapplies HUD's regulations, imposes irreparable harm

on the plaintiffs and others, and serves no legitimate governmental interest.  Accordingly, the

plaintiffs seek an expedited order which stays or enjoins the debarments pending a final

resolution of the merits of this action, pursuant to 5 U.S.C. § 705, Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65.1.

An expedited ruling is warranted and necessary because the debarments have caused, and will continue to cause, immediate and irreparable harm, the plaintiffs are likely to prevail on the merits, and the balance of interests weighs in their favor.

One imminent and irreparable consequence of HUD's debarment will be the replacement of two of the plaintiffs as commissioners of the Harrisburg Housing Authority (HHA) in Harrisburg, Pennsylvania. Pursuant to successive five year terms, Plaintiffs Leon J. Feinerman and Earl Harris have served as HHA commissioners since 1983 and 1999, respectively. If their debarments are not stayed or enjoined, the Mayor of Harrisburg will have to replace Messrs. Feinerman and Harris as commissioners, they will not be able to resume service on HHA's Board for at least one five year term of their successors, and HHA will lose two commissioners who have a history of effective service and make valuable contributions to the organization.

HUD's debarment determination is having other immediate and prejudicial consequences for the plaintiffs. All three have already suffered extreme embarrassment and injury to their personal and professional reputations, and that harm will continue and increase unless their debarments are stayed or enjoined. In addition, Mr. Feinerman has already been required to resign from the position of Chairman of a hospital in Pennsylvania and, unless his debarment is stayed or enjoined, will be obligated to resign from the board of an insurance company in Vermont. Mr. Feinerman also stands to lose up to 40 percent of his insurance business, the insurance which he brokers for municipalities, schools and other entities which receive federal funds. Finally, all of the plaintiffs have always been active in public service and, unless their

2

debarments are stayed or enjoined, none of them will be able to serve in a leadership position for any organization which receives, or applies for, federal funds.

Accordingly, expedition is essential to preserve the status quo and prevent further irreparable harm while the plaintiffs seek a reversal of HUD's debarment determination.

## FACTS

**A.    Factual background to HUD's debarment action**

Plaintiff Leon J. Feinerman has been a member of the HHA Board of Commissioners and its Chairman since 1983.[4]  Plaintiffs Earl Harris and Constance Buxton were appointed to the HHA Board in December 1999.  Pursuant to a Pennsylvania statute, HHA board members are appointed by the Mayor of Harrisburg, with the approval of the City Council, and serve for five year terms unless they resign or are removed for cause.  HHA commissioners are uncompensated and meet during regular monthly meetings.

Mr. Feinerman is an insurance agent and broker, Reverend Harris is a pastor of a church congregation, and both are active in community service.  Ms. Buxton was a resident of HHA public housing for sixteen years.  Although inactive since their debarments, Mr. Feinerman and Reverend Harris continue to hold positions as HHA commissioners, but Ms. Buxton resigned from HHA's Board for health reasons in July, 2007.

In 1998, and in order to provide desperately needed financial services to its residents, HHA became involved in the planning for a low-income community credit union, which later became the Greater Harrisburg Community Credit Union (GHCCU).

---

[4] Except as otherwise noted, all of the facts recited here are detailed in the administrative record of the debarment proceeding.  The facts set forth in the background section without citation are undisputed.

3

At the monthly meeting of the Board in October, 1999, HHA's executive director, Dorsey Howard, informed the commissioners that he had set aside $100,000 per year for five years to support the operation of GHCCU in the plan which HHA is required to submit to HUD. The HHA Board members understood that the expenditures for the credit union were detailed in that plan when it was approved by HUD. However, the employee responsible for preparing the plan, Jerry Shenck, neglected to include the expenditures for the credit union and, when he discovered that oversight, concluded that operating funds could be used to support the credit union since HUD regulations and annual plan guidance did not require detailed descriptions of uses of operating subsidies. Mr. Shenck reported his omission of the credit union expenditures in the plan, and his conclusion that the mistake did not require action, to Mr. Howard. Neither Mr. Howard nor Mr. Shenck informed the HHA Board.

Of the three plaintiffs, only Mr. Feinerman was a member of HHA's Board at the time of the October, 1999 meeting. In 2000, and after Reverend Harris and Ms. Buxton were appointed to the Board, HHA began providing funding support for the credit union. Until 2004, proposed expenditures for the credit union came to the HHA Board for action when GHCCU requested payments in advance of scheduled payment dates. Payments made in the year they were scheduled were paid without Board action.

In September 2004, HHA learned that GHCCU would continue to require funding support to maintain net worth requirements. HHA's original commitment of $500,000 was exhausted and the HHA Board approved the executive director's recommendation that an additional $495,000 be committed to GHCCU, to be paid in installments over the next several years. Reverend Harris did not attend the HHA Board meeting at which that action was taken.

4

At each HHA Board meeting during which the GHCCU was discussed and expenditures for it were authorized, HHA's Executive Director, other members of senior management, and HHA's general counsel were in attendance and supportive of the action proposed and taken. None of those professionals ever advised HHA's Board not to provide financial support to GHCCU, and the commissioners were never informed that HUD had not been notified of, and had not authorized, that support.

In February 2006, GHCCU was closed for the failure to meet net worth requirements.

Thereafter, an audit of HHA's activities conducted by HUD's Office of Inspector General (OIG), questioned the funding of GHCCU but acknowledged that the HHA and its board believed those expenditures were proper. Through the audit, the plaintiffs learned that HUD had not been notified of, and had not approved, HHA's financial support of the credit union.

In response to the audit, and to ensure that questionable and unauthorized expenditures were not made in the future, the HHA Board, including Mr. Feinerman and Reverend Harris, committed to perform a management review and to adopt additional policies and internal controls. The Board also voted to create standing Governance and Audit Committees and caused HHA to enter into a payment plan so that all of the operating funds used to support the credit union are eventually replenished with non-federal funds. As detailed in the accompanying declaration of Mr. Feinerman, all of those corrective actions are either completed or ongoing. Furthermore, HUD has been notified of, has approved of, and has been kept apprised of, all of those actions.

**B.      Procedural Background**

By notices dated July 30, 2007, HUD separately notified each of the plaintiffs that it was

proposing their debarments from future participation in transactions with the executive branch of

the federal government for three years. The notices charged the plaintiffs with "allowing large

sums of HHA's operating subsidy funds, which it receives annually from HUD for the purpose of

developing and operating the HHA, to be used to fund . . . the Greater Harrisburg Community

Credit Union (GHCCU) without obtaining HUD's authorization for such expenditures" in

violation of the Annual Contributions Contract (ACC) between HUD and HHA.

HUD's notices state that the proposed debarments of the plaintiffs were based on acts and

omissions of HHA which established cause for debarment pursuant to 24 C.F.R. § 24.800(b) and

(d).[5]  The notices further stated that HHA's acts and omissions were imputed to the plaintiffs

because, as its commissioners and pursuant to 24 C.F.R. § 24.630(b), they had "participated in,

had knowledge of, or had reason to know of the violations."

The three debarment actions were subsequently consolidated. Thereafter, HUD filed its

brief and evidence in support of the debarments and, through counsel, the plaintiffs then filed

their opposition to the debarments. Among other facts and arguments, the plaintiffs presented

undisputed evidence that they had not participated in, had no knowledge of, and had no reason to

know of, the lack of HUD authorization for HHA's expenditures for the credit union. The

plaintiffs also presented evidence about the many factors which mitigated against their

debarment, including the steps which HHA and they had taken to avoid a recurrence of the

conduct complained of. Based on all of that evidence, the plaintiffs contended that the

---

[5]  As noted in the debarment determination, on December 27, 2007, HUD published a
final rule that relocated and recodified 24 CFR part 24 as 2 CFR part 2424. Because this
debarment proceeding arose prior to the publication of HUD's final rule, the debarment
determination refers to the regulations in their former location at 24 CFR part 24. For
convenience and consistency, this memorandum does as well.

6

consolidated debarment action should be dismissed.  In the event that it proceeded,  however, the plaintiffs asserted a right to an adjudicative proceeding before an Administrative Law Judge to disprove the allegations that they had engaged in willful, reckless or other serious wrongdoing and to prove their present responsibility.

In response to the plaintiffs' submission, HUD filed a motion requesting that the consolidated debarment action be referred to a hearing officer for fact-finding.  HUD's motion contended that there was a genuine factual dispute about whether the plaintiffs knew, or had reason to know, that HHA's expenditures for the credit union were unauthorized.  In opposing that motion, the plaintiffs argued that HUD had failed to present any evidence showing that there was a genuine dispute about that critical fact.  The plaintiffs also argued that HUD had failed to satisfy its burden of proof and contended again that they were entitled to the dismissal of their proposed debarments.

HUD's motion for referral to a hearing officer was never ruled upon.

On January 30, 2008, a hearing was held before the Debarring Official's designee, Mortimer F. Coward.  Mr. Coward heard arguments from both HUD and the plaintiffs' counsel. No evidence was presented.

On March 31, 2008, the Debarring Official, Henry S. Czauski, who did not attend the January 30 hearing, issued a determination debarring Mr. Feinerman and Ms. Buxton for three years and debarring Reverend Harris for eighteen months.  Mr. Czauski found that "[t]he HHA Board did not solicit, make inquiry, or receive any legal opinion or professional advice from legal counsel, professional staff or HUD as to whether the use of HUD funds for the establishment or support of the credit union was an eligible expense under section 9 of the ACC."  (Debarring

Official's Determination, Exhibit 10).  Based on that finding, Mr. Czauski concluded that "[t]he HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program."

Mr. Czauski's determination makes no reference to any disputes about material facts, or lack thereof, and does not discuss HUD's motion for referral to a hearing officer for fact-finding about what the plaintiffs knew, or had reason to know.  Nonetheless, Mr. Czauski concluded that "[t]he improper conduct of the HHA is imputable to Respondents . . . who participated in, had knowledge of, or had reason to know of the improper conduct."

Mr. Czauski's determination similarly makes no reference to the plaintiffs' contention that, if the debarment action was not dismissed, they were entitled to an adjudicative fact-finding proceeding.  Nonetheless, in reference to the factors mitigating against debarment, Mr. Czauski concluded that "[a]lthough Respondents allege that they have taking (*sic*) certain steps to put procedures and controls in place, including the creation of a governance committee and an audit committee to avoid a repetition of a similar problem and a proposal to repay all the funds contributed to GHCCU with non-federal funds, no affirmative action has been taken by any of the respondents or the HHA Board to implement the steps, controls or repayment suggested and to avoid a recurrence."  That conclusion is both false and unsupported by any facts in the administrative record.

Based on those findings and conclusions, Mr. Czauski debarred Mr. Feinerman and Ms.

8

Buxton from participation in covered transactions with the federal government for three years,

and Reverend Harris for eighteen months.  Mr. Czauski provided no explanation about how he

determined the appropriate length of the three debarments.

## ARGUMENT

Plaintiffs obtain injunctive relief by demonstrating (1) they are likely to prevail on the

merits of their challenge; (2) they are likely to suffer irreparable injury if the injunction is not

granted; (3) there will be no substantial injury to other interested parties; and (4) the public

interest would be served by the injunction.  *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir 1985);

*Fund for Animals v. Norton*,  281 F. Supp. 2d 209, 219 (D.D.C. 2003).

> Plaintiffs ultimately are not required to prevail on each of these
> four factors. Rather, the factors "interrelate on a sliding scale and
> must be balanced against each other."

*Canales v. Paulson*, 2006 U.S. Dist. Lexis 61915, *8-*9 (D.D.C. 2006), *quoting Serono Lab. v.*

*Shalala,* 158 F.3d 1313, 1318 (D.C. Cir. 1998).  "If the arguments for one factor are particularly

strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed*

*Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995).  Therefore, "a stay

may be granted with either a high probability of success and some injury, or vice versa." *Cuomo*,

772 F.2d  at 974.[6]

**A.**    **Plaintiffs are likely to prevail on the merits of their challenge to their debarments**

1.    The Court's review of HUD's debarment determination under the APA

---

[6]  The four-factor standard used by courts for a motion to stay agency action is the same
legal standard as that used in a motion for preliminary injunction.  *Hill Dermaceuticals, Inc. v.*
*United States FDA*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007).

Under the APA, the court is required to determine whether HUD's debarment determination is supported by proper fact-finding and legal reasoning. Section 706(2)(A) of the APA directs the court to set aside agency action, findings and conclusions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." When conducting review under this standard, the inquiry is focused on whether the agency examined the relevant data and articulated a satisfactory explanation for its action "including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983) (citations omitted). The court must not "countenance an agency's failure to 'consider relevant factors' or 'clear errors of judgment.'" *Sloan v. HUD*, 231 F.3d 10, 15 (D.C. Cir. 2000), *quoting Motor Vehicle Mfrs.,* 463 U.S. at 43.

2.     <u>The Debarring Official found grounds for debarment by imposing an erroneous legal standard</u>

a)     *No grounds exist for debarring the plaintiffs*

Debarment is a discretionary action intended to ensure that the Federal Government conducts business "only with responsible persons." 24 C.F.R. § 24.110(a). Debarment therefore is appropriate only where it is determined that a contractor is not "presently responsible," and is not to be used "for purposes of punishment" of past misconduct. 24 C.F.R. § 24.110(b) & (c).

Grounds for debarment include:

> (b) violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program, such as –
>
> > (1) A willful failure to perform in accordance with the terms of one or more public agreements or transactions;

> (2) A history of failure to perform or of
> unsatisfactory performance of one or more public
> agreements or transactions....or

> (d) Any other cause of so serious or compelling nature that it
> affects your present responsibility.

24 C.F.R. § 24.800.

In addition, when an organization engages in improper conduct warranting debarment, that conduct may be "imputed" from the organization to an individual "if the individual to whom the improper conduct is imputed either participated in, had knowledge of, or reason to know of the improper conduct." 24 C.F.R. § 24.630.

HUD has the burden of proving that cause for debarment exists. 24 C.F.R. § 24.855. HUD must satisfy a high standard of proof to prevail in a debarment action on a charge that alleged misconduct is "willful," by proving both that conduct warranting debarment occurred, and that the plaintiffs either knew their actions constituted a violation of a legal or contractual obligation, or that they acted with reckless disregard of their obligations. Willfulness "denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental . . .The word is also employed to characterize a thing done without ground for believing it is lawful or conduct marked by a careless disregard whether or not one has the right so to act." *United States v. Murdock*, 290 U.S. 389, 394-395, 54 S. Ct. 223, 78 L. Ed. 381(1933); *see In Re Randy L. Stephens*, 58 Agric. Dec. 266, 271 (USDA 1999) (debarment under USDA regulations).

For example, a wrongful act is not willful if it is based on a good faith misunderstanding of law or regulation. *In the Matters of Nell Witt, Charles Hager, Charles Forbush, Agnes Cowan*, HUDBCA Nos. 90-5321-D82, 90-5322-D83, 90-5323-D84, 90-5324-D85, 1991 HUD

11

BCA Lexis 10 (April 22, 1991). In addition, willful conduct is distinguishable from a mistake. *In the Matter of Richard D. Salvatierra,* EPA Case No. 94-0009-01, 1997 EPADEBAR Lexis 2 (January 28, 1997) (debarment under EPA regulations); *In the Matter of Seb J. Passenesi,* HUDALJ, No. 92-1835-DB (1992).

There are no specific standards or guidance from HUD on the proper exercise of the duties of commissioners of public housing authorities, and none were cited by HUD in its submissions in support of the debarment of plaintiffs. (Declaration of James G. Stockard, Jr., Exhibit 1). [7] Rather, the duties of such commissioners are derived from state and common law. (*Id.*)

While the commissioners exercise a supervisory role over HHA, the Authority's enabling statute contemplates that they will require the assistance of others to effectively govern the organization. "The Authority may employ a secretary, such technical experts, and other such officers, agents, and employees, permanent or temporary, as it may require." 35 Pa. Cons. Stat. § 1547. Furthermore, HHA commissioners are statutorily entitled to rely on the information and advice provided by the officers, staff, counsel and other professionals employed. 15 Pa. Cons. Stat. § 5712.

Accordingly, the three plaintiffs understood their role on the board as establishing policy and direction for HHA, and they necessarily and properly relied on their executive directors and general counsel to inform them of the specific requirements of the ACC and HHA's other legal obligations, which is standard practice for housing authority board members. (Stockard

---

[7] Except for the supplemental declarations of the three plaintiffs, all of the declarations cited herein are part of the administrative record. All of those declarations, and the plaintiffs' supplemental declarations, are exhibits hereto.

Declaration, Exhibit 1; Declaration of Leon J. Feinerman, Exhibit 2; Declaration of Earl L. Harris, Exhibit 3; Declaration of Constance Buxton, Exhibit 4). Day-to-day operational details at HHA were handled and implemented by its management and professional staff.  (Feinerman Declaration, Exhibit 2).

Each of the plaintiffs believed that a low-income credit union was a reasonable and proper undertaking that would benefit HHA residents.  They knew that other housing authorities had established credit unions, that HUD had facilitated meetings about their doing so, that over half of HHA's households had reported a need for financial services, and that HHA's professional staff, and its general counsel, had no concerns about the eligibility and propriety of the expenditures for GHCCU.  (Feinerman Declaration, Exhibit 2; Harris Declaration, Exhibit 3; Buxton Declaration, Exhibit 4; Declaration of Irwin Aronson, Exhibit 6).

Moreover, HHA's Board had been expressly told in 1999 that the expenditures for the credit union were detailed in the five year plan submitted to and approved by HUD, and were wholly unaware that HUD had not been informed of those expenditures.  Furthermore, all of the decisions which HUD now contends constitute willful violations of the ACC, were made by the plaintiffs after they were provided information and advice by two different executive directors, both of whom had years of experience in the industry, and in the presence of the HHA's general counsel, who attended all Board meetings to assure compliance with legal and contractual obligations.

Accordingly, there is no evidence that the plaintiffs engaged in a willful violation of the terms of any public agreement or transaction, nor that they acted in reckless disregard of their obligations.

Likewise, the participation of the three plaintiffs in decisions to provide financial support to the credit union does not warrant debarment under 24 C.F.R. § 24.800(b)(2), because they have no history of either any failure to perform or of unsatisfactory performance of any public agreements or transactions. During the eight year period at issue, only two acts occurred which even arguably warrant debarment: the first funding commitment made by HHA to GHCCU in 1999 and the second funding commitment made in 2004. The other actions taken by the HHA Board concerning GHCCU involved only the implementation of those two decisions. The implementation of a decision over time does not constitute a history of decision-making. Moreover, during the relevant time frame, HHA consistently performed as either a standard or high performer under HUD reviews. (Feinerman Declaration, Exhibit 2; Declaration of Jerry Shenck, Exhibit 5).

Because HUD cannot demonstrate that the three plaintiffs engaged in wrongdoing, it also cannot establish a history of failure to perform or unsatisfactory performance. The initial decision of HHA's Board to fund the credit union in 1999, and the subsequent related decisions, were made in good faith reliance on staff and counsel. Just as one non-willful mistake does not create cause for debarment, neither does the repetition or reiteration of that mistake over time.

In the audit conducted by HUD, its own OIG acknowledged that the HHA and its board believed that the expenditures for the credit union were proper. (Supplemental Declaration of Leon J. Feinerman, Exhibit 7). Moreover, in its motion to refer this matter to a hearing officer, HUD argued not that the plaintiffs had engaged in "willful" misconduct, but rather that violations by HHA should be imputed to them on the grounds that they "participated in, had knowledge of, or reason to know of" the improper conduct. HUD's motion contended the plaintiffs had raised a

14

dispute of material fact warranting a fact-finding hearing by presenting evidence that they "never knew that HUD had not authorized the disbursements for GHCCU, and that at no time did any question or suspicion of impropriety arise." (Government's Motion to Refer to Hearing Officer, dated December 3, 2007, at 2, Exhibit 11). HUD did not, however, present any evidence that supported imputing grounds for debarment to the plaintiffs.

Innocent "participation" in funding a project based on a good faith, albeit mistaken, belief that approval for the project had been secured does not warrant imputation of grounds for debarment, for the same reason that a person's position or status in a corporation alone does not allow for imputation of improper conduct. *See* 68 Fed. Reg. 66533, 66539 (November 26, 2003); *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991). The debarment regulations do not support a standard of strict liability. *Id.* Rather, there has to be sufficient evidence of culpability to impute grounds for debarment from an organization to an individual within the organization. HUD's debarment rule "retains the *reason to know* standard for imputing misconduct to individuals under section 630(b)." 68 Fed. Reg. at 66539.

The term "reason to know" is not defined by the HUD regulations, but the D.C. Circuit had an occasion to construe the same term in the federal acquisition regulations: "'reason to know' imposes no duty of inquiry; it merely requires that a person draw reasonable inferences from information already known to him." *Novicki*, 946 F.2d at 941 (finding that the drafters of the debarment regulations intended "reason to know" to have its accepted common law definition). This standard for imputing debarment based on a "reason to know" of misconduct was expressly adopted in the commentary to the government-wide debarment regulations. 68 Fed. Reg. at 66539.

