# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LEON J. FEINERMAN *et al*.        )
                                            )

        Plaintiffs,          )

                                            )

v.                                    )      Civil Action No. 08-759 (RBW)
                                            )      ECF

ROY A. BERNARDI, in his official capacity as  )
Acting Secretary and Head of the UNITED  )
STATES DEPARTMENT OF HOUSING AND  )
URBAN DEVELOPMENT          )

                                            )

                                            )

        Defendant.        )
_____)

## FEDERAL DEFENDANT OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED RULING

      Defendant Roy A. Bernardi, Acting Secretary of the Department of Housing and Urban Development, by and through undersigned counsel, respectfully submits the following memorandum in opposition to Plaintiffs' Motion for a Preliminary Injunction. Defendant submits that Plaintiffs can establish neither irreparable harm nor likelihood of success on the merits.

## FACTUAL BACKGROUND

      The Department of Housing and Urban Development ("HUD" or "Department") is authorized and funded by Congress to provide housing assistance to eligible persons through a variety of public and assisted housing programs. 42 U.S.C. § 1437c. The Department administers public and assisted housing programs through, among others, local housing authorities, which develop and own and/or subsidize private rental units. Id. In order to receive its annual operating subsidy from the Department, a public housing authority ("PHA") must enter into an Annual

Contributions Contract ("ACC") with HUD.  The ACC sets forth the terms and conditions the

PHA must follow for the operation and management of the housing authority. 24 C.F.R. §

968.105.

The Harrisburg (Pennsylvania) Housing Authority ("HHA") is a PHA administering

public and assisted housing programs funded by HUD, in Harrisburg, Pennsylvania.  Plaintiff

Leon J. Feinerman has been a member, as well as Chairperson, of HHA's Board of

Commissioners since 1983. Plaintiffs Earl Harris and Constance Buxton were appointed to the

HHA Board in December 1999. Although inactive since their debarments, Mr. Feinerman and

Reverend Harris continue to hold positions as HHA commissioners.  Ms. Buxton resigned from

the HHA Board in July, 2007 for health reasons.

HHA board members are appointed by the Mayor of Harrisburg, with the approval of the

City Council, and serve for a five year term unless they resign or are removed for cause by the

Mayor.  HHA commissioners are uncompensated and attend monthly meetings.  Plaintiffs, in

their capacity as commissioners of HHA, determine policy and have overall supervisory

authority over the operation of HHA.

HUD and HHA entered into an Annual Contributions Contract ("ACC") on May 22,

1997.  Attached as Exhibit 1.[1]  The ACC was executed by Mr. Feinerman on behalf of HHA's

Board.  Exhibit 1, p. 12.  In 1998, HHA became involved in the planning for a low-income

community credit union, which later became the Greater Harrisburg Community Credit Union

("GHCCU").  GHCCU was a state chartered credit union which operated in the City of

Harrisburg.  GHCCU did not limit its membership to residents in HHA housing units.  Rather,

---

[1] Defendant will be filing a Notice of Filing Exhibits and Exhibits on May 19,2008.  Defendant has notified Plaintiff's counsel of this filing date.  All exhibits are part of the Administrative Record and therefore Plaintiffs are already in possession of exhibits.

GHCCU served non-residents, businesses, and other individuals in the city of Harrisburg. Debarring Official's Determination, Plaintiffs' Exhibit 10, p. 9 ¶ 6.

At the October 14, 1999 Board meeting, HHA's executive director at the time, Dorsey Howard, (since deceased) informed the commissioners that he had set aside $100,000 per year for five years to support the operation of GHCCU in the five year plan which HHA is required to submit to HUD. However, the HHA employee responsible for preparing the plan, Jerry Shenck, neglected to include the expenditures for the credit union. Plaintiffs claim that Mr. Shenck reported his omission to Mr. Howard. Of the three plaintiffs, only Mr. Feinerman was a member of the HHA Board at the time of the October, 1999 meeting.

Funding for GHCCA was discussed at subsequent board meetings held on May 10, 2001 and September 11, 2003, which were attended by all three Plaintiffs. See Exhibits 2, 3. These exchanges evidence that the Plaintiffs knew that HHA's funding of GHCCU prevented HHA from maintaining a balanced budget and that the credit union provided virtually no benefit to HHA residents.

Throughout this time period, Plaintiffs never took any action to assure themselves that HHA was acting in accordance with the ACC requirements. Further, on September 9, 2004, Mr. Feinerman and Ms. Buxton voted to authorize HHA to provide an additional $495,000 of funding to GHCCU.[2] This transfer, along with previous advances of funds,[3] were approved without any Board solicitation or inquiry as to whether the use of funds for the support of the credit union was an eligible expense under the ACC.

---

[2] Reverend Harris did not attend the September 9, 2004 Board meeting. See Exhibit 25
[3] On September 11, 2003 the Board unanimously approved an advance of $30,000 to GHCCU. Exhibit 3, p. 3, 8-9. On April 8, 2004, the Board unanimously approved an advance of $20,000 to GHCCU and to set aside $25,000 a quarter for the remainder of 2004 for the 2005 commitment. Exhibit 4, p.4. All Plaintiffs were present at both meetings.

In February 2006, GHCCU was closed for the failure to meet state imposed net worth requirements. Thereafter, HUD's Officer of Inspector General ("OIG") conducted an audit of HHA's activities and HUD began its investigation into the actions of the HHA commissioners. The audit questioned the funding of GHCCU and found that from January 1998 to June 2006, HHA improperly disbursed $841,655 from its General Fund to GHCCU[4]  See OIG Audit Report, Exhibit 5.

PROCEDURAL BACKGROUND

By letters dated, July 30, 2007, HUD proposed Plaintiffs' debarment from future participation in procurement and nonprocurement transactions with the Executive Branch of the Federal Government for three years. Attached as Exhibits 7, 8, and 9. The notices charged Plaintiffs with "allowing large sums of HHA's operating subsidiary funds, which it receives annually from HUD for the purpose of development and operating that HHA, to be used to fund . . . the Greater Harrisburg Community Credit Union (GHCCU) without obtaining HUD's authorization for such expenditures." See Exhibits 7, 8, and 9.

The notices stated that the proposed debarments of the Plaintiffs were based on acts and omissions of HHA which established cause for debarment pursuant to 24 C.F.R. § 24.800(b) and (d). The notices further stated that HHA's acts and omissions were imputed to the plaintiffs because, as its commissioners and pursuant to 24 C.F.R. § 24.630(b), they had "participated in, had knowledge of, or had reason to know of the violations."

