UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEON J. FEINERMAN *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No:  08-759 (RBW) |
| U.S. DEPARTMENT OF HOUSING | ) | |
| AND URBAN DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF APPLICATION FOR
PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED RULING**

Plaintiffs hereby reply to the opposition to their application for a preliminary injunction

and request for expedited ruling filed by Defendant Roy A. Bernardi, in his official capacity as

Acting Secretary of the United States Department of Housing and Urban Development ("HUD").

The key facts and contentions supporting the plaintiffs' application remain undisputed,

and HUD's arguments in defense of its debarments of them and against their request for

injunctive relief are meritless.  The plaintiffs have demonstrated that they are likely to prevail on

the merits of this action, that they will suffer irreparable injury absent injunctive relief, and that

the balance of interests weighs in favor of a preliminary injunction.

**A.**     **The plaintiffs have demonstrated that they are likely to prevail on the merits**

As set forth in the plaintiffs' application and below, HUD's Debarring Official clearly

erred by misconstruing the legal standards for debarment, and by finding cause for debarment

where it is wholly unsupported by the evidence in the administrative record.  Accordingly,

HUD's debarment of the plaintiffs was arbitrary, capricious, an abuse of discretion, otherwise not

in accordance with law, and should be set aside.

1.      The administrative record contains no evidence supporting the Debarring Official's
        determination that cause exists for debarment of the plaintiffs

        In its opposition, HUD does not and cannot argue that any of the plaintiffs knew of any

error or impropriety concerning the financial support of the credit union by the Harrisburg

Housing Authority (HHA).  To the contrary,  the undisputed evidence shows that throughout the

relevant time period, each of the plaintiffs believed the expenditures for the credit union were

proper, and it was only through an audit by HUD's Office of Inspector General (OIG) that they

discovered in 2007 that the expenditures had not been authorized by HUD.

        With the plaintiffs' good faith so established, the Debarring Official in his determination,

and now HUD in its opposition, attempt to find "willful" misconduct or similar such grounds for

debarment of the plaintiffs based on a purported "failure to make affirmative inquiry."

Debarment of the plaintiffs on this basis fails as a matter of law.  The administrative record is

devoid of facts which would compel any such "affirmative inquiry" by any one of the plaintiffs.

Moreover, no facts before the Debarring Official warrant debarment of the plaintiffs under any

proper application of the regulatory standards.

        HUD's opposition cites a Pennsylvania statute which obligates the plaintiffs to exercise

the care "a person of ordinary prudence would use in the same circumstances" in carrying out

their duties as commissioners of a public housing authority.  (HUD Opposition, at 17).  The

contours of the plaintiffs' responsibilities and obligations under this standard were described in a

declaration by James G. Stockard, Jr. which the plaintiffs submitted to HUD during the course of

the administrative proceedings:[1]

        [1] Mr. Stockard is a preeminent authority on the operation and management of public
housing.  Mr. Stockard has served as a commissioner of a public housing authority for over 35

> The principal responsibilities of PHA Commissioners are to
> develop policy for their authorities, to engage Executive Directors
> who have the knowledge and abilities to implement that policy,
> and to monitor that implementation through appropriate review and
> oversight. To exercise those responsibilities, Commissioners
> should have an understanding of, and commitment to, the mission
> of public housing, and a basic understanding of its proper operation
> and management. Even if they are public housing professionals,
> Commissioners should not become involved in the day to day
> operations and management of their authorities and, particularly if
> they are not public housing professionals, Commissioners may,
> must, and should rely on the technical expertise and advice of the
> executive staff they have chosen and other carefully selected
> professionals such as lawyers, accountants, auditors, and architects.
> Not to do so is to take the dangerous position of substituting one's
> own, typically amateur, judgment on technical matters for that of
> professionals in the field, and thereby placing the agency in
> jeopardy.

(Declaration of James G. Stockard, Jr., Exhibit 1, ¶5).

