# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| LEON J. FEINERMAN, et al., ) | |
| , ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 08-759 (RBW) |
| ) | |
| ROY A. BERNARDI, ) | |
| Acting Secretary of Department of ) | |
| Housing and Urban Development, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

## MEMORANDUM OPINION

Leon J. Feinerman, Earl L. Harris, and Constance Buxton, the plaintiffs in this civil

lawsuit, seek "review of, and declaratory and injunctive relief from, the decision of [the

Department of Housing and Urban Development ('HUD')] to debar the [p]laintiffs . . . pursuant

to the Administrative Procedures Act, [5 U.S.C. §§ 551-59, 701-06, 1305, 3105, 3344, 4301,

5335, 5372, 7521 (2000) (the "APA")]."  Complaint ¶ 1.  Soon after filing their complaint, the

plaintiffs filed a motion to preliminarily enjoin Roy A. Bernardi, the Acting Secretary of the

Department of Housing and Urban Development and the sole defendant in this case in his official

capacity, from effectuating HUD's debarment determination.  Plaintiffs' Amended Application

for Preliminary Injunction and Request for Expedited Ruling at 1.[1]  The Court granted that

---

[1] In addition to the plaintiffs' complaint and amended motion, the Court considered the following
documents in reaching its decision: (1) the Memorandum of Points and Authorities in Support of Plaintiff[s']
Amended Application for Preliminary Injunction and Request for Expedited Ruling (the "Pls.' Mem."), (2) the
Federal Defendant['s'] Opposition to Plaintiffs' Application for a Preliminary Injunction and Request for Expedited
Ruling (the "Def.'s Opp'n"), and (3) the Plaintiffs' Reply in Support of Application for Preliminary Injunction and

(continued...)

motion in part and denied the motion in part at the conclusion of the hearing on the plaintiffs'

motions held on May 27, 2008.  This memorandum opinion supplements and, where applicable,

amends the findings of fact and conclusions of law issued by the Court at that time.

## I. Background

Except where otherwise noted,[2] the following facts are either undisputed or matters of

public record.  Pursuant to the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1437bbb-9

(2000) (the "Housing Act"), HUD "may make annual contributions to public housing agencies to

assist in achieving and maintaining the lower income character of their projects," provided that

the "provisions for such annual contributions" are embodied "in a contract guaranteeing their

payment," id. § 1437c(a).  These "annual contribution contracts" "contain[] the terms and

conditions under which [HUD] assists the [public housing agency] in providing decent, safe, and

sanitary housing for low-income families."  24 C.F.R. § 968.105 (2007).  "The [annual

contribution contract] must be in a form prescribed by HUD, under which . . . the [public housing

agency] agrees to develop, modernize, and operate the project in compliance with all provisions

of the [annual contribution contract] and the [Housing] Act, and all HUD regulations and

implementing requirements and procedures."  Id.

The plaintiffs are present and former commissioners of the Harrisburg Housing Authority

---

[1](...continued)
Request for Expedited Ruling (the "Pls.' Reply").

[2]  Due to the procedural posture of this case, the defendant has not yet filed an answer formally admitting or denying the allegations raised in the plaintiffs' complaint.  The Court therefore cites to those passages of the parties' memoranda of law that do not appear to be disputed throughout its recitation of the background for this case.

(the "HHA") in Harrisburg, Pennsylvania. Pls.' Mem. at 2.[3] Feinerman has been a member of

the Board of Commissioners (the "Board") since 1983, and Harris and Buxton "were appointed

to the HHA [b]oard in December [of] 1999." Id. at 3. "HHA board members are appointed by

the Mayor of Harrisburg . . . for five[-]year terms unless they resign or are removed for cause,"

and meet once per month. Id. Commissioners are not compensated for their service on the

Board. Id.

The HHA and HUD entered into an annual contribution contract on May 22, 1997.

Def.'s Opp'n at 2. Section 9 of that agreement provides in pertinent part that "[t]he [HHA] shall

deposit and invest all funds and investment securities received by or held for the account of the

HHA in connection with the development, operation[,] and improvement of the projects under an

[annual contribution contract] with HUD in accordance with the terms of the General Depository

Agreement(s)." Id., Ex. 1 (Consolidated Annual Contributions Contract) (the "ACC") § 9(A).

That section further provides that "[t]he [HHA] shall maintain records that identify the source

and application of funds in such a manner as to allow HUD to determine that all funds are and

have been expended in accordance with each specific program regulation and requirement."

ACC § 9(C).

"In 1998, . . . [the] HHA became involved in the planning for a low-income community

credit union," which resulted in the creation of the Greater Harrisburg Community Credit Union

(the "GHCCU"). Pl.'s Mem. at 3. Dorsey Howard, the HHA's executive director, informed the

commissioners at a meeting in October of 1999 that "he had set aside $100,000 per year for five

---

[3]  Feinerman and Harris are currently inactive members of the Board. Pls.' Mem. at 3. Buxton resigned "for health reasons" in July of 2007. Id.

years to support the operation of [the] GHCCU" in a plan submitted for HUD's approval.  Id. at

4.  The members of the Board "understood that the expenditures for the credit union were

detailed in that plan when it was approved by HUD[;]" however, the employee tasked with

preparing the plan "neglected to include the expenditures for the credit union."  Id.  When the

employee discovered his oversight, he decided that "operating funds could be used [nonetheless]

to support the credit union" because "HUD regulations and annual plan guidance did not require

detailed descriptions of uses of operating subsidies."  Id.  The employee informed Howard of his

error, but neither he nor Howard informed the Board of this oversight.  Id.

     "In 2000, . . . [the] HHA began providing funding support for the credit union."  Id.