15

None of the three plaintiffs knew or had reason to know of any improper conduct in connection with funding GHCCU. Mr. Feinerman, the only one of the three plaintiffs on HHA's Board when it first decided to commit funds for the creation and operations of the credit union, believed that commitment would help provide desperately needed financial services to HHA residents. Mr. Feinerman and his fellow board members believed that support for a low-income credit union was a sound idea and a proper expenditure of funds, and they were told by HHA's executive director that those expenditures were detailed in the plan submitted to and subsequently approved by HUD. HHA's general counsel also endorsed the idea of providing operating funds to the credit union and raised no legal concerns about doing so. (Aronson Declaration, Exhibit 6).

Based upon that information and advice, Mr. Feinerman could reasonably conclude that the executive director had taken all necessary steps to implement the support for the credit union in a manner that was compliant with the ACC and other regulations. It was years later when Mr. Feinerman learned through HUD's OIG's audit that information regarding the credit union expenditures was omitted from the plan submitted to HUD in1999, and that the staff member responsible had told only Executive Director Dorsey, who had since died.

Reverend Harris and Ms. Buxton, both of whom were appointed to the HHA Board after the commitment of funds was made to the credit union, also believed that the support of the credit union served the interests of HHA residents. Furthermore, absent any indication of impropriety, they had no obligation to scrutinize the earlier decision of their predecessors to make that commitment. For them, virtually all of the issues which arose about the credit union in HHA Board meetings were not about whether funds should be made available, but when. And,

16

when Mr. Feinerman and Ms. Buxton later approved a further authorization of funds for the

credit union in 2004, they viewed it as an extension of the initial decision made in 1999.

(Stockard Declaration, Exhibit 1; Feinerman Declaration, Exhibit 2; Buxton Declaration, Exhibit

4).

Each time questions regarding the credit union arose at HHA Board meetings, they were

presented or explained by the executive director in the presence of the general counsel, and at no

time did any question or suspicion of impropriety arise.  Furthermore, throughout the time these

expenditures were being made, HHA's operations were subject to independent audits, including

an annual financial audit which specifically examined the expenditures for GHCCU for

compliance with regulatory requirements.  None of those audits raised serious problems and none

raised cause for concern that the expenditures for the credit union were improper.[8]

b)    *The Debarring Official misconstrued the standards for debarment and imputed grounds for debarment without any factual basis*

The Debarring Official ignored his agency's contention that there was a genuine factual

dispute about the plaintiffs' culpability for any misconduct, and similarly disregarded the

plaintiffs' assertion that they were entitled to an adjudicative hearing.  Rather, with no reference

to HUD's motion for referral to a hearing officer, with no discussion about either a need for fact-

finding or a lack thereof, and by applying an erroneous legal standard, the Debarring Official

---

[8]  HUD's argument that the plaintiffs knew or had reason to know that approving expenditures from the general fund to GHCCU without obtaining HUD's prior authorization was prohibited misses the point.  *See* Debarring Official's Determination, Exhibit 10, at 4.  Knowing that unauthorized contributions are prohibited does not reach the relevant question of whether the plaintiffs knew that these particular expenditures had not been authorized and then approved them in spite of that knowledge.

implicitly determined there was no dispute of material fact, and simply concluded that the

plaintiffs were culpable.

In his debarment determination, the Debarring Official found the following facts:

> Respondent Feinerman and the other commissioners serving at that
> time believed that the availability of a credit union to HHA
> residents would be a benefit to the residents;

> Respondent Feinerman was informed by Dorsey Howard that the
> Binghamton Housing Authority was involved in the establishment
> of a credit union for its residents and staff and that HUD sponsored
> a training session for PHA's interested in creating credit unions;

> At a HHA board meeting in October 1999, Dorsey Howard
> informed Board members Feinerman, Martini and Jones that he
> recently became chairman of the GHCCU and that "the housing
> authority, in its five year plan, has set aside up to $100,000 a year
> for operating subsidy";

> The benefits, composition of Board and amount of funding needed
> by GHCCU were discussed in HHA Board meetings, in the
> presence of HHA's general counsel, executive directors, and other
> professional staff;

> The HHA Board did not solicit, make inquiry, or receive any legal
> opinion or professional advice from legal counsel, professional
> staff or HUD as to whether the use of HUD funds for the
> establishment or support of a credit union was an eligible expense
> under section 9 of the ACC.[9]

---

[9] In his background discussion, the Debarring Official also acknowledged the following
undisputed facts:
> The details of this commitment, as the HHA Board understood it, were set forth in
> the Comprehensive Grant Program Annual Submission when it was approved by
> HUD.  However, as sworn to by the responsible employee...he inadvertently
> omitted in the Submission to HUD a description of the planned financial support
> for GHCCU.  In his declaration, the employee swears he informed the ED of his
> mistake...The employee admits in his declaration that he "did not inform the HHA
> Board that the financial support for the credit union was not included in the plan
> submitted to HUD.

(Debarring Official's Determination, Exhibit 10, at 6)

(Debarring Official's Determination, Exhibit 10, at 9-10). The Debarring Official further referenced the undisputed contention that "the Board was never advised either that HUD had not been informed of the financial support for the credit union, or that funding of the credit union was improper." (*Id.* at 6).

The Debarring Official's findings reflect the absence from the record of any evidence that the plaintiffs engaged in willful misconduct or a history of misconduct or unsatisfactory performance warranting debarment. Moreover, the Debarring Official's finding that the plaintiffs received no information about the eligibility of the expenditures for the credit union, in light of the acknowledgment by HHA's counsel that they relied upon him to notify them of any such legal issues, on its face compels a conclusion that they had "no reason to know" that there was anything improper about the expenditures. Nevertheless, the Debarring Official then concluded:

> The HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program.
>
> The improper conduct of the HHA Board is imputable to the Respondents pursuant to 24 CFR 24.630(b) who participated in, had knowledge of, or had reason to know of the improper conduct.

(*Id*. at 11).

The Debarring Official's conclusion that a "failure to solicit or make affirmative inquiry"

19

by the plaintiffs amounts to "reason to know" squarely adopts the argument for debarment put

forward by HUD, that regardless of what the plaintiffs knew or believed, their failure to inquire

into the approval of the funding for the credit union demonstrates they "knew or had reason to

know" that HHA lacked the requisite approval.  (Government's Reply in Support of its Motion to

Refer to a Hearing Officer, dated January 11, 2008, Exhibit 12, at 3-8).  More importantly, the

Debarring Official's conclusion thereby imposes a standard for imputing grounds for debarment

which is erroneous as a matter of law.

As the D.C. Circuit observed in a similar dispute,

> the Special Assistant phrased the relevant issue as whether Novicki
> properly "carr[ied] out his duty of inquiry."  This suggests that
> Novicki was debarred because he "should have known" of Dale's
> misconduct – that is, because his position as president and chief
> executive officer gave him an obligation to seek out wrongdoing.

*Novicki*, 946 F.2d at 942.  The Court agreed with Novicki that imposing such a duty to inquire in

a debarment action "misconstrued the 'reason to know' standard and instead improperly imputed

Dale's misconduct to him under either a strict liability or a 'should have known' standard."  *Id.*,

at 941.

As the commentary to the government-wide federal debarment regulations makes clear,

> Under this rule, if a person in a position of control, influence or
> authority over a business activity acquires information that
> suggests misconduct and fails to take action to prevent the
> misconduct from occurring, or to mitigate the injurious
> consequences of the misconduct once it has occurred, imputation
> under the *reason to know* standard of section 630(b) is appropriate.
> If a person in authority over a business activity can be shown to
> have deliberately avoided acquiring information about misconduct
> that would otherwise reasonably be expected to come to their
> attention in the ordinary course of performing their duties, they
> may be deemed to have *reason to know* of the misconduct under

20

section 630(b).

68 Fed.Reg. at 66539 (italics in original).

There was no evidence before the Debarring Official that the plaintiffs either acquired information that suggested misconduct, or deliberately avoided acquiring information about misconduct that would otherwise reasonably be expected to come to their attention. The Debarring Official therefore clearly erred by concluding that each plaintiff had "reason to know" of improper conduct by the HHA based on findings which showed they had not acquired any information putting them on notice of any such misconduct. Particularly in light of the evidence that the plaintiffs had no cause for concern about whether HHA had honored its contractual obligations, the Debarring Official's determination that grounds for debarment are imputable to each of the plaintiffs lacks "a rational connection between the facts found and the choice made," and is arbitrary and capricious.

3.     The Debarring Official disregarded facts in the record favorable to plaintiffs, and made erroneous factual findings with no record support, in order to determine that the plaintiffs are not "presently responsible" and that debarment is warranted

If no cause for debarment exists in the first instance, as the Debarring Official should have determined, then the debarment action proceeds no further. On the other hand, the existence of cause for debarment does not by itself require debarment. *Canales v. Paulson*, 2007 U.S. Dist. Lexis 50924, *15-16 (D.D.C. 2007). The Debarring Official "need not debar you even if cause for debarment exists." 24 C.F.R. § 24.845(a). Rather, debarment is appropriate only where it is determined that the individual is not "presently responsible." 24 C.F.R. § 24.110(b). "The ultimate inquiry in a debarment must be directed to the 'present responsibility' of the contractor." *Silverman v. United States Dep't of Defense*, 817 F. Supp. 846, 848-849 (D. Cal.

21

1993).  Indeed, the catch-all ground for debarment is "any other cause of so serious or compelling nature that it affects your present responsibility."  24 C.F.R. § 24.805(d).  Where HUD carries its burden of proving that cause for debarment exists, the burden is then on the respondent to demonstrate that he or she is presently responsible and that debarment is not warranted or necessary.  24 C.F.R. § 24.855(b).

The Debarring Official must base the decision to debar "on all information contained in the official record," including mitigating factors.  24 C.F.R. §§ 24.845(b) & 24.860. Accordingly, the Debarring Official must  "carefully consider any favorable evidence of responsibility to ensure that all findings of responsibility are based on the presence of a realistic and articulable threat of harm to the government's proprietary interest."  *Silverman*, 817 F. Supp. at 849.  "Affording the contractor this opportunity to overcome a blemished past assures that the agency will impose debarment only in order to protect the Government's proprietary interest and not for the purpose of punishment."  *Robinson v. Cheney*, 876 F.2d 152, 160 (D.C. Cir. 1989).

HHA's decision to provide financial support to the credit union was made in 1999, nearly ten years ago.  Although the payment of that support followed in each year through 2005, the facts concerning the underlying wrongdoing are stale.  *See In the Matter of  Lynne Borrell and Lynne Borrell and Associates*, HUDBCA No. 91-5907-D52, 1991 HUD BCA Lexis 22 (September 20, 1991) (passage of time diminishes probative value of acts showing lack of present responsibility).

Furthermore, the evidence of present responsibility offered by the plaintiffs included the following mitigating factors:

The three HHA commissioners are dedicated public servants who

22

have no history or pattern of violating the ACC or the law;

The three plaintiffs did not initiate or develop the HHA plan to support the credit union, nor did they handle the paperwork which mistakenly omitted discussion of the proposed project. Indeed, two of them were not even commissioners when that plan was first developed and approved;

The amount of money expended for support of the credit union was paid over an eight year period and amounted to less than one percent of HHA's budget;

The unauthorized funding involved no charge of self-dealing; rather, the funds at issue were devoted to a project that the plaintiffs reasonably believed to be in the best interest of HHA residents, and many HHA residents benefitted from the credit union;

During the relevant time frame, HHA scored well under the Public Housing Assessment System (PHAS), which evaluates, among other things, the physical condition of HHA property and resident satisfaction. HHA has also consistently scored well on HUD evaluations of its management and operations and has undergone and passed numerous financial audits;

Each of the three commissioners was fully cooperative during the investigations of their activities, and volunteered to be interviewed by HUD's OIG;

Mr. Feinerman and Reverend Harris have fully cooperated with HUD in attempting to resolve the audit findings, and have taken affirmative steps to ensure that the problem does not occur again;

HHA intended to replenish the funds expended for the support of credit union with non-federal funds.[10]

(Stockard Declaration, Exhibit 1; Feinerman Declaration, Exhibit 2; Harris Declaration, Exhibit

3; Buxton Declaration, Exhibit 4; Shenck Declaration, Exhibit 5; Aronson Declaration, Exhibit

---

[10] On February 5, 2008, after the administrative hearing on the plaintiffs' proposed debarments but before the Debarring Official made his determination, HUD executed a repayment agreement with HHA. (Supplemental Feinerman Declaration, Exhibit 7.)

6). *See* 24 C.F.R. § 24.860 (listing mitigating factors relevant to debarment).

The Debarring Official here purported to consider mitigating factors in reaching his conclusion that the plaintiffs are presently irresponsible and their debarment is warranted. Based upon his findings and conclusions, however, he apparently gave no weight to any of the relevant mitigating factors, stating only that "the cooperation of Respondents in resolving the audit findings is acknowledged." (Debarring Official's Determination, Exhibit 10, at 12).

In another debarment decision which failed administrative review before this court, the plaintiff had presented a variety of mitigating factors, and "the DO acknowledged that such factors existed, but imposed the maximum term of debarment without explaining why he found them unpersuasive."

> Sharpe's failure to address in any detail the mitigating factors Canales raised, or to explain why he gave them so little weight, makes it impossible to evaluate whether there was a 'rational connection' between the facts of her case and his decision to impose debarment.

*Canales*, 2007 U.S. Dist. Lexis 50924, at *17.

The debarment determination in this case likewise fails to address the relevant mitigating factors presented by the plaintiffs. Even more disturbingly, the Debarring Official erroneously discounted a significant factor demonstrating present responsibility:

> Although Respondents allege that they have taking [*sic*] certain steps to put procedures and controls in place, including the creation of a governance committee and an audit committee to avoid a repetition of a similar problem and a proposal to pay all the funds contributed to GHCCU with non-federal funds, no affirmative action have [*sic*] been taken by any of the respondents or the HHA Board to implement the steps, controls or repayment suggested and to avoid a reoccurrence.

24

(Debarring Official's Determination, Exhibit 10, at 12). As evidenced by the supplemental declaration of Mr. Feinerman, the Debarring Official's assertion that HHA and its commissioners have failed to take that corrective action is wholly outside the record, and utterly false. In fact, HHA's Board of Commissioners, including Mr. Feinerman and Reverend Harris, has created governance and audit committees. HHA has also retained a consulting firm which is reviewing its policies and procedures, has already conducted training of its Board, and will be proposing further action by HHA as appropriate. Furthermore, HHA and HUD have entered into a repayment agreement. Finally, as of the date of the debarment determination and contrary to it, HUD was aware of, had approved, and knew the status of all of those corrective measures. (Supplemental Feinerman Declaration, Exhibit 7).

The Debarring Official's mishandling of the remedial measures taken by the plaintiffs bears directly on the ultimate issue in this debarment action, namely their present responsibility. "[T]he contractor can meet the test of present responsibility by demonstrating that it has taken steps to ensure that the wrongful acts will not recur." *Robinson*, 876 F.2d at 160. Significantly, the false assertion that such steps have not been taken here is the only "mitigating" factor to which the Debarring Official gave any express consideration in his conclusions, and its prominence in his determination renders the debarments invalid on their face. That error is compounded by the absence of any explanation for the Debarring Official's decision to impose the maximum standard period for a debarment – three years – on Mr. Feinerman and Ms. Buxton. *See* 24 C.F.R. § 24.865 ("Generally, debarment should not exceed three years").[11]

---

[11] As he did with the mitigating factors identified by the plaintiffs, the Debarring Official also disregarded their request for a fact-finding hearing in the event the charges against them were not dismissed. That request was effectively denied without reference, explanation or any

The Debarring Official did not carefully or accurately consider the mitigating factors in the record, and instead found a lack of present responsibility based on a clearly erroneous factual determination. His debarment determination therefore has no rational basis and constitutes an improper punitive measure against three individuals who have demonstrated their present responsibility. Accordingly, that determination is an abuse of discretion, arbitrary and capricious, and must be set aside.

**B.      Plaintiffs will suffer irreparable harm if the debarment is not stayed**

In order to warrant injunctive relief, the plaintiffs must demonstrate that they are likely to suffer irreparable harm which is imminent and certain, rather than remote and speculative. *See AFGE v. United States*, 104 F. Supp. 2d 58, 63 (D.D.C. 2000). The plaintiffs have made that showing.

HUD's own regulations expressly recognize that debarment "is a serious action" which purportedly is based on a need "to protect the public interest." 24 C.F.R. § 24.110(c). Debarment "directs the power and prestige of government at a particular person"; consequently, while the majority of administrative review actions concern agency rules that impact citizens only indirectly, "the resolution of debarment cases 'is a serious matter' that has an immediate and profound effect on the particular individuals involved." *Canales*, 2007 U.S. Dist. Lexis 50924 at *14 n.5, *quoting Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998).

> In this case, appellants have endured economic losses, professional indignities, and injuries to their reputations, and these sufferings no doubt will continue to linger so long as appellants are tarnished by

---

apparent consideration.

26

> an official record suggesting that they engaged in "serious
> irregularities" in their business dealings with the Government.

*Sloan*, 231 F.3d at 17.

As a direct and immediate result of their debarments, the plaintiffs have already suffered

extreme embarrassment, and significant injury to their personal and professional reputations.

(Supplemental Feinerman, Harris and Buxton Declarations, Exhibits 7, 8 and 9.)

In addition, Mr. Feinerman has been required to resign from a hospital board and, absent

intervention by the court, will soon be forced to resign from the board of an insurance company.

Mr. Feinerman's business as an insurance agent and broker is also imperiled by his debarment,

since forty percent of his insurance business is derived from entities that receive federal funds.

(Supplemental Feinerman Declaration, Exhibit 7).

Reverend Harris is employed as the pastor of the St. Paul Missionary Baptist Church. As

such, he occupies a sensitive role based on trust and respect, and will be unable to minister

effectively with a stamp of irresponsibility by the federal government, particularly if his tenure on

the HHA Board is terminated as a result of his debarment. (Supplemental Harris Declaration,

Exhibit 8).

All three plaintiffs have also always been active in public service. During their lengthy

debarments, however, none of the plaintiffs will be permitted to serve in a leadership position

with any organization which receives, or may apply for, federal funds. Indeed, given the stigma

of their debarments, they may never again be afforded the privilege of such service.

More specifically, as the Debarring Official instructed Harrisburg's Mayor by letter dated

April 18, 2008, HHA "is prohibited from allowing debarred individuals to supervise, exercise

critical influence over or substantially control transactions funded with money provided to the HHA through Annual Contributions Contracts with HUD."  (Supplemental Feinerman Declaration, Exhibit 7).  In other words, Mr. Feinerman and Reverend Harris are effectively enjoined from continuing their service as HHA commissioners and, absent court intervention, will have to resign or be removed from their positions.  With the approval of the City Council, the Mayor will then be obligated to appoint two new HHA commissioners, both of whom will be entitled to serve at least one five year term.

Mr. Feinerman and Reverend Harris will thus be deprived of the right and privilege of public service which they believe in, are committed to, are proud of and want to continue.  And, for its part, HHA will be stripped of Mr. Feinerman and Reverend Harris' 34 years of combined experience on its board and become governed by a body whose most senior member has served less than a year and a half.  (Supplemental Feinerman and Harris Declarations, Exhibits 7 and 8)

The eroding effect of HUD's debarment on the plaintiffs' reputations, their professional and public service commitments, and their positions in community organizations warrants expedited preliminary relief.  While it is true that a determination on the merits in their favor will ameliorate these injuries, "it is also true that 'in many cases the ultimate absolution never catches up with the stigma of the accusation.'"  *Greene v. Bowen*, 639 F. Supp. 554, 563 (D. Cal. 1986) *quoting Sampson v. Murray*, 415 U.S. 61, 94, 39 L. Ed. 2d 166, 94 S. Ct. 937 (1974) (Douglas, J. dissenting)(district court granted preliminary injunction to physician who challenged a two-year exclusion from the Medicare program).

The plaintiffs' involvement in leadership roles in public service organizations is their constitutional right, the loss of which qualifies as irreparable harm.  "The right to associate with

28

others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends has long been accorded First Amendment protection." *Bray v. City of New York*, 346 F. Supp. 2d 480, 488 (D.N.Y. 2004) (citations omitted). *See also Clarke v. District Council of New York City*, 1981 U.S. Dist. LEXIS 16294 *10 (S.D.N.Y. 1981) (recognizing irreparable harm where union member was deprived of a valuable right to participate in membership meetings, to express his views and to vote at such meetings).

Furthermore, in assessing whether irreparable harm exists, the court considers only the available remedies, and even pecuniary losses may qualify as irreparable harm if a later federal suit to recover monetary damages would be barred. *Haley v. Pataki*, 883 F. Supp. 816, 824 (N.D.N.Y. ) *app. dis.*, 60 F.3d 137, 139 (2d Cir. 1995) (assessing lack of adequate remedy at law against state pursuant to Eleventh Amendment). "Where monetary loss may well be irrecoverable if plaintiff prevails on the merits at a later trial, injunctive relief is proper." *Alexander v. Savings Life Ins. Co.*, 1987 U.S. Dist. Lexis 5839, *10 (D. La. 1987).

The plaintiffs will never be entitled to money damages for injuries caused by HUD's debarment in violation of the APA. *See Iyengar v Barnhart*, 233 F. Supp. 2d 5, 15 (D.D.C. 2002). The APA does not waive sovereign immunity for "an action at law for damages, which are intended to provide victim with monetary compensation for injury to his person, property, or reputation." *Bowen v. Massachusetts*, 487 U.S. 879, 893, 101 L. Ed. 2d 749, 108 S. Ct. 2722 (1988).