The three debarment actions were thereafter consolidated. HUD filed its brief and evidence in support of the debarments and Plaintiffs filed their opposition to the debarments,

---

[4] The OIG audit for HHA determined that HHA improperly distributed $834,969 from its General Fund to GHCCU. Since the audit, a HUD auditor found that HHA improperly distributed an addition $6,686 of its General Fund monies to GHCCU, making the total $841,655. See Declaration of Amy Genevie, Exhibit 6.

along with supporting evidence and asserted their right to an adjudicative proceeding before an Administrative Law Judge.  In response, HUD filed a motion requesting that the action be referred to a hearing officer for fact finding.  HUD's motion contended that there was a genuine factual dispute about whether the Plaintiffs knew, or had reason to know, that HHA's expenditures for the credit union were unauthorized.  Plaintiffs opposed the motion asserting that HUD failed to present any evidence showing that there was a genuine dispute about that fact.

On January 11, 2008, HUD filed its Reply in Support of Its Motion to Refer to a Hearing Officer in which HUD stated that even though it believed that it had satisfied its burden of proof in establishing that the debarments of the Plaintiffs are warranted, HUD filed the motion to refer to a hearing officer because HUD is required, in accordance with <u>Sameena Inc. v. U.S. Air Force, et. al</u>. 147 F.3d. 1148, 1153 (9th Cir. 1998), to give Plaintiffs the benefit of the doubt, i.e., that their declarations have raised material facts in dispute, and must abide by the regulations it has promulgated.  HUD further stated in its Reply "[i]f however, Respondents do not wish to utilize the procedures which are available to them under HUD regulations for fact finding and holding an evidentiary hearing, and will concede that there are no genuine disputes over material facts, HUD will withdraw its motion to refer to a hearing officer and go forward with the hearing that is presently scheduled for January 30, 2008 before the Debarring Official's Designee" Government's Reply in Support of its Motion to Refer to a Hearing Officer, Plaintiffs' Exhibit No. 12, p. 3.

On January 18, 2008 a telephone conference call was held by and between the parties, through their counsel, and the Debarring Official's Designee, Tim Coward, regarding HUD's Motion to Refer to a Hearing Officer.  At the January 18, 2008 conference call, Mr. Coward denied HUD's Motion to Refer to a Hearing Officer and set the matter for hearing for January

30, 2008 (which was already the tentative hearing date). There was no written order entered from the January 18, 2008 conference call.

On January 30, 2008, a hearing was held before Mr. Coward. Mr. Coward heard arguments from both sides, however it was not an evidentiary hearing. On March 31, 2008, the Debarring Official, Henry S. Czauski, issued a determination debarring Mr. Feinerman and Ms. Buxton for three years and debarring Reverend Harris for eighteen months. Mr. Czauski concluded that "[t]he HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of GHCCU was appropriate under the ACC, and if not to obtain prior written approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program." Debarring Official's Determination, Plaintiffs' Exhibit 10, p. 11 ¶6. The Debarring Official concluded that "[t]he improper conduct of the HHA is imputable to Respondents ... who participated in, had knowledge of, or had reason to know of the improper conduct." Debarring Official's Determination, Plaintiffs' Exhibit 10, p. 11 ¶ 8.

On May 1 2008, Plaintiffs filed the current lawsuit under the Administrative Procedure Act ("APA") seeking to set aside the debarment alleging that the Debarring Official acted arbitrarily and capriciously. See generally Plaintiff's Complaint (Dkt. No.1). Concurrent with that Complaint, Plaintiffs also filed a Motion for Preliminary Injunction. (Dkt. Nos. 2, 7 (Amended Motion for a Preliminary Injunction)).

ARGUMENT

**I.   Plaintiff Has Failed To Satisfy the Standards For Issuance of Injunctive Relief.**

**A.   Plaintiffs Bear a Heavy Burden to Justify the Grant of Preliminary Injunctive Relief**

It is well settled that injunctive relief is an extraordinary remedy, and the party seeking it has a substantial burden of proof.  American Coastal Line Joint Venture v. United States Lines, Inc., 580 F. Supp. 932, 935 (D.D.C. 1983); see Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958).  To be entitled to the extraordinary remedy of injunctive relief, plaintiffs must meet this strict burden by showing that: (1) there is a substantial likelihood of their prevailing on the merits of their claims; (2) a preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury to the plaintiff outweighs the possible harm to others; and (4) the public interest favors issuance of the injunction.  Sea Containers, 890 F.2d at 1208; Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Virginia Petroleum, 259 F.2d at 924-25.  These factors "interrelate on a sliding scale and must be balanced against each other."  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak." Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1999), quoting CifiFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Wisconsin Gas Co., 758 F.2d at 674.  To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical."  Id.  The burden is particularly difficult to meet in the procurement context, which is analogous to this debarment case, where the courts consistently hold that agency discretion must be given

particular force.  E.g., Sea-Land Serv., Inc. v. Brown, 600 F.2d 429, 434 (3d Cir. 1979); M.
Steinthal & Co. v. Seamens, 455 F.2d 1289, 1301, 1304 (D.C. Cir. 1971).

Applying this standard in this case plainly reveals that Plaintiffs are not entitled to
preliminary injunctive relief.  Not only have Plaintiffs failed to demonstrate a substantial
likelihood of success on the merits, but they have also failed to show the existence of any
genuine irreparable harm or that they have no adequate remedy at law.  Consequently, for the
reasons outlined below, Plaintiffs' application should be denied.

**B.**     **Plaintiffs Cannot Demonstrate Likelihood of Success on the Merits.**

1.     Debarment

Debarment proceedings are designed to ensure that, in the public interest, the government
does business only with responsible people and entities.  See 24 C.F.R. § 24.110.  Department
regulations detail the conditions that must be satisfied before the sanctions of debarment are
imposed and the procedures that must be followed in order to impose them. See 24 C.F.R. Part
24.

Debarment may be imposed for any of a long list of actions that constitute "cause,"
including "violation of the terms of a public agreement or transaction so serious as to affect the
integrity of an agency programs, such as (1) a willful failure to perform in accordance with the
terms of one or more public agreements or transactions or (2) a history of failure to perform or of
unsatisfactory performance of one or more public agreements or transactions . . ." 24 C.F.R. §
24.800(b). There is also cause for debarment under 24 C.F.R. § 24.800(d) if the offense is "so
serious or compelling a nature that it affects [one's] present responsibility."

HUD regulations permit the agency to impute to an individual "the improper conduct of any organization ... if the individual to whom the improper conduct is imputed either participated in, had knowledge of, or reason to know of the improper conduct." 24 C.F.R. § 24.630(b).