Notwithstanding their contentions that the plaintiffs engaged in misconduct warranting

debarment by failing to make "affirmative inquiry" about HHA's expenditures for the credit

union, neither the Debarring Official's determination or HUD's opposition make any reference to

Mr. Stockard's declaration, his testimony about the roles and responsibilities of public housing

commissioners, or his expert opinion that, "[b]ased on my professional training and experience,

none of the three HHA commissioners breached any obligation imposed by law, or the prevailing

standards of care, by the actions they took in connection with the community credit union." (*Id*.,

at ¶10.)

The circumstances surrounding the development and funding of the credit union have

already been detailed in the plaintiffs' application. Put simply, the record is devoid of facts

---

years, has trained more than 1000 other commissioners, and has regularly provided consulting
services to, among other entities, HUD.

supporting HUD's alleged failure of "reasonable inquiry" or diligence by the plaintiffs in

connection with HHA's expenditures for the credit union. As Mr. Feinerman explained in his

initial declaration, at no time did it occur to him "that the decision to expend funds for the

creation and support of a credit union that could eventually provide vital services to our residents

would ever be challenged as ineligible expenditures." His undisputed account makes this

abundantly clear:

> [A]s commissioners, while we have responsibility for setting
> policy and supervising the work of the HA, we understand that we
> can rely on our professional management staff and general counsel
> for assuring that we are in compliance with regulations and
> contract provisions. In the case of the credit union, our executive
> director believed it to be an eligible activity, as did our general
> counsel who continuously urged the board to go forward with the
> project. There was reason to believe that these two men could be
> relied on in matters such as this. Mr. Howard was highly respected
> in the public housing industry as a very competent executive
> director. He was selected as the Treasurer of the Council of Large
> Public Housing Authorities, one of the three national public
> housing interest groups. Our general counsel, Irwin Aronson, is an
> accomplished lawyer and over the years has continuously availed
> himself of public housing CLE courses offered by CLPHA
> affiliated lawyers and by the Housing Development Law Institute.
> If any aspect of HHA's support of the credit union was in violation
> of the ACC or HUD regulations, the commissioners certainly
> expected to be informed by our executive director and general
> counsel. This did not occur, and we proceeded with the credit
> union project.
>
> . . .Because the Executive Director told the Commissioners that the
> financial commitment to GHCCU was in the Five Year Plan,
> which was subsequently approved by HUD, it did not cross my
> mind that there was any impropriety in what had occurred, nor was
> any impropriety pointed out by the executive director or the general
> counsel.
>
> . . .During this time we were subject to ongoing management audits
> by HUD, and financial audits by qualified and experienced

4

> independent auditors as required by the Single Audit Act.  In one
> of the audits by our independent auditor, expenditures to the credit
> union were selected for additional review and, even in light of this
> additional analysis, the auditor did not raise any issues about the
> expenditure of those funds.

(Feinerman Declaration, Exhibit 2, ¶¶ 12, 16, & 21).

Given the undisputed evidence presented by Mr. Feinerman and the two other plaintiffs,
HUD did not, and cannot, demonstrate that any one of them were on notice of any misconduct or
impropriety associated with HHA's funding of the credit union.  In other words, HUD did not,
and cannot, prove that the plaintiffs engaged in "willful" misconduct, nor for that matter, that any
one of them knew, or had reason to know, that HUD had not authorized HHA's expenditures for
the credit union.

Although HUD devotes a substantial portion of its opposition to reviewing the terms of
its Annual Contributions Contract (ACC) with HHA and related regulations, (HUD Opposition,
at 12-16), the issue of whether the expenditures for the credit union were proper without HUD's
knowledge and approval was not raised in plaintiffs' application, and need not be decided here.
With regard to the central issue of whether the Debarring Official had grounds for debarring the
plaintiffs, however, it should be noted that the ACC is a generic and ambiguous document, and
contains no details about specific expenditures which are prohibited or must be approved by
HUD prior to funding.  Accordingly, the HHA commissioners would have no reason to know
whether the credit union could be deemed a "project" under the ACC, a term which is not even
defined in that document.  Likewise, as opined by Mr. Stockard in his declaration:

> In my professional opinion, Mr. Feinerman also cannot be faulted
> for his lack of knowledge that HHA's management failed to
> properly notify HUD of the policy decision which he and his

> fellow Commissioners had made.  The Annual Plan in which HUD now asserts that this information should have been supplied is a lengthy, technical document.  Even if Mr. Feinerman read every page of HHA's plan, which in my professional opinion he was not obligated to do, he cannot reasonably have been expected to know which details were required to be reported and which were not. The responsibility to know and fulfill HUD's specific contractual and regulatory requirements is a responsibility of the management of a PHA, not its Commissioners.