Thereafter, proposed expenditures for the credit union were presented to the Board only "when

[the] GHCCU requested payments in advance of scheduled payments dates."  Id.  This

arrangement lasted until September of 2004, when the HHA "learned that [the] GHCCU would

continue to require funding support to maintain net worth requirements."  Id.  With the support of

the HHA's executive director, general counsel, and "other members of senior management," id.

at 5, the Board "approved the executive director's recommendation that an additional $495,000

be committed to [the] GHCCU, to be paid in several installments over the next several years," id.

at 4.

     Despite this infusion of capital, the GHCCU ceased operations in February of 2006 due to

its "failure to meet net worth requirements."  Id. at 5.  Thereafter, HUD's Office of Inspector

General conducted an audit of the HHA's involvement in the creation and maintenance of the

GHCCU, which resulted in the plaintiffs "learn[ing] that HUD had not been notified of, and had

not approved, [the] HHA's financial support of the credit union."  Id.  In response, the Board

"committed to perform a management review and to adopt additional policies and internal

controls." Id.  "The Board also voted to create standing [g]overnance and [a]udit [c]ommittees

and caused [the] HHA to enter into a payment plan so that all of the operating funds used to

support the credit union are eventually replenished with non-federal funds." Id.

On July 30, 2007, HUD sent notices to each of the plaintiffs "proposing their debarments

from future participation in transactions with the executive branch of the federal government for

three years." Id. at 6.  The basis for this proposed debarment was the failure of the plaintiffs, as

members of the Board, to ensure that the HHA received approval from HUD before allocating

funds received annually from HUD to the GHCCU.  Id.  The plaintiffs' individual debarment

actions were subsequently consolidated.  Id.

In support of their opposition to their potential debarment, the plaintiffs argued to HUD

that "they had not participated in, had no knowledge of, and had no reason to know of, the lack of

HUD authorization for [the] HHA's expenditures for the credit union."  Id.  "[T]he plaintiffs

contended that the consolidated debarment actions should be dismissed," id. at 6-7, or that, at a

minimum, the actions should be tried before an Administrative Law Judge, id. at 7.[4]  For its part,

HUD conceded that "there was a genuine factual dispute about whether the plaintiffs knew, or

had reason to know, that [the] HHA's expenditures for the credit union were unauthorized," and

therefore "request[ed] that the consolidated debarment action be referred to a hearing officer for

fact-finding."  Id.

---

[4]  As set forth in the Debarring Official's written determination, the plaintiffs also argued in their opposition to the debarment proceeding "that it [was] not clear that either the Housing Act . . . or the ACC require[d] HUD approval for the use of public housing funds to support a credit union."  Pls.' Mem., Ex. 10 (Debarring Official's Determination) at 6.  The plaintiffs do not raise this argument in their motion for preliminary injunctive relief.

According to the defendant, the Debarring Official's designee held a conference call with the parties on January 18, 2008. Def.'s Opp'n at 5. He denied HUD's motion for referral to a hearing officer at that time. Id. "On January 30, 2008, a hearing was held before . . . [the] designee," during which "[n]o evidence was presented." Pls.' Mem. at 7.

Two months later, the Debarring Official "issued a determination debarring [Feinerman] and [Buxton] for three years and . . . [Harris] for eighteen months." Id. The Debarring Official concluded that the entire Board willfully ignored the provisions of the ACC by failing to inquire whether the HHA's expenditures on behalf of the GHCCU had been approved by HUD in derogation of former 24 C.F.R. § 24.800(b) (2007), and that this transgression should be imputed to each of the individual commissioners pursuant to former 24 C.F.R. § 24.630(b). Id. at 7-8.[5] He also dismissed the Board's attempt to correct its prior oversights, concluding that the Board had not implemented any of its proposed new programs. Id. at 8.

The plaintiffs responded to the Debarring Official's ruling by filing a complaint in this Court on May 1, 2008. In their complaint, the plaintiffs seek declaratory and injunctive relief

---

[5] Since HUD initiated its debarment proceedings against the plaintiffs, it has restructured its rules governing debarment. Part 24 now provides that "[t]he policies, procedures, and requirements for debarment, suspension, and limited denial of participation are set forth in 2 C.F.R. part 2424," 24 C.F.R. § 24.1 (effective Jan. 28, 2008), which, in turn, provides that the policies and procedures to be used in HUD debarment proceedings "are the policies and procedures specified in each applicable section of the [Office of Management and Budget] guidance in subparts A through I of 2 [C.F.R.] part 180, as that section is supplemented by the section in this part with the same section number," 2 C.F.R. § 2424.30 (effective Jan. 28, 2008). However, the Debarring Official cited to the regulations governing the plaintiffs' debarment proceedings as they existed at the time of the initiation of those proceedings–a practice which the parties have continued in their memoranda of law. See Pls.' Mem. at 6 n.5 ("Because this debarment proceeding arose prior to the publication of [the] HUD's final rule, the debarment determination refers to the regulations in their former location at 24 CFR part 24. For convenience and consistency, this memorandum does as well."); see also, e.g., Def.'s Opp'n at 4, 8-10, 16, 18-23 (citing to the prior version of part 24 of title 24 of the Code of Federal Regulations). This practice is in error, as regulatory change must "take[] away or impair[] vested rights acquired under existing law, or create[] a new obligation, impose a new duty, or attach[] a new disability in respect to transactions or considerations already past" for the general presumption against the retroactive application of a rule to apply. Nat'l Mining Ass'n v. Dep't of Labor, 292 F.3d 849, 859 (D.C. Cir. 2002) (internal quotation and citation omitted). The Court therefore cites to the regulations applicable to the plaintiffs as of this date throughout its memorandum opinion, with the prior regulation in parentheses where appropriate.

against HUD based on HUD's alleged violation of the APA, which provides in pertinent part that a "reviewing court shall[,] . . . [inter alia,] hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The plaintiffs also filed a motion for a preliminary injunction along with their complaint, which the Court denied without prejudice in an order entered on May 6, 2008.[6] The plaintiffs renewed their motion on May 7, 2008.