An ultimate favorable decision on the merits therefore cannot provide an adequate remedy at law to the plaintiffs. "[T]he plaintiffs present a persuasive argument that if the injunction does not issue but the court ultimately [rules in their favor], they might be precluded

29

from suing the federal government to recoup pay and benefits they lost before the court so ruled."
*AFGE v. United States*, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (finding plaintiffs demonstrated irreparable injury in support of request for preliminary injunction).

Accordingly, the plaintiffs have demonstrated they are likely to suffer irreparable harm absent an expedited preliminary injunction or an immediate stay of HUD's debarment.

**C.    Enjoining the debarment will cause no injury to HUD**

An order staying or enjoining the plaintiffs' debarments will not harm any legitimate interest of the government.

First, contrary to the Debarring Official's erroneous findings, the HHA has taken decisive and effective action to avoid questionable expenditures in the future and to repay its unauthorized expenditures for the credit union. Moreover, Mr. Feinerman and Reverend Harris were instrumental in adopting those remedial measures. Indeed, notwithstanding the isolated and stale facts at issue in this meritless debarment action, both men have lengthy and effective records of service to HHA, neither poses any real or present threat to the integrity of its operations, and the government will suffer no harm by their continuing to serve on its governing body.

Secondly, Ms. Buxton resigned from the HHA board for health reasons, and enjoining her debarment pending resolution of this matter will have no consequence for HUD.

Thirdly, prior to HUD's debarments of them, the plaintiffs enjoyed unblemished personal and professional reputations, and commendable records of public service at HHA and elsewhere. The government is not harmed when its citizens conduct themselves in the manner that the plaintiffs always have, and will not be harmed by their continuing to do so.

Finally, the injunctive relief sought by the plaintiffs is "extremely modest" and "cannot

30

constitute meaningful harm" to HUD, especially given the serious questions they have raise

concerning the validity of their debarment.  *Canales*, 2006 U.S. Dist. Lexis 61915 at *16-17.

**D.    There is strong public interest in enjoining HUD's unlawful debarments**

As described above, one imminent and irreparable consequence of HUD's debarment

determination will be the loss of Mr. Feinerman and Reverend Harris' combined 34 years of

institutional knowledge and experience to HHA's Board and the community which it serves.

Enjoining the debarments will serve the public interest by avoiding the harm and disruption

which will result from the involuntary termination of the two longest serving members of HHA's

Board.  Likewise, to the extent HUD's debarment threatens or precludes plaintiffs' service in

other civic and private institutions, the public interest is served by allowing the plaintiffs to

continue their service, particularly where there is no nexus between the conduct at issue here and

those unrelated commitments.

Moreover, allowing the debarments to stand could discourage service on boards of public

housing authorities.  As they are in Pennsylvania, most commissioners of public housing

authorities are unpaid volunteers who agree to serve to do good in their communities.  Most

commissioners are also not public housing experts, nor are they expected or required to be.  *See,*

*e.g.,* 35 Pa. Cons. Stat. § 1546.  Most directors are members of the community with professions,

families and lives apart from the authority and the housing industry and some, like Ms. Buxton,

are residents of an authority property.

If commissioners are held personally liable and sanctioned for actions taken in good faith

and in accordance with fiduciary obligations, and are consequently deemed obligated to know all

of the intricacies of HUD rules and regulations, both the risk and burden of serving as a

31

commissioner may dissuade reasonable and qualified people from assuming that responsibility. (Stockard Declaration, Exhibit 1).

## CONCLUSION

The plaintiffs have demonstrated that they are likely to prevail on the merits of this action, that they will suffer irreparable injury if a stay or injunction does not issue, that there will be no substantial injury to any other interested party, and that the public interest would be served by immediate injunctive relief.

The plaintiffs have also demonstrated that HUD's debarment determination is an invalid punitive measure based on past actions which have no bearing on the plaintiffs' demonstrable present responsibility.   For all those reasons, this Court should promptly and expeditiously stay or enjoin the plaintiffs' debarments pending a resolution of this case on its merits.

Respectfully submitted,

/s/Mona Lyons,  DC Bar No. 914234
Peter Butcher, DC Bar No. 441692
Law Office of Mona Lyons
1666 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20009
(202) 387-7000

Lee P. Reno, DC Bar No. 152256
Sarah L. Molseed, DC Bar No. 975677
Reno & Cavanaugh
1250 Eye Street, NW
Suite 900
Washington, D.C.  20005
(202) 783-2800

Attorneys for Plaintiffs

33

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEON J. FEINERMAN *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Civil Action No. 08-759 (RBW) |
| ROY A. BERNARDI, in his official | ) | |
| capacity as Acting Secretary and Head of the | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN | ) | |
| DEVELOPMENT | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXHIBIT LIST TO
PLAINTIFFS' AMENDED APPLICATION FOR PRELIMINARY INJUNCTION
AND REQUEST FOR EXPEDITED RULING**

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of James G. Stockard, Jr.

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Leon J. Feinerman

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Earl Harris

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Constance Buxton

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Jerry Shenck

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Irwin Aronson

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . Supplemental Declaration of Leon J. Feinerman

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Supplemental Declaration of Earl Harris

Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . Supplemental Declaration of Constance Buxton

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Debarring Official's Determination

1

Exhibit 11 . . . . . . . .   Government's Motion to Refer to Hearing Officer, dated December 3, 2007

Exhibit 12 . . . . . . . .   Government's Reply in Support of its Motion to Refer to a Hearing Officer dated January 11, 2008

# EXHIBIT 1

DECLARATION OF JAMES G. STOCKARD, JR.

I, James G. Stockard, Jr., do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.  I am the Curator of the Loeb Fellowship program at Harvard University's Graduate School of Design, where I also teach graduate level courses in housing, community development and neighborhood revitalization.

2.  I received a Bachelor of Arts in Architecture from Princeton University in 1964 and a Master of City Planning from the Harvard Graduate School of Design in 1968.

3.  Throughout the subsequent four decades, the central focus of my professional activities has been the development, operation and management of affordable housing and, in particular, public housing. A detailed description of my professional experience, affiliations and publications is attached to this declaration.

4.  I have experience with, have studied and written about, and have expertise in, the role and responsibilities of Commissioners of Public Housing Authorities (PHAs). I have served as a Commissioner of the Cambridge Housing Authority for almost 35 years, serving seven terms as its chair. I have provided consulting services to numerous other PHAs throughout the country, as well as regional and national offices of HUD. I have served as a Special Master appointed by the Superior Court of the District of Columbia to investigate and make recommendations about the future organization and governance of the District of Columbia Housing Authority, one of the most troubled in the country at the time. I have trained well

over 1000 PHA Commissioners in their role and the proper exercise of their responsibilities.

5.     The principal responsibilities of PHA Commissioners are to develop policy for their authorities, to engage Executive Directors who have the knowledge and abilities to implement that policy, and to monitor that implementation through appropriate review and oversight.  To exercise those responsibilities, Commissioners should have an understanding of, and commitment to, the mission of public housing, and a basic understanding of its proper operation and management.  Even if they are public housing professionals, Commissioners should not become involved in the day to day operations and management of their authorities and, particularly if they are not public housing professionals, Commissioners may, must, and should rely on the technical expertise and advice of the executive staff they have chosen and other carefully selected professionals such as lawyers, accountants, auditors, and architects.  Not to do so is to take the dangerous position of substituting one's own, typically amateur, judgment on technical matters for that of professionals in the field, and thereby placing the agency in jeopardy.

6.     I have reviewed a variety of documents concerning HUD's proposed debarments of Leon J. Feinerman, Earl L. Harris, and Constance Buxton, three Commissioners of the Harrisburg Housing Authority (HHA).  Those documents include HUD OIG's Final Audit Report, HHA's response to that report, HHA's proposals to HUD to resolve the audit findings, the letter from HUD proposing the debarment of Mr. Feinerman, the three Commissioners' request for a hearing,

HUD's brief in support of the debarment of Mr. Feinerman, and the declarations of Mr. Feinerman, Reverend Harris, and Ms. Buxton.

7.      I have never met or communicated with any of the three Commissioners whom HUD is proposing to debar, and I do not presently have, and have never previously had, any personal or professional affiliation with HHA.

8.      Based upon my educational and professional experience and expertise, and my review of the documents concerning HUD's proposed debarments of the three HHA Commissioners, my opinion is that the debarments are unwarranted, would be harmful to the public interest, and have the potential to cripple governance of the public housing industry.

9.      There is no evidence in the documents I have reviewed which even suggests that any one of the three Commissioners knowingly or willfully violated the Annual Contributions Contract, any other HUD requirement or regulation, or otherwise engaged in any intentional wrongdoing. In addition, there is inadequate evidence to support a finding that any one of the three Commissioners fulfilled his or her responsibilities improperly.

10.     I am unaware of any specific standards or guidance from HUD on the proper exercise of the duties of Commissioners of PHAs, and none are referenced or cited in HUD's submissions concerning its proposed debarments of the three HHA Commissioners. Based upon my training, knowledge and experience, the duties of such Commissioners are derived from state and common law, and the proper exercise of those duties is guided by the prevailing standards of care of governing bodies of both public housing authorities and other non-profit corporate

entities. Based upon my professional training and experience, none of the three HHA Commissioners breached any obligation imposed by law, or the prevailing standards of care, by the actions they took in connection with the community credit union.

11.     Based upon the information I have reviewed, Mr. Feinerman was the only one of the three Commissioners who had a role in the HHA's initial decision to support the creation and operation of a community credit union in Harrisburg in the late 1990s. Based upon my knowledge of HUD's programs and policies, and the information I have been provided about the needs and resources of HHA's residents, it is my professional opinion that HHA's decision to support the creation and operation of a community credit union was an appropriate and laudatory policy decision designed to provide an important and necessary resident service, and that, if it had been properly notified about the decision at the time, HUD would have applauded and readily approved it. The late 1990s were a period when HUD was encouraging PHAs to "think outside the box" and find new ways to support low income residents; it was the time of the beginnings of Hope VI, Moving to Work, resident self-sufficiency programs and other innovative initiatives and ideas, such as supporting credit unions to meet the financial need of public housing residents.

12.     In my professional opinion, Mr. Feinerman also cannot be faulted for his lack of knowledge that HHA's management failed to properly notify HUD of the policy decision which he and his fellow Commissioners had made. The Annual Plan in which HUD now asserts that this information should have been supplied is a

lengthy, technical document. Even if Mr. Feinerman read every page of HHA's

plan, which in my professional opinion he was not obligated to do, he cannot

reasonably have been expected to know which details were required to be reported

and which were not. The responsibility to know and fulfill HUD's specific

contractual and regulatory requirements is a responsibility of the management of a

PHA, not its Commissioners.

13.     Based upon the information I have reviewed, the three Commissioners

subsequently participated in HHA decisions to advance and increase its financial

support of the community credit union, and to monitor the operation and

management of that organization by securing representation on its separate board.

In my professional opinion, and notwithstanding the ultimate failure of the credit

union, those decisions were reasonable and appropriate decisions for the three

Commissioners to make.

14.     In my professional opinion, Reverend Harris and Ms. Buxton were not obligated

to scrutinize the earlier policy decision of their predecessors to support the

community credit union, or the implementation of that decision by HHA

management, before voting to advance or increase funds to the credit union. HUD

policy requires that annual independent audits of PHAs be performed and

forwarded to HUD, and it is my understanding that HHA fully complied with that

requirement and that no findings or objections were made about the expenditures

for the credit union for any of the years in which they had been made. Based upon

those audits, it would have been reasonable for any PHA commissioner, including

Reverend Harris and Ms. Buxton, to assume that the earlier policy decision to

support the credit union was an appropriate one, that it had been implemented properly, and that the expenditures for it were proper.

15.    I have reviewed the audit findings made by HUD's OIG about HHA's support of the community credit union, and HHA's proposals to resolve those findings. I do not agree with all of the findings and conclusions of the audit but, in my professional opinion, HHA's proposals to address and resolve them are considerably more than adequate.

16.    I am familiar with the Annual Contributions Contract (ACC) between HUD and PHAs. Although the ACC imposes compliance with all HUD requirements and regulations, it does not inform readers, and particularly those who are not housing professionals, about what is specifically required or allowed by those requirements and regulations. The ACC also provides no information about whether or not a credit union is an eligible resident service or a "project."

17.    Based upon my professional experience and expertise, none of the information which I have been provided about HHA's support of the community credit union justifies the imposition of any sanction or penalty on any one of its three Commissioners whom HUD is now proposing to debar. In my professional opinion, HUD's proposals to debar the three Commissioners are without basis, punitive, and wrong. Furthermore, in my professional opinion, HUD's imposition of any sanction on the three Commissioners has the potential to have an immediate, and enormously negative, impact on the governance of PHAs throughout the country.

18.    After more than 35 years of service as a Commissioner of the Cambridge Housing

Authority, and notwithstanding the fact that I am a housing professional and have unusually extensive knowledge of public housing programs, policies and regulations, HUD's imposition of a sanction on any one of the three HHA Commissioners would have to cause me, and the other 15,000 plus volunteer PHA Commissioners, to give serious thought to whether we can continue in such a role. In my professional opinion, if HUD imposes any sanction based upon the facts at issue here, few knowledgeable, thoughtful and public-spirited citizens may be willing to undertake or continue voluntary service as PHA Commissioners and, as a direct and inevitable result, responsible governance of the public housing industry could be destroyed.

So sworn this 19th day of November, 2007

By: _____

James G. Stockard, Jr.

**James G. Stockard, Jr.**
**141 Oxford St.**
**Cambridge, MA 02140**
**(617) 864-8947 at home**
**(617) 495-5988 at the office**
stockard@gsd.harvard.edu

## Professional Experience

1997-Present
: **Curator, Loeb Fellowship, Harvard Graduate School of Design**
Director of a fellowship program that brings 10-12 mid career professionals concerned with the built and natural environment to Harvard for a year of independent study. Responsible for leading the selection process, providing assistance and advice to the Fellows while they are in residence, and catalyzing events involving the Fellows and the larger community.

1997-Present
: **Lecturer in Housing, Harvard Graduate School of Design**
Responsible for all aspects of teaching graduate level courses in housing, community development and neighborhood revitalization.

1999-2003
: **Principal Investigator, Public Housing Operating Cost Study.**
Overall direction of a GSD study to determine for the United States Congress the reasonable costs for administering a well-run Public Housing program. Results of the study were used to create a new operating subsidy formula as well as a number of other fundamental changes in the administration of the nation's oldest affordable housing program.

1970-2000
: **Principal, Stockard & Engler & Brigham**
Founding principal of a small consulting firm focusing on affordable housing and related urban concerns. Originally formed as Justin Gray Associates, the firm assists public and private organizations in the development of affordable housing, the creation of programs supporting affordable housing, neighborhood planning, property management, and organizational development for groups with affordable housing as a part of their mission. The following assignments are among the most significant work undertaken as a part of the firm:

Court-appointed Special Master for the Washington, D.C. Housing Authority. Investigation, analysis, and recommendations to Judge Steffen Graae of the Superior Court of the District of Columbia about the future organization and governance of the Authority, one of the most troubled in the nation at the time.

Consultant to Public Housing Authorities (PHAs) with Hope VI
Grants.  Service to a number of authorities (Boston, Richmond,
New Orleans, Philadelphia among others) regarding their
application for, or implementation of, a Hope VI grant.  Particular
expertise with regard to management operations, development
strategies, and social services.

Facilitator for meetings, retreats and strategic planning sessions for
groups concerned with affordable housing issues.  Assistance with
planning, development of materials and exercises, coordination of
related activities, leading of sessions, and production of material
resulting from meetings.  Recent clients have included the
Millennial Housing Commission, the National Housing
Conference, the Seaside-Pienza Institute, the Local Initiatives
Support Corporation, the US Conference of Mayors, the
Neighborhood Reinvestment Corporation and the Portland (OR)
and Seattle Housing Authorities.

Author, curriculum designer, and trainer regarding asset and
property management.  Author or co-author of two books about
property management.  Author of a 36-module curriculum for
training non-profits about asset management.  25 of the modules
have been published.  Trainer of non-profits in the fields of asset
and property management with extensive experience in cities
across the country.  The client for much of this work has been the
Local Initiatives Support Corporation.

Consultant to Public Housing Authorities, resident groups, HUD,
and others concerned with quality public housing.  Numerous
assignments, including policy development, program evaluation,
procedural consultation, training, and strategic planning.  Service
to PHAs of all sizes in all parts of the country, as well as regional
and national offices of HUD.

Consultant in Affordable Housing Development to Community
Development Corporations, non-profits, church groups and public
agencies.  Full development consultation for numerous housing
developments taking advantage of every significant assisted
housing program over the past 30 years.

Consultant to communities in the development of affordable
housing policies and procedures.  Frequently asked to work with a
city or town government and a potential developer of affordable
housing to reach comfortable terms for a new development.  Many
program development assignments for local communities, as well.

Teacher and trainer in the fields of affordable housing development and management, as well as strategic planning, board development and public housing policies and procedures. Numerous assignments for a wide variety of clients. Settings have varied from full graduate courses at the university level to week long executive education programs to weekend strategic planning retreats with community based organizations to one hour orientations with new board members of a non-profit neighborhood association.

## Professional Affiliations

**1973-Present**      Commissioner, Cambridge Housing Authority, Six terms as Chair

**1988-Present**      Founding Trustee, Cambridge Affordable Housing Trust

**1985-Present**      Board Member, Citizens Housing and Planning Association,
                      Member of the Executive Committee since 1990
                      President, 1994–1996

**2002-Present**      Board Member, Neville Communities, Inc., Neville Communities
                      Home, Inc., and Neville Communities Assisted Living, Inc.
                      These are the non-profit boards that own and operate
                      Neville Center and Neville Place, the affordable assisted
                      living center and nursing home developed by the
                      Cambridge Housing Authority and the Cambridge Health
                      Alliance.

**2005-Present**      Member, Massachusetts Housing Appeals Committee
                      This is the Committee that hears appeals under Section 40B
                      of Massachusetts law that allows overrides of local zoning
                      decisions when the development of affordable housing is
                      involved.

**1999-2002**         Member, Harvard Housing Advisory Committee
                      Appointed by the President of the University to serve on a
                      Committee to provide advice and technical assistance to the
                      University as it created a plan for increasing the amount of
                      housing it would provide to graduate students and junior
                      faculty, with particular reference to the growth of the
                      University in the Allston-Brighton community of Boston.

**1998-Present**      Member, Faculty Advisory Committee, Joint Center for Housing
                      Studies, Harvard University

| | |
|---|---|
| **1991-1993** | Chair, Mayor's Commission on University-Community Relationships, City of Cambridge |
| **1992-1993** | Member, Massachusetts Legislative Study Commission on the Leased Housing Programs |
| **1993, 1994,1995** | Testimony to the United States Senate and House of Representatives, Presentations regarding the improvement of the Public Housing program, in general, and the District of Columbia Housing Authority, in particular |

## Publications

| | |
|---|---|
| **2005** | A Study of the Appropriate Operating Costs for State-Funded Public Housing in Massachusetts, a study prepared for the Citizens Housing and Planning Association and the Massachusetts Chapter of the National Association of Housing and Redevelopment Officials, Cambridge |
| **2005** | *The Affordable Housing Imperative for America's Cities: Can Government Solve it?* in Affordable Housing in New York City, Henry Wollman and Petr Vancura, editors, The Steven L. Newman Real Estate Institute of Baruch College/ The City University of New York, New York |
| **2003** | Final Report of the Public Housing Operating Cost Study, A study prepared for the United States Congress under a Cooperative Agreement with the US Department of Housing and Urban Development, Harvard Graduate School of Design, Cambridge |
| **1998** | *Public Housing: The Next 60 Years?*, the Epilogue for New Directions in Urban Public Housing, David F. Varady, Wolfgang F.E. Preiser and Francis P. Russell, editors, Center for Urban Policy Research, New Brunswick, New Jersey |
| **1998** | Asset Management Training Curriculum, Volume I, Local Initiatives Support Corporation, New York |
| **1998** | *The Status of Nonprofit-Owned Affordable Housing: Short-term Successes and Long-Term Challenges*, with Rachel G. Bratt, Avis C. Vidal, Alex Schwartz and Langley C. Keyes, Journal of the American Planning Association, Winter 1988, Volume 64, Number 1, pages 39-51 |

**1996**          Managing Affordable Housing: A Practical Guide to Creating
                  Stable Communities, with Bennett L. Hecht and the Local
                  Initiatives Support Corporation, John Wiley & Sons, New York

**1994**          Guide to Comprehensive Asset and Property Management, Local
                  Initiatives Support Corporation, New York

**1994**          Confronting the Management Challenge: Affordable Housing in
                  the Nonprofit Sector, with Rachel G. Bratt, Langley C. Keyes,
                  Alex Schwartz, Avis C. Vidal, Philip L. Clay, Melvyn Colon and
                  Judith Shapiro, New School for Social Research, New York

**1991**          Property Maintenance Guide: Organizational and Procedural
                  References for Maintaining Public Housing, Executive Office of
                  Communities and Development, Commonwealth of Massachusetts,
                  Boston

## Education

**1978**          Loeb Fellow, Harvard Graduate School of Design

**1968**          Master of City Planning, Harvard Graduate School of Design

**1965**          Rockefeller Fellow, Union Theological Seminary, New York

**1964**          Bachelor of Arts in Architecture, Princeton University

# EXHIBIT 2

## DECLARATION OF LEON J. FEINERMAN,

## CHAIRMAN OF THE BOARD OF COMMISSIONERS OF THE HARRISBURG HOUSING AUTHORITY

I, Leon J. Feinerman, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.  I have been a Commissioner on the Board of the Harrisburg Housing Authority (HHA) since my appointment in 1983, and have served as its Chairman from 1983 to the present.