The debarring official does not issue a decision until the respondent has had an opportunity to contest the proposed debarment. 24 C.F.R. § 24.810. If the respondent wishes to contest the proposed debarment, he must provide the debarring official with "specific facts that contradict the statements contained in the Notice of Proposed Debarment." 24 C.F.R. § 24.825. The Department must establish that a cause for debarment exists by a preponderance of the evidence. 24 C.F.R. § 24.850. However, once the Department establishes a cause for debarment, the respondent has the burden of demonstrating "to the satisfaction of the debarring official that [he] is presently responsible and that debarment is not necessary." 24 C.F.R. § 24.855(b).

2. <u>Standard of Review</u>

Judicial review of the Debarring Official's decision to debar Plaintiffs from participation in transactions with the federal government is very limited. Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." 5 U.S.C. § 706(2)(A). This review is "highly deferential," and the Court "must presume the validity of agency action." <u>Kisser v. Cisneros</u>, 14 F.3d 615, 618 (D.C. Cir. 1994), citing <u>American Horse Protection Ass'n, Inc. v. Yeutter</u>, 917 F.2d 594, 596 (D.C. Cir. 1990); <u>see also</u> <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974) (court's role in determining whether governmental action is arbitrary, capricious, or an abuse of discretion is a narrow one). The Court may make inquiry only into whether the decision maker considered

"relevant factors and whether there has been a clear error of judgment . . . [however,] the court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also Kisser, 14 F.3d at 619. If the Court finds a reasonable basis for the agency's action, the Court must affirm that action even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the regulation or standard at issue. See Delta Data Sys. Corp. v. Webster, 744 F.2d 197, 204 (D.C. Cir. 1984).

3.    Evidence Supporting the Deciding Official's Decisions

The evidence in the administrative record supports the Debarring Official's bases to debar Mr. Feinerman and Ms. Buxton for a period of three years and Reverend Harris for a period of eighteen months from participation in procurement and non procurement transactions with the Federal Government. The decision imposing debarment reflected careful consideration of the Plaintiffs' arguments. The Debarring Official properly concluded that Plaintiffs' actions of transferring monies from HHA's General Fund to the GHCCU without HUD approval violated the ACC and established grounds for debarment under HUD regulations.

a.    Plaintiffs are Subject to Debarment under the Provisions of 24 C.F.R. Part 24.

Plaintiffs are subject to debarment under the provisions of 24 C.F.R. Part 24. Section 24.105(a) of Title 24 of the C.F.R. provides that:

> These regulations apply to all persons who have been, is, or may reasonably be expected to be, a participant or principal in a covered transaction.

A "participant" is defined at 24 C.F.R. § 24.980 as:

> Any person who submits a proposal for or who enters into a covered transaction, including an agent or representative of a participant.

A "person" is defined at 24 C.F.R. § 24.985 as an:

Individual, corporation, partnership, association, unit of government, or legal entity,… .

A "covered transaction" is defined at 24 C.F.R. § 24.200 as:

… a non-procurement or procurement transaction that is subject to the prohibitions of this part.  It may be a transaction at -

(a)  The primary tier, between a Federal Agency and a person or ;
(b)  A lower tier, between a participant in a covered transaction and another person.

A "Nonprocurement transaction" is defined at 24 C.F.R. § 24.970 as:
(a)  … any transaction, regardless of type (except procurement contracts), including, but not limited to the following:
(1) Grants…
(5) Contracts of assistance. …
(8) Subsidies….

(b)  A nonprocurement transaction at any tier does not require the transfer of Federal funds.

Public housing authority commissioners are considered supervisors of housing authorities, are participants engaged in primary covered transactions, and are subject to HUD sanctions under 24 C.F.R. Part 24.  In the Matter of Ronald A. Jackson, HUDBCA 95-A-106-D5, 1995 HUD BCA Lexis 6 at *8-10 (June 7, 1995).[5]  In addition, Pennsylvania law expressly provides that PHA Board members always have supervisory responsibilities over the operation of the PHA.  See Solomon v. Philadelphia Housing Authority  143 Fed. Appx. 447 at 456-57 (3rd Cir. (Pa.) 2005). (A housing authority is governed by a Board of Commissioners which has final policymaking authority. See 35 Pa. Cons. Stat. §1545 (2003); 35 Pa. Cons. Stat. §1547 (2003)

---

[5] Although the 1995 definition of participant, 24 C.F.R. § 24.105(m),  referenced in Jackson at *8 is slightly longer than the current definition of participant, a plain reading of the 1995 definition and the current definition shows that both definitions are the same in substance.  The 1995 definition of "participant" is "Any person who submits a proposal for, enters into, or reasonably may be expected to enter into a covered transaction.  This term also includes any person who acts on behalf of or is authorized to commit a participant in a covered transaction as an agent or representative of another participant." 24 C.F.R. § 24.105(m).   For the current definition of participant, see 24 C.F.R. § 24.980.

("An Authority may delegate to one or more of its agents or [employees] such of its powers as it shall deem necessary to carry out the purposes of this act, subject always to the supervision and control of the Authority")).

Accordingly, Plaintiffs qualify as a "person" and a "participant" under HUD regulations. Plaintiffs are members of the Board of Commissioners of HHA, which administers HUD programs, receives operating subsidies from HUD, and has entered into an ACC with HUD. As public housing authority board members, Plaintiffs are responsible for supervising and controlling the operation of HHA; and are authorized to commit the HHA in covered transactions, such as contracts and subsidies. As such, Plaintiffs are participants under HUD regulations.

      b.  <u>There was a Violation of the ACC</u>

Section 9(B) of the ACC requires housing authorities to place all funds it holds into the "General Fund." Further, Section 9(C) of the ACC sets forth restrictions stating that the General Fund monies may only be used for (1) "payment of the costs of development and operation of the projects under the ACC with HUD; (2) the purchase of investment securities as approved by HUD;[6] and (3) such other purposes as many be specifically approved by HUD." Plaintiffs cannot contest the Debarring Official's conclusion that the transfer of funds to GHCCU did not constitute costs of "development" or "operation" because GHCCU is not a "project under the ACC with HUD." Debarring Official's Determination, Plaintiffs' Exhibit 10, p.11 ¶ 5. GHCCU was not a HHA program or operation, nor did it limit its membership residents of HHA housing units. Debarring Official's Determination, Plaintiffs' Exhibit 10, p.9 ¶ 6.