(Stockard Declaration, Exhibit 1, ¶12).

In sum, HUD is arguing at best that the plaintiffs were negligent in carrying out their duties as commissioners, a claim which is not only belied by the evidence, but more importantly, falls short of demonstrating a "willful failure to perform" as a matter of law.

As discussed in the plaintiffs' application, "willfulness" requires evidence of intent, or at the least reckless disregard.  The administrative record does not support a finding of "willful failure to perform" by any of the plaintiffs, a point made clear by review of the authority cited by HUD in its opposition, *In the Matter of Seb J. Passanesi*, HUDALJ 92-1835-DB (December 16, 1992).  Passanesi had entered into a contract with HUD which expressly required him to "certify" the legitimacy of his contractor's monthly estimates "based on his personal comparison of contract documents with on-site observations" of the contractor's work and materials.  *Passanesi*, slip opinion at 5.  Passanesi personally certified nine estimates without making any independent determination that those estimates were legitimate.  *Id*., at 6-7.  In fact, the estimates were not legitimate.  The Administrative Law Judge found willful misconduct, explaining

> "Willful" behavior must be distinguished from "mere mistake resulting from inexperience, excitement or confusion, and ...mere thoughtlessness or inadvertence, or simple inattention." [] Respondent did not commit mere mistakes or inadvertent errors.

*Id.*, at 8 (citations omitted).

In contrast, it is undisputed that the plaintiffs had no knowledge of any impropriety, and neither the Debarring Official nor HUD identifies any basis to conclude that their inadvertent involvement in unauthorized funding of the credit union constitutes willful misconduct.

HUD separately contends in its opposition that the Debarring Official properly imputed cause for debarment to the plaintiffs, (HUD Opposition, at 21-23), but like the Debarring Official in his determination, fails to apply the proper standard for imputation.  As discussed in plaintiffs' application, the D.C. Circuit clarified what evidence is sufficient to support imputing grounds for debarment, in *Novicki v. Cook*, 946 F.2d 938 (D.C. Cir. 1991).  Significantly, the circuit court's analysis was expressly adopted in the government-wide debarment regulations.  68 Fed. Reg. 66533, 66539 (November 26, 2003).  As the commentary to those regulations explains:

> We also note that this rule retains the *reason to know* standard as the appropriate standard for imputing misconduct to individuals under 630(b). The Circuit Court of Appeals for the DC Circuit, in *Novicki v. Cook*, 946 F.2d, 938 (D.C. Cir.1991), noted that the *reason to know* standard was not defined in the FAR. Using an analysis of that standard at common law, the Court reasoned that this standard is not one of strict liability or a *should have known* standard that can be met merely because of an individual's position as president of a corporation. We agree with that interpretation.

*Id.*

The commentary further explains that "if a person in a position of control, influence or authority over a business activity acquires information that suggests misconduct and fails to take action to prevent the misconduct from occurring, or to mitigate the injurious consequences of the misconduct once it has occurred, imputation under the *reason to know* standard of section 630(b) is appropriate." *Id.*  In addition, "if a person in authority over a business activity can be shown to

have deliberately avoided acquiring information about misconduct that would otherwise reasonably be expected to come to their attention in the ordinary course of performing their duties, they may be deemed to have *reason to know* of the misconduct under section 630(b)." *Id.*

The plaintiffs neither knew, nor had reason to know, of any improper conduct in connection with HHA's funding of the credit union. Moreover, contrary to the Debarring Official's determination and HUD's opposition, the *reason to know* standard imposes no duty of inquiry, and to impute wrongdoing to the plaintiffs on that basis is erroneous as a matter of law.[2]

Likewise, the fact that Mr. Feinerman and Ms. Buxton co-signed checks payable to the credit union does not constitute "participation" in misconduct sufficient to impute debarment. As *Novicki* and the commentary to the debarment regulations make clear, the imputation standard is not one of strict liability, and to impute debarment based on the plaintiffs' innocent, good faith "participation" in funding the credit union erroneously applies just such a standard where the record demonstrates lack of bad intent or improper state of mind.