In their renewed motion for a preliminary injunction, the plaintiffs argued that they were entitled to a preliminary injunction "stay[ing] . . . the[ir] debarments pending a final resolution of the merits of this action." Pls.' Mem. at 1-2. In support of their motion, they argued that they were likely to succeed on the merits of their APA claim because the Debarring Official relied upon the wrong legal standard and erroneous factual findings as the basis for his conclusions that the HHA should be debarred and that the debarment should be imputed to the individual members of the Board. Id. at 10-26. The plaintiffs further argued that they would suffer irreparable injury absent injunctive relief because (1) the debarments would ruin their "personal and professional reputations," would interfere with the private careers of Feinerman and Harris, and would effectively foreclose public service as an option for any of the three defendants, id. at 27, (2) the debarments deprived the plaintiffs of their constitutional right to freedom of association, id. at 28-29, and (3) any pecuniary losses suffered by the plaintiffs would be irreparable because they cannot recover damages from the defendant, id. at 29-30. Finally, the plaintiffs asserted that "[a]n order staying or enjoining the plaintiffs' debarments [would] not

---

[6] The Court denied the plaintiffs' motion because it was not accompanied by a certificate of service as required by Federal Rule of Civil Procedure 5 and Local Civil Rule 5.3

harm any legitimate interest of the government," id. at 30, and that the public interest favored the entry of an order granting the plaintiffs preliminary injunctive relief because "the public interest is served by allowing the plaintiffs to continue their [public] service," and "allowing the debarments to stand could discourage service on boards of public housing authorities," id. at 31.

The defendant challenged the plaintiffs' assertions of error in the Debarring Official's determination that the HHA should be debarred and that this debarment should be imputed to the HHA's Board of Commissioners. Def.'s Opp'n at 16-23.[7] The defendant further argued that "[the p]laintiffs have not shown that they [would] suffer irreparable harm absent injunctive relief" because (1) "damage to one's reputation is not adequate to establish irreparable harm," id. at 23, (2) the damage to Feinerman's business "[was] purely monetary," which "is not irreparable harm unless it threaten[ed] the very existence of the plaintiff's business," and (3) "membership on a public housing authority's board [was] not an organization or association that [was] intended to be protected by the First Amendment right to associate," id. at 24. The defendant also asserted that HUD would face "real and substantial harm," id. at 27, if the Court were "[t]o compel [it] to contract with [the p]laintiffs in the face of undisputed evidence that [their] actions

_____

[7] The defendant also argues at length that the Debarring Official correctly determined (1) that HUD regulations concerning debarment apply to the HHA and the plaintiffs, Def.'s Opp'n at 10-12, and (2) that the HHA's failure to inform HUD of its allocation of funds procured pursuant to the ACC to the GHCCU violated § 9 of the ACC, id. at 12-16; however, the plaintiffs do not contest these determinations in either their complaint or their motion for preliminary injunctive relief, see Complaint ¶¶ 24-25 (alleging that the Debarring Official's "determination makes no reference to any disputes about material facts" and "disregards evidence of mitigating factors which demonstrate the [p]laintiffs' present responsibility"), id. ¶¶ 29-31 (claiming a violation of the APA based on the allegations set forth in paragraphs 24 and 25 of the complaint); Pls.' Mem. at 10-26 (arguing only that the Debarring Official erred in concluding that the HHA's failure to inform HUD of its allocation of funds to the GHCCU was a "willful" violation of the ACC governing the parties and that any debarment of the HHA should not be imputed to the individual members of the Board); see also Pls.' Reply at 5 ("the issue of whether the expenditures for the credit union were proper without HUD's knowledge and approval was not raised in [the] plaintiff's application"). Consequently, these arguments have no bearing on the likelihood of success on the merits of the plaintiffs' claims.

resulted in the unauthorized transfers of monies," and that "[t]he public interest at stake in this matter [was] closely aligned with [HUD's] interest in ensuring that [it] only conducts business with responsible persons," id. at 28.

The parties appeared before the Court on May 27, 2008, to present oral argument in support of their positions.  At the conclusion of that hearing, the Court granted in part and denied in part the plaintiffs' motion.  It reasoned that the plaintiffs were likely to succeed on the merits of their APA claims because the Debarring Official employed the wrong standard in imputing any misconduct by the HHA to the plaintiffs and erred in failing to explain why he did not consider the mitigating evidence presented by the plaintiffs, that Feinerman had established that he would suffer irreparable injury absent injunctive relief, that the defendant had not established any injury arising from the entry of an order granting such relief at this time, and that the public interest favored the plaintiffs.  However, the Court also concluded that Harris and Buxton had not established the existence of an irreparable injury without injunctive relief.  The Court therefore granted injunctive relief to Feinerman, but not with respect to Harris or Buxton.[8]

## II. Standard of Review

A preliminary injunction "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation and citation omitted).  In deciding whether to grant preliminary injunctive relief, the Court "must examine whether (1) there is a substantial likelihood plaintiff will succeed on the merits; (2)

---

[8]  The Court also established a briefing schedule for the submission of dispositive motions and memoranda of law responsive thereto at the conclusion of the hearing on the plaintiffs' motion.

plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (internal quotation and citation omitted). The Court "must balance these factors, and if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. (internal quotation and citation omitted). "Despite this flexibility, though, a movant must demonstrate at least some injury for a preliminary injunction to issue, . . . for 'the basis of injunctive relief in the federal courts has always been irreparable harm.'" Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974) (quotation omitted)) (further internal quotation omitted).