2.  I am employed by the American Insurance Administrators, in Mechanicsburg, Pennsylvania, as a Vice-President. I have been employed in the insurance industry my entire working career after receiving my BA from the University of Pittsburgh in 1967.

3.  In addition to my employment I have been active for over 30 years in community service organizations. I am presently the Chairman of the Board of Holy Spirit Hospital in Camp Hill, PA. I have been the President of PACE Risk Retention Group of Burlington, VT since 2003, which insures the professional and general liability risks of five community hospitals and their staff. I am also Chairman of the Board of American Charities, of Chantilly VA, a federation of over 80 charities that raises over $20 million annually.

4.  I have been the President of Harrisburg City Council. I am past president of The United Way of the Capital region, past president of The Rabbi David L. Silver Yeshiva Academy, past president of Beth El Temple, and past Chairman of Dauphin County Social Services for Children and Youth.

5.  Through my service on boards of charitable and professional organizations, I am aware of corporate officers' and directors' duties and obligations to the corporate entities for which they serve. As an HHA commissioner I assist in the setting of overall policy and direction of HHA. However, I do not participate in the implementation of those policies nor the day to day operations of HHA; those tasks fall to management.

6.  Part of the mission of the HHA and an obligation under the Annual Contribution Contract (ACC) is to operate in a way that promotes the economic and social well-being of the tenants that we serve.

7.  In 1996, the mayor established a broad representative task force to consider the banking and credit needs of the low-income community in Harrisburg which makes up a significant portion of the population.

8.  By the end of 1997, the task force concluded that because commercial banks were not serving, and had no desire to serve the low-income community, it would be desirable to establish a low-income credit union in the city. The definition of a low-income credit union is that more than half of its members are low-income residents of the service area.

9.  The HHA Executive Director at the time was Dorsey Howard. Mr. Howard recognized that the HHA was the largest landlord in Harrisburg and that all of its residents were low- or very low-income people. He concluded, and the Commissioners agreed, that the creation of a low-income credit union would be a major benefit to HHA residents. As the credit union matured it was envisioned that it would encourage and accommodate modest savings accounts, provide free check cashing services in lieu of commercial check cashing used by many low-income wage

earners, MAC cards, direct deposit of social security checks, checking accounts, small loans to members with weak credit ratings, and eventually larger loans for autos, small business start up, and credit counseling. Our residents were in desperate need of these financial services. Our elderly residents needed an institution that they had access to for the direct deposit of their social security checks. Employed residents had been using check cashing companies, pawn brokers, and money transmittal companies (many were near HHA's developments) to cash their payroll checks and, as a result, were being charged usurious fees which drained their already sparse resources. Most of our residents had no access to credit, so major purchases such as a new sofa or mattress were out of reach or resulted in time payments that carried exorbitant interest rates. We believed that with access to a credit union, our residents could proceed much more quickly to self-sufficiency. We saw this as a tenant service of equal importance to job preparation training, computer training, obtaining a GED, and the like. It was simply one of the necessities required by our residents if they were to succeed in self-sufficiency.

10.    Mr. Howard also learned that the Binghamton, New York housing authority had created a credit union for its residents and staff, and that HUD had sponsored a training session in Philadelphia for public housing authorities interested in creating credit unions. Unfortunately, Mr. Howard died in 2001, and an important piece of the history behind the decision to become involved in the creation of the credit union is lost.

11.    It became evident to Mr. Howard and a number of us on the board, that if the credit union was to be created, HHA would have to take a significant leadership and financial role, as there were only limited resources available in the community.

Notwithstanding that, we understood that because the credit union was not exclusively for HHA residents, others in the community would also have to provide financial support.

12. It did not occur to me that the decision to expend funds for the creation and support of a credit union that could eventually provide vital services to our residents would ever be challenged as ineligible expenditures for at least two reasons. First, its creation and subsequent benefit to our residents was in line with our mission to promote the economic and social well being of our residents, in other words, their self-sufficiency. Second, as commissioners, while we have responsibility for setting policy and supervising the work of the HHA, we understand that we can rely on our professional management staff and general counsel for assuring that we are in compliance with regulations and contract provisions. In the case of the credit union, our executive director believed it to be an eligible activity, as did our general counsel who continuously urged the board to go forward with the project. There was reason to believe that these two men could be relied on in matters such as this. Mr. Howard was highly respected in the public housing industry as a very competent executive director. He was selected as the Treasurer of the Council of Large Public Housing Authorities, one of the three national public housing interest groups. Our general counsel, Irwin Aronson, is an accomplished lawyer and over the years has continuously availed himself of public housing CLE courses offered by CLPHA affiliated lawyers and by the Housing Development Law Institute. If any aspect of HHA's support of the credit union was in violation of the ACC or HUD regulations, the commissioners certainly expected to be informed by our executive director and general counsel. This did not occur, and we proceeded with the credit union project.

13. Our first undertaking was to engage a consultant, Carl Payne, in January, 1998, on a part time basis, to provide information and assistance to HHA in acquiring an understanding of what assistance a credit union could provide our residents. Mr. Payne was also tasked with determining our residents' needs regarding money management and how a credit union could assist in meeting those needs. In addition, he was to provide guidance and assistance to HHA in securing interest and participation of HHA's residents.

14. Following this initial work HHA extended the contract with Mr. Payne to undertake the legwork necessary to get the credit union, now called the Greater Harrisburg Community Credit Union or GHCCU, established.

15. In April, 1999, the Pennsylvania Department of Banking approved the field of membership for GHCCU which included all who lived, worked, and worshiped in the city of Harrisburg, including the residents of HHA. In June, 1999, the National Credit Union Administration designated the GHCCU as a low-income credit union which requires that over 50 percent of the membership must have annual incomes of less than $25,000. Mr. Howard, HHA's Executive Director, was named the Chairman of the Board of GHCCU. Mr. Howard wanted the HHA to be closely linked to GHCCU since it would be an institution essential to HHA's residents' needs.

16. At the October 14, 1999, Commissioners meeting, Mr. Howard informed the Commissioners that he had set aside $100,000 for GHCCU for each of the next five years in the Five Year Plan. I understood that this would be part of what would be needed for start-up costs and operational support for the GHCCU until it was earning sufficient profit to support itself. This amount accounted for less than one percent of HHA's budget. The person responsible for detailing the support for the GHCCU in

the plan neglected to add it in any specificity; however the board was not informed of this fact. Because the Executive Director told the Commissioners that the financial commitment to GHCCU was in the Five Year Plan, which was subsequently approved by HUD, it did not cross my mind that there was any impropriety in what had occurred, nor was any impropriety pointed out by the executive director or the general counsel.

17.    In April of 2001 GHCCU opened its doors for business with more than $2,000,000 in start-up capitalization from area financial institutions and businesses. The marketing plan for GHCCU expressly targeted HHA residents. The credit union served the needs of the community, and according to information prepared by the City of Harrisburg, provided meaningful access to financial services to over 1,000 members of the community. Even though privacy laws have prevented us from ascertaining exactly how many public housing residents were members of the credit union, based on information we had about the zip codes of credit union members and the addresses of our public housing properties, we believe the credit union was serving a significant number of public housing residents. We also believed that despite the actual number of residents that were members, the presence of the credit union had, and would continue to have, a positive impact on many families and the public housing community in general.

18.    In June, 2001, Carl Payne became the Deputy Director of HHA. In August, 2001, Dorsey Howard died and Mr. Payne was appointed as Acting Executive Director and later Executive Director. He continued to serve GHCCU as its CEO on a voluntary basis.

19. The HHA made various payments to GHCCU from 2000 to 2005, pursuant to its 1999 commitment. In addition it was paying certain operating expenses of GHCCU directly, again pursuant to HHA's commitment to provide operating support to GHCCU.

20. At the September 11, 2003 Board meeting it became evident that it was going to take longer than planned to get the GHCCU operating on a profitable basis. This was for at least two reasons: first, the GHCCU's investment income was lower than expected as a result of lower interest rates, and second, the National Credit Union Administration (NCUA) required GHCCU to maintain a net worth of seven percent of its assets. In other words, for every $100,000 deposit received GHCCU had to have a net worth of $7,000. The only way to create and maintain that net worth as deposits grew is from profit, of which there was none yet, or additional grants such as those from HHA and the City of Harrisburg and others. Consequently, GHCCU had to slow its growth, that is, not admit as many depositors, until additional equity could be found or the NCUA changed its onerous equity requirements. Our general counsel advised us that because the credit union was dependent on HHA's support HHA should have permanent representation on the Board of the GHCCU. The general counsel also advocated the continued support of the credit union.

21. During this time we were subject to ongoing management audits by HUD, and financial audits by qualified and experienced independent auditors as required by the Single Audit Act. In one of the audits by our independent auditor, expenditures to the credit union were selected for additional review and, even in light of this additional analysis, the auditor did not raise any issues about the expenditure of those funds. Moreover, during this time period HHA consistently scored well under PHAS and

SEMAP and was designated as either a standard or high performing agency at all times.

22.  By September, 2004, HHA's original commitment of funds was exhausted, and it was clear that HHA would have to commit additional funds to GHCCU if it was going to continue to meet its net worth requirement and demonstrate that commitment to the NCUA.  In August, 2004 the Pennsylvania Department of Economic and Community Development awarded a $74,300 grant to GHCCU and the City of Harrisburg committed an additional $30,000 a year for 2005 through 2009.  In addition, we were told that other of GHCCU's efforts to obtain grant funds had been unsuccessful. The HHA Board, after considerable discussion as to the amount we had invested in the GHCCU and its importance to our residents, voted unanimously (with one member absent) to commit an additional $495,000 to GHCCU to be paid in installments over the next few years.  I viewed this additional commitment of funds, and all other actions accelerating the payment of funds, to be extensions and implementation of our initial policy decision in 1999 to support the formation of a credit union.

23.  The GHCCU continued to have problems maintaining the net worth requirement imposed by NCUA and also suffered from several non-performing loans.  As a result, the NCUA closed the GHCCU in February 2006.  All of the depositors had their deposits returned.  Because the payments made by HHA, the City of Harrisburg, and the Pennsylvania Department of Economic and Community Development were considered equity, those funds were not returned.

24.  From the first time we heard of the concept of a low-income credit union in 1997, and hired a consultant in 1998, it was the intent of HHA's board to serve its residents.  We understood that the credit union would serve others in order to succeed, but our

interest was in HHA residents. To my knowledge, no one to my knowledge from HHA who was involved with GHCCU's creation and operation considered that the expenses HHA was incurring were in violation of any contract, agreement or regulation.

25. The HHA undertook the credit union project openly. It was discussed frequently in Board meetings, and was publicized in newspapers and in HHA's newsletters and annual reports. The expenditures were also included in the annual operating budget.

26. The Office of the Inspector General (OIG) conducted an investigation and audit of HHA's operations during 2006 and 2007. In order to fully cooperate with the OIG, I was willing to be interviewed by the auditors, however, an interview was never requested.

27. The HHA Board has considered the OIG's Audit Report regarding HHA which found the expenditures in support of the credit union to be ineligible expenditures under the ACC. While we continue to disagree with the legal conclusions of the OIG and the manner in which they were reached, the Board understands the seriousness of the issue. To assure HUD of HHA's seriousness, the Board has begun to institute a series of decisions that result from the OIG Audit Report, as communicated to Dennis Bellingtier at the HUD Philadelphia Field Office by letters dated September 28, 2007 and November 9, 2007. First, the Board has established Governance and Audit Committees to make sure the Board functions properly in reaching future decisions and to uncover any wrongdoing within the HHA at the earliest possible time. Second, the Board has proposed to HUD that HHA hire one or more consultants to undertake a management review and make recommendations for the adoption of policies and procedures and appropriate training to assure that agreements with HUD are

understood and followed and actions and decisions are adequately documented. Finally, the Board has agreed to repay over a period of years the funds used to support the credit union with nonfederal funds, after deducting the costs of undertaking and implementing the management review described above.

28.     No Board or staff member of HHA benefited personally from HHA's financial support of GHCCU. I felt an obligation to the credit union and secured an auto loan through them that is now being paid through the NCUA in St Louis. The loan was transacted at arms-length, and I did not receive any special considerations in connection with the loan.

29.     To my knowledge, and during my tenure as a commissioner, other than the findings of the OIG's Audit Report, the HHA has not been accused of or been determined to be in violation of the ACC. Before these proceedings I have never been accused or found guilty of violating the ACC or any federal law or regulation concerning federal funds. I have also never been excluded or disqualified from participation by any agency of the Federal Government nor have I been prohibited from participating in State or local contracts or assistance agreements. I have never entered into an administrative agreement regarding any wrongdoing with any Federal agency or State or local government.

So sworn this _19_ day of November, 2007.

By: _____

Leon J. Feinerman

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

# EXHIBIT 3

## DECLARATION OF EARL L. HARRIS,

## MEMBER OF THE BOARD OF COMMISSIONERS OF THE
## HARRISBURG HOUSING AUTHORITY

I, Earl L. Harris, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.    I have been a commissioner on the board of the Harrisburg Housing Authority ("HHA") since December 1999.

2.    I am employed as the pastor of the St. Paul Missionary Baptist Church in Harrisburg, Pennsylvania where I serve a congregation of 150 souls. I have a Bachelor of Science in Psychology from Howard University, a Juris Doctor from the University of Pittsburgh School of Law, and a Master of Divinity from Virginia Union University School of Theology. In addition, I attended the Graduate School of Public and International Affairs at the University of Pittsburgh and was an instructor in General Studies at that same university.

3.    Once I received my law degree, I worked as a lawyer in various capacities for different public and quasi-public entities. I was a police magistrate for the City of Pittsburgh. I worked at the Pittsburgh Office of the U.S. Department of Housing and Urban Development ("HUD"). I was employed with Fannie Mae. I was the general counsel for the Pennsylvania Housing Finance Agency and I served as solicitor with the City of Harrisburg School District.

4.    In 1985, I was called to be a pastor of the Children's Church. After receiving a Masters Degree in Divinity, I became assistant pastor of the St. Paul Missionary Baptist Church. In December of 1994, I became its pastor.

5.    As a trained lawyer, I am aware of the fiduciary duties and obligations of corporate officers and directors and how those duties and obligations apply to governmental corporations such as the HHA.

6.    An essential component of HHA's mission is to promote the economic and social well-being of the people HHA serves. This concept is also embodied in the Annual Contributions Contract ("ACC") between HHA and HUD.

7.    In 1996, the mayor of Harrisburg established a forty-five member task force called the Community Investment Partnership. The Community Investment Partnership included leaders from every segment of the Harrisburg community and was asked to consider the banking and credit needs of the low-income residents of Harrisburg. The City's population includes a significant proportion of low income households and the mayor was concerned that these citizens were not being served by conventional financial institutions. I was a member of the Community Investment Partnership. I was not a member of the HHA board of commissioners at this time.

8.    After a year of research and analysis of the financial needs of the low income citizens of the City of Harrisburg, the Community Investment Partnership recommended that the City needed a "low-income credit union" to serve people not served by the commercial banks. As I understand it, the national body that regulates credit unions, the National Credit Union Administration ("NCUA"), defines a "low-income credit union" as a credit union where more than half-of its members are low-income residents of the service area. The Community Investment Partnership began the process to create such a credit union.

9.    To document the need for a community credit union under NCUA rules, the Community Investment Partnership was required to conduct a survey of the

Harrisburg community that would potentially demonstrate the need and demand for a low income credit union. The Community Investment Partnership conducted the survey in 1998 and collected 1,560 survey responses. Nine hundred public housing residents responded to the survey. In 1999, the NCUA determined that the Greater Harrisburg Community Credit Union ("GHCCU") met the requirements for the creation of a credit union.

10. Before I became a volunteer member of the HHA board of commissioners, I was aware that HHA was providing assistance to get the credit union established. I did not know the details about the HHA assistance to the GHCCU.

11. During my first three years on the HHA board of commissioners, HHA's support of GHCCU rarely came up at meetings. I was aware that HHA's budget each year included $100,000 for the GHCCU. It was my understanding that the budgeted amounts represented the fulfillment of an obligation made by HHA prior to my joining the board in December of 1999. While $100,000 is not a small sum of money, it accounts for less than one percent of the HHA annual budget.

12. The first time I recall that the GHCCU came up at a board meeting was in October, 2002, when the chairman reported on a letter from the GHCCU. The letter requested that HHA make an advance payment of $63,000 which would otherwise have been due to GHCCU in 2003 under HHA's five-year funding commitment. GHCCU wanted the funds advanced to enable the credit union to meet NCUA equity requirements. The chairman stated that he had authorized payment of the advance after consulting with the executive director, Carl Payne. HHA general counsel, Irwin Aronson, advised that the board should adopt a resolution ratifying the payment. Mr. Aronson also stated that the issue presented by the GHCCU letter created "a question

of timing, not a question of obligation" because the HHA Board had already decided to subsidize the start up of the credit union and established a payment schedule relating to that commitment.

13.    The next time the GHCUU came up in a board meeting was in March 2003. The HHA fee accountant, Jason Casterline, reported on the results of 2002 expenditures compared against the budget. He noted that HHA had made two payments to GHCCU in 2002 instead of the one payment that was budgeted. He reported that it was a management decision to do so because HHA could absorb the payment in 2002 better than it would be able to do in 2003. Nothing that Mr. Casterline said caused me to believe that anything that had happened with regard to HHA's support of GHCCU was improper.

14.    At the September meeting in 2003, the board very thoroughly discussed the GHCCU and HHA's support of it. Carl Payne reported that GHCCU would likely ask HHA for a $30,000 advance from the 2004 commitment. He explained this support was needed because of a NCUA requirement that GHCCU maintain a net worth of 7% in excess of deposits. This meant that for every $100,000 deposit the credit union had to have $7,000 of net worth. When asked by counsel, Irwin Aronson, if others were providing support like HHA was, Mr. Payne indicated that Commonwealth of Pennsylvania was contributing $225,000 over a three year period, and the City of Harrisburg was contributing $120,000 over a period of four years. HHA's general counsel, Irwin Aronson, thought that the HHA should have representation on the GHCCU board of directors because it was the credit union's largest supporter. Counsel Aronson also advocated for the continued support of the credit union. The

board discussed the matter and concluded that the executive director, Carl Payne, should be on the GHCCU board, along with possibly another representative of HHA.

15.    On September 9, 2004, the HHA board voted to commit an additional $450,000 over a number of years after considerable discussion according to the minutes. I was not at this meeting, which is reflected in the minutes for that meeting.

16.    I viewed the decisions that I describe in this declaration about the acceleration of the funds to the GHCCU as ministerial implementation decisions relating to the fulfillment of an overall funding obligation made by the HHA board prior to my tenure. I had no reason to doubt that the original decision to fund the GHCCU over a five-year period was proper. I did have reason to believe that HHA management, as well as HHA's general counsel, had concluded that committing these funds for the GHCCU was proper and that the commitment had been made properly. Because our staff and counsel often raised or addressed questions as to proper or required conduct under HUD regulations and because I knew of other credit unions that were supported by housing authorities, I was never concerned that there was any impropriety. If I did become concerned, I would have required counsel and staff to address it. As board members we are entitled to rely on management and counsel to assure that policy decisions made by the board are legal and conform to any contractual or regulatory requirements. As a commissioner my role is to set the overall policy and direction for HHA, and not to implement that policy or to otherwise participate in the day-to-day activities of HHA. Day-to-day management and implementation of board policies, including the submission of documents to HUD, is the responsibility of management staff at HHA.

17. For the entire time I have served on the HHA board, I believed HHA's support of the GHCCU was for the benefit of HHA's residents. I fully understood that this benefit would not be immediate. I understood that the point was to create a lasting institution for the community that needed time to organize and stabilize in order to offer HHA residents the financial services they needed and desired. I understood that HHA's support was the seed money required to get the credit union operable and profitable.

18. To my knowledge, no Board or staff member of HHA benefited personally from HHA's financial support of GHCCU.

19. The HUD Office of the Inspector General ("OIG") conducted an investigation and audit of HHA's operations during 2006 and 2007. I was willing to be interviewed and was interested in cooperating with the OIG. However, the OIG never requested an interview with me.

20. To my knowledge, and during my tenure as a commissioner, other than the findings of the OIG's Audit Report, the HHA has not been accused of or been determined to be in violation of the ACC. Before this debarment action, I have never been accused or found guilty of violating the ACC or any federal law or regulation concerning federal funds. I have also never been excluded or disqualified from participation by any agency of the Federal Government nor have I been prohibited from participating in State or local contracts or assistance agreements. I have never entered into an administrative agreement regarding any wrongdoing with any Federal agency or State or local government.