---

[6] Plaintiffs' cannot and do not claim that their involvement with GHCCU was the "purchase of investment securities"

Plaintiffs argue that HUD's interpretation of Section 9 of the ACC is overly restrictive, and that HHA did not violate Section 9 because "the expenditures were appropriate as an eligible tenant service under the [U.S. Housing] Act's definition of operations, or in furtherance of a permissible arrangement under Section 13 of the [U.S. Housing] Act to enter into business relationships with affiliated entities to provide tenant services." See Exhibit 5, p. 13-14. Plaintiffs' claim is erroneous. Not only do Plaintiffs misstate the United States Housing Act's ("Act") meaning of "operations" and "tenant services and programs" but wrongly suggest that the Act defines such terms so broadly as to include a business, such as the GHCCU, that has slight if any connection to a PHA. It is not enough for a PHA tenant, if he or she chooses, to be a customer of that business.[7] A plain reading of Section 3(c)(2) of the Act shows that "operations" and "tenant programs and services" only pertain to activities that are conducted for the sole purpose of benefiting the PHA and its tenants (or residents), and not for businesses that are open to the public at large.[8]

---

[7] HHA estimate that in 2001, that GHCCU had 56 HHA residents as clients out of a total of 516 clients; in 2002, GHCCU had 88 HHA residents as clients out of a total of 837 clients; and in 2003, GHCCU had 106 HHA residents as clients out of a total of 1115 clients. This estimate is based upon census data as to the number of HHA properties in certain zip codes. See Exhibit 5, p. 25. Based upon this estimate, HHA residents amounted to approximately 10 per cent of GHCCU total number of clients for the period of 2001 – 2003. HHA owns and manages 1,730 public housing units. See Exhibit 5, p. 4.

[8] Section 3(c)(2) of the United States Housing Act of 1937.provides:

> The term "operation" means any or all undertakings appropriate for management, operation, services, maintenance, security (including the cost of security personnel), or financing in connection with a low-income housing project. The term also means the financing of tenant programs and services for families residing in low-income housing projects, particularly where there is maximum feasible participation of the tenants in the development and operation of such tenant programs and services. As used in this paragraph, the term "tenant program and services" includes the development and maintenance of tenant organizations which participate in the management of low-income housing projects; the training of tenants to manage and operate such projects and the utilization of their services in project management and operation; counseling on household management, housekeeping, budgeting, money management, child care, and similar matters; advice as to resources for job training and placement, education, welfare, health, and other community services; services which are directly related to meeting tenant needs and providing a wholesome living environment; and referral to appropriate agencies in the community when necessary for the provision of such services. To the maximum extent available and appropriate, existing public and private agencies in the community shall be used for the provision of such services.

In addition, Section 3(b)(1) defines "low income housing" and "project" as follows:

Plaintiffs' argument that Section 13 of the Act also supports HHA's funding of the GHCCU similarly fails. While Section 13 does authorize PHAs to enter into joint ventures, partnerships, or other business arrangements with other entities, it does not authorize PHAs to withdraw its General Fund monies for non-housing authority purposes without obtaining HUD's permission, or to otherwise disregard the terms of the ACC.  Section 13(b), United States Housing Act of 1937.

Plaintiffs' claim that HHA obtained the necessary HUD approval by listing the expenditure on line item 1406, entitled "operations", of HHA's annual plan.  See Exhibit 5, p. 16-17, and Exhibit 12.[9]  Plaintiffs also characterize the funds listed at line item 1406 as "capital funds applied to operations."  Exhibit 5, p. 16 (heading #4).

The explanation offered by Plaintiffs for not obtaining HUD's specific approval is entirely without merit.  Regardless of how Plaintiffs choose to characterize the subject expenditures, they are, in fact, HHA's General Fund monies.  See Exhibits 13-19.[10]  As such, HHA is required, in accordance with Section 9(C)(3) of the ACC, to obtain HUD's specific

_____

The term "low-income housing" means decent, safe, and sanitary dwellings assisted under this Act.  The term "public housing" means low-income housing, and all necessary appurtenances thereto, assisted under this Act other than under section 8.  The term "public housing" includes dwelling units in a mixed finance project that are assisted by a public housing agency with capital or operating assistance.  When used in reference to public housing, the term "low-income housing project" or "project" means (A) housing developed, acquired, or assisted by a public housing agency under this Act, and (B) the improvement of any such housing.

[9] HHA does not disclose which years the HHA submitted its annual plan to HUD that included an expenditure for GHCCU at line item 1406.  However, attached as Exhibit 12 is the annual statement for the Comprehensive Grant Program, for 2000, and the annual statement for the Capital Fund program (CFP) for 2001 – 2004 which lists the following amounts at line item 1406: $850,984.00 for 2000, $885,101.00 for 2001, $880,422.00 for 2002, $880,422.00 for 2003, and $200,000.00 for 2004.   We were not able to locate completed CFP statements in HHA's annual plans for 2005 and 2006.  Obviously, the amounts listed for this line item for the years 2001-2004 were not dedicated solely to GHCCU.  Nor was there any way for HUD to divine that these funds were to be used to fund a wholly unrelated credit union.

[10] Moreover, since capital funds are used for the development and modernization of PHA projects, capital funds are also considered part of the PHA's General Fund. See Section 9(d)(1) of the Act, and Sections 9(B) and (C) of the ACC.

approval to withdraw its General Fund monies and give those funds to the GHCCU.  HHA, by its

own admission, has failed to obtain such specific approval from HUD.  See Exhibit 5, p. 16-17.

Contrary to Plaintiffs' assertion, HHA did not have the choice to either disclose to HUD

that it intended to give its General Fund monies to the GHCCU and to obtain HUD's approval

for that expenditure, or to list the expenditure under line item 1406 of its annual plan.  Section 5

of the ACC makes it abundantly clear that PHAs must comply with "all the provisions of this

ACC and all applicable statutes, executive orders, and regulations issued by HUD."  See Exhibit

1, p.4.

Moreover, HHA is incorrect that it satisfied all disclosure requirements under 24 C.F.R.

Part 903 by including the statement that HHA would "continue to establish partnership

agreements and, cooperative agreements with various governmental, federal, state, private,

profit, and non-profit entities for the production of affordable housing and the provision of

supportive services" in HHA's annual plans for the years 2001 - 2006. See Exhibit 5, p. 17.

Such a general statement of intent fails to satisfy 24 C.F.R. § 903.7(l)(1).  Section 903.7(l)(1)

requires that PHAs must include the following information in the annual plan:

A statement of the PHA's community service and self-sufficiency programs.

(1) This statement describes:

(i) Any PHA programs relating to services and amenities coordinated, promoted or
provided by the PHA for assisted families, including programs provided or offered as a
result of the PHA's partnership with other entities;

(ii) Any PHA programs coordinated, promoted or provided by the PHA for the
enhancement of the economic and social self-sufficiency of assisted families, including
programs provided or offered as a result of the PHA's partnership with other entities, and
activities under section 3 of the Housing and Community Development Act of 1968 and
under requirements for the Family Self-Sufficiency Program and others.  The description
of programs offered shall include the program's size (including required and actual size
of the Family Self-Sufficiency program) and means of allocating assistance to
households.