HUD makes no reference to *Novicki* in its opposition, but relies on *Kisser v. Cisneros*, 14 F.3d 615 (D.C. Cir. 1994), a subsequent decision by the D.C. Circuit which illustrates this point. That decision reviewed the debarment of an individual arising from his company's defiance of HUD directives regarding the proper handling of foreclosure proceeds. Kisser was responsible for the administration of foreclosure proceeds, and in preparation for his duties had

_____

[2] HUD emphasizes in its opposition that Pennsylvania law requires directors of non-profit associations to exercise the "*reasonable inquiry*, skill and diligence, as a person of ordinary prudence would use under similar circumstances." (HUD Opposition, at 17) (emphasis added). The question of whether the plaintiffs exercised appropriate care under state law, which the evidence establishes that they did, does not alter the separate and higher standard for debarment which HUD must satisfy and the Debarring Official must apply.

personally "studied" the operating documents and guidelines. *Kisser*, 14 F.3d at 622. He "participated" in discussions regarding both the directives from HUD regarding how he should handle foreclosure proceeds, as well as the company's decision to defy those directives. *Id.*, at 622-23. Applying the "reason to know" standard it had articulated three years earlier in *Novicki*, the D.C. Circuit found "substantial evidence in the record to establish that Kisser not only had 'reason to know' of DRG's misconduct, but participated in it as well." *Id.*, at 623.

The undisputed evidence in this record that the plaintiffs neither knew of, had reason to know of, nor participated in any misconduct stands in stark contrast to the facts presented in *Passanesi* and *Kisser*, and the guidance provided in the commentary to the debarment regulations. By debarring the plaintiffs on the basis of such evidence, HUD has improperly set a standard of care for housing authority commissioners which charges them with personal knowledge of HUD's complex regulatory scheme and holds them strictly liable for any violation of those requirements by housing authority management, and without regard to the commissioners' intent or actual knowledge.

2.  The Debarring Official's decision to debar the plaintiffs is unsupported by and contrary to the administrative record

The Debarring Official's clear error in finding cause for debarment of the plaintiffs compels setting aside his determination. That determination is additionally and independently invalid because the Debarring Official improperly found that debarment of each plaintiff was warranted notwithstanding mitigating factors which demonstrate their present responsibility.

As detailed in the plaintiffs' application, and acknowledged by HUD in its opposition, the debarment regulations identify numerous mitigating factors which the Debarring Official "may"

9

consider in deciding whether or not to debar.  Those same regulations also provide the following:

- •        Debarment must be based on a finding of lack of present responsibility, 24 C.F.R. § 24.110(b);

- •        The Debarring Official need not debar "even if cause for debarment exists," 24 C.F.R. § 24.845(a); and

- •        "The debarring official bases the decision on all information in the official record," which includes any "information and argument presented in support of, or in opposition to, the proposed debarment."  24 C.F.R. § 24.845(b).

HUD's contention that the Debarring Official is "not required" to consider evidence of mitigating factors is in direct conflict with those regulations and the fundamental purpose of a debarment action where, as HUD itself asserts "the governing inquiry in this debarment is whether Plaintiffs are 'presently responsible.'" (HUD Opposition, at 28).  Indeed, the only reasonable construction of the use of the word "may" in the debarment regulations is not that the Debarring Official can ignore evidence of mitigating factors, but that he "shall" consider any and all such evidence which "may" be available. [3]  Moreover, HUD's conclusory assertion that the

_____

[3] As Judge Sullivan observed in *Roth v. D.C. Courts*, 160 F. Supp. 2d 104 (D.D.C. 2001):
> Courts have often grappled with whether "may" means may or shall.  Shall and may are frequently treated as synonyms and their meaning depends on context. . . May is most commonly used to indicate that an action is permissive, or in the discretion of the actor.  At times, may is used to indicate that *if* an actor chooses a particular course of action he must (or shall or is required to) do so in a particular manner. The Supreme Court noted that "the word 'may,' when used in a statute, usually implies some degree of discretion, but this common-sense principle of statutory construction can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute.