"A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." Id. (citation omitted). Nevertheless, even if a district court concludes that a party seeking preliminary injunctive relief cannot demonstrate irreparable injury, the District of Columbia Circuit has instructed that it should address all of the factors set forth above because "[i]t is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with [Federal Rule of Civil Procedure 52]." Id. at 304-05. This rule requires a court considering an application for preliminary injunctive relief to "set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed. R. Civ. P. 52(a).

### III. Legal Analysis

Pursuant to Rule 52(a), this Court must assess the merit of the plaintiff's request for

preliminary injunctive relief with respect to each of the factors delineated by the Circuit Court. The Court considers each of these factors in turn.

A.    <u>Likelihood of Success on the Merits</u>

"It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits," <u>Hubbard v. United States</u>, 496 F. Supp. 2d 194, 198 (D.D.C. 2007) (citation omitted), for "absent a substantial indication of likely success on the merits, there would be no justification for the [C]ourt's intrusion into the ordinary processes of administration and judicial review," <u>id.</u> (internal quotation and citation omitted).  In this case, the plaintiffs seek relief from the Debarring Official's determination made pursuant to the APA.  Under this statute, the Court must uphold the Debarring Official's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

"Highly deferential, the arbitrary and capricious standard presumes the validity of the agency action[,] and permits reversal only if the agency's decision is not supported by substantial evidence[] or the agency has made a clear error in judgment."  <u>Hagelin v. FEC</u>, 411 F.3d 237, 242 (D.C. Cir. 2005).  "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence."  <u>FPL Energy Me. Hydro, LLC v. FERC</u>, 287 F.3d 1151, 1160 (D.C. Cir. 2002); <u>see also</u> <u>Kay v. FCC</u>, 396 F.3d 1184, 1188 (D.C. Cir. 2005) (defining the term "substantial evidence" to mean "the amount of evidence constituting 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn . . . is one of fact for the jury'" (quoting <u>Ill. Cent. R.R. v. Norfolk & W. Ry.</u>, 385 U.S. 57, 66 (1966) (further internal quotation and citation omitted))).  The "agency's explanation need not be a model of analytic precision to survive a challenge" under the

APA; rather, "[a] reviewing court will uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned." Frizelle v. Slater, 111 F.3d 172, 176 (D.C. Cir. 1997)

(internal quotation and citation omitted).

The Debarring Official determined that the plaintiffs should be debarred for three reasons.

First, he concluded that the entire HHA Board of Commissioners should be debarred because its

"actions in failing to comply with the specific terms of the ACC on more than one occasion and

its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was

appropriate under the ACC" constituted both a "willful failure to perform" and "a history of

failure to perform" its obligations under the ACC "so serious as to affect the integrity of the

program." Pls.' Mem., Ex. 10 (Debarring Official's Determination) (the "Determination") at 11.

Second, he concluded that the Board's actions "warrant debarment because they are so serious

that they affect [the plaintiffs'] present responsibility." Id. Finally, he concluded that "[t]he

improper conduct of the [Board]" should be imputed to the individual plaintiffs because they

"participated in, had knowledge of, or had reason to know of the improper conduct." Id.

All three of these conclusions are "arbitrary and capricious" within the meaning of the

APA. Pursuant to 2 C.F.R. § 180.800 (formerly 24 C.F.R. § 24.800):

> A Federal agency may debar a person for[, inter alia,]-
>
> (b)    Violation of the terms of a public agreement or transaction so
>        serious as to affect the integrity of an agency program, such
>        as-
>
>        (1)    A willful failure to perform in accordance with the
>               terms of one or more public agreements or
>               transactions; [or]
>
>        (2)    A history of failure to perform or of unsatisfactory

> performance of one or more public agreements or
> transactions[.]
>
> . . .
>
> (d)    Any other cause of so serious or compelling a nature that it
>        affects your present responsibility.

2 C.F.R. §§ 180.800(b)(1)-180.800(b)(2).  Further, "[a] [f]ederal agency may impute the

fraudulent, criminal, or other improper conduct of any organization to an individual . . . if the

individual to whom the improper conduct is imputed either participated in, had knowledge of, or

reason to know of the improper conduct."  Id. § 180.630.

As an initial matter, and although not an issue raised by either the plaintiffs or the

defendant, it is difficult to discern the rationale for the Debarring Official's determination that the

HHA's Board of Commissioners violated 2 C.F.R. § 180.800.  As the Debarring Official

correctly notes at the outset of his decision, Determination at 1, the notices of proposed

debarment issued to the plaintiffs state that the debarment proceeding against them is "based

upon the acts and omissions of the [HHA] during the time that [the plaintiffs] were [] member[s]

of the HHA's Board of Commissioners."  Def.'s Opp'n, Ex. 7 (Letter from Henry S. Czauski,

Acting Director, Office of General Counsel, United States Department of Housing and Urban

Development to Leon J. Feinerman (July 30, 2007)) (the "Feinerman Notice") at 1; see also id.,

Ex. 8 (Letter from Henry S. Czauski, Acting Director, Office of General Counsel, United States

Department of Housing and Urban Development to Rev. Earl Harris (July 30, 2007)) (the "Harris

Notice") at 1 (same); id., Ex. 9 (Letter from Henry S. Czauski, Acting Director, Office of General

Counsel, United States Department of Housing and Urban Development to Constance Y. Buxton

(July 30, 2007)) (the "Buxton Notice") at 1 (same).  According to the notices, "[t]he HHA

13

violated [§] 9 of the [ACC] . . . by allowing large sums of [the] HHA's operating subsidy funds .

. . to be used to fund [the GHCCU]."  Feinerman Notice at 1; see also Harris Notice at 1 (same);

Buxton Notice at 1 (same).