So sworn this _14_ day of November, 2007

By: _____
    Earl L. Harris

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

# EXHIBIT 4

## DECLARATION OF CONSTANCE BUXTON,

## FORMER MEMBER OF THE BOARD OF COMMISSIONERS OF THE HARRISBURG HOUSING AUTHORITY

I, Constance Buxton, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.    I was a Commissioner on the Board of the Harrisburg Housing Authority (HHA) from December 1999 until I resigned for health reasons in July 2007.

2.    I was born on   *   ,1932.

3.    I moved into public housing in Harrisburg on May 2, 1991 and was a resident of HHA housing until July 31, 2007.

4.    Following surgery earlier this year I needed someone to care for me so I moved in with my daughter.

5.    I believed that the financial support HHA was providing to the Greater Harrisburg Community Credit Union ("GHCCU") would provide needed financial services to the residents of public housing in Harrisburg.

6.    It never crossed my mind that the financial support HHA was providing GHCCU would be considered an ineligible use of funds received from HUD.  The decision to provide that support was made before I became a Commissioner.  When the subject came up in Board meetings to advance funds before payments were scheduled or to commit additional funds, I would have expected the Executive Director, Carl Payne or our General Counsel, Irwin Aronson to have raised a concern about it if anything was wrong with our actions.  I viewed these decisions not as policy decisions but as extensions and implementations of the decision made by the HHA Board in 1999 to support the credit union.

7.    I know that directors of boards may rely on the experts such as senior management, counsel, auditors, and consultants because I have attended training sessions for

*Pursuant to Local Rule 5.4(f)(3) the month and day of Declarant's birth have been redacted.

Commissioners put on by the National Association of Redevelopment and Housing Officials ("NARHO"). I took NARHO's Basic and Advanced Commissioners Training, and Commissioner training in Procurement and Ethics. I also understood that my role as a Commissioner was to set the overall policy and direction of the HHA. I was not responsible for the implementation of those policies or other day to day operations of HHA, those tasks were left to management.

8.     During the time I was a Commissioner and HHA was providing financial support to GHCCU, no one, including our auditor and fee accountant, ever said anything that even suggested such financial support might be questionable.

9.     The Office of the Inspector General (OIG) conducted an investigation and audit of HHA's operations during 2006 and 2007. In order to fully cooperate with the OIG, I was willing to be interviewed by the auditors. However, when the OIG requested an interview, and I asked that the interview be conducted at the HHA offices, the OIG dropped their request and consequently I was never interviewed for the audit.

10.    To my knowledge, no one on the Board or Staff of HHA ever received any personal financial benefit from HHA's relationship with GHCCU.

11.    To my knowledge, and during my tenure as a commissioner, other than the findings of the OIG's Audit Report, the HHA has not been accused of or been determined to be in violation of the ACC. Before these proceedings I have never been accused or found guilty of violating the ACC or any federal law or regulation concerning federal funds. I have also never been excluded or disqualified from participation by any agency of the Federal Government nor have I been prohibited from participating in State or local contracts or assistance agreements. I have never entered into an administrative agreement regarding any wrongdoing with any Federal agency or State or local government.

So sworn this 20 day of November, 2007.

By: _Constance Buxton_
Constance Buxton

# EXHIBIT 5

## DECLARATION OF JERRY SHENCK,

## ACTING EXECUTIVE DIRECTOR OF THE
## HARRISBURG HOUSING AUTHORITY

I, Jerry Shenck, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.      I am the Acting Executive Director of the Harrisburg Housing Authority ("HHA") and have been since I came out of retirement to assume these duties on a temporary basis when the Executive Director, Carl Payne, was suspended from his position by HUD.  Before my retirement from HHA I was in charge of all modernization activities.

2.      In 1999 I was in charge of putting together the Comprehensive Grant Program ("CGP") Annual Submission.  The HHA Executive Director, Dorsey Howard informed me that HHA was setting aside $500,000 to support the Greater Harrisburg Community Credit Union ("GHCCU") over a five year period and he directed me to put it in the submission.

3.      While preparing the submission I was busy with construction contracts and other CGP work, and preparing the performance and evaluation reports for the open CGP programs.  I was the sole staff member of the Modernization Department.

4.      After completing the Annual statement, holding the various resident meetings, public hearings and submitting it to HUD, I remembered that I should have described the financial support we planned to provide to GHCCU in the Management Improvement Account (Item 1408) but I had failed to do so.

5.      I informed Mr. Howard of my mistake and suggested we could support the credit union out of the 1406 account. That account permits the HHA to convert up to twenty

percent of its CGP funds to Operating Subsidy and use it for operations of HHA. While we had not proposed to fund the 1406 in our submission, there were funds available from previous submissions in 1997 and 1998.

6.   I assumed Mr. Howard later determined that it was appropriate to use these funds in this manner. He often did not share all information with me or other staff.

7.   At that time I did not make regular reports to the HHA Board of Commissioners as that was Mr. Howard's job. Consequently, I did not inform the HHA Board of Commissioners that the financial support for the credit union was not included in the plan submitted to HUD. I do not know if Mr. Howard informed the Board of my mistake.

8.   During the time period that HHA was supporting the credit union we were scoring well under the Public Housing Assessment System (PHAS) which evaluates the operations of the housing authority, including the physical condition of the units managed by the housing authority, the financial condition of the authority, management operations of the authority and resident service and satisfaction. HHA was designated either a high or standard performer in every year that HHA gave financial support to the credit union, meaning that HUD determined we were a well managed housing authority and that our residents were adequately served.

So sworn this nineteenth day of November, 2007

By: _Jerry Shenck_____
       Jerry Shenck

# EXHIBIT 6

## DECLARATION OF IRWIN ARONSON,
## COUNSEL TO THE
## HARRISBURG HOUSING AUTHORITY

I, Irwin Aronson, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.    I am an attorney in the private practice of law, employed by the law firm of Willig, Williams & Davidson. I am engaged by the Harrisburg Housing Authority ("HHA") as their outside Counsel. I have served as outside Counsel to HHA since approximately 1988.

2.    I received my Bachelor of Arts Degree in 1973 from the Pennsylvania State University, and my Juris Doootor from the Dickinson School of Law in 1982.

3.    I am admitted to the practice before the Supreme Court of the United States of America and the Supreme Court of the Commonwealth of Pennsylvania.

4.    During my professional career, I have participated in training as a counsel for a public housing agency by attending Continuing Legal Education programs conducted by the Housing and Development Law Institute which is associated with the National Association of Housing and Redevelopment Officials and Big Law which is associated with the Council of Large Public Housing Authorities.

5.    A portion of my activities as Counsel to HHA involves provide the HHA and its Board of Commissioners with advice relating to compliance with local, state and federal law. I attend almost all of the HHA Board meetings in order to be generally aware of the organization's activities and advise the Commissioners regarding legal issues, including the requirements of law, that may arise concerning their actions and

deliberations. I believe the HHA Commissioners rely on me to identify such issues and on any advice I give regarding those issues, as is their right.

6. I was present at most, if not all, of the HHA Board meetings when the credit union was discussed and action was taken regarding HHA's financial support of it. I was aware of the general circumstances regarding the expenditures by HHA in support of the Greater Harrisburg Community Credit Union and I did not express any objections for such support in my capacity as counsel to HHA. During these discussions I was not aware of a prohibition to such support in the law or the Annual Contributions Contract and consequently I did not raise an objection regarding any legal implications of the HHA's financial support of the credit union.


So sworn this 19th day of November, 2007

By: _____

Irwin Aronson

# EXHIBIT 7

## SUPPLEMENTAL DECLARATION OF LEON J. FEINERMAN

I, Leon J. Feinerman, make the following declaration:

1.    I have been a Commissioner on the Board of the Harrisburg Housing
       Authority (HHA), and served as its Chairman, since 1983.

2.    I have been informed by my attorneys that, effective March 31, 2008, I have
       been debarred for three years from participation in transactions with the
       federal government.

3.    On September 27, 2007, HUD's Office of Inspector General (OIG) issued a
       final audit report finding that HHA improperly disbursed operating funds to
       open and support the Greater Harrisburg Community Credit Union (GHCCU).
       OIG's audit report found that HHA's "noncompliance occurred because it
       believed that its use of operating funds … for the credit union was proper."

4.    I have been involved with, and have knowledge of, the resolution of the OIG
       audit.  With the knowledge and approval of HUD, HHA has taken affirmative
       steps to address the findings of the audit.  That corrective action was
       developed by HHA and is detailed in a letter from HUD dated December 3,
       2007, which is attached as Exhibit 1 to my declaration.

5.    All of that corrective action is either completed or ongoing, and HHA is
       providing monthly status reports to HUD on its progress.  HHA's monthly
       reports to HUD are attached as Exhibit 2 to my declaration.

6.    In November, 2007, the HHA Board of Commissioners created standing Audit
       and Governance Committees.

7.    On January 15, 2008, the HHA Board of Commissioners approved the
procurement of Gilmore Kean, LLC, a firm experienced in the operations of
public housing authorities, to assess HHA's organizational structure and its
policies and procedures regarding program operations and board governance,
and to assist HHA in drafting revised policies and procedures and training
staff.  The consultants have begun their work. They have interviewed staff,
reviewed existing policies, and, on April 28, 2008, provided training to
members of the Board of Commissioners.

8.    On January 15, 2008, HHA's Board of Commissioners approved a Repayment
Agreement, which was executed by HHA's acting Executive Director and
approved by HUD on February 5, 2008, to repay all funds expended on the
credit union from non-federal funds.  HUD and HHA had been actively
negotiating the Repayment Agreement since November 28, 2007.  The first
payment under the agreement is due December 31, 2008 and is scheduled by
HHA to be paid on December 18, 2008.  The executed Repayment Agreement
is attached as Exhibit 3 to my declaration.

9.    I am employed by the American Insurance Administrators, in Mechanicsburg,
Pennsylvania as an insurance agent and insurance broker.  I have worked in
the insurance industry since I received my BA from the University of
Pittsburgh in 1967.

10.   The debarment will cause irreparable harm to my personal and professional
reputation and will substantially interfere with my desire, efforts, and ability
to serve the community.

11.    In certain cases I sell insurance policies as an agent of insurance companies to mnicipalities, school districts, and other entities which receive federal funds. In other cases, I represent those entities as their insurance broker to obtain particular insurance policies for them.  Currently, 40 percent of my business is derived from these activities.  It is my understanding that as an insurance broker for entities receiving federal funds I may be considered a participant in covered transactions, and if debarred, precluded from being their broker.

12.    Unless my debarment is stayed or enjoined, my insurance business may be severely damaged.  Long-standing clients of mine may seek insurance elsewhere because they are unwilling, or unable, to do business with a debarred individual, or to avoid the perception of impropriety that could result from doing business with one.  The debarment may also have a negative impact on my ability to attract customers for my insurance business.

13.    My personal and professional reputation is of utmost importance to my livelihood.  To be successful as an insurance salesman, my clients must perceive me as a responsible and trustworthy person.  As a result of my debarment, I have already suffered extreme embarrassment and significant damage to my personal and professional reputation.  Unless my debarment is stayed or enjoined, that harm will continue and increase.

14.    I was the Chairman of the Board of Holy Spirit Hospital in Camp Hill, PA, but, at the direction of its general counsel, resigned on April 18, 2008 because of my debarment.  If my debarment is stayed or enjoined, I will be reinstated to my position on the hospital board.

15.    By virtue of my position on the hospital board, since 2003 I have also served as President of PACE Risk Retention Group of Burlington, Vermont, a member-owned insurance company which insures the professional and general liability risks of five community hospitals and their staff. Unless my debarment is stayed or enjoined, I will be required to resign from that position.

16.    I am currently the Chairman of the Board of America's Charities, a national civic organization which depends upon my ability and experience to function effectively. Although my service to that organization is not precluded by my debarment, it may be unwilling to maintain a relationship with a debarred individual. If I am asked to resign from that position as a result of my debarment, that organization will be denied the benefits of my experience and leadership, and I will be denied the opportunity to continue serving and associating with the organization.

17.    I believe in, am committed to, am proud of, and want to continue my service to, and association with, Holy Spirit Hospital, the PACE Risk Retention Group, and the Board of America's Charities. Unless my debarment is stayed or enjoined, I will not be able to serve in a leadership position for any community organization which receives, or may apply for, federal funds, such as Holy Spirit Hospital, or any community organization that does not want to associate with a debarred individual.

18.    By letter dated April 18, 2008, HUD's Debarring Official, Henry S. Czauski, notified the mayor of Harrisburg that Earl Harris, Constance Buxton and I had

been debarred. Mr. Czauski informed the mayor that HHA "is prohibited from allowing debarred individuals to supervise, exercise critical influence over or substantially control transactions funded with money provided to the HHA through Annual Contributions Contracts with HUD." Mr. Czauski's letter is attached as Exhibit 4 to my declaration.

19.    The Pennsylvania statute governing public housing authorities provides that authorities such as Harrisburg's have five commissioners who are appointed by the Mayor of Harrisburg with the approval of its City Council. HHA commissioners serve for terms of five years, may only be removed for cause, and continue serving at the end of their terms until they are replaced by new commissioners.

20.    I believe in, am committed to, am proud of, and want to continue my service to, and association with, HHA and the community which it serves. Unless my debarment is stayed or enjoined, I will be prohibited from continuing that service for three years and the mayor will be required to replace me by appointing a new commissioner who will serve for at least one five year term.

21.    Unless it is stayed or enjoined, my debarment, together with the debarment of Earl Harris, will have a significantly adverse effect on the operations of HHA. Mr. Harris has served as an HHA commissioner for nine years, and I have served as one for 25. No other current commissioner of HHA has served the organization for more than a year and a half.

I declare under penalty of perjury that the foregoing is true and correct.

By:    _____    _4/30/08_____

    Leon J. Feinerman    Date

# EXHIBIT 1



**DEC 0 3 2007**

U.S. Department of Housing and Urban Development

Philadelphia Office
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania  19107-3380



RECEIVED
DEC - 5 2007
HARRISBURG
HOUSING AUTHORITY

Mr. Jerry Shenck
Acting Executive Director
Harrisburg Housing Authority
351 Chestnut Street
Harrisburg, PA 17101

Dear Mr. Shenck

SUBJECT:    Management Decisions with Corrective Action Plans
            OIG Audit Report:    2007-PH-1013
            Report date:         September 27, 2007

Our office has sustained the Office of Inspector General's (OIG) finding as detailed in the subject audit report.  The report contains 1 finding with 4 recommendations which require corrective action.

Our office in coordination with the Authority has developed proposed management decisions with corrective action plans which we feel will address the OIG's concerns. In accordance with the Departments audit resolution process, our office submitted the proposed management decisions to the OIG for concurrence.  The OIG concurred with the management decision corrective action plans on November 28, 2007.

As outlined below, our office has specified the corrective actions required to resolve the reported deficiencies and timeframes to complete the tasks for each recommendation.

In addition, the Authority is required to provide a monthly status report to our office on the progress made to resolve the recommendations.  The status report is due the 15th of each month until final resolution has occurred. Our comments regarding the subject report are outlined below:

**Finding The Authority Improperly Used Public Housing Operating Funds and Allowed a Conflict-of-Interest Situation to Exist.**

RECOMMENDATION 1A   Review the issues in this report and if appropriate, initiate action to declare the Authority in substantial default of its consolidated annual contributions contract and take appropriate administrative action as detailed in Section 17 (Notices, Defaults, and Remedies) of the contract.

Our office concurs that if the Authority does not take adequate steps to address all the recommendations outlined in the OIG report a declaration of default of its Consolidated Annual Contributions Contract may be warranted.  However, at this time, our office feels the Authority has demonstrated a willingness to resolve the recommendations.

Therefore, this recommendation will remain open pending receipt of the executed repayment agreement as well as, development and implementation of the revised control policies and procedures required to address recommendations 1C and 1D.

The final action target date for recommendation 1A is September 30, 2008. As directed above, monthly status reports are required detailing the progress of the recommendation.

**RECOMMENDATION 1B:  Repay its low-rent public housing program $834,969 from nonfederal funds for the ineligible disbursements related to the credit union:**

Our office and the Authority have agreed in principal to the terms of the repayment agreement.  The Authority will repay its low-rent public housing program the $834,969 as reported by the OIG from non federal funds.  The Authority's legal counsel is finalizing the agreement for the parties to execute.

The final action target date to execute the repayment agreement is April 30, 2008.  Once the agreement is executed the recommendation will be recognized as under repayment and the final action target date will coincide with the dates in the signed agreement.  As directed above, monthly status reports are required detailing the progress of the recommendation.

**RECOMMENDATION 1C:  Develop and implement controls to ensure that disbursements of operating funds are eligible and supported:**

It is our understanding that the Authority is in the process of contracting with a management consulting firm to perform a comprehensive review of the Authorities management practices and control environment.  The firm will develop the necessary policies and procedures to address the OIG's concerns.  In addition, the firm will assess the internal control environment over disbursements and management practices and develop controls to improve the effectiveness of the Authority's operations.

Furthermore, the firm will provide management training to the Authority's personnel to assist in the implementation of the revised policies, procedures and control environment. The Authority will provide our office copies of the Board Resolutions approving the revised policies, procedures and management control structure, along with evidence that Authority personnel and the applicable Board members have received the necessary training to implement the revisions.

The final action target date for recommendation 1C is September 30, 2008. As directed above, monthly status reports are required detailing the progress of the recommendation.

**RECOMMENDATION 1D:  Develop and implement controls to detect, prevent and resolve future conflict-of-interest situations:**

The Authority has agreed that the management consulting firms review will also include the development and implementation of controls to detect prevent and resolve future conflict of interest situations.  The Authority will provide our office copies of the Board Resolutions approving the revised policies relating to monitoring and resolution of conflict-of interest-

situations. Also, the Authority will provide evidence that the appropriate staff and Board members have received the necessary training to implement the policies and resolve any conflict-of-interest issues.

The final action target date for recommendation 1D is September 30, 2008. As directed above, monthly status reports are required detailing the progress of the recommendation.

If you have any questions please contact, Andrew Cianci, Financial Analyst at (215) 861-7611. Our TTY number for the hearing impaired is (215) 656-3450.

Sincerely,

Dennis G. Bellingtier
Director
Office of Public Housing

# EXHIBIT 2

Monthly Status Report
OIG Audit Report 2007-PH1013

As required by the Office of Inspector General, U.S. Department of Housing and Urban Development, the Harrisburg Housing Authority is providing a progress report toward resolving the following recommendations:

**Recommendation 1A** – It was agreed not to initiate default action.

**Recommendation 1B** – Repayment agreement has been executed and first payment is scheduled for December 18, 2008.

**Recommendation 1C** – The Authority has executed a contract with Gilmore Kean Associates for management organizational review, policies and procedures, which will include internal control and ensure eligible expenditure of operating funds.

**Recommendation 1D**– (1) The Authority has as of November 8, 2007, created an Audit Committee to provide oversight for the implementation of the OIG Audit Report recommendations and the Authority's auditor provides regular audit reports to the committee, and (2) establishment of a Governance Committee was completed on November 8, 2007, with the responsibility to evaluate Board functioning, expectations of the Executive Director and General Counsel, and review compliance with legal and ethical requirements of the Authority.fs

Monthly Status Report
OIG Audit Report 2007-PH1013
March 2008

As agree between the U.S. Department of Housing and Urban Development and the Harrisburg Housing Authority, the following is a progress report toward resolving these recommendations:

**Recommendation 1A** – It was agreed not to initiate default action.

**Recommendation 1B** – Repayment agreement has been executed and first payment is scheduled for December 18, 2008.

**Recommendation 1C** – The Authority's senior staff met with Gilmore Kean Associates for the kick-off meeting of the management organizational review on February 27, 2008. The consultant provided a schedule meeting the deadlines the Authority had agreed to with HUD. After review of the schedule, staff and consultant agreed that the Authority would be better served by allowing the consultant more time. Subsequently the consultant presented a revised schedule, attached. A conversation between Jerry Shenck, Acting Executive Director, and Dennis Bellingtier, Director of Public Housing, HUD, resulted in tentative agreement to accept the revised schedule as in the best interest of HHA and schedule would be forwarded to HUD for review and approval.

The staff has forwarded, electronically, a large quantity of the documents requested for review by the consultant.

**Recommendation 1D**– (1) The Authority has as of November 8, 2007, created an Audit Committee to provide oversight for the implementation of the OIG Audit Report recommendations and the Authority's auditor provides regular audit reports to the committee, and (2) establishment of a Governance Committee was completed on November 8, 2007, with the responsibility to evaluate Board functioning, expectations of the Executive Director and General Counsel, and review compliance with legal and ethical requirements of the Authority.

Monthly Status Report
OIG Audit Report 2007-PH1013
April 2008

As agree between the U.S. Department of Housing and Urban Development and the Harrisburg Housing Authority, the following is a progress report toward resolving these recommendations:

**Recommendation 1A** – It was agreed not to initiate default action.

**Recommendation 1B** – Repayment agreement has been executed and first payment is scheduled for December 18, 2008.

**Recommendation 1C** – An on-site orientation occurred 2.27.08 among senior staff as conducted by Principals David Gilmore and Patrick Kean, along with associate Dan Wuenschel, in attendance. All were required to submit a job analysis survey, followed by on-site interviews at their respective job locations. Preliminary interviews of senior staff began the week of March 17th and have continued through the first week of April. Quality control issues were examined, flow of work was analyzed and employees' suggestions at improving their department were discussed. During this time, a review of contracts and procurement activities also was done.