24 C.F.R. § 903.7(l)(1).

The above mentioned statement of intent made by HHA in its annual plans clearly fails to comply with the requirements of 24 C.F.R. § 903.7(l)(1).  There is no mention at all of the GHCCU in HHA's statement, let alone any information responsive to the criteria requested in sections 903.7(l)(1)(i) or (ii).  See Exhibits 20 – 24.[11]

In short, the arguments raised by Plaintiffs that the contributions to the GHCCU complied with HUD requirements are without merit.  In addition, as a result of the HHA's unauthorized gift to the GHCCU of $841,655 from HHA's General Fund, the residents in HHA housing units, who were the intended beneficiaries, have been permanently prevented from receiving any benefit from those funds.

       c.   There is Cause for Debarment under 24 C.F.R. § 24.800(b) and (d)

In this instance, cause for debarment exists under 24 C.F.R. § 24.800(b)(1) because HHA contributed $841,655 of its General Fund to the GHCCU without first obtaining HUD's authorization, which is a willful violation of Section 9 (C) of the ACC.  24 C.F.R. § 24.800(b)(1) states that debarment may be imposed for "a willful failure to perform in accordance with the terms of one or more public agreements or transactions."

A HUD Administrative Law Judge has determined that willfulness is a failure to perform duties that are clearly and unambiguously prescribed in a contract where Respondent either knew of the duties or acted in reckless disregard of the duties that were imposed.  In the Matter of Seb. J. Passanesi, HUDALJ 92-1835-DB, 1992 WL 378943, at * 6 (Dec. 16, 1992).  In this case,

---

[11] HHA states that the statement that HHA would "continue to establish partnership agreements and, cooperative agreements with various governmental, federal, state, private, profit and non-profit entities for the production of affordable housing and the provision of supportive services" is included in HHA's annual statement for the years 2001 – 2006.  The subject statement is contained in HHA's annual plan for the years 2001, 2002, 2003, 2004 and 2005, which are attached as Exhibits 20 – 24 (the statement is on the second page of each exhibit).  HUD OGC counsel was unable to locate the subject statement in HHA's 2006 annual plan.

HHA had entered into an ACC with HUD, which clearly prohibited the use of monies from the HHA's General Fund for non-HHA purposes without first obtaining HUD's authorization.

While Plaintiffs claim that there are "no specific standards or guidance from HUD on the proper exercise of the duties of commissioners of public housing authorities." Declaration of James G. Stockard, Jr., Plaintiffs' Exhibit 1, p. 1. Plaintiffs acknowledge that because HHA is a governmental corporation, "its commissioners are subject to the standards applicable to non-profit directors." Debarring Official's Determination, Plaintiffs' Exhibit 10, p.7.

While Plaintiffs accurately state that HHA commissioners may rely on the information and advice provided by the officers, staff, counsel, and other professionals employed, Plaintiffs fail to note that the same statutory provision requires the Plaintiffs to "perform [their] duties . . . in good faith, in a manner . . . including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." (emphasis added). 15 Pa. Cons. Stat. § 5712.

Therefore, Plaintiffs claim that their debarment is not warranted because the HHA board voted to approve the expenditures for GHCCU "in good faith reliance" upon the advice of management and staff, is without merit See Plaintiffs' Motion for Preliminary Injunction p. 14 (Dkt. Nos. 2, 7). While PHA board members are authorized to delegate certain tasks to their agents or employees, under state law, such delegation is "subject always" to PHA Board members' supervision and control and good faith supervision includes "reasonable inquiry" and "diligence." 35 Pa. Cons. Stat. § 1547; 15 Pa. Cons. Stat. § 5712. Nothing in the record indicates any of the Plaintiffs, at any time, themselves referenced the ACC, or asked HHA's executive director, general counsel, or other senior staff, who "at every HHA Board meeting at which the HHA funding of the credit union was discussed . . .were present," whether HHA's

continued funding of the GHCCU complied with the ACC.  Debarring Official's Determination, Plaintiffs' Exhibit 10, p.6.

Further, Plaintiffs claim that "Reverend Harris and Mr. Buxton, had no obligation to scrutinize the earlier decision of their predecessors" regarding the support of the credit union, is also clearly without merit.  Plaintiffs' Motion for Preliminary Injunction p. 16 (Dkt. Nos. 2, 7).  While Reverend Harris and Ms. Buxton were not Board members at the time of the initial approval of the GHCCU funding, they were members for a six year period in which the GHCCU funding occurred and new funding was approved.  During this time, Reverend Harris and Ms. Buxton clearly had a duty as Board commissioners to "scrutinize" HHA's actions.

Plaintiffs' also assert that they believed that the credit union was a proper undertaking because they "knew other housing authorities had established credit unions." Plaintiffs' Motion for Preliminary Injunction p. 13 (Dkt. Nos. 2, 7).  However, as the Debarring Official noted in his finding of facts, "no information was provided to the Board confirming the establishment of a credit union . . .or that HUD funds were approved for the creation of  . . .any  . . . credit union." Debarring Official's Determination, Plaintiffs' Exhibit 10, p.10 ¶ 8.

The Debarring Official properly held that "there was a willful failure to perform because the HHA failed to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval." Debarring Official's Determination, Plaintiffs' Exhibit 10, p.11 ¶ 6.

Cause for debarment also exists under 24 C.F.R. § 24.800(b)(2) for "a history of failure to perform or of unsatisfactory performance of one or more public agreements or transactions . . ."  because HHA gave GHCCU $841,655 from its General Fund without HUD's authorization over an eight and one-half year period, January 1998 – June 2006, during which time Plaintiffs

were members of the HHA Board.[12]  See Exhibit 5.  As such, Plaintiffs' conduct demonstrates a history of a failure to perform in accordance with program requirements.

Plaintiffs' conduct also constitutes cause for debarment under 24 C.F.R. § 24.800(d), which provides that debarment is warranted for any cause of so serious or compelling a nature that it affects one's present responsibility.  Not only did Plaintiffs use HHA's General Fund monies for non-HHA purposes without HUD's prior authorization, but HHA also violated its obligation to safeguard Federal program funds by allowing those funds to be given to GHCCU as a gift, thereby depriving HHA and its residents of those funds.  Plaintiffs, as HHA Board members with supervisory responsibility over the operation and management of HHA, have an obligation to make sure Federal funds are appropriately spent and that contract provisions are complied with when Federal funds are involved.  This irresponsible conduct has prevented HHA from using the General Funds monies for their intended purpose under section 9(C) of the ACC, i.e., the operation, management, and development of the PHA.