*Roth*, 160 F.Supp. 2d at 109 (citations omitted).  Applying those principles in *Curtis v. Mosbacher*, 1990 U.S. Dist. LEXIS 10796 (D.D.C. March 30, 1990), Judge Hogan construed an EEOC regulation providing that a complainant "may" seek administrative enforcement of an

Debarring Official properly considered the mitigating factors in this record is belied by his findings and conclusions.

Significantly, HUD does not contend there is any factual basis for the Debarring Official's crucial and false finding that "no affirmative action" has been taken by any of the plaintiffs or HHA to implement corrective steps to avoid future violations of HUD requirements. And, notwithstanding its dismissive approach to evidence of mitigating factors, HUD does not deny the prejudicial significance of the Debarring Official's error, in light of the fact that a "contractor can meet the test of present responsibility by demonstrating that it has taken steps to ensure that the wrongful acts will not recur." *Robinson v. Cheney*, 876 F.2d 152, 160 (D.C. Cir. 1989).

HUD instead argues that "the 'corrective action' taken by Plaintiffs was not part of the administrative record at the time of the Debarring Official's decision," and therefore cannot be considered by this Court. (HUD Opposition, at 20). HUD's argument is wrong in several respects.

First, the following facts regarding HHA's corrective actions are well documented in the administrative record:

- On September 27, 2007, the OIG issued its Audit Report concluding that the expenditures for the credit union were ineligible under the ACC;

- On October 8, 2007, representatives of HHA and HUD met to resolve findings from the audit, and HHA committed to promptly undertake several remedial measures, including 1) create an audit committee by November 8, 2007 to implement corrective actions and coordinate future

---

agency order to mean that she "must" do so before filing suit. As Judge Hogan explained, "[a]ny other reading of the regulation, it seems to the Court, would be contrary to the fundamental logic of the regulation." *Curtis*, 1990 U.S. Dist. Lexis 10796, *8.

audit efforts; 2) establish a governance committee by November 8, 2007
responsible for six different measures designed to ensure ongoing board
compliance with applicable contract and regulations; and 3) issue a request
for proposals for an organization specializing in public agency
management to assist the board in a comprehensive review of HHA's
organizational structure;

•     On November 9, 2007, HHA sent HUD a three page letter, detailing its
      proposed plan for repaying all of the credit union expenditures deemed
      ineligible; and

•     On November 19, 2007, HHA and HUD representatives discussed HHA's
      efforts to resolve the audit findings, and at that time HUD agreed to and
      accepted HHA's payment plan and the remedial measures proposed by
      HHA in October.

These prompt and diligent efforts by HHA in response to the audit are memorialized in

letters to HUD representative Dennis Bellingtier, and included in the administrative record as

Exhibits 9-11 to the plaintiffs' Brief in Opposition to Debarment.[4]

In addition, HUD's argument ignores the fact that the plaintiffs expressly invoked their

right to a fact-finding hearing before an administrative law judge "to prove their present

responsibility," in the event the debarment action was not dismissed. Without referencing or

ruling on that request, the Debarring Official issued his decision on March 31, 2008, debarring

the plaintiffs.[5]

_____

[4] That Brief and "all exhibits thereto" is cited by the Debarring Official on page 3 of his
Determination.

[5] HUD had also filed a motion requesting the referral of the debarment action to a
hearing officer for fact-finding about whether the three commissioners knew, or had reason to
know, that HHA's expenditures for the credit union were unauthorized. In its opposition, HUD
asserts, without evidentiary support, that the motion for referral was denied by the Debarring
Official's designee, Mr. Coward, during a conference call with counsel on January 18, 2008.
Three of the plaintiffs' undersigned counsel participated in that conference call. Based upon
their recollection and notes, Mr. Coward decided to proceed with the hearing which had been
previously scheduled for January 30, 2008, and to determine thereafter if there was a factual

In so doing, the Debarring Official both effectively denied the plaintiffs' request for an evidentiary hearing without explanation, and closed the administrative record without giving them an opportunity to demonstrate the extent of HHA's continuing remedial efforts, and thus their present responsibility.  In particular, *prior to the date of the Debarring Official's Determination*, HUD sent a letter to HHA acknowledging and approving its progress, HHA continued issuing monthly reports to HUD regarding its efforts, an outside consulting firm was retained and began the task of interviewing staff and training board members, and a final repayment agreement was executed by HHA and approved by HUD.  (Supplemental Declaration of Leon J. Feinerman, Exhibit 7, ¶¶ 7, 8).