    However, the Debarring Official states in those same notices that the plaintiffs

themselves somehow breached the terms of the ACC by "vot[ing] in 2003[] to transfer $30,000

of [the] HHA's operating subsidy funds to [the] GHCCU and . . . vot[ing] [in 2004] to transfer a

total of $505,000 of [the] HHA's operating subsidy funds to [the] GHCCU over a

four[-]year period," Feinerman Notice at 1; see also Harris Notice at 1 (same); Buxton Notice at

1 (same), and that those specific actions "are evidence of serious irresponsibility and are cause

for [the plaintiffs'] debarment under the provisions of [former] 24 [C.F.R.] §§ 24.800(b) and (d)

[(now 2 C.F.R. §§ 180.800(b), 180.800(d))]," Feinerman Notice at 2; see also Harris Notice at 2

(same); Buxton Notice at 2 (same).  Similarly, he concludes in his final decision that "[t]he

HHA['s] Board [of Commissioners] voted in 2003 to transfer $30,000 to the GHCCU and voted

in 2004 to transfer $495,000 to the GHCCU in violation of [§] 9(C) of the ACC," and that the

"Board['s] actions in failing to comply with the specific terms of the ACC on more than one

occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the

GHCCU was appropriate under the ACC," along with its failure "to obtain approval [from

HUD]" if it determined that the HHA's funding of the GHCCU violated the ACC, "constitutes a

willful failure to perform[] [and] a history of failure to perform and unsatisfactory performance in

accordance with the ACC so serious as to affect the integrity of the program."  Determination at

11.  In other words, the Debarring Official conflated the HHA's Board of Commissioners with

the HHA itself, and then concluded that the purported oversights of the Board constituted a

breach of the terms of the ACC.

This conclusion is in error. Although the plaintiffs are subject to HUD's regulations by virtue of their status as "[p]articipant[s] . . . in a 'covered transaction,'" 2 C.F.R. § 2424.20(a) (effective Jan. 28, 2008) (formerly 24 C.F.R. § 24.105(a) (2007)),[9] that does not mean, as the Debarring Official apparently assumed, that they owed any contractual duties to HUD under the ACC.[10] To the contrary, the ACC was a contract between HUD and the HHA, not HUD and the HHA's officers and directors, see ACC at 12 (bearing the signature of the Chairperson of the HHA on behalf of the HHA), and "[m]embers of [a housing authority] shall not be liable personally on the bonds or other obligations of the [housing authority]" under Pennsylvania law, 35 Pa. Const. Stat. § 1547 (2003) (emphasis added). Consequently, the only entity that could have "fail[ed] to perform in accordance with the terms of" the ACC was the HHA, not its Board.

This fundamental misjudgment by the Debarring Official renders his subsequent determinations nugatory. Regardless of whether the members of the Board breached any fiduciary duties owed to the HHA by virtue of their actions or inaction with respect to the

---

[9] A "participant" is "any person who submits a proposal for or who enters into a covered transaction, including an agent or representative of a participant," 2 C.F.R. § 180.980, where the term "person" refers to "any individual, corporation, partnership, association, unit of government, or legal entity, however organized," id. § 180.985. A "covered transaction" includes "any contract . . . that is awarded by a contractor, subcontractor, supplier, consultant, or its agent or representative in any transaction, if the contract is to be funded or provided by HUD under a covered nonprocurement transaction and the amount of the contract is expected to equal or exceed $25,000," id. § 2424.220 (effective Jan. 28, 2008), where the term "nonprocurement transaction" includes "[c]ontracts of assistance," id. § 180.970.

[10] The purpose of § 2424.20 is to establish whether the federal regulations concerning debarment proceedings generally apply to a particular individual, not whether HUD has the authority to initiate a debarment proceeding against a specific person. Indeed, the section provides that part 2 of the Code of Federal Regulations applies to, inter alia, a "[r]espondent in a HUD suspension or debarment action." 2 C.F.R. § 2424.20(b). It does not impose any duties on those persons subject to its reach other than those specified elsewhere in part 2 of the Code of Federal Regulations.

allocation of funds to the GHCCU,[11] it is simply incorrect as a matter of law for the Debarring

Official to have concluded that these errors constituted a "fail[ure] to comply with the specific

terms of the ACC," much less a "willful" or systemic one.  Determination at 11.[12]  Moreover,

because the Board's supposed  failures to abide by the terms of the ACC are the only "actions"

identified by the Debarring Official as "so serious that they affect [the plaintiffs'] present

responsibility" and therefore warrant debarment under 2 C.F.R. § 180.800(d) (formerly 24 C.F.R.

§ 24.800(d)), that determination must be reversed as well.  Id.  And because the Debarring

Official erred in concluding that the Board of Commissioners (as opposed to the HHA itself)

violated the terms of the ACC through their inaction, he necessarily erred in imputing the

---

[11]  In their memoranda of law in support of their motion and at the hearing on their motion, the plaintiffs indicated that they are subject to Pennsylvania law governing the conduct of officers and directors for non-profit domestic corporations.  See Pls.' Mem. at 12 (arguing that the plaintiffs were entitled to rely on their officers, staff, and professional employees under 15 Pa. Const. Stat. § 5712, which establishes the governing standard of care for the directors and officers of non-profit domestic corporations).  The defendant apparently agrees with this view of the law.  See, e.g., Def.'s Opp'n at 17 (citing § 5712 as binding authority).  However, it is not clear to the Court why the HHA, which is not a corporation at all, but rather is "[a] public body and a body corporate and politic" created by virtue of statute, 35 Pa. Const. Stat. § 1543, would be subject to these standards, see Solomon v. Philadelphia Housing Auth., 143 Fed. Appx. 447, 455 (3d Cir. 2005) (assuming that a Pennsylvania housing authority was a "governmental unit" for purposes of qualified immunity from suit for municipalities).  The Court anticipates that the parties will address this quandary in their memoranda of law to be filed in support of their forthcoming dispositive motions.  See supra n.8.