Interviews of two Board members were conducted 3.24.08.

Data collection of HHA policies, plans, organizational chart and procedures from all departments occurred via electronic submission, or by courier if size prohibitive. Info from files continues to be extracted at random selection to review for adherence to policy. Job analysis surveys were then distributed to the remainder of HHA staff for completion and submittal to the consultant by COB 4.7.08.

A team teleconference call was conducted 4.10.08 by Gilmore Kean to discuss plans for the next scheduled on-site visit, as well as determine any outstanding data still required. The owner shall be apprised this week.

The staff has forwarded, electronically, a large quantity of the documents requested for review by the consultant.

**Recommendation 1D** – (1) The Authority has as of November 8, 2007, created an Audit Committee to provide oversight for the implementation of the OIG Audit Report recommendations and the Authority's auditor provides regular audit reports to the committee, and (2) establishment of a Governance Committee was completed on November 8, 2007, with the responsibility to evaluate Board functioning, expectations of the Executive Director and General Counsel, and review compliance with legal and ethical requirements of the Authority. At the next regularly scheduled Board Meeting the new members to the Board will become a part of these two committees.

# EXHIBIT 3



U.S. Department of Housing and Urban Development

Philadelphia Office
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107-3380



**FEB 0 5 2008**

Mr. Jerry Shenck
Acting Executive Director
Harrisburg Housing Authority
351 Chestnut Street
Harrisburg, PA 17101

Dear Mr. Shenck

SUBJECT:    Recommendation 1B: Executed Repayment Agreement
            OIG Audit Report:    2007-PH-1013
            Report date:         September 27, 2007

    Attached is a copy of the executed repayment agreement for your files. In accordance with the established management decision, the Authority has agreed to repay the Low-Rent Housing Program $50,000 a year over a 17 year period from non-federal funds. The initial payment should be made prior to December 31, 2008 with final payment due December 31, 2024.

    In addition, at the end of each fiscal year the agreement is in effect, the Authority would contribute an additional twenty-five percent (25%) of any Central Office net income as calculated and reported in their Audited Financial Statements towards the outstanding balance.

    Furthermore, The Office of Inspector General (OIG) concurred with the recoding of the recommendation to repayment status and has adjusted the final action target date to coincide with the repayment terms.

    Also, the Authority is required to provide a monthly status report to our office on the progress made to resolve all the outstanding recommendations. The status report is due the 15th of each month until final resolution has occurred.

    If you have any questions please contact, Andrew Cianci, Financial Analyst at (215) 861-7611. Our TTY number for the hearing impaired is (215) 656-3450.

Sincerely,

Dennis G. Bellingtier
Director
Office of Public Housing

### Repayment Agreement

This repayment agreement ("Repayment Agreement") is entered into as of the date first written below by and between the United States of America, acting by and through the Secretary of Housing and Urban Development ("HUD"), and the Harrisburg Housing Authority ("HHA"), a public housing authority organized under the laws of the Commonwealth of Pennsylvania.

### Recitals

Whereas, on September 27, 2007, the HUD Office of Inspector General ("OIG") issued Audit Report 2007-PH-1013 final audit report entitled (the "Audit"), which, among other things, questioned the eligibility of expenditures made by HHA for the Greater Harrisburg Community Credit Union ("GHCCU") and recommended that the Philadelphia HUD Office require HHA to repay HHA's low rent public housing program $834,969.00 HHA had spent toward GHCCU;

Whereas, the Philadelphia Office of HUD concurred with the findings and recommendations of the Audit and notified HHA to that effect; Whereas, HHA has not and does not agree with the findings or recommendations of the Audit, but has determined that it is in the agency's best interest to settle matters with HUD so that HHA may focus on other aspects of agency operations;

Whereas, in entering into this Repayment Agreement, HHA is not conceding to the conclusions drawn by the HUD OIG;

Therefore, for good and valuable consideration that both HUD and HHA agree is sufficient, HUD and HHA agree as follows:

1. By December 31, 2024, HHA will repay its low rent public housing program $834,969.00 in accordance with the repayment schedule described in sections 2 and 3 below.

2. HHA will repay its low rent public housing program at least $50,000 annually for a period of seventeen years, or until the $834,969.00 is fully repaid or this Repayment Agreement is otherwise terminated under the terms and conditions herein.

3. At the end of each fiscal year this Repayment Agreement is in effect, HHA would contribute twenty-five percent (25%) of any Central Office net income as calculated under Generally Accepted Accounting Principles that is in excess of the $50,000 annual repayment amount toward the remaining balance of the amount owed back to the HHA low-rent public housing program.

4. HUD agrees that the Audit and this resulting Repayment Agreement will not be considered a major compliance deficiency for determining eligibility for the "stop loss"

provisions of 24 CFR Part 990 as long as HHA is operating in good faith to resolve the audit findings.

5. HHA and HUD agree to consider amending this Repayment Agreement in the future if circumstances change such that HHA is unable to meet this repayment schedule and meet its obligations to its residents.

6. HHA agrees that if it is in a position to accelerate its payments it will consider doing so.

7. This Repayment Agreement may be modified by written agreement of HHA and HUD.

8. This Repayment Agreement shall express the entire agreement of HUD and HHA, written or oral with respect to the subject matter hereof. If there is any conflict between this Repayment Agreement and a provision of any other existing agreement, the provisions of this Repayment Agreement shall prevail.

9. This Repayment Agreement shall terminate at such time that (i) the full amount has been repaid to the HHA low rent public housing program or (ii) the parties otherwise agree that the repayment is not necessary.

10. If any part of this Repayment Agreement is found to be contrary to law, that part may be severed from the Repayment Agreement and the remainder of the Repayment Agreement shall remain in full force and effect. The remaining Repayment Agreement shall be construed as far as is lawful and practicable to enforce the overall intent of the original Repayment Agreement.

11. In the event that HUD finds that the Authority is not complying with this Repayment Agreement by failing to make payments, HUD will provide the Authority with a written statement specifying the facts of the alleged noncompliance and 30 days for the Authority to resolve or cure the alleged noncompliance.  However, if HUD determines that the Authority has not satisfactorily resolved the findings of noncompliance, the Department may take whatever necessary steps to cure the noncompliance.

**[Signatures follow on next page]**

In consideration of the foregoing covenants, the parties do hereby execute this
Repayment Agreement.

HARRISBURG HOUSING AUTHORITY

By ___Jerry Shenck___ 1/15/08
Jerry Shenck
Acting Executive Director

UNITED STATES OF AMERICA
Secretary of Housing and Urban
Development

By _____
Director of Public Housing
Philadelphia State Office

Date: ___2/5/08___

# **EXHIBIT 4**



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-0500

Office of General Counsel
Departmental Enforcement Center

APR 1 8 2008

**VIA FACSIMILE AND UNITED PARCEL SERVICE**

The Honorable Stephen R. Reed
Mayor, City of Harrisburg
City Government Center
10 North Second Street, Suite 202
Harrisburg, PA 17101

Re:    Harrisburg Housing Authority – Board of Commissioners
       Debarment of Members Feinerman, Buxton and Harris

Dear Mayor Reed:

This letter is intended to inform you that on March 31, 2008, the Department of Housing and Urban Development (Department or HUD) debarred Leon J. Feinerman, Constance Buxton and Earl Harris. Mr. Feinerman is a current member of the Board of Commissioners (Board) of the Harrisburg, PA, Housing Authority (HHA) and was debarred for three years through March 30, 2011. Mr. Harris is also a current member of the Board and was debarred for eighteen months through March 30, 2011. Ms. Buxton was debarred for three years through March 30, 2011, but the Department has been informed that she has resigned from the Board.

This letter is also intended to assist you and the HHA in understanding the effect of a debarment, especially since it is our understanding that you have a role in the appointment of commissioners for the HHA. A debarred individual is prohibited from future participation in covered procurement and nonprocurement transactions as a participant or principal with HUD and throughout the Executive Branch of the Federal Government. Among other things, the HHA is prohibited from allowing debarred individuals to supervise, exercise critical influence over, or substantially control transactions funded with money provided to the HHA through Annual Contributions Contracts with HUD.

Debarments imposed by HUD are governed by the Department's regulations, found at Title 2, Code of Federal Regulations (C.F.R.), Part 180 as implemented by Title 2, C.F.R., § 2424.10.[1]  A failure to observe HUD regulations may subject the HHA to sanctions by the Department.

---

[1] Subsequent to the issuance of the Notices described above, HUD moved its Suspension and Debarment regulations to Title 2 in the Code of Federal Regulations pursuant to an OMB mandate. Effective 28, 2008, HUD adopted OMB's Guidelines on Suspension and Debarment found at 2 C.F.R. Part 180, by enacting 2 C.F.R. § 2424.10. The move did not make substantive changes to HUD's suspension and debarment regulations. 72 Fed. Reg. 73484 (December 27, 2007).

If you have any questions, please call Art Orton, Director, Compliance Division, at (202) 708-3041.

Sincerely,

Henry S. Czauski
Acting Director

Enclosure

cc: Mr. Jerry Shenck
    Acting Executive Director
    Harrisburg Housing Authority
    351 Chestnut Street
    Harrisburg, PA 17101

# EXHIBIT 8

## SUPPLEMENTAL DECLARATION OF EARL L. HARRIS

I, Earl L. Harris, make the following declaration:

1. I have been a commissioner of the board of the Harrisburg Housing Authority ("HHA") since December 1999.

2. I am employed as the pastor of the St. Paul Missionary Baptist Church in Harrisburg, Pennsylvania. I have a Bachelor of Science in Psychology from Howard University, a Juris Doctor from the University of Pittsburgh, and a Master of Divinity from Virginia Union University School of Theology.

3. I have been informed by my attorneys that, effective March 31, 2008, I have been debarred for eighteen months from participation in transactions with the federal government.

4. On September 27, 2007, HUD's Office of Inspector General (OIG) issued a final audit report finding that HHA improperly disbursed operating funds to open and support the Greater Harrisburg Community Credit Union (GHCCU). I have been involved with, and have knowledge of, the resolution of the OIG audit. With the knowledge and approval of HUD, HHA has taken affirmative steps to address the findings of the audit. All corrective action to resolve the findings of the audit is either completed or ongoing.

5. The debarment will cause irreparable harm to my personal and professional reputation and interfere with my desire, efforts and ability to serve my congregation and the community.

6. As a pastor, the members of my congregation look to me for guidance and advice and must trust and respect me in order for me to minister to them

effectively. The debarment will create doubt about my integrity within my
congregation and hinder my ability to minister to them effectively.

7.    I have devoted my adult life to both my ministry and to public service. Before
I became a minister, I served as a police magistrate for the City of Pittsburgh,
worked at the Pittsburgh Office of the U.S. Department of Housing and Urban
Development ("HUD"), was employed with Fannie Mae, was the general
counsel for the Pennsylvania Housing Finance Agency, and served as solicitor
with the City of Harrisburg School District. The debarment casts a shadow on
my past professional service to those entities.

8.    I believe in, am committed to, am proud of, and want to continue my service
to HHA and the community which it serves. Unless my debarment is stayed
or enjoined, I will be prohibited from continuing that service for eighteen
months, and the mayor will be required to replace me by appointing a new
commissioner to serve for at least one five year term. I will also not be
afforded the opportunity to serve other community organizations which
receive, or may apply for, federal funds.

9.    Unless it is stayed or enjoined, my debarment, together with the debarment of
Leon Feinerman, will have a significantly adverse effect on the operations of
HHA. Mr. Feinerman has served as an HHA commissioner for 25 years, and I
have served as one for nine. No other current commissioner of HHA has
served the organization for more than a year and a half.

I declare under penalty of perjury that the foregoing is true and correct.

By:    _____        _____
       Earl L. Harris                 Date    4/30/08

# EXHIBIT 9

## SUPPLEMENTAL DECLARATION OF CONSTANCE BUXTON

I, Constance Buxton, make the following Declaration:

1.    I was a Commissioner on the Board of the Harrisburg Housing Authority (HHA) from December 1999 until I resigned for health reasons in July 2007.

2.    I moved into public housing in Harrisburg on May 2, 1991, and was a resident of HHA housing until July 31, 2007. I left public housing due to health reasons.

3.    I have been informed that, effective March 31, 2008, I have been debarred for three years from participation in transactions with the federal government.

4.    The debarment will cause irreparable harm to my personal reputation, cause me extreme embarrassment, and interfere with my ability to serve my community.

5.    As a resident of public housing, I was very active in the resident community and governance, which led to my appointment to the HHA Board. I zealously represented the residents of the housing authority and advocated on their behalf in my role as a HHA Commissioner and in other contexts as necessary. The debarment casts a shadow on my past service on behalf of the residents of HHA.

6.    I believed in, was committed to, and am proud of, my service to HHA and the community which it serves. Unless my debarment is stayed or enjoined, that service will be permanently tarnished by the debarment. I have also suffered, and will continue to suffer, extreme embarrassment from the debarment, and it has caused, and will continue to cause, substantial harm to my reputation. In the event I am able to return to public housing, I will also be prohibited from resuming service as an HHA Commissioner for three years, and will probably never be afforded the opportunity to do so.

So sworn this 29th day of April, 2008

By: Constance Buxton
Constance Buxton

# EXHIBIT 10

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Washington, D.C.

| | |
|---|---|
| **In the Matter of:**     * | |
|     * | |
|     * | |
| **LEON J. FEINERMAN,**     * | **DOCKET NO.  07-3441-DB** |
| **EARL HARRIS, AND**     * | **DOCKET NO.  07-3432-DB** |
| **CONSTANCE BUXTON,**     * | **DOCKET NO.  07-3443-DB** |
|     * | |
|     * | |
| **Respondent.**     * | |
|     * | |

## DEBARRING OFFICIAL'S DETERMINATION

### INTRODUCTION

By separate Notices dated July 30, 2007("Notice"), the Department of Housing and Urban Development ("HUD") notified each of the respective Respondents, LEON J. FEINERMAN, EARL HARRIS, and CONSTANCE BUXTON, that HUD was proposing their debarment from future participation in procurement and nonprocurement transactions as a participant or principal with HUD and throughout the Executive Branch of the Federal Government for a period of three years from the date of final determination of this action.  HUD advised each of the Respondents in the July 30, 2007 Notice that the proposed debarment action was in accordance with the procedures set forth in 24 CFR part 24[1].

The respective Notices informed each Respondent that the proposed debarment was based on the acts and omissions of the Harrisburg (Pennsylvania) Housing Authority (HHA) during Respondents' tenure on the HHA's Board of Commissioners.[2]  The Notice further explained to each of the Respondents that "[t]he acts and omissions of the HHA are imputed to [them] pursuant to 24 CFR 24.630(b) because as a member of HHA's Board, [they] participated in, had knowledge of, or had reason to know of the violations."

---

[1] HUD published a final rule on December 27, 2007 (72 FR 73484) that relocated and recodified 24 CFR part 24 as 2 CFR part 2424.  HUD's December 27, 2007, rule stated that the rule "adopts, by reference, the baseline provisions of 2 CFR 180," the government-wide rule published by OMB on August 31, 2005 (70 FR 51863) setting forth guidance for agencies with respect to nonprocurement debarment and suspension. However, because this matter arose before publication of HUD's final rule, for the convenience of the reader, references herein will be to the regulations in their former location at 24 CFR part 24.
[2] Respondent Feinerman has been a member of the HHA Board since 1983 to the present.  Respondents Harris and Buxton became Board members in December 1999. Reverend Harris continues to serve to the present time.  Respondent Buxton is no longer a member of the Board.

1

The violations were described in the respective Notices as Respondents' "allowing large sums of HHA's operating subsidy funds, which it receives annually from HUD for the purpose of developing and operating the HHA, to be used to fund . . . the Greater Harrisburg Community Credit Union (GHCCU) without obtaining HUD's authorization for such expenditures" in violation of the Annual Contributions Contract (ACC) between HUD and HHA.

The Notices specifically cited the provision in Section 9(B) of the ACC that requires the housing authority to place all funds it holds into the "General Fund." Further, the Notices set forth the restrictions in Section 9(C) on the use of the General Fund monies as including (1) "payment of the costs of development and operation of the projects under the ACC with HUD; (2) the purchase of investment securities as approved by HUD; and (3) such other purposes as may be specifically approved by HUD." The Notices also advised Respondents that "GHCCU is not an operation or function of HHA, nor is it an HHA owned property covered under the ACC."

The specific charges against each of the Respondents were that in 2003 and 2004, they voted to transfer $30,000.00 and $505,000.00, [3] respectively, of HHA's operating subsidy funds to GHCCU. Because HAA did not obtain HUD approval, the payments to GHCCU violated Section 9 of the ACC.

A hearing on Respondents' proposed debarment was held in Washington, D.C. on January 30, 2008, before the Debarring Official's Designee, Mortimer F. Coward. Respondents Feinerman and Harris were present at the hearing (Respondent Buxton was not present). Respondents were represented by Mona Lyons, Esq., and Lee Reno, Esq, and Sarah Molseed, Esq. of Reno and Cavanaugh. Brendan Power, Esq. appeared on behalf of HUD.

## SUMMARY

I have determined, pursuant to 24 CFR part 24, to debar Respondents Feinerman and Buxton for a period of three years from the date of this Determination and to debar Respondent Harris for a period of eighteen months from the date of this Determination from future participation in procurement and nonprocurement transactions, as a participant, principal, or contractor with HUD and throughout the Executive Branch of the Federal Government. My decision is based on the administrative record in this matter, which includes the following information:

1) The Notices of Proposed Debarment dated July 30 2007.

---

[3] With respect to Respondent Harris, the government notes that the "Notice of Debarment directed against Harris incorrectly states that in 2004 Harris voted to authorize HHA to transfer $505,000 to GHCC over a four-year period." The footnote states that Reverend Harris was not present at the September 9, 2004, HHA Board meeting. See Government's Brief in Support of Three-Year Debarment of Respondent Harris at n.5 (Harris Brief).

2

2) A letter dated August 31, 2007, addressed to the Debarring Official's Designee from Respondents' attorney.

3) The Government's Motion to Refer to a Hearing Officer, filed December 3, 2007.

4) Respondents' Opposition to Government's Motion to Refer to a Hearing Officer, filed December 21, 2007.

5) Government's Request for Leave to File Its Reply in Support of Its Motion to Refer to a Hearing Officer, filed January 11, 2008.

6) The Government's Reply in Support of Its Motion to Refer to a Hearing Officer, filed January 11, 2008.

7) 7) The separate briefs filed October 19, 2007, by the Government with respect to each of the Respondents, styled Government's Brief in Support of Three Year Debarment (including all exhibits and attachments thereto).

8) Brief of Respondents Leon J. Feinerman, Earl Harris, and Constance Buxton in Opposition to Debarment, filed November 20, 2007 (including all exhibits thereto).

9) The Debarring Official's Designee's notes from a conference call held January 18, 2008, with counsel for the parties.

10) The digital recording of the January 30, 2008, hearing.

## HUD'S ARGUMENTS

HUD argues that Respondents, who were all board members of the HHA, either participated in, knew of, or had reason to know that their actions in "diverting" monies from the HHA General Fund to fund the GHCCU, without obtaining HUD's authorization, was a violation of the ACC. Respondent Feinerman, chair of HHA's board, executed the ACC in 1997 on behalf of the board.[4] HUD notes that, pursuant to 24 CFR 968.105, the ACC describes the requirements that govern the PHA's actions with respect to the operation and management of a housing authority. HUD notes further that the GHCCU was not an HHA program or operation and did not limit its membership to HHA residents.[5]

HUD argues that in furtherance of its support for the GHCCU, HHA "improperly disbursed $841,655[6] from its General Fund to GHCCU," as shown by GHCCU's own records. Each of the respondents was a participant at various Board meetings and actively supported the funding of GHCCU from HHA's General Fund,[7] including the

---

[4] The Government's arguments summarized here generally relate to all three Respondents. Where there are specific differences in the actions of the three Respondents that bear on their alleged culpability, based on the Government's arguments, these will be noted. For the most part, however, immaterial differences in the allegations against the three Respondents, especially to the extent those differences play no part in the Determination, will not be treated at length here.

[5] The record reveals that up to the time of its closure, only a small minority of GHCCU's membership was drawn from the residents of HHA.

[6] The OIG Audit Report holds that HHA improperly disbursed $834,969.00. *See* Audit Report Number 2007-PH-1013, issued September 27, 2007.

[7] See, e.g., HUD's Brief in Support of Three-Year Debarment of Feinerman at pp.4 ff.(Feinerman Brief); HUD's Brief in Support of Three-Year Debarment of Harris at pp.5 ff (Harris Brief); and HUD's Brief in Support of Three-Year Debarment of Buxton at pp.4 ff (Buxton Brief).

signing of HHA checks therefor (Feinerman), making motions to approve contributions of HHA funds to GHCCU (Harris), and cosigning of HHA checks to transfer funds to the credit union and membership on GHCCU's Board (Buxton).