Plaintiffs assert that they are "presently responsible" because the "decision to provide financial support to the credit union was made in 1999."  Plaintiffs' Motion for Preliminary Injunction p. 22 (Dkt. Nos. 2, 7).  Plaintiffs, however, failed to mention the frequent subsequent decisions involving GHCCU made by Plaintiffs including a unanimous approval of $495,000 to be committed to GHCCU through 2008. See Exhibit 25.  Further, HHA's involvement with GHCCU ceased in 2006, only because GHCCU was closed for the failure to meet net worth requirements, not because of an act by Plaintiffs.

Further, Plaintiffs' state, citing to 24 C.F.R. §§ 24.845(a) and 24.860, that the Debarring Official must base the decision on all information in the record, "including mitigating factors."

---

[12]Mr. Feinerman has been a member, as well as Chairperson, of the Board since 1983. Ms. Buxton and Reverend Harris were appointed to the Board in December 1999.

Plaintiffs' Motion for Preliminary Injunction p. 22 (Dkt. Nos. 2, 7). Plaintiffs misstate HUD regulations. Both 24 C.F.R. §§ 845(a) and 24.860, explicitly state that the debarring official "may" consider mitigating factors. Both sections also state that the debarring official may consider "aggravating" factors in determining whether to debar.

Moreover, Plaintiffs assert that the debarment decision "fails to address the relevant mitigating factors." Plaintiffs' Motion for Preliminary Injunction p. 24 (Dkt. Nos. 2, 7). While not required, the Debarring Official did take into account the "mitigating" factors in the record at the time of the decision. The "corrective action" taken by Plaintiffs was not part of the administrative record at the time of the Debarring Official's decision.[13] "Review under the APA is limited to the administrative record that was before the decision-making agency and may not include a new record constructed by the reviewing court. National Treasury Employees Union v. Hove, 840 F. Supp. 165, 168-169 (D.D.C. 1994), citing Camp v. Pitts, 411 U.S. 138, 142-43, 36 L. Ed. 2d 106, 93 S. Ct. 1241 (1972). Further, "if a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision." Walter O. Boswell Memorial Hosp. v. Heckler, 242 U.S. App. D.C. 110, 749 F.2d 788, 792 (D.C. Cir. 1984); see also Doraiswamy v. Secretary of Labor, 180 U.S. App. D.C. 360, 555 F.2d 832, 839-40 (D.C. Cir. 1976); Polcover v. Secretary of Treasury, 155 U.S. App. D.C. 338, 477 F.2d 1223, 1226 (D.C. Cir. 1973) (acknowledging that a district court's review is

---

[13] The Debarring Official issued his decision on March 31, 2008. The Supplemental Declaration of Mr. Feinerman, (Plaintiff' Exhibit 7) stating that the corrective actions are "either completed or ongoing" was taken on April 30, 2008 and therefore not a part of the administrative record at the time of the decision. Mr. Feinerman's original declaration, taken on November 17, 2007, (Plaintiffs' Exhibit 2)and hence part of the record at the time of the decision, only stated that HHA had "proposed" and "agreed to" corrective steps, not that any action had actually taken place. Mr. Feinerman's original declaration also noted that Governance and Audit Committees had been established. Again, however, no actual action by the Committees was detailed.

limited to the agency record submitted and that "no *de novo* evidentiary hearing is permitted"),

*cert. denied,* 414 U.S. 1001, 38 L. Ed. 2d 237, 94 S. Ct. 356 (1973).[14]

     d.     <u>Actions of HHA were Properly Imputed to Plaintiffs</u>

HHA's violations of 24 C.F.R. § 24.800(b) and (d) are imputed to Plaintiffs under 24

C.F.R. § 24.630(b) because they participated in, knew of, or had reason to know of the improper

conduct.  The administrative record plainly demonstrates that Plaintiffs played an active role in

HHA's unauthorized funding of GHCCU.  Plaintiffs were present at and participated in

numerous HHA Board meetings in which GHCCU was discussed, and voted to authorize HHA

to give GHCCU General Fund monies.  <u>See</u> Exhibits 3, p. 3, 8-9; 4, p. 4; and 25, p. 7-8.

Further, Mr. Feinerman took the lead in discussions regarding GHCCU's need for more

money and for HHA to have adequate representation on GHCCU's Board.  <u>See</u> Exhibits 3, p. 7-

12; 25, p. 6-10.  In addition, Mr. Feinerman was the co-signer of 57 HHA General Fund checks,

amounting to $116**,**750 that were made payable to Carl Payne in his capacity as a GHCCU

consultant.  <u>See</u> Exhibit 18.  He also co-signed two General Fund checks made payable directly

to GHCCU, one for $25,000 dated June 30, 2004 and another for $55,000 dated April 7, 2005

<u>See</u> Exhibits 29 and 30.  Ms. Buxton also co-signed two General Fund checks made payable to

GHCCU, one for $25,000 dated June 30, 2004 and another for $55,000 dated April 7, 2005.  <u>See</u>

Exhibits 26 and 27.  Ms. Buxton even became a member of GHCCU's Board of Commissioners

in December 2004, during which time she continued as a HHA Board member.  <u>See</u> Exhibit 28,

---

[14] A court may consider evidence outside of the administrative record, however such review is for "limited purposes," including material that is "explanatory in nature, such as requiring the involved administrative officials to demonstrate the basis for their action." <u>Asarco, Inc. v. EPA</u>, 616 F.2d 1153, 1159-1160 (9th Cir. 1980); <u>see also</u> <u>Camp</u>, 411 U.S. at 142-43 (remedy for unclear record is to obtain additional explanation from agency as to the reasons for its decision); <u>Citizens To Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 420, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971) (court may require the administrative officials who participated in the decision to provide testimony explaining their determination); <u>Environmental Defense Fund v. Costle</u>, 211 U.S. App. D.C. 313, 657 F.2d 275, 285 (D.C. Cir. 1981); <u>Doraiswamy</u>, 555 F.2d at 842-43.

p. 20; 29, p. 13.  Such evidence clearly shows Plaintiffs' participation in HHA's ongoing practice of giving GHCCU substantially large amounts of the HHA's General Fund monies without HUD's authorization.[15]

In addition to Plaintiffs' participation in the ongoing practice of giving HHA's public housing General Fund monies to GHCCU, the record plainly shows that Plaintiffs knew, or had reason to know, that such contributions from HHA's General Fund, without obtaining HUD's prior authorization, was prohibited by Section 9 of the ACC.