Therefore, as Mr. Feinerman's supplemental declaration makes clear, at the same time that HUD's Debarring Official was crafting his determination, HUD was not only fully on notice of HHA's ongoing corrective actions, but was actively engaged with HHA in expressly approving the remedial measures it was implementing.  Having slammed the procedural door on plaintiffs, HUD now argues that the Court cannot consider the supplemental evidence which they would have proffered to prove their present responsibility and which they now offer to prove that the Debarring Official's contrary finding was unsupported by the evidence and false.  HUD's argument is disingenuous and baseless.

HUD cannot justify the erroneous findings by *its* own Debarring Official regarding *HUD's* own agreements with individuals *it* has debarred.  Indeed, where HUD has negotiated, approved and agreed to the corrective measures the plaintiffs have implemented, the agency should be estopped from arguing that they can properly be debarred on the specious and

_____

dispute which required further fact-finding.

erroneous grounds that they failed to take such corrective measures.  To allow otherwise would

be to countenance an abuse of HUD's debarment authority, and to permit the arbitrary and

capricious debarment of three presently responsible individuals without rational basis.

For all those reasons, the plaintiffs have "raised questions going to the merits so serious,

substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more

deliberative investigation."  *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,

559 F.2d 841, 844 (D.C. Cir. 1997), *quoting Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d

738, 740 (2d Cir. 1953).  By raising a "serious legal question" regarding HUD's debarment of

them, the plaintiffs have thus demonstrated a "substantial likelihood of success" on the merits.

*Id*.

**B.    The plaintiffs have demonstrated that they are likely to suffer irreparable harm in the absence of preliminary injunctive relief**

Plaintiffs have alleged injuries for which they have no remedy at law, and which support

preliminary injunctive relief.

HUD contends that the injuries claimed by the plaintiffs are inadequate to show

irreparable harm as a matter of law, relying substantially on *Sampson v. Murray*, 415 U.S. 61, 39

L. Ed. 2d 166, 94 S.Ct. 937 (1974).  *Sampson* is distinguishable in significant respects from the

present case, and a review of that decision underscores the irreparable nature of the harm

demonstrated by the plaintiffs.

In *Sampson*, a probationary federal employee filed an administrative appeal of her

dismissal by a government agency, and then filed an action in federal district court seeking

injunctive relief while her administrative appeal was pending.  Her complaint asserted that the

agency had failed to follow the appropriate Civil Service regulations, and alleged that her prospective discharge would deprive her of income and cause her to suffer the embarrassment of being wrongfully discharged. The district court granted the relief and the Supreme Court subsequently reversed. *Sampson*, 415 U.S. at 62-65.

The Supreme Court noted several factors that weighed against allowing injunctive relief at all, including the fact that the plaintiff was seeking relief prior to having exhausted her administrative remedies, the disruptive effect of the temporary relief on the pending administrative process, and the fact that the plaintiff was a probationary employee entitled to few procedural rights. *Id.*, at 77-84. The Court explained that the plaintiff at the very least must make a showing of irreparable injury "sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Id.*, at 84.

The Court then noted the complete absence in the record, with the exception of certain statements in the plaintiff's unverified complaint, of any evidence of irreparable harm. *Id.*, at 89-91. The Court emphasized that she also had recourse to the Back Pay Act to recover any loss of earnings. *Id.*, at 90-91.

It was in this context that the Court explained that "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Id.*, at 90, *citing Virginia Petroleum Jobbers Assn. v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm").

In contrast to *Sampson,* the action filed in this Court, and the injunctive and declaratory

relief sought herein, is the *sole* potential remedy available to the debarred plaintiffs.  They are without access to alternate administrative and statutory remedies or any of the "other corrective relief available at a later date" which rendered Ms. Sampson's injuries purely temporary, and ultimately recoverable and reparable.