[12]  Even if the errors committed by the Board of Commissioners could be construed as a breach of the ACC, it is unlikely that they could be considered "willful."  "In common usage the word 'willful' is considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional.'"  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  Though it is "a word of many meanings whose construction is often dependent on the context in which it appears," Safeco Ins. Co. of Am. v. Burr, ___ U.S. ___, ___, 127 S. Ct. 2201, 2208 (2007), "it is generally understood to refer to conduct that is not merely negligent," McLaughlin, 486 U.S. at 133, and is therefore usually interpreted as "cover[ing] not only knowing violations of a standard, but reckless ones as well," Safeco Ins., ___ U.S. at ___, 127 S. Ct. at 2208; see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 614-17 (1993) (holding that an employer's violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (2000) (the "ADEA"), should be considered "willful" "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA").  As the plaintiffs correctly point out, "there is no evidence that the plaintiffs engaged in a willful violation of the terms of any public agreement or transaction, []or that they acted in reckless disregard of their obligations" because "[e]ach of [them] believed that a low-income credit union was a reasonable and proper undertaking that would benefit HHA residents," Pls.' Mem. at 13, and the plaintiffs "necessarily and properly relied on their executive directors and general counsel to inform them of the specific requirements of the ACC and [the] HHA's other legal obligations, which is [the] standard practice for housing authority board members," id. at 12.

16

debarment of the Board to the individual plaintiffs pursuant to 2 C.F.R. § 180.630 (formerly 24 C.F.R. § 24.630 (2007)).

Had the Debarring Official considered the conduct of the HHA overall rather than the specific actions taken by its Board of Commissioners, he could have easily concluded based on the record before him that the HHA's allocation of funds to the GHCCU on multiple occasions from 2000-2004 constituted "[a] history of failure to perform" its obligations under § 9 of the ACC. Indeed, he probably could have concluded that the HHA's failure to inform HUD of its allocation of resources to the GHCCU after one of its employees discovered the oversight was reckless and therefore "willful" for purposes of 2 C.F.R. § 180.800(b)(1) notwithstanding that employee's conclusion that the error did not violate the terms of the ACC. Pls.' Mem. at 4.[13] But the Debarring Official did not reach these conclusions, and the Court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 206 (D.C. Cir. 2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Moreover, even if the Debarring Official had concluded that the HHA (as opposed to the HHA's Board of Commissioners) had violated 2 C.F.R. § 180.800 (or its analog in the prior version of the Code of Federal Regulations, 24 C.F.R. § 24.800 (2007)), he could not have imputed that conduct to the individual plaintiffs because there is not substantial evidence in the

---

[13] Whereas the Board's reliance on the HHA's officers and professional employers could be excused as merely negligent or even innocent error, the HHA's failure to inform HUD of its allocation of resources to the GHCCU even after one of its employees discovered the oversight was at least arguably reckless and therefore "willful" for purposes of 2 C.F.R. § 180.800 notwithstanding that employee's conclusion that the error did not violate the terms of the ACC. Pls.' Mem. at 4.

record that the plaintiffs "participated in" or "had knowledge of . . . the improper conduct." 2

C.F.R. § 180.630(b). To the contrary, Feinerman stated in his declaration submitted in HUD's

debarment proceeding that "the [B]oard was not informed" of the HHA's failure to include its

funding of the GHCCU in its plan submitted to HUD, "nor was any impropriety pointed out by

the executive director or the general counsel." Pls.' Mem., Ex. 2 (Declaration of Leon J.

Feinerman dated Nov. 19, 2007) (the "Feinerman Decl.") ¶ 16.[14] Harris stated that he "had no

reason to doubt the original decision to fund the GHCCU over a five-year period was proper,"

Pls.' Mem., Ex. 3 (Declaration of Earl L. Harris dated Nov. 19, 2007) (the "Harris Decl.") ¶ 16,

and Buxton declared that "no one, including our auditor and fee accountant, ever said anything

that even suggested such financial support might be questionable," Pls.' Mem., Ex. 4

(Declaration of Constance Buxton dated Nov. 20, 2007) (the "Buxton Decl.") ¶ 8. Even Jerry

Schenck, the HHA employee who forgot to include the allocation of funds to the GHCCU in the

plan submitted to HUD, stated that he "did not inform the HHA Board of Commissioners that the

financial support for the credit union was not included in the plan submitted to HUD," and "[did]

not know if [Howard, the Chief Executive Officer of the HHA at the time] informed the Board of

[his] mistake." Pls.' Mem., Ex. 5 (Declaration of Jerry Schenck dated Nov. 19, 2007) ¶ 7.

Nor is there any evidence in the record indicating that the plaintiffs had "reason to know

of" the HHA's contractual breaches within the meaning of 2 C.F.R. § 180.630(b). As the District

of Columbia Circuit explained in Novicki v. Cook, 946 F.2d 938 (D.C. Cir. 1991), the phrase

---

[14]   As best the Court can discern, the declarations of Feinerman, Harris, HHA employee Jerry Schenck, and former HHA attorney Irwin Aronson dated November 19, 2007, and the declaration of Buxton dated November 20, 2007, were all part of the record submitted to the Debarring Official. See Def.'s Opp'n at 20 n.13 (distinguishing those declarations submitted in November of 2007, which "were part of the record at the time of the decision," from the supplemental declarations submitted by the plaintiffs for the first time in support of their motion for preliminary injunctive relief).