It is these actions recited above that HUD argues should result in Respondents' debarment. First, HUD argues that each of the Respondents in their capacity as an HHA Board member "is a 'person' and a 'participant' as those terms are defined by HUD regulations." Further, as commissioners of a housing authority, Respondents "are considered supervisors" of a housing authority, thus they "are participants engaged in primary covered transactions, and are subject to HUD sanctions under 24 CFR part 24."

HUD next argues that there is cause for debarment of Respondents under 24 CFR 24.800(b)(1) "because HHA contributed $841,655 of its General Fund to GHCCU without first obtaining HUD's authorization, which is a willful violation of Section 9(C) of the ACC." HUD also contends that there is cause for debarment under 24 CFR 800(b)(2)(a) based on HHA's "history of failure to perform in accordance with program requirements," citing the large "unauthorized" contributions made to GHCCU over several years.

With respect to each of the Respondents, HUD argues that "the record plainly shows that [they] knew or had reason to know" that approving the contributions from the General Fund to GHCCU "without obtaining HUD's prior authorization was prohibited by Section 9 of the ACC." Further, applicable Pennsylvania law imposes on Respondents the responsibility to make "sure that the requirements set forth in the ACC are followed." The ACC, HUD argues, "is not an obscure government publication[;]" thus, Respondents must have known that funding GHCCU "was in violation of Section 9 of the ACC."

HUD contends that there also is cause for debarment of Respondents under 24 CFR 24.800(d). Respondents' conduct was irresponsible in that they violated their obligation to safeguard federal funds by making a gift of HHA funds to GHCCU, "thereby permanently depriving HHA and its residents from those funds."

The wrongful actions of HHA detailed above, HUD argues, are imputable to Respondents under 24 CFR 24.630(b) because they "participated in, knew of, or had reason to know of the improper conduct."

HUD dismisses HHA's argument that HUD's interpretation of Section 9 of the ACC is overly restrictive. HHA was responding to the OIG's conclusion in its audit that HHA improperly disbursed its General Funds monies to GHCCU. HUD characterizes as erroneous HHA's claim that "the expenditures were appropriate as an eligible tenant service under the [U.S. Housing] Act's definition of operations, or in furtherance of a permissible arrangement under Section 13 of the [U.S. Housing] Act to enter into business relationships with affiliated entities to provide tenant services."

HUD argues that HHA misstates the Act's meaning of certain terms therein. According to HUD, "a plain reading of Section 3(c)(2) of the Act shows that 'operations' and 'tenant programs and services' only pertain to activities that are conducted for the sole purpose of benefiting the PHA and its tenants (or residents), and not for businesses that are open to the public at large."

Section 13 of the Act, HUD insists, "does not authorize PHAs to withdraw its General Funds monies for non-housing authority purposes without obtaining HUD's permission." HHA, HUD points out, admits that it failed to obtain HUD approval. HUD also rejects HHA's claims that it had a choice to disclose to HUD its intentions to make contributions to GHCCU or to list the contributions as a line item in its annual plan. Similarly, HUD rejects HHA's claim that it satisfied "all disclosure requirements under 24 CFR part 903" by including a statement that HHA "would continue to establish partnership agreements" etc. HUD states that "[s]uch a general statement of intent fails to satisfy 24 C.F.R. 903.7(l)(1)."

HUD concludes that Respondents did not act responsibly in their supervision of HHA, and their claim of "good faith reliance upon the advice of professionals, consultants, management, and staff is without merit." Accordingly, Respondents three-year debarment is warranted and is necessary to protect the public interest.

## RESPONDENTS' ARGUMENTS

Respondents raise as general contentions that HUD cannot dispute that the HHA residents needed the financial resources offered by a credit union. Moreover, none of the Respondents knew that the contributions to GHCCU from HHA were not approved by HUD. Consequently, "given the benign nature of the [Respondents'] alleged wrongdoing . . . HUD's proposed debarments of them are without factual and legal basis, and punitive."

Respondents note as background to the instant dispute that a mayoral task force recommended the establishment of a low-income credit union to serve the low-income residents of the city. The then-Executive Director of HHA along with the commissioners serving at the time, including Respondent Feinerman, believed that a credit union could offer HHA residents a benefit equal to other recognized resident services. Over half of the responses received to a survey canvassing the possible need for a credit union were from HHA residents. In April 1999, the responsible state agency approved the credit union's eligible membership base to include all persons who lived and worked in the City of Harrisburg, including the residents of HHA. In June 1999, GHCCU was designated by the National Credit Union Administration (NCUA) as a low-income credit union.

The Executive Director (ED) of the HHA was appointed Chair of the credit union's Board. At an HHA Board meeting in October 1999, the ED informed HHA's commissioners that $500,000.00 had been set aside to support the operations of the credit union over a five-year period. The details of this commitment, as the HHA Board understood it, were set forth in the Comprehensive Grant Program Annual Submission

5

("Submission") when it was approved by HUD. However, as sworn to by the responsible employee in his declaration attached to Respondents' brief as Respondents' Exhibit 5, he inadvertently omitted in the Submission to HUD a description of the planned financial support for GHCCU[8]. In his declaration, the employee swears that he informed the ED of his mistake and suggested that the credit union could be supported from an account tied to the operating subsidy. The employee admits in his declaration that he "did not inform the HHA Board that the financial support for the credit union was not included in the plan submitted to HUD."[9]

Respondents acknowledge that by 2004 the $500,000.00 set aside had been spent and the HHA Board approved a further multi-year commitment of $495,000.00. It is Respondents' position that at every HHA Board meeting at which the HHA funding of the credit union was discussed, the HHA general counsel and ED along with other senior staff were present. Moreover, the Board was never advised that funding of the credit union was improper nor of the failure to inform HUD of the financial support to GHCCU.

It is against this factual background, as described by Respondents, that Respondents reject the arguments offered by HUD to justify their debarment. First, Respondents contend that there is no basis for HUD's argument that, pursuant to 24 CFR 24.800(b), their votes to fund GHCCU, as described above, constituted "willful failure to perform" or a "willful violation of a legal or contractual obligation." HUD's argument is baseless because, Respondents claim, they did not know that HUD was not informed of the contributions to be made to GHCCU nor that the contributions were ineligible under the ACC or the Housing Act of 1937. Additionally, Respondent Feinerman argues that he knew at least one housing authority had established a credit union, that HUD facilitated meetings to accomplish that goal, and that "HHA's professional staff, and its general counsel, had no concerns about the eligibility and propriety of the expenditures for GHCCU."

Respondents argue that willfulness "denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental," or "a thing done without ground for believing it is lawful or conduct marked by a careless disregard whether or not one has the right so to act," *citing United States v. Murdock*, 290 U.S. 389 (1933). As such, "[a]n individual does not willfully violate a public agreement or transaction if the person does not know that he or she is violating the agreement or transaction." Moreover, "signing a document containing erroneous information is not 'willful' unless the signer has knowledge of the error." (Citation omitted) In light of these authorities, and because HUD has the burden of proving that cause for debarment exists, HUD has "wholly failed to meet it on the grounds that the HHA commissioners engaged in 'willful' wrongdoing."

Respondents also argue that it is not clear that either the Housing Act of 1937 or the ACC requires HUD approval for the use of public housing funds to support a credit union. In any event, say Respondents, even accepting HUD's interpretation of the law,

---

[8] Schenck Declaration at ¶ 5.
[9] *Id.*, at ¶ 7.

HUD has not demonstrated that the Respondents knew that funding GHCCU was in violation of the ACC, or that they "acted with reckless disregard for the ACC when they voted to fund GHCCU."

As an additional challenge to HUD's willfulness argument, Respondents cite HUD Board of Contract cases for the proposition that a "wrongful act is not willful if it is based on a misunderstanding of the applicable law or undertaken without knowledge of the law or public agreement." So too, "willful conduct is distinguishable from a mistake." (Citations omitted) Respondents thus conclude that because they "had no reason to believe that their actions did not conform to the requirements of the ACC, they cannot be found to have acted willfully even if they were mistaken."

Respondents argue further that pursuant to applicable Pennsylvania law, HHA is empowered to hire, among others, technical experts. See 35 Pa. Cons. Stat. § 1547. Further, Respondents argue that HHA is a governmental corporation and in accordance with 42 Pa. Cons. Stat. § 8332.5(b), directors of a governmental corporation are subject to the standards and immunities that apply to non-profit organizations. Accordingly, because HHA is a governmental corporation, "its commissioners are subject to the standards applicable to non-profit directors." In this regard, Respondents argue that under 15 Pa. Cons. Stat. § 5712, a director is "entitled to rely in good faith on information [and] opinions, . . . prepared by . . . officers or employees . . . counsel . . . or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person."

Respondents thus contend that their decisions to fund the credit union that HUD now challenges as willful violations of the law or ACC were made by them subsequent to their receiving advice and information from two experienced executive directors. Furthermore, HHA's general counsel was present at the Board meetings when the funding issue was discussed and decided. Therefore, Respondents argue, they properly relied on the expertise of the professional and executive staff for guidance with respect to the law and the ACC. As Respondents see it, their reliance on their staff and general counsel for guidance on the provisions of the ACC makes a charge of willful violation untenable, because "neither bad advice nor reliance on it rises to the level of a willful violation under 24 CFR 24.800(b)."

Respondents take issue with what they view as HUD's implication that the ACC is so clear and unambiguous in its terms that they should have known that their funding decisions violated it. Respondents argue that the ACC is a generic document that does not describe in detail applicable HUD's regulations. For example, say Respondents, the ACC does not specify which expenditures are prohibited or what constitutes an eligible resident service, nor does HUD provide such guidance. Additionally, the provisions of Section 3 and Section 9 of the ACC as they relate to critical terms like "operation" and "project" seem to be in conflict. This conflict is evident, Respondents argue, in their construction of the ACC that is clearly contrary to HUD's position. Respondents' position is that because resident services are included in the definition of "operation" in

section 3(c)(2) of the Housing Act of 1937, the services can be funded without HUD's approval.

Respondents make the argument that because HUD "was actively promoting credit unions as a resident service at the time GHCCU was created, one might reasonably assume that HUD considered credit unions to be eligible resident services." HUD, however, disagrees. The result, as Respondents view it, is that no matter which interpretation is correct, "the provisions are at least ambiguous and arguably conflicting," thus "HUD has not established, and cannot establish", that their actions "constituted willful violations of the ACC or the law."

Respondents contend that their decision to fund the credit union is no cause for debarment because they have no history of failure to perform or of unsatisfactory performance of any public agreements or transactions. Only two acts, the two commitments in 1999 and 2004, respectively, to fund GHCCU "could even arguably warrant debarment." The other actions with respect to funding GHCCU involved implementation of the two decisions, and "the implementation of a decision over time does not constitute a history of decision-making." Respondents also note that during the time at issue here, HHA was rated by HUD as either a standard or high performer. Thus, there is no cause for debarment under 24 CFR 24.800(b)(2).

Similarly, Respondents reject HUD's contention that debarment is warranted under 24 CFR 24.800(d). First, Respondents argue that they fulfilled their duties under Pennsylvania law, and their doing so "establishes their present responsibility as a matter of law." In addition, Respondents argue that they were faithful in discharging "their fiduciary duties to the agency they serve as volunteers," and followed the advice of legal counsel and other professionals with respect to establishing and supporting GHCCU. Respondent Feinerman also knew at the time the issue of establishing GHCCU was being discussed that other housing authorities, including Binghamton Housing Authority in New York, were supporting credit unions. Respondents also note that during the relevant time period, HHA's books were audited annually, including examination of its operations to determine compliance with regulatory requirements. None of the audits questioned HHA's financial support for GHCCU.

Respondents reject, too, HUD's charge that they failed to safeguard federal funds and permanently deprived HHA residents of the use of the funds given to GHCCU. Respondents point out that, in light of the OIG audit, HHA has determined to repay the funds given to the credit union. Respondents also disagree with HUD that they failed in their supervisory responsibility with respect to HHA and use of its funds, because it is not their responsibility as commissioners to obtain prior approval of specific expenditures. Such operational details, Respondents argue, are the responsibility of the Executive Director and the staff. It is Respondents' position that to the extent they "did not act with knowledge that required HUD approval was absent, or disregard the need for such approval . . . , the failure to obtain prior approval [of the contributions to GHCCU] does not, and legally cannot, implicate their present responsibility."

8

Accordingly, Respondents argue that because they have fulfilled and continue to fulfill their fiduciary duties, and because HHA has suffered no permanent harm, HUD has failed to establish a cause so compelling that it bears on their present responsibility. In this regard, Respondents note that the contributions made to GHCCU, while substantial, were made over an eight-year period and accounted for less than one percent of HHA's budget.

Respondents cite as further mitigating factors, HHA's intent to repay the federal funds with non-federal funds, their dedicated service as public servants, their contention that the alleged wrongdoing was isolated and not pervasive, their cooperation or willingness to cooperate with HUD to resolve the OIG findings, and their commitment to implement new policies and internal controls to ensure compliance with HUD regulations, applicable law, and the ACC.

Respondents note that their conduct, which is now at issue, began over ten years ago. For that reason, their present responsibility "cannot genuinely or fairly be called into question and the only purpose served by their debarments would be punitive and contrary to law." Moreover, their debarment would be "contrary to public policy limiting the liability of directors . . . and would deter qualified and competent individuals from offering their services to" PHA's.

Respondents conclude that HUD has failed to establish adequate factual or legal grounds to debar them "and its flawed and unfair efforts to do so constitute an abuse of its debarment authority." Further, even if the evidence is considered sufficient to establish cause for debarment, "it simultaneously mitigates against debarment and demonstrates that the actions proposed by HUD are unjustified, stale and contrary to public policy." Accordingly, Respondents urge dismissal of their proposed debarment.

## FINDINGS OF FACT

1. During all relevant times in this matter, Respondents Feinerman, Harris, and Buxton served on the HHA Board of Commissioners, as unpaid volunteers.
2. Respondents, in their capacity as commissioners of HHA, determine policy and have overall supervisory authority over the operation of HHA.
3. In 1996, the Mayor of Harrisburg established a task force to consider the banking and credit needs of the low income community in Harrisburg and Respondent Harris served on the task force.
4. In 1999, the GHCCU was designated as a low-income credit union.
5. Respondent Feinerman and the other commissioners serving at that time,[10] believed that the availability of a credit union to HHA residents would be a benefit to the residents.
6. GHCCU's membership was not limited to HHA residents but included non-residents, businesses and other individuals in the city of Harrisburg.

---

[10] Respondents Harris and Buxton were not appointed to the HHA until December 1999. Ms Buxton resigned from the Board in July 2007.

9

7. The first chair of the GHCCU Board was Dorsey Howard, also the then-Executive Director of HHA.

8. Respondent Feinerman was informed by Dorsey Howard that the Binghamton Housing Authority (BHA), [11] was involved in the establishment of a credit union for its residents and staff and that HUD sponsored a training session for PHAs interested in creating credit unions; however, no information was provided to the Board confirming the establishment of a credit union by BHA, the type of training provided by HUD to support credit unions or that HUD funds were approved for the creation of the BHA or any other credit union.

9. At a HHA Board meeting in October 1999, Dorsey Howard informed Board members Feinerman, Martini and Jones that he recently became chairman of the GHCCU and that "the housing authority, in its five year plan, has set aside up to $100,000 [12] a year for operating subsidy".

10. The employee responsible for preparing the Plan, Mr. Jerry Shenck did not include the set aside in the submission to HUD.

11. Section 9(B) of the ACC provides that "All monies . . . received by or held for the account of the HA in connection with the development, operation and improvement of projects . . . shall constitute the General Fund."

12. Section 9(C) of the ACC provides that the HA may withdraw funds from the General Fund only for: "(1) the payment of the costs of development and operation of the projects under the ACC with HUD; (2) the purchase of investment securities as approved by HUD; and (3) such other purposes as may be specifically approved by HUD."

13. The ACC for the HHA was executed by Respondent Feinerman on behalf of HHA and governs the use of program funds provided by HUD.

14. The benefits, composition of Board and amount of funding needed by GHCCU were discussed in HHA Board meetings, in the presence of HHA's general counsel, executive directors, [13] and other professional staff.

15. The HHA Board did not solicit, make inquiry, or receive any legal opinion or professional advice from legal counsel, professional staff or HUD as to whether the use of HUD funds for the establishment or support of a credit union was an eligible expense under section 9 of the ACC.

16. HHA did not request or receive HUD approval to fund GHCCU.

17. At the HHA Board meeting of September 11, 2003, Board members Feinerman, Buxton and Harris voted to transfer $30,000 to the GHCCU.

18. At the HHA Board meeting of September 9, 2004, Board members Feinerman and Buxton voted to transfer $495,000 to the GHCCU.

19. In FY'2006 an audit by the HUD Office of Inspector General (OIG) identified improprieties in connection with HHA's financial contributions to GHCCU. [14]

---

[11] At the hearing, neither party provided relevant details of the Binghamton Housing Authority credit union.

[12] The minutes of the meeting do not identify who in the HHA authorized or approved the set-aside or when it was approved.

[13] Mr. Dorsey died in August 2001, and was succeeded by Carl Payne as Executive Director.

[14] An OIG audit of HHA's FY 2006 operations determined that HHA "did not administrator its low-rent housing program in accordance with HUD regulations." Specifically, the OIG found that HHA "improperly disbursed $834,969.00 in operating funds from its low-rent public housing program to open and support" GHCCU.

## CONCLUSIONS

Based on the above Findings of Fact, I have made the following conclusions:

1.  Respondents were participants in a covered transaction, as defined in 24 CFR part 24, and members of the Board of the HAA.

2.  The ACC was executed by the Chairman of the Board of Directors on behalf of the HHA Board and the Board is aware that the terms and conditions of the Annual Contributions Contract govern the use of HUD funds.

3.  Section 9(C) of the ACC prohibits the use of HUD funds except for the payment of "costs of development and operation of the projects under ACC with HUD"; the "purchase of securities as approved by HUD" and "such other purposes as may be specifically approved by HUD".

4.  The HHA Board voted  in 2003 to transfer $30,000 to the GHCCU and voted in 2004 to transfer $495,000 to the GHCCU in violation of Section 9 (C) of the ACC.

5.  The transfer of funds to the GHCCU did not constitute costs of "development" or "operation" because the GHCCU is not a "project under ACC with HUD"; the transfer was not an "investment security" approved by HUD and the transfer as "such other purpose" under Section 9 (C) was not approved by HUD.

6.  The HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program.

7.  The HHA Board actions resulted in a financial loss to the HHA and warrant debarment because they are so serious that they affect Respondents' present responsibility.

8.  The improper conduct of the HHA Board is imputable to Respondents pursuant to 24 CFR 24.630(b) who participated in, had knowledge of, or had reason to know of the improper conduct.

9.  Respondents Feinerman, Harris and Buxton voted at the September 11, 2003 HHA Board meeting to transfer $30,000 to the GHCCU in violation of Section 9 (C) of the ACC.

10. Respondents Feinerman and Buxton voted at the September 9, 2004 HHA Board meeting to transfer $495,000 to the GHCCU in violation of Section 9 (C) of the ACC.

11

11. Pursuant to 24 CFR 24.850, HUD "has established the cause for debarment by a preponderance of the evidence" and under 24 CFR 24.855, HUD has met its "burden to prove that a cause for debarment exists."

12. The evidence supports debarment based on 24 CFR 24.800(b) and (d).

13. The actions of Respondents Feinerman and Buxton at the Board meetings on September 11, 2003 and September 9, 2004 resulted in the unauthorized transfer of $525,000 by the HHA to the GHCCU and warrant a debarment of three years.

14. The actions of Respondent Harris at the Board meeting on September 11, 2003 resulted in the unauthorized transfer of $30,000 by the HHA to the GHCCU and warrants a debarment of eighteen months.

15. Respondents offer several factors in mitigation of their actions, all of which have been considered in the terms of the debarments. The cooperation of Respondents in resolving the audit findings is acknowledged. Although Respondents allege that they have taking certain steps to put procedures and controls in place, including the creation of a governance committee and an audit committee to avoid a repetition of a similar problem and a proposal to repay all the funds contributed to GHCCU with non-federal funds, no affirmative action have been taken by any of the respondents or the HHA Board to implement the steps, controls or repayment suggested and to avoid a reoccurrence.

16. Respondents suggest that their debarments would be contrary to public policy and would discourage qualified persons from volunteering to serve housing authorities; however HUD has a responsibility to protect the public interest and take appropriate measures against participants whose actions may adversely affect the integrity of its programs and debarment is an appropriate action.

17. HUD cannot effectively discharge its responsibility and duty to the public if participants in its programs or programs that it funds fail to act responsibly and with sufficient care for the duties entrusted to them.

## DETERMINATION

Based on the foregoing, including the Findings of Fact, Conclusions, and the administrative record, I have determined, in accordance with 24 CFR 24.870(b)(2)(i) through (b)(2)(iv), to debar Respondents Feinerman and Buxton for a period of three years and Respondent Harris for a period of eighteen months from the date of this Determination. The debarments are "effective for covered transactions and contracts that are subject to the Federal Acquisition Regulation (48 CFR chapter 1), throughout the executive branch of the Federal Government unless an agency head or an authorized designee grants an exception."

Dated: *31 March 2008*

*Henry Czauski*

Henry S. Czauski
Debarring Official

CERTIFICATE OF SERVICE

I hereby certify that on this ___31st___ day of March, 2008, a true copy of the
DEBARRING OFFICIAL'S DETERMINATION was served in the manner
indicated.