Under Pennsylvania state law, HHA's Board members are responsible for supervising and controlling the operation and management of the housing authority.  35 Pa. Cons. Stat. § 1547.  Such responsibility necessarily includes making sure that the requirements set forth in the ACC are followed.  Indeed, Section 5 of the ACC expressly requires housing authorities to comply with "all provisions" of the ACC, as well as all applicable statutes executive orders, and HUD regulations.

It stands to reason that during the eight and one-half year period in which GHCCU was regularly receiving contributions from HHA's General Fund, Plaintiffs had access to the ACC, and knew, or had reason to know, of the ACC and its requirements.  Further, Mr. Feinerman, the Board's Chairperson, executed the ACC on behalf of the HHA Board.  See Exhibit 1 p. 12.  The ACC is not an obscure government publication.  Rather, it is the contract between HUD and PHAs, by which PHAs receive their annual operating subsidy from HUD.  See also 24 C.F.R. § 968.105.  The language of Section 9(C) of the ACC clearly limits expenditures to costs for the

---

[15] When comparing this case with the leading case that addresses HUD's imputation regulation, Kisser v. Cisneros, et. al., 14 F. 3d 615 (DC Cir. 1994), the conduct of Plaintiffs easily satisfies the participation requirement set forth in 24 C.F.R. § 24.630(b).  In Kisser, it was held that the debarment of the respondent, Vice-President of DRG Funding Corporation ("DRG"), a HUD coinsured lender for multi-family properties, was proper, because he participated in, knew of, or had reason to know of the violation of HUD requirements i.e., improper pass-through procedures regarding foreclosure proceeds. Id., 622-24.  The respondent in Kisser was in charge of DRG's GNMA pool administration, was second in command of DRG under its president, and participated in meetings in which discussions were held regarding DRG's use of the improper pass through procedures. Id, at 622.  In this case, Plaintiffs played a significant role in the unauthorized funding of GHCCU, just as the respondent in Kisser did with regard to the improper pass through procedures.

development and operation of the PHA project, unless other expenditures are specifically approved.  Plaintiffs knew that GHCCU was not a PHA project.  It was clear that this was merely a community credit union, open to anyone in Harrisburg.

Plaintiffs cannot now claim that they did not know, or have reason to know, that this ongoing practice of giving its General Fund monies to GHCCU, without first obtaining HUD's authorization to specifically fund GHCCU in this manner, was in violation of the Section 9 of the ACC.

## C.   Plaintiff Cannot Establish Irreparable Harm

Plaintiffs have not shown that they will suffer irreparable harm absent injunctive relief. To warrant the extraordinary relief of reversing Plaintiffs' debarment during the pendency of this lawsuit, Plaintiffs must demonstrate that they are being irreparably harmed.  Beacon Theatres v. Westover, 359 U.S. 500, 506-07 (1959); see also Rondeau v. Mosinee Paper Corp., 422 U.S. 49 (1975).

Plaintiffs contend that "as a result of their debarments, they have suffered "extreme embarrassment, and significant injury to their personal and professional reputations."  Plaintiffs' Motion for Preliminary Injunction p. 27 (Dkt. Nos. 2, 7).  Under the law, damage to one's reputation is not adequate to establish irreparable harm.  See Sampson v. Murray, 415 U.S. 61, 91-92 (1973); see also Veitch v. Danzig, 135 F. Supp.2d 32, 36-37 (D.D.C. 2001) (in denying plaintiff's preliminary injunction application the court held that loss of salary, benefits, as well as damage to plaintiff's reputation are not sufficient to show irreparable harm).  Further, these claims of injury are based on speculation, and therefore should be disregarded.

Mr. Feinerman specifically asserts that as a result of his debarment, his business as an insurance agent and broker is "imperiled."  Plaintiffs' Motion for Preliminary Injunction p. 27

(Dkt. Nos. 2, 7).  This concern may be dispatched quickly because it is purely monetary.  As a matter of law, monetary loss is not irreparable harm unless it threatens the very existence of the plaintiff's business.  The law is well settled that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."  Sampson v. Murray, 415 U.S. 61, 90 (1974).  Further, Mr. Feinerman does not assert that he will be forced out of business as a result of his debarment, simply that his business is "imperiled."  Plaintiffs' Motion for Preliminary Injunction p. 2.   In fact, sixty percent of Mr. Feinerman's insurance business is derived from entities that do not receive federal funds.  See Plaintiffs' Motion for Preliminary Injunction p. 27 (Dkt. Nos. 2, 7).

Plaintiffs also claim that their "involvement in leadership roles in public service organizations is their constitutional right, the loss of which qualifies as irreparable harm" and that this "constitutional right" is purportedly protected under the First Amendment right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.  Plaintiffs' Motion for Preliminary Injunction p. 28-29 (Dkt. Nos. 2, 7).  Neither of the two cases cited by Plaintiffs, Bray v. City of NY, 346 F. Supp. 2d 480 (S.D.N.Y. 2004), or Clarke v. District Council of NYC, 1981 U.S. Dist. LEXIS 16294 (S.D.N.Y. 1981), support Plaintiffs' claim that holding "leadership roles in public service organizations" or more specifically, membership in a public housing authority's board of commissioners, are the type of activities or associations that are protected by the First Amendment.  Indeed, membership on a public housing authority's board is not an organization or association that is intended to be protected by the First Amendment right to associate.  The purpose of the right to "freedom of association," as expressed by the U. S. Supreme Court in Roberts v. United States Jaycees, 468 US 609, 104 S. Ct. 3244 (1984) is "the Court has recognized a right to associate for the purpose

of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion.".  Roberts 468 U.S., at 617-18 (emphasis added).

For example, the Court has determined that the Jaycees is an organization which is entitled to protection under the First Amendment right to associate because a substantial part of the Jaycees' activities constitute protected expression on political, economic, cultural, and social affairs; over the years, the national and local levels of the organization have taken public positions on a number of diverse issues, and members of the Jaycees regularly engage in a variety of lobbying, fundraising, and other activities worthy of constitutional protection under the First Amendment. Roberts v. United States Jaycees, 468 U.S. 609, at 626-27, 104 S. Ct. 3244, at 3254.  In addition, a bicycle riding organization (Critical Mass bike rides in Manhattan) was entitled to protection under the First Amendment right to freely associate because it is an organization intended to espouse a view on an issue of public import, namely to promote the environmental and aesthetic benefits of alternative modes of transportation. Bray v. City of NY, 346 F. Supp. 2d 480, 488 (S.D.N.Y. 2004).