To the contrary, as a result of their debarment, Mr. Feinerman and Reverend Harris face imminent removal from their positions as HHA commissioners, and once their replacements are instated they will be entitled to occupy those positions for at least five years.  Mr. Feinerman has already been forced to resign from his hospital chairmanship, and faces another involuntary resignation from the board of an insurance company.  HUD does not and cannot identify any recourse or compensation available to the plaintiffs for the impact of their debarment on such associational activities.

HUD belittles the damage to Mr. Feinerman's insurance business from his debarment, noting that sixty percent of it is derived from entities that do not receive federal funds and he therefore may not be forced out of business.  (HUD Opposition, at 24).  HUD contends Mr. Feinerman must show that the debarment "threatens the very existence of his business," but fails to note that this principle is invoked where the plaintiff is alleging otherwise *recoverable monetary loss.  See, e.g., Wisconsin Gas Co. v. Federal Energy Regulatory Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Mr. Feinerman has no potential recourse for business injuries which may result from his debarment; likewise, the intangible injuries alleged by the plaintiffs, such as the impact on Reverend Harris' pastorship, will never be remedied and are irreparable.

Significantly, the plaintiffs need not show substantial or severe injury from their debarment, if a "relatively slight showing of irreparable injury" is balanced by a strong showing

16

on the merits.

> If the arguments for one factor are particularly strong, an injunction
> may issue even if the arguments in other areas are rather weak. An
> injunction may be justified, for example, where there is a
> particularly strong likelihood of success on the merits even if there
> is a relatively slight showing of irreparable injury.

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Plaintiffs

have demonstrated both a strong likelihood of success on the merits and sufficient irreparable

harm to merit preliminary injunctive relief.

**C.     A preliminary injunction would present no threat of harm to the government nor to
the public interest**

For the first time in this debarment action, and without any basis other than the fact of the

debarment itself, HUD contends to this Court that the plaintiffs are not "trustworthy,"

underscoring the prejudicial impact of HUD's action against them. Moreover, HUD argues that

the debarments are the result of "carefully crafted" regulations which provided the plaintiffs "an

opportunity to be heard," neglecting to mention that they requested just such an opportunity but

were denied it without explanation or any apparent consideration. As a result, the plaintiffs were

barred from conclusively demonstrating the "present responsibility" which HUD now claims they

lack.

In addition, HUD raises the specter of the plaintiffs' commission of unspecified "future

unauthorized acts" and speculates about the consequences to the public "if Plaintiffs repeat these

types of acts." It bears repeating that HUD never alleged, and the evidence does not show, that

the plaintiffs engaged in any intentional wrongdoing, and it is also beyond dispute that they have

taken prompt and effective remedial steps to avoid a recurrence of the "acts" which resulted in

these proceedings.   In addition, Ms. Buxton has retired from HHA's board, and enjoining her

debarment clearly presents no threat to the public interest whatsoever.

     Under the circumstances, a preliminary injunction of the plaintiffs' debarments presents

no threat of harm to the government or the public interest.

CONCLUSION

     Mr. Feinerman, Reverend Harris and Ms. Buxton are honest and public-spirited citizens

who engage in commendable community service.   HUD's debarment of the plaintiffs for their

volunteer service to HHA and the community which it serves is without factual or legal support,

and has tarnished their reputations, interfered with their associational rights and responsibilities,

and imperiled their business and professional interests.   Because it is both legally baseless and

irreparably harmful, HUD's debarment of the plaintiffs should be set aside without further delay.

Respectfully submitted,

/s/ _____

Mona Lyons,  DC Bar No. 914234
Peter Butcher, DC Bar No. 441692
Law Office of Mona Lyons
1666 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20009
(202) 387-7000

/s/ _____

Lee P. Reno, DC Bar No. 152256
Sarah L. Molseed, DC Bar No. 975677
Reno & Cavanaugh
1250 Eye Street, NW
Suite 900
Washington, D.C.  20005
(202) 783-2800

Attorneys for Plaintiffs