"'reason to know' imposes no duty of inquiry; it merely requires that a person draw reasonable inferences from information already known to him," id. at 941.  Here, the plaintiffs were never told that HUD was not informed of the HHA's allocation of funds to the GHCCU, Feinerman Decl. ¶¶ 12, 16; Buxton Decl. ¶ 8, and were encouraged at every turn to vote in favor of additional funding to the credit union by the HHA's officers and professionals, Feinerman Decl. ¶ 12; Harris Decl. ¶ 16; cf. Pls.' Mem., Ex. 6 (Declaration of Irwin Aronson dated Nov. 19, 2007) 6 (declaring that, as counsel for the HHA, Aronson "did not raise an objection regarding any legal implications of the HHA's financial support of the credit union").  They could not have reasonably inferred from the representations made by those employees of the HHA that the HHA was repeatedly breaching its agreement with HUD; therefore, they had no "reason to know" that such breaches were occurring.[15]

Finally, the Debarring Official acted in an arbitrary and capricious manner by failing to explain why he did not find the mitigating evidence presented by the plaintiffs persuasive.  See 2 C.F.R. § 180.845(b)(2) (specifying that a debarring official will consider "[a]ny . . . information and argument presented in . . . opposition to[] the proposed debarment").  As another member of this Court recently explained in a similar case involving a challenge under the APA to the conclusion reached in a debarment proceeding, a debarring official's "failure to address in any

---

[15]  Conceivably, the Debarring Official could have determined (1) that the plaintiffs breached their fiduciary duties of care owed to the HHA, and (2) that these repeated breaches of fiduciary duty were so "serious or compelling" that they "affect[ed] [the plaintiffs'] present responsibilit[ies]" and therefore warranted debarment under 2 C.F.R. § 180.800(d) (formerly 24 C.F.R. § 24.800(d)).  But the Debarring Official did not make this determination, and the Court is constrained to evaluate the reasonableness of his conclusions based on the explanation actually given by the Debarring Official, not any other reason that the Court could supply.  See Spring Nextel Corp. v. FCC, 508 F.3d 1129, 1132-33 (D.C. Cir. 2007) (noting that even when a court "agree[s] with an agency's ultimate judgment," it does not "sustain a 'right-result, wrong-reason' decision of an agency" (internal quotation and citation omitted)).

detail the mitigating factors" presented by those subject to debarment makes it impossible for the Court to conclude that the debarring official considered the evidence required by federal regulation.  Canales v. Paulson, Civil Action No. 06-1330 (GK), 2007 WL 2071709, *5-6 (D.D.C. July 16, 2007).  The Court would be inclined to rule in the plaintiffs' favor on this point alone, as it indicated at the conclusion of the hearing on the plaintiffs' motion.

The Debarring Official confused the fiduciary duties arguably owed by the plaintiffs to the HHA with the contractual obligations owed by the HHA to HUD, and then proceeded to debar the plaintiffs on the basis of their purported breaches of those duties.  Further, it appears that he did not apply the correct legal standard for imputation to the individual parties under 2 C.F.R. § 180.630(b).  Finally, the Debarring Official failed to provide any explanation, let alone a satisfactory one, as to why he did consider the mitigating evidence presented by the plaintiffs.  Each of these errors warrants reversal and remand to the Debarring Official.  Thus, the plaintiffs have satisfied their burden of showing that there is a likelihood they will succeed on the merits of their APA claim.

B.    Irreparable Injury

The second prong of the Court's required four-prong analysis asks whether the plaintiff can demonstrate that he will endure irreparable injury should his request for preliminary injunctive relief be denied.  To qualify, the plaintiff's injury "must be both certain and great; it must be actual and not theoretical."  Wisc. Gas Go. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  The alleged injury must be "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  Id. (internal quotation and citations omitted) (emphasis in original).  Finally, "the injury must be beyond remediation" to warrant

20

preliminary injunctive relief.  Chaplaincy of Full Gospel Churches, 454 F.3d at 297.

Based on the record before the Court, it appears that Feinerman can demonstrate at least

some degree of irreparable injury absent preliminary injunctive relief, but that Harris and Buxton

cannot.  In his supplemental declaration, Feinerman states that "[forty] percent of [his] business"

consists of selling insurance policies to "entities which receive federal funds" and "represent[ing]

those entities as their insurance broker."  Pls.' Mem., Ex. 7 (Supplemental Declaration of Leon J.

Feinerman dated Apr. 30, 2008) (the "Feinerman Suppl. Decl.") ¶ 11.  According to Feinerman,

"[u]nless [his] debarment is stayed or enjoined, [his] insurance business may be severely

damaged" because "[l]ong-standing clients . . . [may be] unwilling, or unable, to do business with

a debarred individual" and it will be difficult for him to attract new customers.  Id. ¶ 12.  While

these statements by Feinerman hardly present an overwhelming case for a finding of irreparable

injury, they do suggest that he is likely to suffer at least some degree of irreparable injury absent

preliminary injunctive relief, which may be sufficient to warrant injunctive relief depending on

the degree to which the other factors considered in assessing a plaintiff's motion for a

preliminary injunction favor the plaintiff.  See CityFed Fin. Corp. v. Office of Thrift Supervision,

58 F.3d 738, 747 (D.C. Cir. 1995) (holding that a party seeking a preliminary injunction must

"demonstrate at least 'some injury'" to succeed on his motion (quoting Sampson, 415 U.S. at

88)).

The defendant argues that "monetary loss is not irreparable harm unless it threatens the

very existence of the plaintiff's business."  Def.'s Opp'n at 24.  The Court agrees with this

proposition as a general matter.  See Sampson, 415 U.S. at 90 ("the temporary loss of income,

ultimately to be recovered, does not usually constitute irreparable injury").  But where, as here,

the plaintiff in question cannot recover damages from the defendant due to the defendant's

sovereign immunity, see Bowen v. Massachusetts, 487 U.S. 879, 893 (1988) (noting that the

APA does not waive sovereign immunity for actions for damages), any loss of income suffered

by a plaintiff is irreparable per se, see United States v. State of New York, 708 F.2d 92, 93-94

(2d Cir. 1983) (finding irreparable injury where plaintiff was unable to recover damages in

federal court due to the defendant's invocation of the protections of the Eleventh Amendment);.