Tammie M. Parshall
Debarment Docket Clerk

**HAND-CARRIED**
Mortimer F. Coward, Esq.
Debarring Official's Designee

Maura Malone, Esq.
Brendan Power, Esq.
Government Counsel

**FIRST CLASS MAIL**
Reno & Cavanaugh
1250 Eye St., N.W., Suite 900
Washington, D.C. 20005

# EXHIBIT 11

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Leon J. Feinerman ) | Docket No. 07-3441-DB |
| Reverand Earl Harris ) | (Feinerman) |
| Constance Buxton ) | |
| ) | Docket No. 07-3442-DB |
| ) | (Harris) |
| Respondents ) | |
| ) | Docket No. 07-3443-DB |
| ) | (Buxton) |
| ) | |
| ) | |

## GOVERNMENT'S MOTION TO REFER TO A HEARING OFFICER

The U.S. Department of Housing and Urban Development ("HUD" or "the Government"), by

its undersigned counsel, requests that the Debarring Official refer this matter to a hearing officer

in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A, because of the

existence of disputed material facts, and to discontinue the hearing scheduled for December 6,

2007. In support of this motion, the Government states as follows:

This matter involves the Harrisburg (Pennsylvania) Housing Authority's ("HHA) violation of

Section 9 of the Annual Contributions Contract ("ACC") between HUD and HHA, by

withdrawing $841,655 of its General Fund monies for the purpose of contributing the funds to a

credit union known as the Greater Harrisburg Community Credit Union ("GHCCU") without

obtaining HUD's authorization. On July 30, 2007, HUD issued notices proposing the three year

debarment of the Respondents, who are all members of HHA's Board of Commissioners, because the HHA's violation is imputed to the Respondents, under 24 C.F.R § 24.630(b), in that they participated in, had knowledge of, or had reason to know of the improper conduct. On October 19, 2007 the Government filed its briefs in support of the debarments of Respondents ("Government's briefs") and, on November 20, 2007, Respondents filed their brief in opposition to the debarments ("Respondents' brief").

Respondents' brief has raised a genuine dispute over facts material to the proposed debarment. Respondents maintain in their brief and declarations that they never knew that HUD had not authorized the disbursements for GHCCU, and that at no time did any question or suspicion of impropriety arise. (See Respondents' brief at pages 1, 6, 7, 8, 10, 18, 20; and Respondents' Exhibit 2 (Feinerman declaration) at pars. 12, 16; Exhibit 3 (Harris declaration) at par. 16; and Exhibit 4 (Buxton declaration) at par. 6).

The Government claims, however, in its notices of proposed debarment and briefs that each of the Respondents knew, or had reason to know, that the HHA's disbursements for GHCCU were not authorized by HUD and therefore violated Section 9 of the ACC. (See Government's Briefs against Feinerman (Feinerman brief) at pages 5-10, 14-17; Harris brief at pages 4-8, 12-14; and Buxton brief at pages 4-8, 13-15).

In addition, such disputed facts are material to this case because whether Respondents "knew, or had reason to know" of the improper conduct are matters to be proved under the imputation standard set forth in 24 C.F.R § 24.630(b).

HUD counsel has spoken with Respondents' counsel and Respondents oppose this motion.

Wherefore, for the above reasons, the Government requests that this case be referred to a Hearing Officer in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A for

findings of fact and recommended conclusions of law, and to discontinue the hearing scheduled

for December 6, 2007.

Respectfully submitted,

Brendan Power
Office of General Counsel
Government Counsel, HUD
202-708-3856 #3543

## CERTIFICATE OF SERVICE

I hereby certify that on this *3rd* day of *December*_____, 2007 a true copy of the foregoing
·Government's Motion to Refer to a Hearing Officer  was served in the manner indicated to:

*Tommie Parshall*_____

DOCKET CLERK


HAND CARRIED
Tim Coward
Debarring Official's Designee

Brendan Power
Maura Malone
Dane Narode
Government Counsel

FAX and First Class Mail
Mona Lyons
Law offices of Mona Lyons
1666 Connecticut Ave., NW
Suite 500
Washington DC, 20009
Fax:  202-387-7116


Lee Reno
Sarah Molseed
Reno & Cavanaugh
1250 I Street, NW suite 900
Washington DC, 20005
FAX: 202-783-0550

# EXHIBIT 12

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Leon J. Feinerman ) | Docket No. 07-3441-DB |
| Reverand Earl Harris ) | (Feinerman) |
| Constance Buxton ) | |
| ) | Docket No. 07-3442-DB |
| ) | (Harris) |
| Respondents ) | |
| ) | Docket No. 07-3443-DB |
| ) | (Buxton) |
| ) | |
| ) | |

## GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION TO REFER TO A HEARING OFFICER

The U.S. Department of Housing and Urban Development ("HUD" or "the Government"), by its undersigned counsel, submits its Reply in Support of its Motion to Refer to a Hearing Officer in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A. In support of this motion, the Government states as follows:

### I. HUD's motion to refer is proper.

Respondents' contention that HUD's request that this case be referred to a hearing officer should be denied because "there is not a single fact referenced in its briefs which demonstrates that any one of the three commissioners (Respondents) knew, or had reason to know, that the credit union expenditures had not been authorized by HUD or were otherwise subject to question. In short, HUD has not presented an iota of evidence which

1

creates any genuine dispute about dispositive factual issues (Respondents' Opposition to

Government's Motion to Refer to a Hearing Officer ("Respondent's Opposition"), p. 3)"

is without merit. First, Respondents' narrow framing of the issue is erroneous. The issue

to be determined is not simply limited to whether Respondents knew that HUD had not

authorized the Harrisburg Housing Authority's ("HHA") funding of the Greater

Harrisburg Community Credit Union ("GHCCU"). On the contrary, the issue to be

determined, as is required by 24 C.F.R. § 24.630(b), is whether Respondents participated

in, had knowledge of, or had reason to know of the HHA's improper contributions of its

General Fund monies to GHCCU. In this regard, HUD has produced ample evidence in

its debarment briefs and exhibits which establishes that Respondents participated in, had

knowledge of, or had reason to know that HHA's disbursements to GHCCU were not

proper.

Nevertheless, in their brief in opposition to HUD's proposed debarments,

Respondents submitted declarations in which they state that they never knew that HUD

had not authorized the disbursements for GHCCU and that there was not any question or

suspicion of impropriety. (See Exhibits 2, 3, and 4 of Respondents' brief in opposition to

debarment). Even though HUD believes that its briefs and exhibits have satisfied its

burden of proof in establishing that the debarments of Respondents are warranted, HUD

filed a motion to refer this case to a hearing officer for fact finding, pursuant to 24 C.F.R.

§ 24.845(c) and 24 C.F.R. Part 26, Subpart A, because HUD is required to give

Respondents the benefit of the doubt, i.e., that the declarations have raised material facts

in dispute, and it must abide by the regulations it has promulgated. See Sameena Inc. v.

U.S. Air Force, et. al. 147 Fed. 3rd 1148, 1153 (1998 9th Cir.) (In finding that the

Respondent's, a contractor, submission has raised a genuine dispute of material facts, and that the Government (U.S. Air Force) was required to provide Respondent with fact finding procedures and an evidentiary hearing which are available under its regulations. "Where a prescribed procedure is intended to protect the interests of a party before the [federal] agency, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.")

If however, Respondents do not wish to utilize the procedures which are available to them under HUD regulations for fact finding and holding an evidentiary hearing, and will concede that there are no genuine disputes over material facts, HUD will withdraw its motion to refer to a hearing officer and go forward with the hearing that is presently scheduled for January 30, 2008 before the Debarring Official's Designee.

**II. Respondents motion to dismiss this case is without merit and should be denied.**

Respondents' claim that HUD's debarment case should be dismissed is similarly erroneous and Respondents' motion should be denied.  On the contrary, HUD has presented argument and documentary evidence including, but not limited to, HHA Board meeting minutes, correspondence, HHA public housing general fund ledgers and checks, the ACC between HUD and HHA (which was executed by Respondent Feinerman), and Pennsylvania state public housing authority law which sets forth the responsibility of public housing authority ("PHA") board members, 35 Pa. Cons. Stat. § 1547, that establish a prima facie case that Respondents knew, or had reason to know, that the HHA's contribution of its General Fund monies to GHCCU was improper.

For example, although Respondent Feinerman claims, in his declaration, that since Mr. Howard (then HHA's executive director ("ED"), now deceased) told him

during the **October 14, 1999 HHA Board meeting**, that HHA's financial commitment to

GHCCU was mentioned in HHA's five year plan, "it did not cross my mind that there

was any impropriety in what had occurred, nor was any impropriety pointed out by the

ED or [HHA's] general counsel" (Exhibit 2, par. 16 of Respondents' Brief in Opposition

to Debarment),[1] Feinerman knew, or had reason to know, that the information provided

from Mr. Howard did not establish that HUD had authorized HHA to contribute its

General Fund monies to GHCCU, as required by Section 9(C) of the ACC. All Mr.

Howard told Feinerman was that "[t]he housing authority, in its five year plan, has set

aside up to $100,000 a year for operating subsidy." (See Exhibit 9, p. 8 of HUD's

debarment brief against Feinerman ("HUD's Feinerman brief"). Feinerman knew, or had

reason to know, that this vague statement from Mr. Howard about referring to the credit

union in HHA's five year plan,[2] did not comply with the Section 9 (C) of the ACC. To

be sure, Section 9(C) requires specific written approval from HUD, for HHA to be

allowed to give its General Fund monies to GHCCU.

     HUD regulations do not provide for PHA's to receive written approval from HUD

following their submission of five year and annual plans. Rather the PHA's five year and

annual plans are automatically approved if HUD does not submit a written disapproval

within 75 days of the plans' submission. See 24 C.F.R. §§ 903.23(b)(2) and (b)(3),

(1999). Whereas the ACC, at Section 9(C), requires PHAs to obtain HUD's specific

authorization, in writing,[3] to use its General Fund monies for purposes other than the

---

[1] Respondents Harris and Buxton were not present at the October 14, 1999 HHA Board meeting.
[2] As it turned out, HHA never even mentioned the credit union in HHA's five year plan. (See Shenck declaration, Exhibit 5 of Respondents' Brief in Opposition to Debarment.
[3] HUD approval is defined in the ACC as "prior written approval from HUD." (See Exhibit 4, p. 2, of HUD's Feinerman brief).

4

operation or development of the authority or for investing in HUD approved securities. (See Exhibit 4 of HUD's Feinerman brief).

Given the fact that Respondent Feinerman, as an HHA board member, is responsible for supervising and controlling the housing authority (see 35 Pa. Cons. Stat. §§ 1545, 1547), which necessarily includes ensuring that the ACC is complied with, he knew, or had reason to know, that the information provided to him by Mr. Howard at the October 14, 1999 Board meeting did not constitute proper authorization from HUD for HHA to give its General Fund money away to GHCCU.

Moreover, it was Feinerman who executed the ACC between HUD and HHA (See Exhibit 4. p. 12, of HUD's Feinerman brief) and he most certainly knew, or had reason to know, of the requirements set forth in the ACC. Nevertheless, Feinerman failed to make any inquiry at the October 14, 1999 Board meeting as to whether HHA had obtained HUD's authorization to contribute its General Fund monies to GHCCU.

The **May 10, 2001 HHA Board meeting**, which was attended by all three Respondents, is another instance in which Respondents knew, or had reason to know, that HHA did not have HUD's specific authorization to contribute its General Fund monies to GHCCU. The following exchange took place at this HHA Board meeting:

> Mr. Feinerman: The treasurer's report for the period ending March 31, 2001 is presented for approval. The only comment I have and which always concerns me, is the revenue item from our actual cumulative year-to-date versus the budget, we are always a little bit lower, but our expenditures are almost $250,000 more than what we budgeted. Is that going to catch up with utilities or not?

> Mr. Howard: There are a couple things that are in there. Some of the stuff that is in here is for the credit union. We are paying it out of our operating funds. It is a contribution that we had decided we were going to make to the credit union and we are paying it out of the operating funds. Instead of passing it through to the credit union for them to pay, because at the time they didn't have a checking account, we paid it directly. (See Exhibit 11, p. 3, HUD's Feinerman brief).

This exchange demonstrates that HHA's contribution of its General Fund monies, which includes operating funds, to GHCCU has prevented the HHA from operating in a fiscally efficient manner and from maintaining a balanced budget. Respondents certainly knew, or had reason to know, by virtue of this exchange that HUD would not authorize the HHA to use its General Fund money for this credit union, which is open to the entire City of Harrisburg, if such contributions would jeopardize the HHA's ability to operate a financially stable housing authority. However, no Respondent ever asked at this Board meeting if HUD had approved the HHA's funding of GHCCU. More importantly, it demonstrates that Respondents knew that HHA's public housing General Fund monies were being used to fund GHCCU. It was incumbent upon them to determine if this was a permissible use those funds. Respondents, however, failed to take any action at all to assure themselves that HHA was acting in accordance with HUD requirements.

The **September 11, 2003 HHA Board meeting**, which was also attended by all three Respondents, is another example in which Respondents knew, or had reason to know, that HHA did not have HUD's specific approval to contribute its General Fund monies to GHCCU. The following exchange took place at the September 11, 2003 HHA Board meeting:

> Mr. Feinerman: How aggressively have we solicited our constituents in the neighborhoods to become members of the credit union?
>
> Mr. Payne: We haven't solicited them very aggressively for a good reason. That reason is that we just now are getting the approval of the regulations to offer ATM and a debit card. We intentionally did not solicit the elderly, who now are on electronic direct deposit because we did not have the ability to do that. Once we get that in place, then we will start. (See Exhibit 12, p. 3, HUD's Feinerman brief).

6

This exchange makes clear to the Respondents that, even though GHCCU had been open for business for almost two and one-half years (April 2001 - September 2003), little, if any, effort has been made to attract HHA residents to be customers and GHCCU has provided very little, if any, service for HHA residents. Given this information provided by Carl Payne (HHA's new ED) during the September 11, 2003 Board meeting, Respondents knew, or had reason to know, that HUD would not have authorized the HHA to give away its General Fund monies to a credit union that has no requirement for HHA residents to be GHCCU customers, and has provided virtually no benefit or service for HHA residents.[4]   Again, no Respondent asked at the September 11, 2003 Board meeting whether HHA had obtained HUD's authorization to give its General Fund money to GHCCU.

Although Respondents claim that they never knew that HUD had not authorized the disbursements for GHCCU, and that at no time did any question or suspicion of impropriety arise, the October 14, 1999, May 10, 2001 and September 11, 2003 HHA Board meetings are all instances which demonstrate that Respondents knew, or had reason to know, that HUD would not have authorized HHA to contribute its General Fund monies for GHCCU.   Moreover, since Respondents, as HHA board members, are responsible for supervising and controlling the housing authority, which necessarily includes ensuring that the ACC is complied with, they should have, at a minimum, inquired at these board meetings whether HHA had HUD's approval to provide funding for GHCCU.   Such an inquiry would not only have been appropriate, since making these

---

[4] The fact that GHCCU had been providing hardly any service or benefit for HHA residents is supported by the HHA's own estimate which it provided to HUD's OIG.   According to this estimate, HHA residents only amounted to approximately 10 per cent of GHCCU's total number of customers for the period of 2001 – 2003.   No estimate was provided for any other years and GHCCU was shut down by the state due to insolvency in February 2006.

kind of inquiries is one of the primary reasons for holding PHA board meetings, but also would have been the Respondents' obligation in fulfilling their responsibility as PHA board members.

However, no such inquiries were made. Rather, on September 11, 2003, April 8, 2004 and September 9, 2004,[5] Respondents voted to authorize HHA to provide additional funding for GHCCU, without any questions as to whether these contributions were authorized by HUD.

In addition, if Respondents would have inquired, as they should have, whether HUD had approved of the HHA's funding of GHCCU and learned that there was no such approval, Respondents should have voted to discontinue any further funding of GHCCU and should have immediately alerted HUD of the violations of its requirements.

Further, although Respondents maintain that they "properly and reasonably relied on HHA's management and general counsel to insure HHA's compliance with the specific requirements of the ACC and HUD" (see Respondents' Opposition, p. 3), they fail to disclose what information was provided to them by either HHA's management or general counsel regarding HHA's compliance with the ACC. In addition, neither the declarations of HHA counsel Irwin Aronson or acting ED Jerry Shenck state that they advised any of the Respondents that the HHA's funding of GHCCU was in compliance with the ACC. (See Exhibits 5 and 6 of Respondents' Brief in Opposition to Debarment).

Accordingly, there is ample evidence demonstrating that Respondents knew, or had reason to know, that the HHA's funding of GHCCU was improper and their motion to dismiss this debarment case must be denied.

---

[5] Respondent Harris was not present at the September 9, 2004 HHA Board meeting.

8

WHEREFORE, for the above reasons, the Government requests that this case be referred to a Hearing Officer in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A for findings of fact and recommended conclusions of law. Alternatively, if Respondents do not wish to utilize the procedures which are available to them under HUD regulations for fact finding and holding an evidentiary hearing, and will concede that there are no genuine disputes over material facts, HUD will withdraw its motion to refer to a hearing officer and go forward with the hearing that is presently scheduled for January 30, 2008 before the Debarring Official's Designee.

Respectfully Submitted,

Brendan Power
Office of General Counsel
Government Counsel, HUD
202-708-3856 #3543

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of January_____, 2008 a true copy of the foregoing Government's Reply in Support of its Motion to Refer to a Hearing Officer was served in the manner indicated to:

DOCKET CLERK

HAND CARRIED
Tim Coward
Debarring Official's Designee

FAX and First Class Mail
Mona Lyons
Law offices of Mona Lyons
1666 Connecticut Ave., NW
Suite 500
Washington DC, 20009
Fax: 202-387-7116

Lee Reno
Sarah Molseed
Reno & Cavanaugh
1250 I Street, NW suite 900
Washington DC, 20005
FAX: 202-783-0550

10

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

| | |
|---|---|
| LEON J. FEINERMAN *et al.*,  )<br>  )<br>    Plaintiffs,  )<br>  )<br>  v.  )<br>  )<br>ROY A. BERNARDI, in his official capacity as  )<br>Acting Secretary and Head of the  )<br>UNITED STATES DEPARTMENT OF  )<br>HOUSING AND URBAN DEVELOPMENT  )<br>451 Seventh Street, S.W.  )<br>Washington, D.C.  20410,  )<br>  )<br>    Defendant.  )<br>_____)  | Civil Action No. 08-759 (RBW) |

**PROPOSED ORDER**

In consideration of Plaintiffs' Amended Application for Preliminary Injunction, any

opposition thereto, and the record herein, it is hereby ORDERED

1. That, having demonstrated a likelihood of success on the merits, that they are

    likely to suffer irreparable harm, and that the balance of equities weighs in favor

    of immediate injunctive relief, Plaintiffs' Application be, and hereby is, granted;

2. That Defendant's Debarring Official's Determination debarring Plaintiffs

    effective March 31, 2008, be and, hereby is, stayed pending further order of the

    Court;

3    That Defendant be, and hereby is, preliminarily enjoined from enforcing the

    debarments of Plaintiffs, or from taking any other act pursuant to the Debarring

    Official's Determination pending further order of the Court; and

4.      That any and all actions taken by Defendant to implement the Debarring Official's

Determination, including any and all actions to debar Plaintiffs be, and hereby

are, preliminarily declared null and void and of no force and effect.

**SO ORDERED.**

_____                    _____
**Date**                                                    **REGGIE B. WALTON**
                                                            **United States District Judge**

Copies to:

Mona Lyons
Peter Butcher
Law Office of Mona Lyons
1666 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20009

Lee P. Reno
Sarah L. Molseed
Reno & Cavanaugh
1250 Eye Street, NW
Suite 900
Washington, D.C.  20005

Jeffrey A. Taylor
United States Attorney for the District of Columbia
Civil Division
4th Floor
501 Third Street, NW
Washington, DC 20530

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEON J. FEINERMAN *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.08-759 (RBW) |
| | ) | |
| ROY A. BERNARDI, in his official capacity as | ) | |
| Acting Secretary and Head of the | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN DEVELOPMENT | ) | |
| 451 Seventh Street, S.W. | ) | |
| Washington, D.C.  20410, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PROPOSED ORDER

In consideration of Plaintiffs' Amended Request for Expedited Ruling, any opposition thereto, and the record herein, it is hereby ORDERED

1.   That Plaintiffs' request be, and hereby is, granted;

2.   That Plaintiffs' Application for Preliminary Injunction and Request for Expedited Ruling will be heard on the _____ day of _____, 2008 at _____ ; and

2.   That the Court's order will issue within _____ days thereafter.


**SO ORDERED.**


_____                    _____
**Date**                                                        **REGGIE B. WALTON**
                                                                  **United States District Judge**

Copies to:

Mona Lyons
Peter Butcher
Law Office of Mona Lyons
1666 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20009

Lee P. Reno
Sarah L. Molseed
Reno & Cavanaugh
1250 Eye Street, NW
Suite 900
Washington, D.C.  20005

Jeffrey A. Taylor
United States Attorney for the District of Columbia
Civil Division
4th Floor
501 Third Street, NW
Washington, DC 20530