The board of commissioners of HHA, on the other hand, was not organized or established for the purpose of engaging in those activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion.  Rather, as is set forth in the Pennsylvania Housing Authorities Law, board members are appointed by the mayor of the city, and their purpose or role is to employ a secretary, technical experts, and such other officers, agents, and employees for the authority; and to delegate certain responsibilities to its agents and employees, subject always to the supervision and control of the board members. See 35 Pa. Cons. Stat. §§ 1545 and 1547.   Nowhere in the Pennsylvania Housing Authorities Law,

35 Pa. Cons. Stat. §§ 1541 – 1568.1, does it state that the purpose of a public housing authority's board of commissioners is to participate in, or advance, those activities which are protected by the First Amendment.

Further, Plaintiffs cannot prove that their debarments by HUD has infringed upon or violated their constitutional right to freely associate.  In order for the Plaintiffs to establish a violation of the First Amendment right to associate, in a case in which the Plaintiff are not employed by Defendant and there is no contractual relationship between them, Plaintiffs must prove (1) that Plaintiffs were engaged in a constitutionally protected activity; (2) that Defendant's actions caused Plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action (in this case HUD's debarment action) was substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct. See Worrell v. Henry, 219 F. 3d 1197, 1212 -13 (10th Cir. 2000); Perez v. Ellington 421 F. 3d 1128, 1131-32 (10th Cir. 2005).

In this case, Plaintiffs do not have a basis to claim that HUD's debarment action violates or infringes upon their First Amendment right to associate with others for political, social, economic, educational, religious, and cultural ends.  As previously mentioned, the Plaintiffs' work, as members of HHA's Board of Commissioners, is not a constitutionally protected activity. In addition, these debarment actions against Plaintiffs were clearly not motivated as a response to Plaintiffs' constitutionally protected conduct.  Rather, the debarments were brought against Plaintiffs because they participated in the housing authority's unauthorized funding of a state chartered community credit union.

The case Clarke v. District Council of NYC, 1981 U.S. Dist. Lexis 16294 (S.D.N.Y. 1981) is also distinguishable.   In Clarke, the Plaintiff claimed that Defendants violated his rights

under the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 USCS § 441(a)(2), which guarantees the right of free assembly and free expression for union members and states in part: Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views upon any business properly before the meeting." <u>Clarke</u>, 1981 U.S. Dist. Lexis 16294 at 10.

Although the Plaintiffs in this case hold housing authority board meetings as part of their responsibility to supervise and control the operation of HHA, the Pennsylvania Public Housing Authority Law, 35 Pa. Cons. Stat. §§ 1541 – 1568.1, does not have a statute which guarantees members of a public housing authority board of commissioners the right to freely meet and assemble with other board members and express their views, arguments or opinions.

Plaintiffs further note the "harm" that will be done to HHA if they are forced to resign. However, as discussed more fully below, HUD has a responsibility to protect the public interest and only contract with responsible individuals and moreover take appropriate measures against participants whose actions adversely affect the integrity of its programs.

**D**.    **<u>The Government Will Be Harmed by the Preliminary Injunction Sought.</u>**

In contrast to the harm alleged but not substantiated by Plaintiffs, the government faces real and substantial harm if the Plaintiffs' debarment is enjoined by the Court.  Federal agencies are under a regulatory duty to do business with responsible persons. <u>See</u> 24 C.F.R. § 24.110(a). One of the federal government's most valuable tools in fulfilling this obligation is its power to debar or suspend nonresponsible government participants.  <u>See</u> <u>Gonzales v. Freemen</u>, 334 F.2d

576-77 (D.C. 1964) (federal government has a strong interest in refusing to deal with companies or individuals when it believes they lack responsibility).

The Department must be able to depend on its participants' honesty, integrity, and responsibility in their business dealings with the Department.

> "Responsibility" as used in the Department's regulations connotes probity, honesty, and uprightness. Arthur H. Padula, HUDBCA No. 78-284-D30 (June 27, 1979). Although the judicially imposed test for debarment is present responsibility, it is well established that a finding of present responsibility may be based on past irresponsible acts. Schlesinger v. Gates, 249 F.2d 111 (D.C. Cir. 1957), cert. denied, 355 U.S. 939 (1958).

In re: Chesley J. Doak, HUDBCA No. 89-4364-D12, at 4 (May 24, 1989); see also In the Matter of Yarborough, HUDBCA No. 92-C-7514-D33 (Oct. 28, 1992).

The governing inquiry in this debarment is whether Plaintiffs are "presently responsible" and trustworthy to continue to serve as federal participants. The determination to debar Plaintiffs turns on their integrity and trustworthiness. Defendants' regulations regarding debarments are carefully crafted to protect these values: they provide for sanctions only upon adequate evidence of improper conduct after notice and an opportunity to be heard. See 24 C.F.R. §§ 24.850 and 24.855. To compel the government to contract with Plaintiffs in the face of undisputed evidence that Plaintiffs' actions resulted in the unauthorized transfers of monies would clearly harm the government.

### E.     The Public Interest Favors Maintaining the Debarment

The final factor weighing against granting the extraordinary relief sought by Plaintiffs is the public interest. The public interest at stake in this matter is closely aligned with the government's interest in ensuring that the government only conducts business with responsible persons. See 24 C.F.R. § 24.110(a). The federal government (and through it the federal taxpayers) has no assurance that Plaintiffs will not commit future unauthorized acts like those

that led to the investigation of Plaintiffs' conduct.  The public will bear the burden of paying for

the consequences if Plaintiffs repeat these types of acts.

CONCULSION

For the foregoing reasons, Defendant respectfully submits that Plaintiffs' application for

a preliminary injunction should be denied.  A draft order is attached.

Date: May 21, 2008

Respectfully submitted,

_/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_/s/_____
MEGAN M. WEIS
Special Assistant U.S. Attorney
United States Attorney's Office
Civil Division
555 4th Street, NW
Washington, D.C. 20530
(202) 514-5134

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LEON J. FEINERMAN *et al*.       )
                        )
         Plaintiffs,      )
                        )
v.                        )     Civil Action No. 08-759 (RBW)
                        )     ECF
ROY A. BERNARDI, in his official capacity as  )
Acting Secretary and Head of the UNITED  )
STATES DEPARTMENT OF HOUSING AND  )
URBAN DEVELOPMENT      )
                        )
                        )
         Defendant.      )
_____)

## PROPOSED ORDER

UPON CONSIDERATION of Plaintiffs' Application for a Preliminary Injunction, Defendant's opposition thereto, and the entire record in this case, the Court finds that Plaintiffs have not demonstrated that they are likely to prevail on the merits, that they are suffering irreparable harm, or that the injunction is in the public interest. Accordingly, it is this _____ day of _____, 2008,

ORDERED that Plaintiffs' Application for Preliminary Injunction be and is hereby DENIED.

_____
Hon. Reginald B. Walton
United States District Judge