     The record is not so kind to Harris and Buxton in this regard.  They argue at length that

they have been stigmatized by their debarment, Pls.' Mem. at 27-28, but even if they could

support their assertions with evidence, such a "showing [would] fall[] far short of the type of

irreparable injury which is a necessary predicate to the issuance of a temporary injunction."

Sampson, 415 U.S. at 91-92.  They also argue that an injunction is necessary to permit them to

remain active in public life and therefore implicates their First Amendment right to freedom of

association.  Pls.' Mem. at 28-29.  However, as the Court pointed out at the hearing on the

plaintiffs' motion, the plaintiffs' debarment does not prevent Harris and Buxton from affiliating

with the HHA; rather, it merely prohibits them from serving as members of the Board for the

HHA.  Moreover, the First Amendment rights asserted by Harris and Buxton would only be

violated if a state or federal agency were to bar the plaintiffs from joining such an organization

without having a "compelling state interest[], unrelated to the suppression of ideas, that cannot be

achieved through means significantly less restrictive of associational freedoms," Roberts v.

United States Jaycees, 468 U.S. 609, 623 (1984), which is clearly not the case so long as the

Debarring Official's determination that "HUD cannot effectively discharge its

responsibility . . . to the public," Determination ¶ 17, unless Harris and Buxton are debarred

remains in effect.

Finally, Harris, a Baptist minister, Harris Decl. ¶ 2, contends that unless his debarment is enjoined, he will be unable to minister effectively to his congregation, Pls.' Mem. at 27; Pls.' Reply at 16, and will not be able to return to the Board for at least five years due to the lack of vacancies on the board once his position is filled, Pls.' Mem. at 27-28; Pls.' Reply at 16. Harris provides no evidence whatsoever to support the former assertion, see Pls.' Mem., Ex. 8 (Supplemental Declaration of Earl L. Harris dated Apr. 30, 2008) (the "Harris Suppl. Decl.") ¶ 6 (stating only that "[a]s a pastor, the members of [Harris's] congregation look to [him] for guidance and advice and must trust and respect [him] in order for [Harris] to minister to them effectively"), and provides no indication that he must resign his post on the Board prior to the resolution of this case, particularly if the Court resolves the plaintiffs' forthcoming dispositive motions in an expedited fashion as the plaintiffs request, see Harris Suppl. Decl. ¶ 8 (indicating only that Harris will have to resign his seat on the Board at some point if his debarment is not vacated).

C.    Other Factors

The other factors considered in determining the merits of a motion for preliminary injunctive relief provide little guidance in this instance. The defendant suggests that "[t]o compel [HUD] to contract with [the p]laintiffs in the face of undisputed evidence that [their] actions resulted in the unauthorized transfers of monies would clearly harm the [defendant]," Def.'s Opp'n at 28, but that argument carries little weight in light of the foregoing analysis of the likelihood of success of the plaintiffs' arguments on their merits. And it is difficult to imagine how the entry of preliminary injunctive relief in Buxton's favor would injure the defendant given

her health concerns.  See Buxton Decl. ¶¶ 1-2 (explaining that Buxton, who was born in 1932, has resigned from the Board "for health reasons").

As for the "public interest" factor, it appears to favor at least some of the plaintiffs, if only to a slight degree.  On the one hand, the factor is "linked with the merits of the case," which clearly favors the plaintiffs.  Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir. 1998).  On the other hand, "[t]he usual rule of a preliminary injunction is to preserve the status quo pending the outcome of litigation," which the plaintiffs seek to upset.  Cobell v. Kempthorne, 455 F.3d 301, 314 (D.C. Cir. 2006) (internal quotation and citation omitted).  Ultimately, Feinerman's and Harris's long tenure on the Board suggests that, at least with respect to these two plaintiffs, the public is better served by having their debarments removed pending the final resolution of this case.  See Feinerman Decl. ¶ 1 (noting that Feinerman has served as Chairman of the Board since 1983); Harris Decl. ¶ 1 (noting that Harris has served on the Board since 1999).

## IV. Conclusion

"[T]he resolution of debarment cases 'is a serious matter' that has an immediate and profound effect on the particular individuals involved."  Canales, 2007 WL 2071709, *5 n.5 (quoting Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 6 (D.C. Cir. 1998)).  In this case, it appears that the Debarring Official acted in an arbitrary and capricious manner in resolving the plaintiffs' debarment proceeding.  Because the plaintiffs are likely to succeed on their claim under the APA disputing those actions, the public interest favors Feinerman, and the evidence adduced by the plaintiffs establishes that Feinerman will suffer some form of irreparable injury absent injunctive relief, the Court will grant the plaintiffs' motion with respect

24

to Feinerman.  See CityFed, 58 F.3d at 747 (holding that injunctive relief may be warranted "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury").

At the same time, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, at 129-130 (2d ed.1995)) (emphasis supplied and footnotes omitted by the Supreme Court in Mazurek).  Here, two of the three plaintiffs have failed to meet their burden of proof with respect to the issue of irreparable injury.  While the Court recognizes that such a showing need not be overwhelming where, as here, the other factors to be considered in deciding whether injunctive relief is appropriate favor the plaintiffs, it cannot grant them the relief that they seek at this time because none of the injuries asserted by these plaintiffs can be described as "irreparable" within the meaning of the traditional balancing test.  The Court will therefore deny without prejudice the plaintiffs' motion with respect to Harris and Buxton, with the understanding that the Court may reach a very different result with respect to these plaintiffs should they file renewed motions supported by some evidence of irreparable injury (e.g., evidence that Harris's removal from the Board is imminent).

**SO ORDERED** this 12th day of June, 2008.[16]


REGGIE B. WALTON
United States District Judge

---

[16] An order follows granting in part and denying in part the plaintiffs' motion and memorializing the briefing schedule for dispositive motions established by the Court at the conclusion of the hearing on the plaintiffs' motion.