UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

———————————————————
LEON J. FEINERMAN *et al.*,

     Plaintiffs,

v.

STEVEN C. PRESTON,
Secretary of Department of
Housing and Urban Development,

     Defendant.
———————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  08-759 (RBW)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Leon J. Feinerman, Earl Harris, and Constance Buxton, through counsel, hereby move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

As set forth in the accompanying memorandum of points and authorities, statement of material facts as to which there is no genuine issue, and supporting exhibits, the Debarring Official's Determination of March 31, 2008, and the Department of Housing and Urban Development's debarment of the plaintiffs based on that Determination was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2).

Accordingly, the plaintiffs are entitled to summary judgment in their favor on their Complaint in its entirety.

---

[1]  Steven C. Preston is substituted for Roy A. Bernardi in the caption pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

/s/ Mona Lyons
Mona Lyons,  DC Bar No. 914234
Peter Butcher, DC Bar No. 441692
Law Office of Mona Lyons
1666 Connecticut Avenue, NW, Suite 500
Washington, DC  20009
(202) 387-7000

/s/ Lee P. Reno
Lee P. Reno, DC Bar No. 152256
Sarah L. Molseed, DC Bar No. 975677
Reno & Cavanaugh
1250 Eye Street, NW, Suite 900
Washington, DC  20005
(202) 783-2800

Attorneys for Plaintiffs

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.     THE STANDARDS GOVERNING DEBARMENT  . . . . . . . . . . . . . . . . . . . . . . 9

      B.     THERE IS NO CAUSE FOR DEBARMENT OF THE PLAINTIFFS ON THE
            ASSERTED BASIS THAT THEY FAILED TO COMPLY WITH THE ACC
            BETWEEN HHA AND HUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.     THE DEBARRING OFFICIAL'S IMPUTATION OF MISCONDUCT TO THE
            PLAINTIFFS IS UNSUPPORTED BY AND CONTRARY TO UNDISPUTED
            EVIDENCE IN THE ADMINISTRATIVE RECORD AND ERRONEOUS AS A
            MATTER OF LAW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.     THE DEBARRING OFFICIAL DEBARRED THE PLAINTIFFS BY
            DISREGARDING MITIGATING FACTORS AND BASED ON A FINDING
            WHICH IS UNSUPPORTED BY AND CONTRARY TO UNDISPUTED
            EVIDENCE IN THE ADMINISTRATIVE RECORD . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# **TABLE OF AUTHORITIES**

CASES:

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) . . . . . 7

*Baystate Med. Ctr. v. Leavitt*, 2008 U.S. Dist. LEXIS 25861, *42 (D.D.C. March 31, 2008) . . . 8

\*\* *Canales v. Paulson*, 2007 U.S. Dist. Lexis 50924, *15 (D.D.C. 2007) . . . . . . . . . . . . . . . . 21, 23

\*\* *Dantran, Inc. v. United States DOL*, 171 F.3d 58 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 21

*In Re Randy L. Stephens*, 58 Agric. Dec. 266 (USDA 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In the Matter of Richard D. Salvatierra,* EPA Case No. 94-0009-01, 1997 EPADEBAR Lexis 2 (January 28, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In the Matter of Seb J. Passenesi*, HUDALJ, No. 92-1835-DB (1992) . . . . . . . . . . . . . . . . . . . 20

*In the Matters of Nell Witt, Charles Hager, Charles Forbush, Agnes Cowan*, HUDBCA Nos. 90-5321-D82, 90-5322-D83, 90-5323-D84, 90-5324-D85, 1991 HUD BCA Lexis 10 (April 22, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

\*\* *Novicki  v. Cook*, 946 F.2d 938 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

*Robinson v. Cheney*, 876 F.2d 152 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Silverman v. United States Dep't of Defense*, 817 F. Supp. 846 (D. Cal. 1993) . . . . . . . . . 21, 22

*Sloan v. HUD*, 231 F.3d 10 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Murdock*, 290 U.S. 389, 54 S. Ct. 223, 78 L. Ed. 381 (1933) . . . . . . . . . . . . . 19

OTHER AUTHORITIES:

2 C.F.R. § 180.120(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2 C.F.R. § 180.125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

_____

\*\*       Cases and authorities on which the Plaintiffs chiefly rely.

2 C.F.R. § 180.125(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21

2 C.F.R. § 180.125(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**   2 C.F.R. § 180.630 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

2 C.F.R. § 180.800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

**   2 C.F.R. § 180.805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**   2 C.F.R. § 180.845 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22

2 C.F.R. § 180.855 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2 C.F.R. § 180.855(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21

2 C.F.R. § 180.860 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

2 C.F.R. § 180.865(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2 C.F.R. § 180.980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2 C.F.R. § 180.985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2 C.F.R. § 2424.220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

24 C.F.R. § 968.105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

35 Pa. Const. Stat. § 1547 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**   5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

68 Fed. Reg. 66533 (November 26, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

_____
                                        )
LEON J. FEINERMAN *et al.*,             )
                                        )
        Plaintiffs,                     )
v.                                      )
                                        )    Civil Action No.  08-759 (RBW)
STEVEN C. PRESTON,                      )
Secretary of Department of             )
Housing and Urban Development,          )
                                        )
        Defendant.                      )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs Leon J. Feinerman, Earl Harris, and Constance Buxton, through counsel, hereby move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  As set forth herein, and in the accompanying statement of undisputed material facts and supporting exhibits, the Debarring Official's Determination of March 31, 2008 and HUD's debarment of the plaintiffs based on that Determination were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2).  Accordingly, the plaintiffs are entitled to summary judgment on their Complaint in its entirety.

### FACTS

The Harrisburg Housing Authority (HHA) administers public and assisted housing programs in Harrisburg, Pennsylvania.  As a condition of receiving operating subsidies from the U.S. Department of Housing and Urban Development (HUD), HHA enters into an Annual Contributions Contract (ACC) with HUD.  The ACC sets forth terms and conditions for HHA's operation.  24 C.F.R. § 968.105.

Plaintiff Leon J. Feinerman has been a member of the HHA Board of Commissioners (Board) and its Chairman since 1983.  (Exhibit 1, Feinerman Declaration, ¶ 1).  Plaintiffs Earl

Harris and Constance Buxton were appointed to the HHA Board in December 1999. (Exhibit 2, Harris Declaration, ¶ 1; Exhibit 3, Buxton Declaration, ¶ 1).

In 1998, and in order to provide financial services needed by its residents, HHA became involved in the planning for a low-income community credit union, which later became the Greater Harrisburg Community Credit Union (GHCCU). (Exhibit 1, Feinerman Declaration, ¶ 9). At the monthly meeting of its Board in October 1999, HHA's executive director, Dorsey Howard, informed the commissioners that he had set aside $100,000 per year for five years to support the operation of GHCCU in the Five Year Plan which HHA is required to submit to HUD. The HHA board members understood that the expenditures for the credit union were detailed in that plan when it was approved by HUD. (*Id*., ¶ 16).

The employee responsible for preparing the Five Year Plan, Jerry Shenck, neglected to include the expenditures for the credit union and, when he discovered that oversight, concluded that operating funds could be used to support the credit union since HUD regulations and annual plan guidance did not require detailed descriptions of uses of operating subsidies. Mr. Shenck reported his omission of the credit union expenditures in the Plan, and his conclusion that the mistake did not require action, to Mr. Howard. (Exhibit 5, Shenck Declaration, ¶¶ 2-5).

Neither Mr. Howard nor Mr. Shenck informed the Board that HHA's financial support for the credit union had not been included in the Five Year Plan. (*Id*., ¶ 7; Exhibit 1, Feinerman Declaration, ¶ 16).

Of the three plaintiffs, only Mr. Feinerman was a member of the HHA Board at the time of the October 1999 meeting. (Exhibit 2, Harris Declaration, ¶ 1; Exhibit 3, Buxton Declaration, ¶ 1). Mr. Feinerman did not believe there was anything improper about HHA's funding

commitment to the credit union, and he was not advised of any impropriety by HHA's executive director or its general counsel. (Exhibit 1, Feinerman Declaration, ¶¶ 16, 29).

In the course of their activities as commissioners, and prior to the audit of HHA in 2006 and 2007, Earl Harris and Constance Buxton also did not believe there was anything improper about the funding HHA had been providing to the credit union. (Exhibit 2, Harris Declaration, ¶ 16; Exhibit 3, Buxton Declaration, ¶ 6).

In September 2003, the HHA Board approved a request for an advance of $30,000 to GHCCU against the $100,000 already committed to it for 2004. (Exhibit 2, Harris Declaration, ¶ 14).

In September 2004, HHA learned that GHCCU would continue to require funding support to maintain net worth requirements. HHA's original commitment of $500,000 was exhausted and the HHA Board approved the executive director's recommendation that an additional $495,000 be committed to GHCCU, to be paid in installments over the next several years. (Exhibit 1, Feinerman Declaration, ¶ 22). Reverend Harris did not attend the HHA Board meeting at which that action was taken. (Exhibit 2, Harris Declaration, ¶ 15).

At each meeting of the Board during which GHCCU was discussed and expenditures for it were authorized, HHA's executive director, other members of senior management, and HHA's general counsel were in attendance and supportive of the action proposed and taken. None of those professionals ever advised HHA's Board not to provide financial support to GHCCU, and the commissioners were never informed that HUD had not been notified of, and had not authorized, that support. (Exhibit 1, Feinerman Declaration, ¶¶ 12, 25; Exhibit 2, Harris Declaration, ¶¶ 12-14; Exhibit 3, Buxton Declaration, ¶¶ 6, 8; Exhibit 6, Aronson Declaration, ¶¶ 5-6).

In February 2006, GHCCU was closed for the failure to meet net worth requirements. (Exhibit 1, Feinerman Declaration, ¶ 23) .

In 2006 and 2007, HUD's Office of Inspector General (OIG) conducted an investigation and audit of HHA's operations. (*Id.*, ¶ 26).   On September 27, 2007, the OIG issued its final audit report, finding that HHA improperly disbursed operating funds to open and support the credit union, in violation of its ACC.  OIG's audit report found that HHA's "noncompliance occurred because it believed that its use of operating funds . . . for the credit union was proper." (Exhibit 7, Supplemental Feinerman Declaration, ¶ 3).

In response to the audit, and to ensure that questionable and unauthorized expenditures were not made in the future, the HHA Board, including Mr. Feinerman and Reverend Harris, committed to perform a management review and to adopt additional policies and internal controls.  The Board also voted to create governance and audit committees and caused HHA to enter into a payment plan so that all of the operating funds used to support the credit union will eventually be replenished with non-federal funds.  (Exhibit 1, Feinerman Declaration, ¶ 27).

All of those corrective actions are either completed or ongoing.  (Exhibit 7, Feinerman Supplemental Declaration, ¶¶ 5-8).  HUD has been notified of, has approved, and has been kept apprised of, all of HHA's corrective actions.  (*Id.*, ¶ 5).

## PROCEDURAL BACKGROUND

By notices dated July 30, 2007, HUD separately notified each of the plaintiffs that it was proposing their debarments from future participation in transactions with the executive branch of the federal government for three years.  The notices charged the plaintiffs with "allowing large sums of HHA's operating subsidy funds, which it receives annually from HUD for the purpose of developing and operating the HHA, to be used to fund . . . the Greater Harrisburg Community

Credit Union (GHCCU) without obtaining HUD's authorization for such expenditures" in violation of the ACC between HUD and HHA. (Complaint, ¶ 16; Answer, ¶ 16).

The three debarment actions were subsequently consolidated. Thereafter, HUD filed its brief and evidence in support of the debarments and, through counsel, the plaintiffs then filed their opposition to the debarments. Among other facts and arguments, the plaintiffs presented undisputed evidence that they had not participated in, had no knowledge of, and had no reason to know of, the lack of HUD authorization for HHA's expenditures for the credit union. The plaintiffs also presented evidence about the many factors which mitigated against their debarment, including the steps which HHA and they had taken to avoid a recurrence of the conduct complained of. Based on all of that evidence, the plaintiffs contended that the consolidated debarment action should be dismissed. In the event that it proceeded, however, the plaintiffs also asserted a right to an adjudicative proceeding before an Administrative Law Judge to disprove the allegations that they had engaged in willful, reckless or other serious wrongdoing and to prove their present responsibility. (Complaint, ¶ 18; Answer, ¶ 18).

In response to the plaintiffs' submission, HUD filed a motion requesting that the consolidated debarment action be referred to a hearing officer for fact-finding. (Exhibit 12, Government's Motion to Refer to Hearing Officer, dated December 3, 2007). HUD's motion contended that there was a genuine factual dispute about whether the plaintiffs knew, or had reason to know, that HHA's expenditures for the credit union were unauthorized. In opposing that motion, the plaintiffs argued that HUD had failed to present any evidence showing that there was a genuine dispute about that critical fact. The plaintiffs also argued that HUD had failed to satisfy its burden of proof and contended again that they were entitled to the dismissal of their proposed debarments. (Complaint, ¶ 19; Answer, ¶ 19).

To the plaintiffs' knowledge, HUD's motion for referral to a hearing officer was never ruled upon.

On January 30, 2008, a hearing was held before the Debarring Official's designee, Mortimer F. Coward. Mr. Coward heard arguments from both HUD and the plaintiffs' counsel. No evidence was presented. (Complaint, ¶ 20; Answer, ¶ 20).

On March 31, 2008, the Debarring Official, Henry S. Czauski, who did not attend the January 30 hearing, issued a determination debarring Mr. Feinerman and Ms. Buxton for three years and debarring Reverend Harris for eighteen months. Mr. Czauski found that "[t]he HHA Board did not solicit, make inquiry, or receive any legal opinion or professional advice from legal counsel, professional staff or HUD as to whether the use of HUD funds for the establishment or support of the credit union was an eligible expense under section 9 of the ACC." (Exhibit 11, Debarring Official's Determination [hereinafter "Determination"], at 10). Based on that finding, Mr. Czauski concluded that "[t]he HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program." (*Id*., at 11).

Mr. Czauski's Determination makes no reference to any disputes about material facts, or lack thereof, and does not discuss HUD's motion for referral to a hearing officer for fact-finding about what the plaintiffs knew, or had reason to know. Nonetheless, Mr. Czauski concluded that "[t]he improper conduct of the HHA is imputable to Respondents . . . who participated in, had knowledge of, or had reason to know of the improper conduct." (*Id*.)

6

Mr. Czauski's Determination similarly makes no reference to the plaintiffs' contention that, if the debarment action was not dismissed, they were entitled to an adjudicative fact-finding proceeding.   Nonetheless, in reference to the factors mitigating against debarment, Mr. Czauski concluded that "[a]lthough Respondents allege that they have taking (*sic*) certain steps to put procedures and controls in place, including the creation of a governance committee and an audit committee to avoid a repetition of a similar problem and a proposal to repay all the funds contributed to GHCCU with non-federal funds, no affirmative action has been taken by any of the respondents or the HHA Board to implement the steps, controls or repayment suggested and to avoid a recurrence."  (*Id.*, at 12).  That conclusion is both false and unsupported by any facts in the administrative record.

Based upon those findings and conclusions, Mr. Czauski debarred Mr. Feinerman and Ms. Buxton from participation in covered transactions with the federal government for three years, and Reverend Harris for eighteen months.  Mr. Czauski provided no explanation about how he determined the length of the three debarments.

## ARGUMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be rendered

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The plaintiffs' challenge to HUD's debarment of them arises under the Administrative Procedures Act, which entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof."  5 U.S.C. § 702. Since this case involves a challenge to a final administrative action, the Court's task is to determine if the agency's decision is supported by the administrative record.

> Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. . . . Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.

*Baystate Med. Ctr. v. Leavitt*, 2008 U.S. Dist. LEXIS 25861, *42-43 (D.D.C. March 31, 2008) (citations omitted).

In this case the court must determine whether HUD's debarment determination is supported by proper fact-finding and legal reasoning.  Section 706(2)(A) of the APA directs the court to set aside agency action, findings and conclusions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  When conducting review under this standard, the inquiry is focused on whether the agency examined the relevant data and articulated a satisfactory explanation for its action "including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983) (citations omitted).  The court must not "countenance an agency's failure to 'consider relevant factors' or 'clear errors of judgment.'"  *Sloan v. HUD*, 231 F.3d 10, 15 (D.C. Cir. 2000), *quoting Motor Vehicle Mfrs.,* 463 U.S. at 43.

A.    THE STANDARDS GOVERNING DEBARMENT

Debarment is a discretionary action intended to ensure that the Federal Government conducts business "only with responsible persons."  2 C.F.R. § 180.125(a).[2]   Debarment therefore is appropriate only where it is determined that a person contracting with the government is not "presently responsible," and is not to be used "for purposes of punishment" of past misconduct.  2 C.F.R. §§ 180.125(b) & (c).

Debarment is a two-step process.  The burden is first on HUD to prove that one or more cause for debarment exists.  2 C.F.R. § 180.855.  The causes for debarment are enumerated in 2 C.F.R. § 180.800, and include a "violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program."  2 C.F.R. § 180.800(b).  Where the wrongdoer is an organization, the cause for debarment may be imputed from the organization to an individual who participated in, had knowledge of, or reason to know of, the organization's improper conduct.  2 C.F.R. § 180.630(b).

If HUD is able to carry its burden, the Debarring Official "need not debar you even if cause for debarment exists."  2 C.F.R. § 180.845(a).  Rather, the respondent then has an opportunity to prove that he is presently responsible, and that debarment is unwarranted notwithstanding the existence of cause for debarment.  2 C.F.R. § 180.855(b).

---

[2]  HUD's debarment regulations apply to all "persons" who have been or are a "participant or principal in a covered transaction."  2 C.F.R. § 180.120(a).  A "participant" is any person who enters into a covered transaction, "including an agent or representative of a participant," and "person" includes an "individual, corporation, partnership, association, unit of government, or legal entity."  2 C.F.R. §§ 180.980 & 180.985.  A "covered transaction" includes "any contract . . . that is awarded by a contractor, subcontractor, supplier, consultant, or its agent or representative in any transaction, if the contract is to be funded or provided by HUD" under certain circumstances.  2 C.F.R. § 2424.220.

B.    THERE IS NO CAUSE FOR DEBARMENT OF THE PLAINTIFFS ON THE
      ASSERTED BASIS THAT THEY FAILED TO COMPLY WITH THE ACC
      BETWEEN HHA AND HUD

In his Determination, the Debarring Official concluded that cause for debarment had been

demonstrated pursuant to the following regulatory standards:

> (b) violation of the terms of a public agreement or transaction so
> serious as to affect the integrity of an agency program, such as –
>
> > (1) A willful failure to perform in accordance with
> > the terms of one or more public agreements or
> > transactions; [or]
> >
> > (2) A history of failure to perform or of
> > unsatisfactory performance of one or more public
> > agreements or transactions.

2 C.F.R. § 180.800.

The plaintiffs' debarments are "based on the acts and omissions of the Harrisburg

(Pennsylvania) Housing Authority (HHA) during [the plaintiffs'] tenure on the HHA's Board of

Commissioners."   (Determination, at 1).  In particular, HUD alleged, and the Debarring Official

concluded, that HHA's disbursement of funds to support GHCCU violated the terms of the ACC

agreement between HHA and HUD.

In his Determination, however, the Debarring Official found a failure to comply with the

terms of the ACC by "actions" of "the HHA Board," rather than HHA itself.  As this Court

properly determined when it granted preliminary injunctive relief, in so doing "the Debarring

Official conflated the HHA's Board of Commissioners with HHA itself, and then concluded that

the purported oversights of the Board constituted a breach of the terms of the ACC."

*Memorandum Opinion*, June 12, 2008, at 14-15.

Whether or not HHA's funding of the GHCCU violated the ACC, it cannot constitute

cause for debarring the plaintiffs directly under 2 C.F.R. § 180.800(b), for a "willful" failure to

perform, nor a "history of failure to perform or of unsatisfactory performance," as both of those

provisions are predicated on demonstrating that the "person" being debarred violated "the terms

of a public agreement or transaction."

The "public agreement or transaction" at issue in this case is the ACC, and the only

parties to the ACC are HHA and HUD.  The plaintiffs were involved in HHA's alleged violation

of the ACC solely pursuant to their role as commissioners on the HHA Board.  In that capacity,

the plaintiffs "shall not be liable personally on the bonds or other obligations of" HHA, including

any alleged violation of the ACC by HHA.   35 Pa. Const. Stat. § 1547 (2007).  As this Court

concluded based on these considerations,

> Consequently, the only entity that could have "fail[ed] to perform
> in accordance with the terms of" the ACC was the HHA, not its
> Board.

*Id*., at 15.

Accordingly, votes by the plaintiffs in their capacity as members of HHA's Board cannot

constitute a "willful" violation of the terms of the ACC, nor a history of any such violations,

which could subject them individually to debarment.  Rather, in order to debar the plaintiffs for

any violation of the ACC by HHA, HUD must rely on the provision of the debarment regulations

which provides for imputation of misconduct "from an organization to an individual" under

certain circumstances.  2 C.F.R. § 180.630.

C.    THE DEBARRING OFFICIAL'S IMPUTATION OF MISCONDUCT TO THE
      PLAINTIFFS IS UNSUPPORTED BY AND CONTRARY TO UNDISPUTED
      EVIDENCE IN THE ADMINISTRATIVE RECORD AND ERRONEOUS AS A
      MATTER OF LAW

The Debarring Official also concluded that the "improper conduct of the HHA Board is

imputable to Respondents pursuant to 24 C.F.R. 24.630(b) who participated in, had knowledge

of, or had reason to know of the improper conduct."  (Determination, at 11).

11

Significantly, although HUD contends that the funding HHA provided to the GHCCU was in violation of its ACC, HHA's initial decision in 1999 to assist with funding the credit union, and its related decision to allocate $100,000 per year for the next five years to the GHCCU, are not at issue in this action, and have not been cited as grounds for debarring the plaintiffs. Rather, the specific violations the plaintiffs were charged with were two votes taken by HHA's Board several years after those initial decisions were made. (Determination, at 2). Consistent with those charges, the Debarring Official found and concluded that debarment was warranted because the "HHA Board voted in 2003 to transfer $30,000 to the GHCCU and voted in 2004 to transfer $495,000 to the GHCCU in violation of Section 9(C) of the ACC." (Determination, at 11).

The vote in 2003 was not a new commitment of funds to the credit union, but an advance against the final $100,000 installment which was allocated by HHA in 1999 for payment in 2004. As such, HHA's general counsel advised that it was "a question of timing, not a question of obligation," because HHA had already committed to funding the credit union and established a payment schedule related to that commitment. (Exhibit 2, Harris Declaration, ¶ 12).

In September 2004, the HHA Board voted to commit an additional $495,000 to GHCCU to be paid in installments over the next five years. That decision was viewed by both Mr. Feinerman and Ms. Buxton as an extension and implementation of HHA's initial policy decision in 1999 to support the credit union. (Exhibit 1, Feinerman Declaration, ¶ 22; Exhibit 3, Buxton Declaration, ¶ 6). Reverend Harris did not participate in the 2004 vote; the *only* "violation" he is charged with was the vote in 2003 to approve an advance of $30,000 against a payment commitment which was made before he joined the HHA Board, and which was not identified by HUD as grounds for debarment in this action. (Determination, at 2 n.3).

None of the three plaintiffs participated in, knew of, or had reason to know of any improper conduct in connection with HHA's funding of the GHCCU, or with the decisions of the Board in 2003 and 2004 for which they were debarred.

The three plaintiffs understood their role on the board as establishing policy and direction for HHA. The day-to-day operational details of HHA were handled and implemented by its management and professional staff, and the plaintiffs necessarily and properly relied on their executive directors and general counsel to inform them of the specific requirements of the ACC and HHA's other legal obligations, which is standard practice for housing authority board members. (Exhibit 14, Declaration of James G. Stockard, Jr., ¶ 5).

While the commissioners exercise a supervisory role over HHA, its enabling statute contemplates that commissioners will require the assistance of others to effectively govern the organization. "The Authority may employ a secretary, such technical experts, and other such officers, agents, and employees, permanent or temporary, as it may require." 35 Pa. Cons. Stat. § 1547. In addition, HHA "may employ its own counsel and legal staff." *Id*. HHA commissioners are also entitled to rely on the information and advice provided by the officers, counsel and other professionals so employed. *Id*.[3]

Mr. Feinerman, the only one of the three plaintiffs on HHA's Board when it first decided to commit funds for the creation and operation of the credit union, believed that commitment

---

[3]    As noted by the Court in its opinion of June 12, 2008, the plaintiffs previously argued that they were entitled to rely on HHA's professional staff and advisors under 15 Pa. Const. Stat. § 5712, a statute which establishes standards of care for directors and officers of non-profit corporations in Pennsylvania. Upon further review, the plaintiffs erred in advancing that argument here. Under Pennsylvania law concerning the immunity afforded to public officers, that statute could afford protection to the plaintiffs in any civil action brought against them about their service as HHA commissioners. The statute has no applicability, however, to HUD's debarment of the plaintiffs or this Court's review of that action.

13

would help provide desperately needed financial services to HHA residents.  Mr. Feinerman and

his fellow board members believed that support for a low-income credit union was a sound idea

and a proper expenditure of funds, and they were told by HHA's executive director that those

expenditures were detailed in the plan submitted to and subsequently approved by HUD.  HHA's

general counsel also endorsed the idea of providing operating funds to the credit union and raised

no legal concerns about doing so.

   In his Determination, the Debarring Official found the following facts, which are

undisputed:

> Respondent Feinerman and the other commissioners serving at that
> time believed that the availability of a credit union to HHA
> residents would be a benefit to the residents;
>
> Respondent Feinerman was informed by Dorsey Howard that the
> Binghamton Housing Authority was involved in the establishment
> of a credit union for its residents and staff and that HUD sponsored
> a training session for PHA's interested in creating credit unions;
> and
>
> At an HHA board meeting in October 1999, Dorsey Howard
> informed Board members Feinerman, Martini and Jones that he
> recently became chairman of the GHCCU and that "the housing
> authority, in its five year plan, has set aside up to $100,000 a year
> for operating subsidy."

(Determination, at 9-10).[4]

   In the background discussion contained in his Determination, the Debarring Official also

acknowledged the following undisputed facts:

> The details of this commitment, as the HHA Board understood it,
> were set forth in the Comprehensive Grant Program Annual
> Submission when it was approved by HUD.  However, as sworn to

---

  [4]  The Debarring Official observed that board meeting minutes "do not identify who in
HHA authorized or approved the set-aside or when it was approved."  (Determination, at 10
n.12).

> by the responsible employee . . . he inadvertently omitted in the
> Submission to HUD a description of the planned financial support
> for GHCCU.  In his declaration, the employee swears he informed
> the ED of his mistake . . . .  The employee admits in his declaration
> that he "did not inform the HHA Board that the financial support
> for the credit union was not included in the plan submitted to
> HUD."

(*Id.*, at 6).  The Debarring Official accordingly referenced the undisputed fact that "the Board was

never advised either that HUD had not been informed of the financial support for the credit

union, or that funding of the credit union was improper."  (*Id.*).  As Mr. Feinerman explained,

> Because the Executive Director told the Commissioners that the
> financial commitment to GHCCU was in the Five Year Plan,
> which was subsequently approved by HUD, it did not cross my
> mind that there was any impropriety in what had occurred, nor was
> any impropriety pointed out by the executive director or the general
> counsel.

(Exhibit 1, Feinerman Declaration, ¶ 16).  Thereafter, HHA's general counsel "advocated the

continued support of the credit union."  (*Id.*, ¶ 20).

Based upon that information and advice, Mr. Feinerman could reasonably conclude that

the executive director had taken all necessary steps to implement the support for the credit union

in a manner that was compliant with the ACC and other requirements.  It was not until years later

that Mr. Feinerman learned through HUD's OIG audit that information regarding the credit union

expenditures was omitted from the plan submitted to HUD in 1999, and that the staff member

responsible had told only Executive Director Dorsey, who had since died.

Reverend Harris and Ms. Buxton, both of whom were appointed to the HHA Board after

the commitment of funds was made to the credit union in 1999, also believed that the support of

the credit union served the interests of HHA residents.  Reverend Harris asserted in his

declaration that he "had no reason to doubt the original decision to fund the GHCCU over a five-

year period was proper," and Ms. Buxton asserted that "no one, including our auditor and fee

accountant, ever said anything that even suggested such financial support might be questionable."

(Exhibit 2, Harris Declaration, ¶ 16; Exhibit 3, Buxton Declaration, ¶ 8).[5]  Absent any indication

of impropriety, they had no obligation to scrutinize the earlier decision of their predecessors to

make that commitment.

      Each time questions regarding the credit union arose at HHA Board meetings, they were

presented or explained by the executive director in the presence of the general counsel, and at no

time did any question or suspicion of impropriety arise.  Furthermore, throughout the time these

expenditures were being made, HHA's operations were subject to independent audits, including

an annual financial audit which specifically examined the expenditures for GHCCU for

compliance with regulatory requirements.  None of those audits raised serious problems and none

raised cause for concern that the expenditures for the credit union were improper.

      The plaintiffs' innocent "participation" in subsequent funding of the GHCCU based on a

good faith, albeit mistaken, belief that approval for the project had been secured does not warrant

imputation of grounds for debarment, for the same reason that a person's position or status in a

corporation alone does not allow for imputation of improper conduct.  *See* 68 Fed. Reg. 66533,

66539 (November 26, 2003); *Novicki  v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991).  The

debarment regulations do not support a standard of strict liability.  *Id.*  Rather, there has to be

sufficient evidence of culpability to impute grounds for debarment from an organization to an

individual within the organization.

      The term "reason to know" is not defined by HUD's debarment  regulations, but the D.C.

Circuit had an occasion to construe the same term in the federal acquisition regulations: "'reason

---

[5]  The plaintiffs' declarations were in the administrative record before the Debarring
Official, as exhibits to the Brief of Respondents Leon J. Feinerman, Earl Harris, and Constance
Buxton in Opposition to Debarment, filed November 20, 2007.  (Determination, at 3).

to know' imposes no duty of inquiry; it merely requires that a person draw reasonable inferences from information already known to him." *Novicki*, 946 F.2d at 941 (finding that the drafters of the regulations intended "reason to know" to have its accepted common law definition). This standard for imputing debarment based on a "reason to know" of misconduct was expressly adopted in the commentary to the government-wide debarment regulations. 68 Fed. Reg. at 66539.

In the audit conducted by HUD, its own OIG acknowledged that HHA and its Board believed that the expenditures for the credit union were proper. Moreover, in its motion to refer this matter to a hearing officer, HUD argued not that the plaintiffs had engaged in "willful" misconduct, but rather that violations by HHA should be imputed to them on the grounds that they "participated in, had knowledge of, or reason to know of" the improper conduct. HUD's motion contended the plaintiffs had raised a dispute of material fact warranting a fact-finding hearing by presenting evidence that they "never knew that HUD had not authorized the disbursements for GHCCU, and that at no time did any question or suspicion of impropriety arise." (Exhibit 12, Government's Motion to Refer to Hearing Officer, dated December 3, 2007, at 2). HUD did not, however, present any evidence that supported imputing grounds for debarment to the plaintiffs.

The Debarring Official ignored his agency's contention that there was a genuine factual dispute about the plaintiffs' culpability for any misconduct, however, and similarly disregarded their assertion that they were entitled to an adjudicative hearing. Rather, with no reference to HUD's motion for referral to a hearing officer, with no discussion about either a need for fact-finding or a lack thereof, and by applying an erroneous legal standard, the Debarring Official

17

implicitly determined there was no dispute of material fact, and simply concluded that the

plaintiffs were culpable:

> The HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program.

> \* \* \*

> The improper conduct of the HHA Board is imputable to the Respondents pursuant to 24 CFR 24.630(b) who participated in, had knowledge of, or had reason to know of the improper conduct.

(Determination, at 11).

  The Debarring Official's conclusion that a "failure to solicit or make affirmative inquiry"

by the plaintiffs amounts to "reason to know" squarely adopts the argument for debarment put

forward by HUD, that regardless of what the plaintiffs knew or believed, their failure to inquire

into the approval of the funding for the credit union demonstrates they "knew or had reason to

know" that HHA lacked the requisite approval.  (Exhibit 13, Government's Reply in Support of

its Motion to Refer to a Hearing Officer, dated January 11, 2008, at 3-8).  More importantly, the

Debarring Official's conclusion thereby imposes a standard for imputing grounds for debarment

which is erroneous as a matter of law.

  As the D.C. Circuit observed in a similar dispute,

> the Special Assistant phrased the relevant issue as whether Novicki properly "carr[ied] out his duty of inquiry."  This suggests that Novicki was debarred because he "should have known" of Dale's misconduct – that is, because his position as president and chief executive officer gave him an obligation to seek out wrongdoing.

*Novicki*, 946 F.2d at 942.  The Court agreed with Novicki that imposing such a duty to inquire in a debarment action "misconstrued the 'reason to know' standard and instead improperly imputed Dale's misconduct to him under either a strict liability or a 'should have known' standard." *Id.*, at 941.

As the commentary to the government-wide federal debarment regulations make clear,

> Under this rule, if a person in a position of control, influence or authority over a business activity acquires information that suggests misconduct and fails to take action to prevent the misconduct from occurring, or to mitigate the injurious consequences of the misconduct once it has occurred, imputation under the *reason to know* standard of section 630(b) is appropriate. If a person in authority over a business activity can be shown to have deliberately avoided acquiring information about misconduct that would otherwise reasonably be expected to come to their attention in the ordinary course of performing their duties, they may be deemed to have *reason to know* of the misconduct under section 630(b).

68 Fed. Reg. at 66539 (italics in original).

The undisputed evidence before the Debarring Official shows that the plaintiffs neither acquired information that suggested misconduct, nor deliberately avoided acquiring information about misconduct that would otherwise reasonably be expected to come to their attention.[6]  The

---

[6]  For these same reasons, the undisputed evidence fails to demonstrate "willful" misconduct by the plaintiffs, or "a history of failure to perform or of unsatisfactory performance." HUD must satisfy a high standard of proof to prevail in a debarment action on a charge that alleged misconduct is "willful," by proving both that conduct warranting debarment occurred, and that the plaintiffs either knew their actions constituted a violation of a legal or contractual obligation, or that they acted with reckless disregard of their obligations.  Willfulness "denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental . . .The word is also employed to characterize a thing done without ground for believing it is lawful or conduct marked by a careless disregard for whether or not one has the right so to act." *United States v. Murdock*, 290 U.S. 389, 394-395, 54 S. Ct. 223, 78 L. Ed. 381(1933); *see In Re Randy L. Stephens*, 58 Agric. Dec. 266, 271 (USDA 1999) (debarment under USDA regulations).
For example, a wrongful act is not willful if it is based on a good faith misunderstanding of law or regulation.  *In the Matters of Nell Witt, Charles Hager, Charles Forbush, Agnes Cowan*, HUDBCA Nos. 90-5321-D82, 90-5322-D83, 90-5323-D84, 90-5324-D85, 1991 HUD

19

Debarring Official therefore clearly erred by concluding that each plaintiff had "reason to know" of improper conduct by the HHA based on findings which showed they had not acquired any information putting them on notice of any such misconduct.  Particularly in light of the evidence that they had no cause for concern about whether HHA had honored its contractual obligations, the Debarring Official's determination that grounds for debarment are imputable to each of the plaintiffs lacks "a rational connection between the facts found and the choice made," is arbitrary and capricious, and erroneous as a matter of law.

Because the debarment of the three plaintiffs rests on a clear error of law, and application of the correct legal standard permits only one proper outcome, the Court should set aside the debarments without remand for further proceedings.

> Courts should not indulge in wasteful wheel-spinning. Thus, in the rare case in which the facts admit of only one plausible legal conclusion, an inquiring court serves the ends of justice by a frank acknowledgment that remand promises to be an exercise in futility. *See Gatson v. Bowen*, 838 F.2d 442, 450 (10th Cir. 1988) (declining to remand after concluding that agency had misapplied the law where, regardless of any further findings, the record would support only one legal conclusion); *Brock v. L.R. Willson & Sons, Inc.*, 249 U.S. App. D.C. 171, 773 F.2d 1377, 1389 n.12 (D.C. Cir. 1985) (concluding that the court of appeals could rule on a question involving application of law to fact, without remanding to the agency, as long as only one conclusion would be supportable); *Donovan ex. rel. Anderson v. Stafford Constr. Co.*, 235 U.S. App. D.C. 352, 732 F.2d 954, 961 (D.C. Cir. 1984) (same); *see also Donovan v. Capital City Excavating Co.*, 712 F.2d 1008, 1010 (6th Cir. 1983); *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 910-11 (2d Cir. 1977).

---

BCA Lexis 10 (April 22, 1991).  In addition, willful conduct is distinguishable from a mistake. *In the Matter of Richard D. Salvatierra,* EPA Case No. 94-0009-01, 1997 EPADEBAR Lexis 2 (January 28, 1997) (debarment under EPA regulations); *In the Matter of Seb J. Passenesi*, HUDALJ, No. 92-1835-DB (1992).

*Dantran, Inc. v. United States DOL*, 171 F.3d 58, 75 (1st Cir. 1999).  As the First Circuit

concluded:

> Because this is such a case – after all, debarment proceedings
> under the Act are all-or-nothing propositions, *see Federal Food
> Serv., Inc. v. Donovan*, 212 U.S. App. D.C. 82, 658 F.2d 830, 834
> (D.C. Cir. 1981); no intermediate penalties are available, so if
> debarment is not in order, no practical necessity exists for
> resurrecting the administrative proceeding – remand is not
> obligatory.

*Id*.  Similarly, debarment is not in order in this matter, no practical necessity exists for

resurrecting the administrative proceeding, and HUD's debarment of each plaintiff should be set

aside without further administrative proceedings.

D.     THE DEBARRING OFFICIAL DEBARRED THE PLAINTIFFS BY DISREGARDING
       MITIGATING FACTORS AND BASED ON A FINDING WHICH IS UNSUPPORTED
       BY AND CONTRARY TO UNDISPUTED EVIDENCE IN THE ADMINISTRATIVE
       RECORD

If no cause for debarment exists in the first instance, as the Debarring Official should

have determined, then the debarment action proceeds no further.  On the other hand, the

existence of cause for debarment does not by itself require debarment.  *Canales v. Paulson*, 2007

U.S. Dist. Lexis 50924, *15-16 (D.D.C. 2007).  Rather, debarment is appropriate only where it is

determined that the individual is not "presently responsible."  2 C.F.R. § 180.125(b).  "The

ultimate inquiry in a debarment must be directed to the 'present responsibility' of the contractor."

*Silverman v. United States Dep't of Defense*, 817 F. Supp. 846, 848-849 (D. Cal. 1993).  Indeed,

the catch-all ground for debarment is "any other cause of so serious or compelling nature that it

affects your present responsibility."  2 C.F.R. § 180.805(d).  Where HUD carries its burden of

proving that cause for debarment exists, the burden is then on the respondent to demonstrate that

he or she is presently responsible and that debarment is not warranted or necessary.  2 C.F.R.

§ 180.855(b).

The Debarring Official must base the decision to debar "on all information contained in the official record," including mitigating factors.  2 C.F.R. §§ 180.845(b) & 180.860.  Accordingly, the Debarring Official must "carefully consider any favorable evidence of responsibility to ensure that all findings of responsibility are based on the presence of a realistic and articulable threat of harm to the government's proprietary interest."  *Silverman*, 817 F. Supp. at 849.  "Affording the contractor this opportunity to overcome a blemished past assures that the agency will impose debarment only in order to protect the Government's proprietary interest and not for the purpose of punishment."  *Robinson v. Cheney*, 876 F.2d 152, 160 (D.C. Cir. 1989).

The evidence of present responsibility offered by the plaintiffs included the following mitigating factors:[7]

- The three HHA commissioners are dedicated public servants who have no history or pattern of violating the ACC or the law;

- The three plaintiffs did not initiate or develop the HHA plan to support the credit union, nor did they handle the paperwork which mistakenly omitted discussion of the proposed project.  Indeed, two of them were not even commissioners when that plan was first developed and approved;

- The amount of money expended for support of the credit union was paid over an eight-year period and amounted to less than one percent of HHA's budget;

- The unauthorized funding involved no charge of self-dealing; rather, the funds at issue were devoted to a project that the plaintiffs reasonably believed to be in the best interest of HHA residents, and many HHA residents benefitted from the credit union;

- During the relevant time frame, HHA scored well under the Public Housing Assessment System (PHAS), which evaluates, among other things, the physical condition of HHA property and resident

_____

[7] These facts are detailed in the Declarations attached to the Respondents' Brief, filed November 20, 2007, and are included in the administrative record.  (*See* Determination, at 3.)

satisfaction.  HHA has also consistently scored well on HUD evaluations of its management and operations and has undergone and passed numerous financial audits;

•    Each of the three commissioners was fully cooperative during the investigations of their activities, and volunteered to be interviewed by HUD's OIG; and

•    Mr. Feinerman and Reverend Harris have fully cooperated with HUD in attempting to resolve the audit findings, and have taken affirmative steps to ensure such a problem does not recur.

*See* 2 C.F.R. § 180.860 (listing mitigating factors relevant to debarment).

The Debarring Official purported to consider mitigating factors in reaching his conclusion that the plaintiffs are presently irresponsible and their debarment is warranted.  Based upon his findings and conclusions, however, he apparently gave no weight to any of the relevant mitigating factors, stating only that "the cooperation of Respondents in resolving the audit findings is acknowledged."  (Determination, at 12).

In another debarment decision which failed administrative review before this court, the plaintiff had presented a variety of mitigating factors, and "the DO acknowledged that such factors existed, but imposed the maximum term of debarment without explaining why he found them unpersuasive."

> Sharpe's failure to address in any detail the mitigating factors Canales raised, or to explain why he gave them so little weight, makes it impossible to evaluate whether there was a "rational connection" between the facts of her case and his decision to impose debarment.

*Canales*, 2007 U.S. Dist. Lexis 50924, at *17.

The debarment determination in this case likewise fails to address the relevant mitigating factors presented by the plaintiffs.  Even more disturbingly, the Debarring Official erroneously discounted a significant factor demonstrating present responsibility:

23

> Although Respondents allege that they have taking [*sic*] certain steps to put procedures and controls in place, including the creation of a governance committee and an audit committee to avoid a repetition of a similar problem and a proposal to pay all the funds contributed to GHCCU with non-federal funds, no affirmative action have [*sic*] been taken by any of the respondents or the HHA Board to implement the steps, controls or repayment suggested and to avoid a reoccurrence.

(Determination, at 12).

The Debarring Official's assertion that HHA and its commissioners have failed to take corrective action is unsupported by the administrative record, and legally invalid in two respects.

First, the following facts regarding HHA's corrective actions are well documented in the record:

- On September 27, 2007, the OIG issued its Audit Report concluding that the expenditures for the credit union were ineligible under the ACC;

- On October 9, 2007, representatives of HHA and HUD met to resolve findings from the audit, and HHA committed to promptly undertake several remedial measures, including 1) create an audit committee by November 8, 2007 to implement corrective actions and coordinate future audit efforts; 2) establish a governance committee by November 8, 2007 responsible for six different measures designed to ensure ongoing board compliance with applicable contract and regulations; and 3) issue a request for proposals for an organization specializing in public agency management to assist the board in a comprehensive review of HHA's organizational structure;

- On November 9, 2007, HHA sent HUD a three-page letter, detailing its proposed plan for repaying all of the credit union expenditures deemed ineligible; and

- On November 19, 2007, HHA and HUD representatives discussed HHA's efforts to resolve the audit findings, and at that time HUD agreed to and accepted HHA's payment plan and the remedial measures proposed by HHA in October.[8]

---

[8] These facts are memorialized in letters to HUD representative Dennis Bellingtier, and included in the administrative record as Exhibits 9 through 11 to Respondent's Brief in Opposition to Debarment. (Determination, at 3). The three letters are attached hereto as Exhibits 8 through 10.

Moreover, the Debarring Official's affirmative finding of no corrective action by the plaintiffs was both wholly outside the administrative record and false. That finding is contradicted by undisputed evidence which conclusively establishes the crucial fact of corrective measures, but which the plaintiffs were denied an opportunity to present. As set forth in the supplemental declaration of Mr. Feinerman, and while this action was pending before the Debarring Official, HHA's Board had created governance and audit committees, and retained a consulting firm which was reviewing its policies and procedures, had already conducted training of its Board, and will be proposing further action by HHA as appropriate. Furthermore, HHA and HUD had entered into, and executed, a repayment agreement. As of the date of the Debarring Official's decision and contrary to it, HUD was aware of, had approved, and knew the status of all of those corrective measures. (Exhibit 7, Supplemental Feinerman Declaration).

The Debarring Official's mishandling of the remedial measures taken by the plaintiffs bears directly on the ultimate issue in this debarment action, namely their present responsibility. "[T]he contractor can meet the test of present responsibility by demonstrating that it has taken steps to ensure that the wrongful acts will not recur." *Robinson*, 876 F.2d at 160. Significantly, the false assertion that such steps have not been taken here is the only "mitigating" factor to which the Debarring Official gave any express consideration in his conclusions, and its prominence in his determination renders the debarments invalid on their face. That error is compounded by the absence of any explanation for the Debarring Official's decision to impose the maximum standard period for debarment – three years – on Mr. Feinerman and Ms. Buxton. *See* 2 C.F.R. § 180.865(a) ("Generally, debarment should not exceed three years").

The Debarring Official did not carefully or accurately consider the mitigating factors in the record, and instead found a lack of present responsibility based on a clearly erroneous factual

determination without any support in the record.  His Determination therefore lacks a rational

basis in the record, and constitutes an improper punitive measure against three individuals who

have demonstrated their present responsibility.  Accordingly, that Determination is an abuse of

discretion, arbitrary and capricious, and must be set aside.

## CONCLUSION

For the reasons set forth herein, the Debarring Official's determination that cause for

debarment of the plaintiffs exists, and that debarment is warranted notwithstanding the mitigating

factors they presented, is unsupported by and contrary to the administrative record.  The

Determination and the plaintiffs' debarment based thereon is arbitrary, capricious, an abuse of

discretion, and otherwise not in accordance with law, and pursuant to 5 U.S.C. § 706(2) this

Court should "hold unlawful and set aside" the findings and conclusions set forth in the

Determination, and all actions taken by HUD to implement that Determination.

Respectfully Submitted,

/s/ Mona Lyons
Mona Lyons,  DC Bar No. 914234
Peter Butcher, DC Bar No. 441692
Law Office of Mona Lyons
1666 Connecticut Avenue, NW, Suite 500
Washington, DC  20009
(202) 387-7000

/s/ Lee P. Reno
Lee P. Reno, DC Bar No. 152256
Sarah L. Molseed, DC Bar No. 975677
Reno & Cavanaugh
1250 Eye Street, NW, Suite 900
Washington, DC  20005
(202) 783-2800

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

_____
                                              )
LEON J. FEINERMAN *et al.*,                   )
                                              )
            Plaintiffs,                       )
v.                                            )
                                              )          Civil Action No.  08-759 (RBW)
STEVEN C. PRESTON,                            )
Secretary of Department of                    )
Housing and Urban Development,                )
                                              )
            Defendant.                        )
_____)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Plaintiffs Leon J. Feinerman, Earl Harris, and Constance Buxton, through counsel, submit the following statement of material facts as to which there is no genuine issue, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h), in support of their motion for summary judgment.

### Statement of Undisputed Material Facts

1.      Plaintiff Leon J. Feinerman has been a member of the Harrisburg Housing Authority (HHA) Board of Commissioners (Board) and its Chairman since 1983.  (Exhibit 1, Feinerman Declaration, ¶ 1; Answer ¶ 3).

2.      Plaintiffs Earl Harris and Constance Buxton were appointed to HHA's Board in December 1999.  (Exhibit 2, Harris Declaration, ¶ 1; Exhibit 3, Buxton Declaration, ¶ 1; Answer ¶¶ 4, 5).

3.      HHA is a public housing authority which is subsidized by the United States Department of Housing and Urban Development (HUD).   HUD and HHA are parties to an Annual Contributions Contract (ACC) which sets forth terms and conditions for HHA's operation.  (Exhibit 4, Annual Contributions Contract ).

4.      The three plaintiffs understood their role on the Board as establishing policy and direction for HHA, and they relied on their executive directors and general counsel to inform them of the specific requirements of regulations and contract provisions.  (Exhibit 1, Feinerman Declaration, ¶ 5, 12; Exhibit 2, Harris Declaration, ¶ 16; Exhibit 3, Buxton Declaration, ¶ 7).

5.      The day-to-day operational details of HHA were handled and implemented by its management and professional staff.  (Exhibit 1, Feinerman Declaration, ¶ 5; Exhibit 2, Harris Declaration, ¶ 16; Exhibit 3, Buxton Declaration, ¶ 7).

6.      In 1998, and in order to provide financial services needed by its residents, HHA became involved in the planning for a low-income community credit union, which later became the Greater Harrisburg Community Credit Union (GHCCU).  (Exhibit 1, Feinerman Declaration, ¶ 9).

7.      At the monthly meeting of the Board in October, 1999, HHA's executive director, Dorsey Howard, informed the commissioners that he had set aside $100,000 per year for five years to support the operation of GHCCU in the Five Year Plan which HHA is required to submit to HUD.  The HHA Board understood that the expenditures for the credit union were detailed in that plan when it was approved by HUD.  (Exhibit 1, Feinerman Declaration, ¶ 16; Answer ¶ 9).

8.      Of the three plaintiffs, only Mr. Feinerman was a member of the HHA Board at the time of the October, 1999 meeting.  (Exhibit 2, Harris Declaration, ¶ 1; Exhibit 3, Buxton Declaration, ¶ 1; Answer ¶ 12).

9.      The employee responsible for preparing the Five Year Plan, Jerry Shenck, neglected to include the expenditures for the credit union and, when he discovered that oversight, concluded that operating funds could be used to support the credit union since HUD regulations and annual plan guidance did not require detailed descriptions of uses of operating subsidies.

Mr. Shenck reported his omission of the credit union expenditures in the Five Year Plan, and his conclusion that the mistake did not require action, to Mr. Howard.  (Exhibit 5, Shenck Declaration, ¶¶ 2-5; Answer ¶ 10).

10.    Neither Mr. Howard nor Mr. Shenck informed the Board that HHA's financial support for the credit union had not been included in the Five Year Plan.  (Exhibit 5, Shenck Declaration, ¶ 7; Exhibit 1, Feinerman Declaration, ¶ 16).

11.    Mr. Feinerman did not believe there was anything improper about HHA's funding commitment to the credit union reported to him by the Executive Director, and he was not advised of any impropriety by HHA's executive director or its general counsel.  (Exhibit 1, Feinerman Declaration, ¶ 16, 29).  In the course of their activities as commissioners, and prior to the audit of HHA in 2006 and 2007, Earl Harris and Constance Buxton also did not believe there was anything improper about the funding HHA was providing to the credit union.  (Exhibit 2, Harris Declaration, ¶ 16; Exhibit 3, Buxton ¶ 6).

12.    In September, 2003, the HHA Board approved an advance of $30,000 to GHCCU against the $100,000 already committed to it for 2004.  (Exhibit 2, Harris Declaration, ¶ 14).

13.    In September, 2004, HHA learned that GHCCU would continue to require funding support to maintain net worth requirements.  HHA's original commitment of $500,000 was exhausted and the Board approved the executive director's recommendation that an additional $495,000 be committed to GHCCU, to be paid in installments over the next several years.  (Exhibit 1, Feinerman Declaration, ¶ 22).

14.    Reverend Harris did not attend the HHA Board meeting in September, 2004, at which that action was taken.  (Exhibit 2, Harris Declaration, ¶ 15).

15.     At each HHA Board meeting during which GHCCU was discussed and expenditures for it were authorized, HHA's Executive Director, other members of senior management, and HHA's general counsel were in attendance and supportive of the action proposed and taken.  None of those professionals ever advised HHA's Board not to provide financial support to GHCCU, and the commissioners were never informed that HUD had not been notified of, and had not authorized, that support.  (Exhibit 1, Feinerman Declaration, ¶¶ 12, 25; Exhibit 2, Harris Declaration, ¶¶ 12 - 14; Exhibit 3, Buxton Declaration, ¶¶ 6, 8; Exhibit 6, Aronson Declaration, ¶¶ 5, 6; Answer ¶ 13).

16.     Throughout the time these expenditures were being made, HHA's operations were subject to independent audits, including an annual financial audit which specifically examined the expenditures for GHCCU for compliance with regulatory requirements, and no concerns were raised about the expenditure of funds for the credit union.  (Exhibit 1, Feinerman Declaration, ¶ 21).

17.     During the time that it was funding the credit union, HHA scored well under the Public Housing Assessment System (PHAS), which evaluates, among other things, the physical condition of HHA property and resident satisfaction.  HHA has also consistently scored well on HUD evaluations of its management and operations and has undergone and passed numerous financial audits.  (Exhibit 1, Feinerman Declaration, ¶ 21; Exhibit 5, Shenck Declaration, ¶ 8).

18.     In February 2006, GHCCU was closed for the failure to meet net worth requirements.  (Exhibit 1, Feinerman Declaration, ¶ 23) .

19.     In 2006 and 2007, HUD's Office of Inspector General (OIG) conducted an investigation and audit of HHA's operations.  Each of the three commissioners was fully cooperative during the investigations of their activities, and volunteered to be interviewed by

4

HUD's OIG.  (Exhibit 1, Feinerman Declaration, ¶ 26; Exhibit 2, Harris Declaration, ¶ 19;

Exhibit 3, Buxton Declaration, ¶ 9).

20.    On September 27, 2007, the OIG issued its final audit report, finding that HHA

improperly disbursed operating funds to open and support the credit union.  OIG's audit report

found that HHA's "noncompliance occurred because it believed that its use of operating funds ...

for the credit union was proper."  (Exhibit 7, Supplemental Feinerman Declaration, ¶ 3; Answer ¶

14).

21.    The three plaintiffs have no history or pattern of violating HHA's Annual

Contributions Contract or the law.  (Exhibit 2, Harris Declaration, ¶ 20; Exhibit 3, Buxton

Declaration, ¶ 11).

22.    In response to the audit, and to ensure that questionable and unauthorized

expenditures were not made in the future, the HHA Board, including Mr. Feinerman and

Reverend Harris, committed to perform a management review and to adopt additional policies

and internal controls.  The Board also voted to create governance and audit committees and

caused HHA to enter into a payment plan so that all of the operating funds used to support the

credit union are eventually replenished with non-federal funds.  (Exhibit 1, Feinerman

Declaration, ¶ 27).

23.    In particular, on October 9, 2007, representatives of HHA and HUD met to

resolve findings from the audit, and HHA committed to promptly undertake several remedial

measures, including 1) creation of an audit committee by November 8, 2007 to implement

corrective actions and coordinate future audit efforts; 2) establishment of a governance

committee by November 8, 2007 responsible for six different measures designed to ensure

ongoing board compliance with applicable contracts and regulations; and 3) issuance of a request

for proposals for an organization specializing in public agency management to assist the board in a comprehensive review of HHA's organizational structure.  (Exhibit 8, Letter to Dennis Bellingtier, dated October 28, 2007).

24.    On November 9, 2007, HHA's representative sent HUD a three page letter, detailing its proposed plan for repaying all of the credit union expenditures deemed ineligible. (Exhibit 9, Letter to Dennis Bellingtier, dated November 9, 2007).

25.    On November 19, 2007, HHA and HUD representatives discussed HHA's efforts to resolve the audit findings, and at that time HUD agreed to and accepted HHA's payment plan and the other remedial measures proposed by HHA in October.  (Exhibit 10, Letter to Dennis Bellingtier, dated November 19, 2007).

26.    All of HHA's corrective actions are either completed or ongoing.  (Exhibit 7, Feinerman Supplemental Declaration, ¶¶ 5-8).

27.    HUD has been notified of, has approved, and has been kept apprised of, all of HHA's corrective actions.  (*Id.*, ¶ 5).

28.    By notices dated July 30, 2007, HUD separately notified each of the plaintiffs that it was proposing their debarments from future participation in transactions with the executive branch of the federal government for three years.  (Exhibit 11, Debarring Official's Determination, at 1).

29.    The notices informed each plaintiff that the proposed debarment was based on the acts and omissions of HHA during their tenure on its Board.  (*Id.*)

30.    The specific charges against the plaintiffs were that they voted in 2003 and 2004 to transfer $30,000 and $505,000 respectively, of HHA's operating subsidy funds to GHCCU, and those payments violated Section 9 of the ACC.  (*Id.*, at 2).

31.    On March 31, 2008, the Debarring Official, Henry S. Czauski, issued a

determination debarring Mr. Feinerman and Ms. Buxton for three years and debarring Reverend

Harris for eighteen months.  (*Id*., at 12).

Respectfully Submitted,

/s/    Mona Lyons
Mona Lyons,  DC Bar No. 914234
Peter Butcher, DC Bar No. 441692
Law Office of Mona Lyons
1666 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20009
(202) 387-7000

/s/   Lee P. Reno
Lee P. Reno, DC Bar No. 152256
Sarah L. Molseed, DC Bar No. 975677
Reno & Cavanaugh
1250 Eye Street, NW
Suite 900
Washington, D.C.  20005
(202) 783-2800

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LEON J. FEINERMAN *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | )    Civil Action No. 08-759 (RBW) |
| STEVEN C. PRESTON, | ) |
| Secretary of Department of | ) |
| Housing and Urban Development, | ) |
| | ) |
| Defendant. | ) |

**EXHIBIT LIST TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Exhibit 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Leon J. Feinerman

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Earl Harris

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Constance Buxton

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Annual Contributions Contract

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Jerry Shenck

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of Irwin Aronson

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . Supplemental Declaration of Leon J. Feinerman

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . Letter to Dennis Bellingtier, dated October 28, 2007

Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . Letter to Dennis Bellingtier, dated November 9, 2007

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . Letter to Dennis Bellingtier, dated November 19, 2007

Exhibit 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Debarring Official's Determination

Exhibit 12 . . . . . . . . Government's Motion to Refer to Hearing Officer, dated December 3, 2007

Exhibit 13   . . . . . . . Government's Reply in Support of its Motion to Refer to a Hearing Officer,
dated January 11, 2008

Exhibit 14   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Declaration of James G. Stockard, Jr.

# EXHIBIT 1

## DECLARATION OF LEON J. FEINERMAN,

## CHAIRMAN OF THE BOARD OF COMMISSIONERS OF THE HARRISBURG HOUSING AUTHORITY

I, Leon J. Feinerman, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1. I have been a Commissioner on the Board of the Harrisburg Housing Authority (HHA) since my appointment in 1983, and have served as its Chairman from 1983 to the present.

2. I am employed by the American Insurance Administrators, in Mechanicsburg, Pennsylvania, as a Vice-President. I have been employed in the insurance industry my entire working career after receiving my BA from the University of Pittsburgh in 1967.

3. In addition to my employment I have been active for over 30 years in community service organizations. I am presently the Chairman of the Board of Holy Spirit Hospital in Camp Hill, PA. I have been the President of PACE Risk Retention Group of Burlington, VT since 2003, which insures the professional and general liability risks of five community hospitals and their staff. I am also Chairman of the Board of American Charities, of Chantilly VA, a federation of over 80 charities that raises over $20 million annually.

4. I have been the President of Harrisburg City Council. I am past president of The United Way of the Capital region, past president of The Rabbi David L. Silver Yeshiva Academy, past president of Beth El Temple, and past Chairman of Dauphin County Social Services for Children and Youth.

5.  Through my service on boards of charitable and professional organizations, I am aware of corporate officers' and directors' duties and obligations to the corporate entities for which they serve. As an HHA commissioner I assist in the setting of overall policy and direction of HHA. However, I do not participate in the implementation of those policies nor the day to day operations of HHA; those tasks fall to management.

6.  Part of the mission of the HHA and an obligation under the Annual Contribution Contract (ACC) is to operate in a way that promotes the economic and social well-being of the tenants that we serve.

7.  In 1996, the mayor established a broad representative task force to consider the banking and credit needs of the low-income community in Harrisburg which makes up a significant portion of the population.

8.  By the end of 1997, the task force concluded that because commercial banks were not serving, and had no desire to serve the low-income community, it would be desirable to establish a low-income credit union in the city. The definition of a low-income credit union is that more than half of its members are low-income residents of the service area.

9.  The HHA Executive Director at the time was Dorsey Howard. Mr. Howard recognized that the HHA was the largest landlord in Harrisburg and that all of its residents were low- or very low-income people. He concluded, and the Commissioners agreed, that the creation of a low-income credit union would be a major benefit to HHA residents. As the credit union matured it was envisioned that it would encourage and accommodate modest savings accounts, provide free check cashing services in lieu of commercial check cashing used by many low-income wage

earners, MAC cards, direct deposit of social security checks, checking accounts, small loans to members with weak credit ratings, and eventually larger loans for autos, small business start up, and credit counseling. Our residents were in desperate need of these financial services. Our elderly residents needed an institution that they had access to for the direct deposit of their social security checks. Employed residents had been using check cashing companies, pawn brokers, and money transmittal companies (many were near HHA's developments) to cash their payroll checks and, as a result, were being charged usurious fees which drained their already sparse resources. Most of our residents had no access to credit, so major purchases such as a new sofa or mattress were out of reach or resulted in time payments that carried exorbitant interest rates. We believed that with access to a credit union, our residents could proceed much more quickly to self-sufficiency. We saw this as a tenant service of equal importance to job preparation training, computer training, obtaining a GED, and the like. It was simply one of the necessities required by our residents if they were to succeed in self-sufficiency.

10.    Mr. Howard also learned that the Binghamton, New York housing authority had created a credit union for its residents and staff, and that HUD had sponsored a training session in Philadelphia for public housing authorities interested in creating credit unions. Unfortunately, Mr. Howard died in 2001, and an important piece of the history behind the decision to become involved in the creation of the credit union is lost.

11.    It became evident to Mr. Howard and a number of us on the board, that if the credit union was to be created, HHA would have to take a significant leadership and financial role, as there were only limited resources available in the community.

Notwithstanding that, we understood that because the credit union was not exclusively for HHA residents, others in the community would also have to provide financial support.

12. It did not occur to me that the decision to expend funds for the creation and support of a credit union that could eventually provide vital services to our residents would ever be challenged as ineligible expenditures for at least two reasons. First, its creation and subsequent benefit to our residents was in line with our mission to promote the economic and social well being of our residents, in other words, their self-sufficiency. Second, as commissioners, while we have responsibility for setting policy and supervising the work of the HHA, we understand that we can rely on our professional management staff and general counsel for assuring that we are in compliance with regulations and contract provisions. In the case of the credit union, our executive director believed it to be an eligible activity, as did our general counsel who continuously urged the board to go forward with the project. There was reason to believe that these two men could be relied on in matters such as this. Mr. Howard was highly respected in the public housing industry as a very competent executive director. He was selected as the Treasurer of the Council of Large Public Housing Authorities, one of the three national public housing interest groups. Our general counsel, Irwin Aronson, is an accomplished lawyer and over the years has continuously availed himself of public housing CLE courses offered by CLPHA affiliated lawyers and by the Housing Development Law Institute. If any aspect of HHA's support of the credit union was in violation of the ACC or HUD regulations, the commissioners certainly expected to be informed by our executive director and general counsel. This did not occur, and we proceeded with the credit union project.

13. Our first undertaking was to engage a consultant, Carl Payne, in January, 1998, on a part time basis, to provide information and assistance to HHA in acquiring an understanding of what assistance a credit union could provide our residents. Mr. Payne was also tasked with determining our residents' needs regarding money management and how a credit union could assist in meeting those needs. In addition, he was to provide guidance and assistance to HHA in securing interest and participation of HHA's residents.

14. Following this initial work HHA extended the contract with Mr. Payne to undertake the legwork necessary to get the credit union, now called the Greater Harrisburg Community Credit Union or GHCCU, established.

15. In April, 1999, the Pennsylvania Department of Banking approved the field of membership for GHCCU which included all who lived, worked, and worshipped in the city of Harrisburg, including the residents of HHA. In June, 1999, the National Credit Union Administration designated the GHCCU as a low-income credit union which requires that over 50 percent of the membership must have annual incomes of less than $25,000. Mr. Howard, HHA's Executive Director, was named the Chairman of the Board of GHCCU. Mr. Howard wanted the HHA to be closely linked to GHCCU since it would be an institution essential to HHA's residents' needs.

16. At the October 14, 1999, Commissioners meeting, Mr. Howard informed the Commissioners that he had set aside $100,000 for GHCCU for each of the next five years in the Five Year Plan. I understood that this would be part of what would be needed for start-up costs and operational support for the GHCCU until it was earning sufficient profit to support itself. This amount accounted for less than one percent of HHA's budget. The person responsible for detailing the support for the GHCCU in

the plan neglected to add it in any specificity; however the board was not informed of this fact. Because the Executive Director told the Commissioners that the financial commitment to GHCCU was in the Five Year Plan, which was subsequently approved by HUD, it did not cross my mind that there was any impropriety in what had occurred, nor was any impropriety pointed out by the executive director or the general counsel.

17.    In April of 2001 GHCCU opened its doors for business with more than $2,000,000 in start-up capitalization from area financial institutions and businesses. The marketing plan for GHCCU expressly targeted HHA residents. The credit union served the needs of the community, and according to information prepared by the City of Harrisburg, provided meaningful access to financial services to over 1,000 members of the community. Even though privacy laws have prevented us from ascertaining exactly how many public housing residents were members of the credit union, based on information we had about the zip codes of credit union members and the addresses of our public housing properties, we believe the credit union was serving a significant number of public housing residents. We also believed that despite the actual number of residents that were members, the presence of the credit union had, and would continue to have, a positive impact on many families and the public housing community in general.

18.    In June, 2001, Carl Payne became the Deputy Director of HHA. In August, 2001, Dorsey Howard died and Mr. Payne was appointed as Acting Executive Director and later Executive Director. He continued to serve GHCCU as its CEO on a voluntary basis.

19.   The HHA made various payments to GHCCU from 2000 to 2005, pursuant to its 1999 commitment. In addition it was paying certain operating expenses of GHCCU directly, again pursuant to HHA's commitment to provide operating support to GHCCU.

20.   At the September 11, 2003 Board meeting it became evident that it was going to take longer than planned to get the GHCCU operating on a profitable basis. This was for at least two reasons: first, the GHCCU's investment income was lower than expected as a result of lower interest rates, and second, the National Credit Union Administration (NCUA) required GHCCU to maintain a net worth of seven percent of its assets. In other words, for every $100,000 deposit received GHCCU had to have a net worth of $7,000. The only way to create and maintain that net worth as deposits grew is from profit, of which there was none yet, or additional grants such as those from HHA and the City of Harrisburg and others. Consequently, GHCCU had to slow its growth, that is, not admit as many depositors, until additional equity could be found or the NCUA changed its onerous equity requirements. Our general counsel advised us that because the credit union was dependent on HHA's support HHA should have permanent representation on the Board of the GHCCU. The general counsel also advocated the continued support of the credit union.

21.   During this time we were subject to ongoing management audits by HUD, and financial audits by qualified and experienced independent auditors as required by the Single Audit Act. In one of the audits by our independent auditor, expenditures to the credit union were selected for additional review and, even in light of this additional analysis, the auditor did not raise any issues about the expenditure of those funds. Moreover, during this time period HHA consistently scored well under PHAS and

SEMAP and was designated as either a standard or high performing agency at all times.

22.  By September, 2004, HHA's original commitment of funds was exhausted, and it was clear that HHA would have to commit additional funds to GHCCU if it was going to continue to meet its net worth requirement and demonstrate that commitment to the NCUA. In August, 2004 the Pennsylvania Department of Economic and Community Development awarded a $74,300 grant to GHCCU and the City of Harrisburg committed an additional $30,000 a year for 2005 through 2009. In addition, we were told that other of GHCCU's efforts to obtain grant funds had been unsuccessful. The HHA Board, after considerable discussion as to the amount we had invested in the GHCCU and its importance to our residents, voted unanimously (with one member absent) to commit an additional $495,000 to GHCCU to be paid in installments over the next few years. I viewed this additional commitment of funds, and all other actions accelerating the payment of funds, to be extensions and implementation of our initial policy decision in 1999 to support the formation of a credit union.

23.  The GHCCU continued to have problems maintaining the net worth requirement imposed by NCUA and also suffered from several non-performing loans. As a result, the NCUA closed the GHCCU in February 2006. All of the depositors had their deposits returned. Because the payments made by HHA, the City of Harrisburg, and the Pennsylvania Department of Economic and Community Development were considered equity, those funds were not returned.

24.  From the first time we heard of the concept of a low-income credit union in 1997, and hired a consultant in 1998, it was the intent of HHA's board to serve its residents. We understood that the credit union would serve others in order to succeed, but our

interest was in HHA residents. To my knowledge, no one to my knowledge from HHA who was involved with GHCCU's creation and operation considered that the expenses HHA was incurring were in violation of any contract, agreement or regulation.

25.    The HHA undertook the credit union project openly. It was discussed frequently in Board meetings, and was publicized in newspapers and in HHA's newsletters and annual reports. The expenditures were also included in the annual operating budget.

26.    The Office of the Inspector General (OIG) conducted an investigation and audit of HHA's operations during 2006 and 2007. In order to fully cooperate with the OIG, I was willing to be interviewed by the auditors, however, an interview was never requested.

27.    The HHA Board has considered the OIG's Audit Report regarding HHA which found the expenditures in support of the credit union to be ineligible expenditures under the ACC. While we continue to disagree with the legal conclusions of the OIG and the manner in which they were reached, the Board understands the seriousness of the issue. To assure HUD of HHA's seriousness, the Board has begun to institute a series of decisions that result from the OIG Audit Report, as communicated to Dennis Bellingtier at the HUD Philadelphia Field Office by letters dated September 28, 2007 and November 9, 2007. First, the Board has established Governance and Audit Committees to make sure the Board functions properly in reaching future decisions and to uncover any wrongdoing within the HHA at the earliest possible time. Second, the Board has proposed to HUD that HHA hire one or more consultants to undertake a management review and make recommendations for the adoption of policies and procedures and appropriate training to assure that agreements with HUD are

understood and followed and actions and decisions are adequately documented. Finally, the Board has agreed to repay over a period of years the funds used to support the credit union with nonfederal funds, after deducting the costs of undertaking and implementing the management review described above.

28.    No Board or staff member of HHA benefited personally from HHA's financial support of GHCCU. I felt an obligation to the credit union and secured an auto loan through them that is now being paid through the NCUA in St Louis. The loan was transacted at arms-length, and I did not receive any special considerations in connection with the loan.

29.    To my knowledge, and during my tenure as a commissioner, other than the findings of the OIG's Audit Report, the HHA has not been accused of or been determined to be in violation of the ACC. Before these proceedings I have never been accused or found guilty of violating the ACC or any federal law or regulation concerning federal funds. I have also never been excluded or disqualified from participation by any agency of the Federal Government nor have I been prohibited from participating in State or local contracts or assistance agreements. I have never entered into an administrative agreement regarding any wrongdoing with any Federal agency or State or local government.

So sworn this _19_ day of November, 2007.

By:

Leon J. Feinerman

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

# EXHIBIT 2

## DECLARATION OF EARL L. HARRIS,

## MEMBER OF THE BOARD OF COMMISSIONERS OF THE
## HARRISBURG HOUSING AUTHORITY

I, Earl L. Harris, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.  I have been a commissioner on the board of the Harrisburg Housing Authority

    ("HHA") since December 1999.

2.  I am employed as the pastor of the St. Paul Missionary Baptist Church in Harrisburg,

    Pennsylvania where I serve a congregation of 150 souls. I have a Bachelor of Science

    in Psychology from Howard University, a Juris Doctor from the University of

    Pittsburgh School of Law, and a Master of Divinity from Virginia Union University

    School of Theology. In addition, I attended the Graduate School of Public and

    International Affairs at the University of Pittsburgh and was an instructor in General

    Studies at that same university.

3.  Once I received my law degree, I worked as a lawyer in various capacities for

    different public and quasi-public entities. I was a police magistrate for the City of

    Pittsburgh. I worked at the Pittsburgh Office of the U.S. Department of Housing and

    Urban Development ("HUD"). I was employed with Fannie Mae. I was the general

    counsel for the Pennsylvania Housing Finance Agency and I served as solicitor with

    the City of Harrisburg School District.

4.  In 1985, I was called to be a pastor of the Children's Church. After receiving a

    Masters Degree in Divinity, I became assistant pastor of the St. Paul Missionary

    Baptist Church. In December of 1994, I became its pastor.

5.   As a trained lawyer, I am aware of the fiduciary duties and obligations of corporate officers and directors and how those duties and obligations apply to governmental corporations such as the HHA.

6.   An essential component of HHA's mission is to promote the economic and social well-being of the people HHA serves. This concept is also embodied in the Annual Contributions Contract ("ACC") between HHA and HUD.

7.   In 1996, the mayor of Harrisburg established a forty-five member task force called the Community Investment Partnership. The Community Investment Partnership included leaders from every segment of the Harrisburg community and was asked to consider the banking and credit needs of the low-income residents of Harrisburg. The City's population includes a significant proportion of low income households and the mayor was concerned that these citizens were not being served by conventional financial institutions. I was a member of the Community Investment Partnership. I was not a member of the HHA board of commissioners at this time.

8.   After a year of research and analysis of the financial needs of the low income citizens of the City of Harrisburg, the Community Investment Partnership recommended that the City needed a "low-income credit union" to serve people not served by the commercial banks. As I understand it, the national body that regulates credit unions, the National Credit Union Administration ("NCUA"), defines a "low-income credit union" as a credit union where more than half of its members are low-income residents of the service area. The Community Investment Partnership began the process to create such a credit union.

9.   To document the need for a community credit union under NCUA rules, the Community Investment Partnership was required to conduct a survey of the

Harrisburg community that would potentially demonstrate the need and demand for a low income credit union. The Community Investment Partnership conducted the survey in 1998 and collected 1,560 survey responses. Nine hundred public housing residents responded to the survey. In 1999, the NCUA determined that the Greater Harrisburg Community Credit Union ("GHCCU") met the requirements for the creation of a credit union.

10. Before I became a volunteer member of the HHA board of commissioners, I was aware that HHA was providing assistance to get the credit union established. I did not know the details about the HHA assistance to the GHCCU.

11. During my first three years on the HHA board of commissioners, HHA's support of GHCCU rarely came up at meetings. I was aware that HHA's budget each year included $100,000 for the GHCCU. It was my understanding that the budgeted amounts represented the fulfillment of an obligation made by HHA prior to my joining the board in December of 1999. While $100,000 is not a small sum of money, it accounts for less than one percent of the HHA annual budget.

12. The first time I recall that the GHCCU came up at a board meeting was in October, 2002, when the chairman reported on a letter from the GHCCU. The letter requested that HHA make an advance payment of $63,000 which would otherwise have been due to GHCCU in 2003 under HHA's five-year funding commitment. GHCCU wanted the funds advanced to enable the credit union to meet NCUA equity requirements. The chairman stated that he had authorized payment of the advance after consulting with the executive director, Carl Payne. HHA general counsel, Irwin Aronson, advised that the board should adopt a resolution ratifying the payment. Mr. Aronson also stated that the issue presented by the GHCCU letter created "a question

of timing, not a question of obligation" because the HHA Board had already decided
to subsidize the start up of the credit union and established a payment schedule
relating to that commitment.

13.    The next time the GHCUU came up in a board meeting was in March 2003. The
HHA fee accountant, Jason Casterline, reported on the results of 2002 expenditures
compared against the budget. He noted that HHA had made two payments to
GHCCU in 2002 instead of the one payment that was budgeted. He reported that it
was a management decision to do so because HHA could absorb the payment in 2002
better than it would be able to do in 2003. Nothing that Mr. Casterline said caused
me to believe that anything that had happened with regard to HHA's support of
GHCCU was improper.

14.    At the September meeting in 2003, the board very thoroughly discussed the GHCCU
and HHA's support of it. Carl Payne reported that GHCCU would likely ask HHA
for a $30,000 advance from the 2004 commitment. He explained this support was
needed because of a NCUA requirement that GHCCU maintain a net worth of 7% in
excess of deposits. This meant that for every $100,000 deposit the credit union had to
have $7,000 of net worth. When asked by counsel, Irwin Aronson, if others were
providing support like HHA was, Mr. Payne indicated that Commonwealth of
Pennsylvania was contributing $225,000 over a three year period, and the City of
Harrisburg was contributing $120,000 over a period of four years. HHA's general
counsel, Irwin Aronson, thought that the HHA should have representation on the
GHCCU board of directors because it was the credit union's largest supporter.
Counsel Aronson also advocated for the continued support of the credit union. The

board discussed the matter and concluded that the executive director, Carl Payne, should be on the GHCCU board, along with possibly another representative of HHA.

15.   On September 9, 2004, the HHA board voted to commit an additional $450,000 over a number of years after considerable discussion according to the minutes. I was not at this meeting, which is reflected in the minutes for that meeting.

16.   I viewed the decisions that I describe in this declaration about the acceleration of the funds to the GHCCU as ministerial implementation decisions relating to the fulfillment of an overall funding obligation made by the HHA board prior to my tenure. I had no reason to doubt that the original decision to fund the GHCCU over a five-year period was proper. I did have reason to believe that HHA management, as well as HHA's general counsel, had concluded that committing these funds for the GHCCU was proper and that the commitment had been made properly. Because our staff and counsel often raised or addressed questions as to proper or required conduct under HUD regulations and because I knew of other credit unions that were supported by housing authorities, I was never concerned that there was any impropriety. If I did become concerned, I would have required counsel and staff to address it. As board members we are entitled to rely on management and counsel to assure that policy decisions made by the board are legal and conform to any contractual or regulatory requirements. As a commissioner my role is to set the overall policy and direction for HHA, and not to implement that policy or to otherwise participate in the day-to-day activities of HHA. Day-to-day management and implementation of board policies, including the submission of documents to HUD, is the responsibility of management staff at HHA.

17. For the entire time I have served on the HHA board, I believed HHA's support of the GHCCU was for the benefit of HHA's residents. I fully understood that this benefit would not be immediate. I understood that the point was to create a lasting institution for the community that needed time to organize and stabilize in order to offer HHA residents the financial services they needed and desired. I understood that HHA's support was the seed money required to get the credit union operable and profitable.

18. To my knowledge, no Board or staff member of HHA benefited personally from HHA's financial support of GHCCU.

19. The HUD Office of the Inspector General ("OIG") conducted an investigation and audit of HHA's operations during 2006 and 2007. I was willing to be interviewed and was interested in cooperating with the OIG. However, the OIG never requested an interview with me.

20. To my knowledge, and during my tenure as a commissioner, other than the findings of the OIG's Audit Report, the HHA has not been accused of or been determined to be in violation of the ACC. Before this debarment action, I have never been accused or found guilty of violating the ACC or any federal law or regulation concerning federal funds. I have also never been excluded or disqualified from participation by any agency of the Federal Government nor have I been prohibited from participating in State or local contracts or assistance agreements. I have never entered into an administrative agreement regarding any wrongdoing with any Federal agency or State or local government.

So sworn this _14_ day of November, 2007

By: _____
     Earl L. Harris

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

# EXHIBIT 3

## DECLARATION OF CONSTANCE BUXTON,

## FORMER MEMBER OF THE BOARD OF COMMISSIONERS OF THE HARRISBURG HOUSING AUTHORITY

I, Constance Buxton, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.      I was a Commissioner on the Board of the Harrisburg Housing Authority (HHA) from December 1999 until I resigned for health reasons in July 2007.

2.      I was born on    *    ,1932.

3.      I moved into public housing in Harrisburg on May 2, 1991 and was a resident of HHA housing until July 31, 2007.

4.      Following surgery earlier this year I needed someone to care for me so I moved in with my daughter.

5.      I believed that the financial support HHA was providing to the Greater Harrisburg Community Credit Union ("GHCCU") would provide needed financial services to the residents of public housing in Harrisburg.

6.      It never crossed my mind that the financial support HHA was providing GHCCU would be considered an ineligible use of funds received from HUD.  The decision to provide that support was made before I became a Commissioner.  When the subject came up in Board meetings to advance funds before payments were scheduled or to commit additional funds, I would have expected the Executive Director, Carl Payne or our General Counsel, Irwin Aronson to have raised a concern about it if anything was wrong with our actions.  I viewed these decisions not as policy decisions but as extensions and implementations of the decision made by the HHA Board in 1999 to support the credit union.

7.      I know that directors of boards may rely on the experts such as senior management, counsel, auditors, and consultants because I have attended training sessions for

*Pursuant to Local Rule 5.4(f)(3) the month and day of Declarant's birth have been redacted.

Commissioners put on by the National Association of Redevelopment and Housing Officials ("NARHO"). I took NARHO's Basic and Advanced Commissioners Training, and Commissioner training in Procurement and Ethics. I also understood that my role as a Commissioner was to set the overall policy and direction of the HHA. I was not responsible for the implementation of those policies or other day to day operations of HHA, those tasks were left to management.

8.    During the time I was a Commissioner and HHA was providing financial support to GHCCU, no one, including our auditor and fee accountant, ever said anything that even suggested such financial support might be questionable.

9.    The Office of the Inspector General (OIG) conducted an investigation and audit of HHA's operations during 2006 and 2007. In order to fully cooperate with the OIG, I was willing to be interviewed by the auditors. However, when the OIG requested an interview, and I asked that the interview be conducted at the HHA offices, the OIG dropped their request and consequently I was never interviewed for the audit.

10.    To my knowledge, no one on the Board or Staff of HHA ever received any personal financial benefit from HHA's relationship with GHCCU.

11.    To my knowledge, and during my tenure as a commissioner, other than the findings of the OIG's Audit Report, the HHA has not been accused of or been determined to be in violation of the ACC. Before these proceedings I have never been accused or found guilty of violating the ACC or any federal law or regulation concerning federal funds. I have also never been excluded or disqualified from participation by any agency of the Federal Government nor have I been prohibited from participating in State or local contracts or assistance agreements. I have never entered into an administrative agreement regarding any wrongdoing with any Federal agency or State or local government.

So sworn this 20 day of November, 2007.

By: _____
Constance Buxton

# EXHIBIT 4

U.S. Department of Housing
and Urban Development

# Terms and Conditions

Constituting Part A of a

Consolidated Annual Contributions Contract

Between Housing Authority and

the United States of America

Forms HUD-53010 and
HUD-53011 are obsolete

Form HUD-53012A
(7/95)

# TABLE OF CONTENTS

## -- Part A --

**Section**                                                                    **Page**

Section 1      Consolidation of Annual Contributions Contract.                    1

Section 2      Definitions.                                                       1

Section 3      Mission of HUD.                                                    2

Section 4      Mission of the HA.                                                 2

Section 5      Covenant to Develop and Operate.                                   3

Section 6      Cooperation Agreement(s).                                          3

Section 7      Covenant Against Disposition and Encumbrances.                     3

Section 8      Declaration of Trust.                                              3

Section 9      Depository Agreement and General Fund.                             4

Section 10     Pooling of Funds.                                                  4

Section 11     Operating Budget.                                                  5

Section 12     Civil Rights Requirements.                                         5

Section 13     Insurance Requirements.                                            6

Section 14     Employer Requirements.                                             7

Section 15     Books of Account, Records, and Government Access.                  7

Section 16     Termination of a Project Under Management.                         7

-i-

Form HUD-53012A
(7/95)

**Section**                                                                                   **Page**

Section 17     Notices, Defaults, Remedies.                                                    7

Section 18     Rights and Obligations of HUD While in Possession of Project(s).                9

Section 19     Conflict of Interest.                                                           9

Section 20     Interest of a Member or Delegate to Congress.                                  11

Section 21     Rights of Third Parties.                                                       11

Section 22     Performance of Conditions Precedent to the Validity of this ACC.               11

Section 23     Waiver or Amendment.                                                           11

-ii-

**Form HUD-53012A**
**(7/95)**

This Annual Contributions Contract ("ACC"), No. _____P183_____, is entered into as of this 22nd day of May_____, 199 7 by and between the United States of America, acting by and through the Secretary of Housing and Urban Development, ("HUD") and the Harrisburg Housing Authority (the "HA"). The parties to this ACC may have previously entered into Consolidated ACCs whose terms and conditions have become obsolete through the subsequent passage of legislation or the promulgation of regulations by HUD. The parties wish to resolve this obsolescence by entering into this ACC, which shall supersede the most recent Consolidated ACC entered into between the HA and HUD bearing the same ACC number as this Consolidated ACC, and which incorporates by reference into this ACC those regulations issued by HUD for the development, modernization, and operation of public and Indian housing projects contained in Title 24 of the Code of Federal Regulations, as said Title shall be amended from time to time. Nothing herein shall release the HA from compliance with all applicable laws, executive orders, and regulations that are not specifically incorporated herein by reference.

This ACC covers all project(s) listed under the most recent Consolidated ACC entered into between HUD and the HA bearing the same ACC number as this ACC, and any amendments thereto, as well as any additional project(s) that may be added as a result of future amendments to this ACC. This ACC shall remain in effect with respect to such projects for the maximum period required by law, or as may be established by HUD. If this ACC consolidates previous ACCs executed by the parties, it shall remain in effect for the maximum period remaining under such previously executed ACCs, including any extension of the original ACC term based upon the HA's receipt of modernization and operating subsidies.

### Section 1 - Consolidation of Annual Contributions Contract.

This ACC supersedes the most recent Consolidated ACC entered into between HUD and the HA bearing the same ACC number as this ACC (including both Parts I and II), and any amendments thereto, provided that this novation shall in no way affect obligations outstanding, accounts due, or other actions taken pursuant to such previous ACCs, all of which matters shall be administered pursuant to and under this ACC.

### Section 2 - Definitions.

**ACC** - Consolidated Annual Contributions Contract between HUD and the HA, as may be amended herein, consisting of Part A (which sets forth requirements applicable to all projects) and Part B (which sets forth additional requirements that apply only to certain types of projects).

**Act** - the United States Housing Act of 1937, as amended.

Page 1 of 12

**Form HUD-53012A**
**(7/95)**

**Cooperation Agreement** - agreement(s) prescribed by HUD for execution by the HA and the local governing body relative to the cooperation of the local governing body in the development and operation of the project(s) and the obligation of the HA for payments in lieu of taxes, due to the exemption of the project from all real and personal property taxes.

**HA** - a public housing agency as defined in the Act, including an Indian housing authority.

**HUD approval** - prior written approval from HUD.

**"Operating receipts" and "Operating expenditures"** - Operating receipts shall mean all rents, revenues, income and receipts accruing from, out of, or in connection with the ownership or operation of such project. Operating receipts shall not include any funds received for development or modernization of a project, annual contributions pledged for payment of bonds or notes, or proceeds from the disposition of real property. Operating expenditures shall mean all costs incurred by the HA for administration, maintenance and other costs and charges that are necessary for the operation of the project. Operating expenditures shall not include any costs incurred as part of the development or modernization cost, or payment of principal or interest of bonds or notes.

**Project** - public and Indian housing developed, acquired, or assisted by HUD under the Act, other than under Section 8 of the Act, and the improvement of such housing. The term shall include all real and personal property, tangible and intangible, which is acquired or held by a HA in connection with a project covered under this ACC.

### Section 3 - Mission of HUD.

HUD shall administer the Federal public and Indian housing program for the provision of decent, safe, and sanitary housing to eligible families in accordance with this ACC and all applicable statutes, executive orders, and regulations. HUD shall provide maximum responsibility and flexibility to HAs in making administrative decisions within all applicable statutes, executive orders, regulations and this ACC. HUD shall provide annual contributions to the HA in accordance with all applicable statutes, executive orders, regulations, and this ACC.

### Section 4 - Mission of the HA.

The HA shall at all times develop and operate each project solely for the purpose of providing decent, safe, and sanitary housing for eligible families in a manner that promotes serviceability, economy, efficiency, and stability of the projects, and the economic and social well-being of the tenants.

**Form HUD-53012A**
**(7/95)**

### Section 5 - Covenant to Develop and Operate.

The HA shall develop and operate all projects covered by this ACC in compliance with all the provisions of this ACC and all applicable statutes, executive orders, and regulations issued by HUD, as they shall be amended from time to time, including but not limited to those regulations promulgated by HUD at Title 24 of the Code of Federal Regulations, which are hereby incorporated into this ACC by reference as if fully set forth herein, and as such regulations shall be amended from time to time. The HA shall also ensure compliance with such requirements by any contractor or subcontractor engaged in the development or operation of a project covered under this ACC.

### Section 6 - Cooperation Agreement(s).

During the development and operation of the project(s), the HA shall perform and comply with all applicable provisions of the Cooperation Agreement(s), in the form prescribed by HUD, including the making of payments in lieu of taxes provided therein (or such lesser amount as may be prescribed by State law or agreed to by the local governing body), shall at all times preserve and enforce its rights thereunder, and shall not terminate or amend the Cooperation Agreement(s) without the written approval of HUD.

### Section 7 - Covenant Against Disposition and Encumbrances.

The HA shall not demolish or dispose of any project, or portion thereof, other than in accordance with the terms of this ACC and applicable HUD requirements. With the exception of entering into dwelling leases with eligible families for dwelling units in the projects covered by this ACC, and normal uses associated with the operation of the project(s), the HA shall not in any way encumber any such project, or portion thereof, without the prior approval of HUD. In addition, the HA shall not pledge as collateral for a loan the assets of any project covered under this ACC.

### Section 8 - Declaration of Trust.

Promptly upon the acquisition of the site of any project, the HA shall execute and deliver an instrument (which may be in the form of a declaration of trust, a trust indenture, or such other document as may be approved by HUD), confirming and further evidencing, among other things, the covenant of the HA not to convey or encumber the project except as expressly authorized in this ACC. Such instrument and all amendments shall be duly recorded or filed for record wherever necessary to give public notice of their contents and to protect the rights and interests of HUD and of any bondholders. The HA shall furnish HUD with appropriate evidence of such recording or filing. From time to time, as additional real property is acquired by the HA in connection with the projects,

Form HUD-53012A
(7/95)

the HA shall promptly amend such instrument to incorporate all such real property and shall record the instrument, as amended.

## Section 9 - Depository Agreement and General Fund.

(A) The HA shall deposit and invest all funds and investment securities received by or held for the account of the HA in connection with the development, operation and improvement of the projects under an ACC with HUD in accordance with the terms of the General Depository Agreement(s). The General Depository Agreement shall be in the form prescribed by HUD and must be executed by the HA and the depository. Immediately upon the execution of any Depository Agreement, the HA shall furnish to HUD such executed or conformed copies thereof as HUD may require. A Depository Agreement shall not be terminated except after 30 days notice to HUD.

(B) All monies and investment securities received by or held for the account of the HA in connection with the development, operation and improvement of projects in accordance with an ACC with HUD shall constitute the "General Fund."

(C) The HA shall maintain records that identify the source and application of funds in such a manner as to allow HUD to determine that all funds are and have been expended in accordance with each specific program regulation and requirement. The HA may withdraw funds from the General Fund only for: (1) the payment of the costs of development and operation of the projects under ACC with HUD; (2) the purchase of investment securities as approved by HUD; and (3) such other purposes as may be specifically approved by HUD. Program funds are not fungible; withdrawals shall not be made for a specific program in excess of the funds available on deposit for that program.

## Section 10 - Pooling of Funds.

(A) The HA may deposit into an account covered by the terms of the General Depository Agreement any funds received or held by the HA in connection with any project operated by the HA under the provisions of this ACC.

(B) The HA may also deposit into an account covered by the General Depository Agreement, by lump-sum transfers of funds from the depositories of other projects or enterprises of the HA in which HUD has no financial interest, amounts necessary for current expenditures of items chargeable to all projects and enterprises of the HA.

(C) The HA shall not withdraw from any of the funds or accounts authorized under this section amounts for the projects under ACC, or for the other projects or enterprises, in excess of the amount then on deposit in respect thereto.

**Form HUD-53012A**
**(7/95)**

## Section 11 - Operating Budget.

(A) The HA shall prepare and have approved by its Board of Commissioners an operating budget for each of its fiscal years in a manner, and using such forms, as prescribed by HUD. The HA shall submit a calculation of operating subsidy eligibility in the manner prescribed by HUD in regulations in Title 24 of the Code of Federal Regulations. HUD shall review the calculation and, if correct, and subject to the availability of funds, take action within 45 days of submission to obligate the funds and approve a payment schedule, unless the HA is notified that it must submit an operating budget as provided in (B) below. HUD may revise or amend the subsidy calculation to bring it into conformity with regulatory requirements. The HA shall submit revised calculations in support of mandatory or other adjustments based on procedures and deadlines prescribed by HUD.

(B) If HUD directs the HA to submit an operating budget because it failed to achieve certain specified operating standards, or for other reasons which in HUD's determination require it, HUD shall, within 45 days of receipt of the complete operating budget, review and approve the operating budget if the plan of operation and the amounts included therein are reasonable. If HUD disapproves any proposed operating budget, or approves such budget with modifications, the HA shall be notified in writing and be furnished with an explanation of the reasons for such disapproval or modified approval. Any HA that is required to submit an operating budget may, at any time prior to thirty days before the end of the HA fiscal year, submit to HUD a proposed revision of any approved operating budget.

(C) HUD shall not in any Federal fiscal year approve any estimate or revision of a HA's operating budget in an amount which, together with the amount of all operating subsidies then contracted for by HUD, would exceed the amount as determined by HUD of contracting authorization for operating subsidies under the Act. HUD shall not be obligated to make any payments on account of operating subsidies in an amount in excess of the amount specifically approved by HUD.

(D) The HA shall not incur any operating expenditures except pursuant to an approved operating budget. If unbudgeted expenditures are incurred in emergencies to eliminate serious hazards to life, health and safety, the operating budget shall be amended accordingly.

## Section 12 - Civil Rights Requirements.

(A) The HA shall comply with all statutory, regulatory, and executive order requirements pertaining to civil rights, equal opportunity, and nondiscrimination, as those requirements now exist, or as they may be enacted, promulgated, or amended from time to time. These requirements include, but shall not be limited to, compliance with at least the following authorities: Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d; 24 CFR part 1); the Fair Housing Act (42 U.S.C. 3601-3619; 24 CFR part 100); section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794; 24 CFR part 8); the Age Discrimination Act of 1975 (42 U.S.C. 6101-6107; 24 CFR part 146); the Americans with Disabilities Act (Pub. L. 101-336, approved July 26, 1990; 28 CFR part 35); Executive Order 11063 on Equal

Form HUD-53012A
(7/95)

Opportunity in Housing (24 CFR part 107); Executive Order 11246 on Equal Employment Opportunity, as amended by Executive Order 11375 (41 CFR part 60); and Executive Order 12892 on Affirmatively Furthering Fair Housing. An Indian Housing Authority established pursuant to tribal law shall comply with applicable civil rights requirements, as set forth in Title 24 of the Code of Federal Regulations.

(B) In connection with the development or operation of any project, the HA shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, disability, age, or national origin. The HA shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, religion, sex, disability, age, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The HA shall insert the foregoing provision (modified only to show the particular contractual relationship) in all its contracts in connection with the development or operation of any project, except contracts for standard commercial supplies or raw materials and contracts referred to in subsection (C) of this section, and shall require all contractors to insert a similar provision in all subcontracts, except subcontracts for standard commercial supplies or raw materials. The HA shall post at the projects, in conspicuous places available to employees and applicants for employment, notices to be provided by HUD setting forth the provisions of this nondiscriminatory clause.

(C) The HA shall incorporate the language required by Executive Order 11246, codified at 41 CFR §60-1.4(b) (or any successor provision), into any contract for construction work, or any modification thereof, which is paid for in whole or in part with funds obtained under this ACC. In addition, the HA agrees that it will be bound by the equal employment opportunity provisions set forth at 41 CFR §60-1.4(b) (or any successor provision) with respect to its own employment practices when it uses its own staff (force account) to carry out Federally assisted construction work.

### Section 13 - Insurance Requirements.

(A) Except as otherwise provided by HUD, the HA shall procure adequate insurance to protect the HA from financial loss resulting from various hazards if the HA determines that exposure to certain hazards exists. The types of insurance required, or that should be purchased, and other requirements with respect to insurance coverage are listed in Part B, Attachment VII, of this ACC.

(B) The HA shall, to the extent that insurance proceeds permit, promptly restore, reconstruct, and/or repair any damaged or destroyed property of a project, except with the written approval of HUD to the contrary.

Form HUD-53012A
(7/95)

## Section 14 - Employer Requirements.

(A) The HA shall comply with all tribal, State and Federal laws applicable to employee benefit plans and other conditions of employment.

(B) No funds of any project may be used to pay any compensation for the services of members of the HA Board of Commissioners.

## Section 15 - Books of Account, Records, and Government Access.

(A) The HA must maintain complete and accurate books of account for the projects of the HA in such a manner as to permit the preparation of statements and reports in accordance with HUD requirements, and to permit timely and effective audit.

(B) The HA must furnish HUD such financial and project reports, records, statements, and documents at such times, in such form, and accompanied by such reporting data as required by HUD.

(C) The United States Government, including HUD and the Comptroller General, and its duly authorized representatives, shall have full and free access to all HA offices and facilities, and to all books, documents, and records of the HA relevant to the administration of the projects under this ACC, including the right to audit and make copies.

## Section 16 - Termination of a Project Under Management.

If any project under management under this ACC is terminated, all project reserves shall become part of another project administered by the HA in accordance with the terms of this ACC. If no other project(s) under management exists, the remaining project reserves shall be distributed as directed by HUD.

## Section 17 - Notices, Defaults, Remedies.

(A) Any notice required or permitted to be given under this ACC shall be in writing, signed by a duly authorized official, and addressed, if to the HA, to the principal office of the HA, and if to HUD, to the HUD office with jurisdiction over the HA, unless otherwise directed by regulation or other requirement of HUD.

(B) Upon the occurrence of a substantial default by the HA, as determined by HUD in accordance with this ACC, HUD shall be entitled to any or all of the remedies set forth in paragraphs (E), (F), and (H) below. A substantial default is a serious and material violation of any one or more of the

Form HUD-53012A
(7/95)

covenants contained in this ACC. Events of substantial default shall include, but shall not be limited to, any of the following occurrences: (1) failure to maintain and operate the project(s) under this ACC in a decent, safe, and sanitary manner; (2) the disposition or encumbrance of any project or portion thereof without HUD approval; (3) failure of the HA to comply with any civil rights requirements applicable to the HA and the project(s); (4) abandonment of any project by the HA, or if the powers of the HA to operate the project(s) in accordance with the provisions of this ACC are curtailed or limited to an extent that will prevent the accomplishment of the objectives of this ACC; (5) failure to carry out modernization or development in a timely, efficient and effective manner; and (6) termination of tax exemption (either real or personal property) on behalf of a project covered under this ACC.

(C) Delivery of a notice of substantial default shall be required before the exercise of any remedy permitted under this ACC. Such notice shall: (1) identify the specific covenants, statutes, executive orders, or regulations alleged to have been violated; (2) identify the specific events, actions, failure to act, or conditions that constitute the alleged substantial default; and (3) provide a specific timeframe for the HA to cure the substantial default, taking into consideration the nature of the default.

(D) Except in cases involving clear and apparent fraud, serious criminal behavior, or emergency conditions that pose an imminent threat to life, health, or safety, the HA shall have the right to appeal any such notice received from the HUD office with jurisdiction over the HA. Such informal appeals shall be in writing and shall be submitted within ten (10) working days from the date of the HA's receipt of such notice. Appeals of the action of a HUD Office shall be made to the Assistant Secretary for Public and Indian Housing, or such other official as shall be a successor thereto.

(E) Upon the occurrence of a substantial default, or the expiration of any applicable cure period provided by HUD, the HA shall: (1) convey to HUD title to the project(s) as demanded by HUD if, in the determination of HUD (which determination shall be final and conclusive), such conveyance of title is necessary to achieve the purposes of the Act; or (2) deliver possession and control of the project(s) to HUD.

(F) Nothing contained in this ACC shall prohibit or limit HUD from the exercise of any other right or remedy existing under applicable law, or available at equity. HUD's exercise or nonexercise of any right or remedy under this ACC shall not be construed as a waiver of HUD's right to exercise that or any other right or remedy at any time.

(G) If HUD shall acquire title to, or possession of the project(s), HUD shall reconvey or redeliver possession of the project(s) to the HA, or to any successor recognized by HUD: (1) upon a determination by HUD that the substantial default has been cured and that the project(s) will thereafter be operated in accordance with the terms of this ACC; or (2) after the termination of HUD's obligation to make annual contributions available, unless there are any obligations or covenants of the HA to HUD that are then in default.

Form HUD-53012A
(7/95)

(H) HUD may at any time by notice to the HA declare this ACC terminated with respect to any project that at such time has not been permanently financed if: (1) the HA has made any fraudulent or willful misrepresentation of any material fact in any document or data submitted to HUD as a basis for this ACC or as an inducement to HUD to enter into this ACC; or (2) a substantial default exists in connection with any of the projects; provided, that no such termination shall affect any obligation of HUD to make annual contributions pursuant to section 12 of Attachment VI, Part B, of this ACC.

## Section 18 - Rights and Obligations of HUD While in Possession of Project(s).

(A) During any period in which HUD holds title to or possession of the projects after a substantial default by the HA, HUD shall develop and/or operate such project(s) as nearly as practicable in accordance with the provisions of this ACC.

(B) During any such period, HUD may, in the name and on behalf of the HA, or in its own name and on its own behalf (as HUD shall solely determine), exercise any and all rights of the HA under this ACC, and perform any and all obligations of the HA under this ACC. Northing herein shall be deemed to make the action(s) or omission(s) of the HA attributable to HUD.

## Section 19 - Conflict of Interest.

(A)(1) In addition to any other applicable conflict of interest requirements, neither the HA nor any of its contractors of their subcontractors may enter into any contract, subcontract, or arrangement in connection with a project under this ACC in which any of the following classes of people has an interest, direct or indirect, during his or her tenure or for one year thereafter:

    (i) Any present or former member or officer of the governing body of the HA, or any member of the officer's immediate family. There shall be excepted from this prohibition any present or former tenant commissioner who does not serve on the governing body of a resident corporation, and who otherwise does not occupy a policymaking position with the resident corporation, the HA or a business entity.

    (ii) Any employee of the HA who formulates policy or who influences decisions with respect to the project(s), or any member of the employee's immediate family, or the employee's partner.

    (iii) Any public official, member of the local governing body, or State or local legislator, or any member of such individuals' immediate family, who exercises functions or responsibilities with respect to the project(s) or the HA.

Form HUD-53012A
(7/95)

(2) Any member of these classes of persons must disclose the member's interest or prospective interest to the HA and HUD.

(3) The requirements of this subsection (A)(1) may be waived by HUD for good cause, if permitted under State and local law. No person for whom a waiver is requested may exercise responsibilities or functions with respect to the contract to which the waiver pertains.

(4) The provisions of this subsection (A) shall not apply to the General Depository Agreement entered into with an institution regulated by a Federal agency, or to utility service for which the rates are fixed or controlled by a State or local agency.

(5) Nothing in this section shall prohibit a tenant of the HA from serving on the governing body of the HA.

(B)(1) The HA may not hire an employee in connection with a project under this ACC if the prospective employee is an immediate family member of any person belonging to one of the following classes:

    (i) Any present or former member or officer of the governing body of the HA. There shall be excepted from this prohibition any former tenant commissioner who does not serve on the governing body of a resident corporation, and who otherwise does not occupy a policymaking position with the HA.

    (ii) Any employee of the HA who formulates policy or who influences decisions with respect to the project(s).

    (iii) Any public official, member of the local governing body, or State or local legislator, who exercises functions or responsibilities with respect to the project(s) or the HA.

(2) The prohibition referred to in subsection (B)(1) shall remain in effect throughout the class member's tenure and for one year thereafter.

(3) The class member shall disclose to the HA and HUD the member's familial relationship to the prospective employee.

(4) The requirements of this subsection (B) may be waived by the HA Board of Commissioners for good cause, provided that such waiver is permitted by State and local law.

(C) The requirements of subsections (A) and (B) of this section do not apply to contracts entered into by an Indian Housing Authority, its contractors or subcontractors, although such contracts remain subject to other applicable conflict of interest requirements.

Form HUD-53012A
(7/95)

(D) For purposes of this section, the term "immediate family member" means the spouse, mother, father, brother, sister, or child of a covered class member (whether related as a full blood relative, or as a "half" or "step" relative, e.g., a half-brother or stepchild).

## Section 20 - Interest of a Member or Delegate to Congress.

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this ACC or to any benefits which may arise from it. (As used in this section, the term "resident commissioner" refers to an individual appointed to oversee a territory or possession of the United States of America, e.g., Guam).

## Section 21 - Rights of Third Parties.

Except as to bondholders, as stated in Part B (Attachment VI) of this ACC, nothing in this ACC shall be construed as creating any right of any third party to enforce any provision of the ACC or to assert any claim against HUD or the HA.

## Section 22 - Performance of Conditions Precedent to the Validity of this ACC.

The HA certifies that all conditions precedent to the valid execution and delivery of this ACC on its part have been complied with, that all things necessary to constitute this ACC its valid, binding, and legal agreement on the terms and conditions and for the purposes herein set forth have been done and have occurred and that the execution and delivery of the ACC on its part have been and are in all respects duly authorized in accordance with law. HUD similarly certifies with reference to its execution and delivery of this ACC.

## Section 23 - Waiver or Amendment.

Any right or remedy that HUD may have under this ACC may be waived in writing by HUD without the execution of a new or supplemental agreement; or by mutual agreement of the parties to this ACC, this contract may be amended in writing: Provided, That none of the provisions of this ACC may be modified or amended so as to impair in any way HUD's obligation to pay any annual contributions that have been pledged as security for any obligations of the HA.

Form HUD-53012A
(7/95)

In witness whereof, the HA and HUD have caused this ACC to be executed and the HA has caused its seal to be hereunto affixed and attested all as of the date first above written.

(SEAL)

ATTEST:

By:

Harrisburg Housing Authority
(Housing Authority)

(Chairperson)

UNITED STATES OF AMERICA
Secretary of Housing and Urban Development

By:

Director, Office of Public Housing
(Official Title)

Form HUD-53012A
(7/95)

# EXHIBIT 5

## DECLARATION OF JERRY SHENCK,

### ACTING EXECUTIVE DIRECTOR OF THE
### HARRISBURG HOUSING AUTHORITY

I, Jerry Shenck, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.  I am the Acting Executive Director of the Harrisburg Housing Authority ("HHA") and have been since I came out of retirement to assume these duties on a temporary basis when the Executive Director, Carl Payne, was suspended from his position by HUD. Before my retirement from HHA I was in charge of all modernization activities.

2.  In 1999 I was in charge of putting together the Comprehensive Grant Program ("CGP") Annual Submission. The HHA Executive Director, Dorsey Howard informed me that HHA was setting aside $500,000 to support the Greater Harrisburg Community Credit Union ("GHCCU") over a five year period and he directed me to put it in the submission.

3.  While preparing the submission I was busy with construction contracts and other CGP work, and preparing the performance and evaluation reports for the open CGP programs. I was the sole staff member of the Modernization Department.

4.  After completing the Annual statement, holding the various resident meetings, public hearings and submitting it to HUD, I remembered that I should have described the financial support we planned to provide to GHCCU in the Management Improvement Account (Item 1408) but I had failed to do so.

5.  I informed Mr. Howard of my mistake and suggested we could support the credit union out of the 1406 account. That account permits the HHA to convert up to twenty

percent of its CGP funds to Operating Subsidy and use it for operations of HHA. While we had not proposed to fund the 1406 in our submission, there were funds available from previous submissions in 1997 and 1998.

6.   I assumed Mr. Howard later determined that it was appropriate to use these funds in this manner. He often did not share all information with me or other staff.

7.   At that time I did not make regular reports to the HHA Board of Commissioners as that was Mr. Howard's job. Consequently, I did not inform the HHA Board of Commissioners that the financial support for the credit union was not included in the plan submitted to HUD. I do not know if Mr. Howard informed the Board of my mistake.

8.   During the time period that HHA was supporting the credit union we were scoring well under the Public Housing Assessment System (PHAS) which evaluates the operations of the housing authority, including the physical condition of the units managed by the housing authority, the financial condition of the authority, management operations of the authority and resident service and satisfaction. HHA was designated either a high or standard performer in every year that HHA gave financial support to the credit union, meaning that HUD determined we were a well managed housing authority and that our residents were adequately served.

So sworn this nineteenth day of November, 2007

By: _[signature]_ _____
    Jerry Shenck

# EXHIBIT 6

# DECLARATION OF IRWIN ARONSON,
## COUNSEL TO THE
### HARRISBURG HOUSING AUTHORITY

I, Irwin Aronson, do hereby swear and declare that the following is true and correct to the best of my knowledge:

1.      I am an attorney in the private practice of law, employed by the law firm of Willig, Williams & Davidson.  I am engaged by the Harrisburg Housing Authority ("HHA") as their outside Counsel.  I have served as outside Counsel to HHA since approximately 1988.

2.      I received my Bachelor of Arts Degree in 1973 from the Pennsylvania State University, and my Juris Dooctor from the Dickinson School of Law in 1982.

3.      I am admitted to the practice before the Supreme Court of the United States of America and the Supreme Court of the Commonwealth of Pennsylvania.

4.      During my professional career, I have participated in training as a counsel for a public housing agency by attending Continuing Legal Education programs conducted by the Housing and Development Law Institute which is associated with the National Association of Housing and Redevelopment Officials and Big Law which is associated with the Council of Large Public Housing Authorities.

5.      A portion of my activities as Counsel to HHA involves provide the HHA and its Board of Commissioners with advice relating to compliance with local, state and federal law.  I attend almost all of the HHA Board meetings in order to be generally aware of the organization's activities and advise the Commissioners regarding legal issues, including the requirements of law, that may arise concerning their actions and

deliberations. I believe the HHA Commissioners rely on me to identify such issues and on any advice I give regarding those issues, as is their right.

6. I was present at most, if not all, of the HHA Board meetings when the credit union was discussed and action was taken regarding HHA's financial support of it. I was aware of the general circumstances regarding the expenditures by HHA in support of the Greater Harrisburg Community Credit Union and I did not express any objections for such support in my capacity as counsel to HHA. During these discussions I was not aware of a prohibition to such support in the law or the Annual Contributions Contract and consequently I did not raise an objection regarding any legal implications of the HHA's financial support of the credit union.

So sworn this 19th day of November, 2007

By: _____
Irwin Aronson

# EXHIBIT 7

### SUPPLEMENTAL DECLARATION OF LEON J. FEINERMAN

I, Leon J. Feinerman, make the following declaration:

1.      I have been a Commissioner on the Board of the Harrisburg Housing

Authority (HHA), and served as its Chairman, since 1983.

2.      I have been informed by my attorneys that, effective March 31, 2008, I have

been debarred for three years from participation in transactions with the

federal government.

3.      On September 27, 2007, HUD's Office of Inspector General (OIG) issued a

final audit report finding that HHA improperly disbursed operating funds to

open and support the Greater Harrisburg Community Credit Union (GHCCU).

OIG's audit report found that HHA's "noncompliance occurred because it

believed that its use of operating funds … for the credit union was proper."

4.      I have been involved with, and have knowledge of, the resolution of the OIG

audit.  With the knowledge and approval of HUD, HHA has taken affirmative

steps to address the findings of the audit.  That corrective action was

developed by HHA and is detailed in a letter from HUD dated December 3,

2007, which is attached as Exhibit 1 to my declaration.

5.      All of that corrective action is either completed or ongoing, and HHA is

providing monthly status reports to HUD on its progress.  HHA's monthly

reports to HUD are attached as Exhibit 2 to my declaration.

6.      In November, 2007, the HHA Board of Commissioners created standing Audit

and Governance Committees.

7.    On January 15, 2008, the HHA Board of Commissioners approved the procurement of Gilmore Kean, LLC, a firm experienced in the operations of public housing authorities, to assess HHA's organizational structure and its policies and procedures regarding program operations and board governance, and to assist HHA in drafting revised policies and procedures and training staff. The consultants have begun their work. They have interviewed staff, reviewed existing policies, and, on April 28, 2008, provided training to members of the Board of Commissioners.

8.    On January 15, 2008, HHA's Board of Commissioners approved a Repayment Agreement, which was executed by HHA's acting Executive Director and approved by HUD on February 5, 2008, to repay all funds expended on the credit union from non-federal funds. HUD and HHA had been actively negotiating the Repayment Agreement since November 28, 2007. The first payment under the agreement is due December 31, 2008 and is scheduled by HHA to be paid on December 18, 2008. The executed Repayment Agreement is attached as Exhibit 3 to my declaration.

9.    I am employed by the American Insurance Administrators, in Mechanicsburg, Pennsylvania as an insurance agent and insurance broker. I have worked in the insurance industry since I received my BA from the University of Pittsburgh in 1967.

10.    The debarment will cause irreparable harm to my personal and professional reputation and will substantially interfere with my desire, efforts, and ability to serve the community.

11.    In certain cases I sell insurance policies as an agent of insurance companies to mnicipalities, school districts, and other entities which receive federal funds. In other cases, I represent those entities as their insurance broker to obtain particular insurance policies for them.  Currently, 40 percent of my business is derived from these activities.  It is my understanding that as an insurance broker for entities receiving federal funds I may be considered a participant in covered transactions, and if debarred, precluded from being their broker.

12.    Unless my debarment is stayed or enjoined, my insurance business may be severely damaged.  Long-standing clients of mine may seek insurance elsewhere because they are unwilling, or unable, to do business with a debarred individual, or to avoid the perception of impropriety that could result from doing business with one.  The debarment may also have a negative impact on my ability to attract customers for my insurance business.

13.    My personal and professional reputation is of utmost importance to my livelihood.  To be successful as an insurance salesman, my clients must perceive me as a responsible and trustworthy person.  As a result of my debarment, I have already suffered extreme embarrassment and significant damage to my personal and professional reputation.  Unless my debarment is stayed or enjoined, that harm will continue and increase.

14.    I was the Chairman of the Board of Holy Spirit Hospital in Camp Hill, PA, but, at the direction of its general counsel, resigned on April 18, 2008 because of my debarment.  If my debarment is stayed or enjoined, I will be reinstated to my position on the hospital board.

15.    By virtue of my position on the hospital board, since 2003 I have also served
as President of PACE Risk Retention Group of Burlington, Vermont, a
member-owned insurance company which insures the professional and
general liability risks of five community hospitals and their staff. Unless my
debarment is stayed or enjoined, I will be required to resign from that
position.

16.    I am currently the Chairman of the Board of America's Charities, a national
civic organization which depends upon my ability and experience to function
effectively. Although my service to that organization is not precluded by my
debarment, it may be unwilling to maintain a relationship with a debarred
individual. If I am asked to resign from that position as a result of my
debarment, that organization will be denied the benefits of my experience and
leadership, and I will be denied the opportunity to continue serving and
associating with the organization.

17.    I believe in, am committed to, am proud of, and want to continue my service
to, and association with, Holy Spirit Hospital, the PACE Risk Retention
Group, and the Board of America's Charities. Unless my debarment is stayed
or enjoined, I will not be able to serve in a leadership position for any
community organization which receives, or may apply for, federal funds, such
as Holy Spirit Hospital, or any community organization that does not want to
associate with a debarred individual.

18.    By letter dated April 18, 2008, HUD's Debarring Official, Henry S. Czauski,
notified the mayor of Harrisburg that Earl Harris, Constance Buxton and I had

been debarred. Mr. Czauski informed the mayor that HHA "is prohibited from allowing debarred individuals to supervise, exercise critical influence over or substantially control transactions funded with money provided to the HHA through Annual Contributions Contracts with HUD." Mr. Czauski's letter is attached as Exhibit 4 to my declaration.

19.    The Pennsylvania statute governing public housing authorities provides that authorities such as Harrisburg's have five commissioners who are appointed by the Mayor of Harrisburg with the approval of its City Council. HHA commissioners serve for terms of five years, may only be removed for cause, and continue serving at the end of their terms until they are replaced by new commissioners.

20.    I believe in, am committed to, am proud of, and want to continue my service to, and association with, HHA and the community which it serves. Unless my debarment is stayed or enjoined, I will be prohibited from continuing that service for three years and the mayor will be required to replace me by appointing a new commissioner who will serve for at least one five year term.

21.    Unless it is stayed or enjoined, my debarment, together with the debarment of Earl Harris, will have a significantly adverse effect on the operations of HHA. Mr. Harris has served as an HHA commissioner for nine years, and I have served as one for 25. No other current commissioner of HHA has served the organization for more than a year and a half.

I declare under penalty of perjury that the foregoing is true and correct.

By:    _____        _____4/30/08_____
       Leon J. Feinerman                   Date

# EXHIBIT 1



**U.S. Department of Housing and Urban Development**

Philadelphia Office
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107-3380



DEC 0 3 2007

Mr. Jerry Shenck
Acting Executive Director
Harrisburg Housing Authority
351 Chestnut Street
Harrisburg, PA 17101

Dear Mr. Shenck

SUBJECT:    Management Decisions with Corrective Action Plans
           OIG Audit Report:     2007-PH-1013
           Report date:          September 27, 2007

      Our office has sustained the Office of Inspector General's (OIG) finding as detailed in the subject audit report. The report contains 1 finding with 4 recommendations which require corrective action.

      Our office in coordination with the Authority has developed proposed management decisions with corrective action plans which we feel will address the OIG's concerns. In accordance with the Departments audit resolution process, our office submitted the proposed management decisions to the OIG for concurrence. The OIG concurred with the management decision corrective action plans on November 28, 2007.

      As outlined below, our office has specified the corrective actions required to resolve the reported deficiencies and timeframes to complete the tasks for each recommendation.

      In addition, the Authority is required to provide a monthly status report to our office on the progress made to resolve the recommendations. The status report is due the 15th of each month until final resolution has occurred. Our comments regarding the subject report are outlined below:

**Finding The Authority Improperly Used Public Housing Operating Funds and Allowed a Conflict-of-Interest Situation to Exist.**

**RECOMMENDATION 1A** Review the issues in this report and if appropriate initiate action to declare the Authority in substantial default of its consolidated annual contributions contract and take appropriate administrative action as detailed in Section 17 (Notices, Defaults, and Remedies) of the contract.

      Our office concurs that if the Authority does not take adequate steps to address all the recommendations outlined in the OIG report a declaration of default of its Consolidated Annual Contributions Contract may be warranted. However, at this time, our office feels the Authority has demonstrated a willingness to resolve the recommendations.

Fair Housing, It's Not An Option. It's The Law!
www.hud.gov     espanol.hud.gov

Therefore, this recommendation will remain open pending receipt of the executed repayment agreement as well as, development and implementation of the revised control policies and procedures required to address recommendations 1C and 1D.

The final action target date for recommendation 1A is September 30, 2008. As directed above, monthly status reports are required detailing the progress of the recommendation.

**RECOMMENDATION 1B: Repay its low-rent public housing program $834,969 from nonfederal funds for the ineligible disbursements related to the credit union.**

Our office and the Authority have agreed in principal to the terms of the repayment agreement. The Authority will repay its low-rent public housing program the $834,969 as reported by the OIG from non federal funds. The Authority's legal counsel is finalizing the agreement for the parties to execute.

The final action target date to execute the repayment agreement is April 30, 2008. Once the agreement is executed the recommendation will be recognized as under repayment and the final action target date will coincide with the dates in the signed agreement. As directed above, monthly status reports are required detailing the progress of the recommendation.

**RECOMMENDATION 1C: Develop and implement controls to ensure that disbursements of operating funds are eligible and supported.**

It is our understanding that the Authority is in the process of contracting with a management consulting firm to perform a comprehensive review of the Authorities management practices and control environment. The firm will develop the necessary policies and procedures to address the OIG's concerns. In addition, the firm will assess the internal control environment over disbursements and management practices and develop controls to improve the effectiveness of the Authority's operations.

Furthermore, the firm will provide management training to the Authority's personnel to assist in the implementation of the revised policies, procedures and control environment. The Authority will provide our office copies of the Board Resolutions approving the revised policies, procedures and management control structure, along with evidence that Authority personnel and the applicable Board members have received the necessary training to implement the revisions.

The final action target date for recommendation 1C is September 30, 2008. As directed above, monthly status reports are required detailing the progress of the recommendation.

**RECOMMENDATION 1D: Develop and implement controls to detect, prevent and resolve future conflict-of-interest situations.**

The Authority has agreed that the management consulting firms review will also include the development and implementation of controls to detect prevent and resolve future conflict of interest situations. The Authority will provide our office copies of the Board Resolutions approving the revised policies relating to monitoring and resolution of conflict-of interest-

situations. Also, the Authority will provide evidence that the appropriate staff and Board members have received the necessary training to implement the policies and resolve any conflict-of-interest issues.

The final action target date for recommendation 1D is September 30, 2008. As directed above, monthly status reports are required detailing the progress of the recommendation.

If you have any questions please contact, Andrew Cianci, Financial Analyst at (215) 861-7611. Our TTY number for the hearing impaired is (215) 656-3450.

Sincerely,

Dennis G. Bellingtier
Director
Office of Public Housing

# EXHIBIT 2

Monthly Status Report
OIG Audit Report 2007-PH1013

As required by the Office of Inspector General, U.S. Department of Housing and Urban Development, the Harrisburg Housing Authority is providing a progress report toward resolving the following recommendations:

**Recommendation 1A** – It was agreed not to initiate default action.

**Recommendation 1B** – Repayment agreement has been executed and first payment is scheduled for December 18, 2008.

**Recommendation 1C** – The Authority has executed a contract with Gilmore Kean Associates for management organizational review, policies and procedures, which will include internal control and ensure eligible expenditure of operating funds.

**Recommendation 1D**– (1) The Authority has as of November 8, 2007, created an Audit Committee to provide oversight for the implementation of the OIG Audit Report recommendations and the Authority's auditor provides regular audit reports to the committee, and (2) establishment of a Governance Committee was completed on November 8, 2007, with the responsibility to evaluate Board functioning, expectations of the Executive Director and General Counsel, and review compliance with legal and ethical requirements of the Authority.fs

Monthly Status Report
OIG Audit Report 2007-PH1013
March 2008

As agree between the U.S. Department of Housing and Urban Development and the Harrisburg Housing Authority, the following is a progress report toward resolving these recommendations:

**Recommendation 1A** – It was agreed not to initiate default action.

**Recommendation 1B** – Repayment agreement has been executed and first payment is scheduled for December 18, 2008.

**Recommendation 1C** – The Authority's senior staff met with Gilmore Kean Associates for the kick-off meeting of the management organizational review on February 27, 2008. The consultant provided a schedule meeting the deadlines the Authority had agreed to with HUD. After review of the schedule, staff and consultant agreed that the Authority would be better served by allowing the consultant more time. Subsequently the consultant presented a revised schedule, attached. A conversation between Jerry Shenck, Acting Executive Director, and Dennis Bellingtier, Director of Public Housing, HUD, resulted in tentative agreement to accept the revised schedule as in the best interest of HHA and schedule would be forwarded to HUD for review and approval.

The staff has forwarded, electronically, a large quantity of the documents requested for review by the consultant.

**Recommendation 1D**– (1) The Authority has as of November 8, 2007, created an Audit Committee to provide oversight for the implementation of the OIG Audit Report recommendations and the Authority's auditor provides regular audit reports to the committee, and (2) establishment of a Governance Committee was completed on November 8, 2007, with the responsibility to evaluate Board functioning, expectations of the Executive Director and General Counsel, and review compliance with legal and ethical requirements of the Authority.

Monthly Status Report
OIG Audit Report 2007-PH1013
April 2008

As agree between the U.S. Department of Housing and Urban Development and the Harrisburg Housing Authority, the following is a progress report toward resolving these recommendations:

**Recommendation 1A** – It was agreed not to initiate default action.

**Recommendation 1B** – Repayment agreement has been executed and first payment is scheduled for December 18, 2008.

**Recommendation 1C** – An on-site orientation occurred 2.27.08 among senior staff as conducted by Principals David Gilmore and Patrick Kean, along with associate Dan Wuenschel, in attendance. All were required to submit a job analysis survey, followed by on-site interviews at their respective job locations. Preliminary interviews of senior staff began the week of March 17th and have continued through the first week of April. Quality control issues were examined, flow of work was analyzed and employees' suggestions at improving their department were discussed. During this time, a review of contracts and procurement activities also was done.

Interviews of two Board members were conducted 3.24.08.

Data collection of HHA policies, plans, organizational chart and procedures from all departments occurred via electronic submission, or by courier if size prohibitive. Info from files continues to be extracted at random selection to review for adherence to policy. Job analysis surveys were then distributed to the remainder of HHA staff for completion and submittal to the consultant by COB 4.7.08.

A team teleconference call was conducted 4.10.08 by Gilmore Kean to discuss plans for the next scheduled on-site visit, as well as determine any outstanding data still required. The owner shall be apprised this week.

The staff has forwarded, electronically, a large quantity of the documents requested for review by the consultant.

**Recommendation 1D**– (1) The Authority has as of November 8, 2007, created an Audit Committee to provide oversight for the implementation of the OIG Audit Report recommendations and the Authority's auditor provides regular audit reports to the committee, and (2) establishment of a Governance Committee was completed on November 8, 2007, with the responsibility to evaluate Board functioning, expectations of the Executive Director and General Counsel, and review compliance with legal and ethical requirements of the Authority. At the next regularly scheduled Board Meeting the new members to the Board will become a part of these two committees.

# EXHIBIT 3



U.S. Department of Housing and Urban Development

Philadelphia Office
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107-3380

**FEB 0 5 2008**



Mr. Jerry Shenck
Acting Executive Director
Harrisburg Housing Authority
351 Chestnut Street
Harrisburg, PA 17101

Dear Mr. Shenck

SUBJECT:    Recommendation 1B: Executed Repayment Agreement
             OIG Audit Report:    2007-PH-1013
             Report date:          September 27, 2007

Attached is a copy of the executed repayment agreement for your files. In accordance with the established management decision, the Authority has agreed to repay the Low-Rent Housing Program $50,000 a year over a 17 year period from non-federal funds. The initial payment should be made prior to December 31, 2008 with final payment due December 31, 2024.

In addition, at the end of each fiscal year the agreement is in effect, the Authority would contribute an additional twenty-five percent (25%) of any Central Office net income as calculated and reported in their Audited Financial Statements towards the outstanding balance.

Furthermore, The Office of Inspector General (OIG) concurred with the recoding of the recommendation to repayment status and has adjusted the final action target date to coincide with the repayment terms.

Also, the Authority is required to provide a monthly status report to our office on the progress made to resolve all the outstanding recommendations. The status report is due the 15th of each month until final resolution has occurred.

If you have any questions please contact, Andrew Cianci, Financial Analyst at (215) 861-7611. Our TTY number for the hearing impaired is (215) 656-3450.

Sincerely,

Dennis G. Bellingtier
Director
Office of Public Housing

## Repayment Agreement

This repayment agreement ("Repayment Agreement") is entered into as of the date first written below by and between the United States of America, acting by and through the Secretary of Housing and Urban Development ("HUD"), and the Harrisburg Housing Authority ("HHA"), a public housing authority organized under the laws of the Commonwealth of Pennsylvania.

### Recitals

Whereas, on September 27, 2007, the HUD Office of Inspector General ("OIG") issued Audit Report 2007-PH-1013 final audit report entitled (the "Audit"), which, among other things, questioned the eligibility of expenditures made by HHA for the Greater Harrisburg Community Credit Union ("GHCCU") and recommended that the Philadelphia HUD Office require HHA to repay HHA's low rent public housing program $834,969.00 HHA had spent toward GHCCU;

Whereas, the Philadelphia Office of HUD concurred with the findings and recommendations of the Audit and notified HHA to that effect; Whereas, HHA has not and does not agree with the findings or recommendations of the Audit, but has determined that it is in the agency's best interest to settle matters with HUD so that HHA may focus on other aspects of agency operations;

Whereas, in entering into this Repayment Agreement, HHA is not conceding to the conclusions drawn by the HUD OIG;

Therefore, for good and valuable consideration that both HUD and HHA agree is sufficient, HUD and HHA agree as follows:

1. By December 31, 2024, HHA will repay its low rent public housing program $834,969.00 in accordance with the repayment schedule described in sections 2 and 3 below.

2. HHA will repay its low rent public housing program at least $50,000 annually for a period of seventeen years, or until the $834,969.00 is fully repaid or this Repayment Agreement is otherwise terminated under the terms and conditions herein.

3. At the end of each fiscal year this Repayment Agreement is in effect, HHA would contribute twenty-five percent (25%) of any Central Office net income as calculated under Generally Accepted Accounting Principles that is in excess of the $50,000 annual repayment amount toward the remaining balance of the amount owed back to the HHA low-rent public housing program.

4. HUD agrees that the Audit and this resulting Repayment Agreement will not be considered a major compliance deficiency for determining eligibility for the "stop loss"

provisions of 24 CFR Part 990 as long as HHA is operating in good faith to resolve the audit findings.

5. HHA and HUD agree to consider amending this Repayment Agreement in the future if circumstances change such that HHA is unable to meet this repayment schedule and meet its obligations to its residents.

6. HHA agrees that if it is in a position to accelerate its payments it will consider doing so.

7. This Repayment Agreement may be modified by written agreement of HHA and HUD.

8. This Repayment Agreement shall express the entire agreement of HUD and HHA, written or oral with respect to the subject matter hereof. If there is any conflict between this Repayment Agreement and a provision of any other existing agreement, the provisions of this Repayment Agreement shall prevail.

9. This Repayment Agreement shall terminate at such time that (i) the full amount has been repaid to the HHA low rent public housing program or (ii) the parties otherwise agree that the repayment is not necessary.

10. If any part of this Repayment Agreement is found to be contrary to law, that part may be severed from the Repayment Agreement and the remainder of the Repayment Agreement shall remain in full force and effect. The remaining Repayment Agreement shall be construed as far as is lawful and practicable to enforce the overall intent of the original Repayment Agreement.

11. In the event that HUD finds that the Authority is not complying with this Repayment Agreement by failing to make payments, HUD will provide the Authority with a written statement specifying the facts of the alleged noncompliance and 30 days for the Authority to resolve or cure the alleged noncompliance. However, if HUD determines that the Authority has not satisfactorily resolved the findings of noncompliance, the Department may take whatever necessary steps to cure the noncompliance.

**[Signatures follow on next page]**

In consideration of the foregoing covenants, the parties do hereby execute this
Repayment Agreement.

HARRISBURG HOUSING AUTHORITY

By _Jerry Shenck_ 1/15/08
Jerry Shenck
Acting Executive Director

UNITED STATES OF AMERICA
Secretary of Housing and Urban
Development

By _____
Director of Public Housing
Philadelphia State Office

Date: _____2/5/08_____

# EXHIBIT 4



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-0500

Office of General Counsel
Departmental Enforcement Center

APR 1 8 2008

VIA FACSIMILE AND UNITED PARCEL SERVICE

The Honorable Stephen R. Reed
Mayor, City of Harrisburg
City Government Center
10 North Second Street, Suite 202
Harrisburg, PA 17101

Re:    Harrisburg Housing Authority – Board of Commissioners
       Debarment of Members Feinerman, Buxton and Harris

Dear Mayor Reed:

This letter is intended to inform you that on March 31, 2008, the Department of Housing and Urban Development (Department or HUD) debarred Leon J. Feinerman, Constance Buxton and Earl Harris. Mr. Feinerman is a current member of the Board of Commissioners (Board) of the Harrisburg, PA, Housing Authority (HHA) and was debarred for three years through March 30, 2011. Mr. Harris is also a current member of the Board and was debarred for eighteen months through March 30, 2011. Ms. Buxton was debarred for three years through March 30, 2011, but the Department has been informed that she has resigned from the Board.

This letter is also intended to assist you and the HHA in understanding the effect of a debarment, especially since it is our understanding that you have a role in the appointment of commissioners for the HHA. A debarred individual is prohibited from future participation in covered procurement and nonprocurement transactions as a participant or principal with HUD and throughout the Executive Branch of the Federal Government. Among other things, the HHA is prohibited from allowing debarred individuals to supervise, exercise critical influence over, or substantially control transactions funded with money provided to the HHA through Annual Contributions Contracts with HUD.

Debarments imposed by HUD are governed by the Department's regulations, found at Title 2, Code of Federal Regulations (C.F.R.), Part 180 as implemented by Title 2, C.F.R., § 2424.10.[1] A failure to observe HUD regulations may subject the HHA to sanctions by the Department.

---

[1] Subsequent to the issuance of the Notices described above, HUD moved its Suspension and Debarment regulations to Title 2 in the Code of Federal Regulations pursuant to an OMB mandate. Effective 28, 2008, HUD adopted OMB's Guidelines on Suspension and Debarment found at 2 C.F.R. Part 180, by enacting 2 C.F.R. § 2424.10. The move did not make substantive changes to HUD's suspension and debarment regulations. 72 Fed. Reg. 73484 (December 27, 2007).

If you have any questions, please call Art Orton, Director, Compliance Division, at (202) 708-3041.

Sincerely,

Henry S. Czauski
Acting Director

Enclosure

cc: Mr. Jerry Shenck
Acting Executive Director
Harrisburg Housing Authority
351 Chestnut Street
Harrisburg, PA. 17101

# EXHIBIT 8

RENO&CAVANAUGH PLLC

1250 Eye Street NW          Tel  (202) 783 2800
Suite 900                  Fax  (202) 783 0550
Washington, DC 20005       renocavanaugh.com

October 28, 2007

Dennis G. Bellingtier
Director, Office of Public Housing
Pennsylvania State Office, 3APH
U.S. Department of Housing and Urban Development
The Wanamaker Building
100 Penn Square, East
Philadelphia, PA 19107-3380

**Re: Harrisburg Housing Authority, Audit Report 2007-PH-1013**

Dear Mr. Bellingtier:

During our meeting on October 9, 2007 to resolve findings from the above audit (the "Audit"), the Harrisburg Housing Authority ("HHA") committed to providing HUD with a plan (1) to upgrade policies and procedures relating to board governance, eligibility of and documentation of expenditures, and conflict of interests and (2) implement the upgraded policies with trainings for the board, staff, and HHA counsel.  As we discussed, HUD's interest in seeing updated policies and procedures is in line with the HHA Board's desire to review and modernize all aspects of housing authority organization.  Prior to the meeting, the HHA Board authorized staff to seek proposals for "a comprehensive review of existing organizational structure, policies and procedures and to incorporate necessary results as appropriate and, if warranted, develop written recommendations for revisions of policies, procedures, budgets, annual and five year plans, etc. to the Board of Commissioners."  (See HHA Resolution No. 24-07 attached.)  HHA plans to incorporate additional items to address HUD concerns, as well as to implement certain "best practices" for governance while HHA staff work to get a consultant on board to assist with policy design and implementation.

**Short Term Actions on Board Governance.**  While a solicitation for professional services to overhaul policies and procedures is outstanding, the HHA will:

1.    ***Create an audit committee by November 8, 2007***. HHA will create a standing committee of the board to (1) as an initial matter, monitor the resolution of the OIG audit and the implementation of the resolution negotiated with HUD and (2) on an ongoing basis, to work with the independent auditor conducting the annual independent audit. The audit committee will ensure that (1) HHA regularly rotates auditors to maintain independence, (2) the selected auditing firms have had satisfactory peer reviews, and (3) that the auditor provides the audit committee with regular audit reports. The audit committee will be alert for:

> signs that management is not providing the auditors needed information or documentation,

> any practices that the auditors note as questionable or high risk, and

> a pattern of discord with auditors and management about accounting procedures that are consistently resolved in favor of management.

RENO&CAVANAUGHᴘʟʟᴄ                                      renocavanaugh.com

Finally, the audit committee, with the assistance of the HHA fee accountant, will establish internal audit procedures to be monitored by the committee.

2.    ***Establish a governance committee by November 8, 2007***. The Authority will form a standing governance committee of the board to (1) establish clearly articulated policies and procedures for informed board oversight of the activities of HHA, (2) periodically review board functioning, (3) create clear expectations for board members, board committees, the executive director, the general counsel (including the expectation that counsel "report up" with respect to fiduciary duties), and senior staff (4) institute a regular training program for existing and new board members, (5) evaluate the effectiveness of individual board members and committees; and (6) regularly review compliance with legal and ethical requirements imposed on the organization, including conflicts of interest and related disclosure requirements.

**Long Term Organizational Changes.**  As previously discussed, HHA plans to issue a request for proposals ("RFP") for a organization with established expertise in public agency management that will work with the Board and staff of HHA to conduct the comprehensive review of HHA's organizational structure by November 15, 2007. HHA will provide a draft of the RFP to HUD for review and comment if needed. The Board anticipates the following schedule pursuant to the RFP: (1) award made and Contractor to begin work by January 15, 2008, (2) Contractor must deliver the Comprehensive Review Report due by March, 15, 2008, (3) the Comprehensive Review Report will include a list of policies to be revised or created, delivery dates for each policy, and training recommendations based on the newly revised policies and existing polices deemed to be adequate.  The Board will evaluate and implement as necessary the recommendations of the Comprehensive Review Report and expects that all policies and procedures and required board, staff, and counsel training will be completed by October 1, 2008.

We look forward to hearing your thoughts on HHA's plans during our call. We are currently working on a response to the other aspects of the Audit per our earlier discussions.

Sincerely,

Megan Glasheen

Cc:    Irwin Aronson, Esq.
       Jerry Shenck
       Ivy Prout, Esq.
       Vickie Longosz, Esq.

# EXHIBIT 9

RENO&CAVANAUGH PLLC

1250 Eye Street NW
Suite 900
Washington, DC 20005

Tel (202) 783 2800
Fax (202) 783 0550
renocavanaugh.com

November 9, 2007

Dennis B. Bellingtier
Director, Office of Public Housing
Pennsylvania State Office, 3APH
U.S. Department of Urban and Housing Development
The Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107-3380

**Re: Harrisburg Housing Authority, Audit Report 2007-PH-1013**

Mr. Bellingtier:

During our meeting on October 9, 2007 regarding the above audit (the "Audit"), the Harrisburg Housing Authority ("HHA") committed to HUD that it would provide proposed resolutions quickly so that your office could meet its internal management goals of resolving audit findings within 60 days. In that meeting, it was agreed that HHA would make proposals in two parts. The first HHA proposal was to deal with management improvements HHA would make to address Audit findings. HHA provided a plan for a comprehensive review of agency functioning and a schedule for policy improvement and training to HUD on October 28, 2007. The second HHA proposal was to address the amount the OIG claimed to be owed by HHA back to its public housing program. This letter is that proposal. HHA is proposing that it repay its public housing program over a period of approximately 14 years. More detail on the repayment plan is below.

In agreeing to this repayment plan, HHA is not conceding in any way that the expenditures for the Greater Harrisburg Community Credit Union ("GHCCU") were not eligible as alleged in the Audit. However, HHA has determined that it is in the agency's best interest to resolve the Audit finding and move forward. The law surrounding this particular area is exceedingly complex and HHA continues to maintain that its analysis and application of the law was both reasonable and proper. Moreover, the HHA employees and commissioners that participated in the creation and maintenance of the GHCCU did so to serve HHA's residents and with the belief that those actions were proper and permissible under the applicable rules and regulations. It is important to note that the Audit arrived at this same conclusion.

HHA proposes repay to its Low Rent Public Housing Program the $834,969 over an approximate 14 year period as reduced by the expenses necessary to undertake and implement the management review and training proposed in my October 28, 2007 letter to you. It is expected that these expenses will be

RENO&CAVANAUGH PLLC                                          renocavanaugh.com

around $100,000 to $150,000. However, we would expect that HUD would retain the ability to review and comment on the proposed expenses so that the total repayment is not unreasonably reduced. HHA further proposes to repay the remaining amount at a rate of $50,000 per year, payable annually. In addition, at the end of each year, HHA would contribute twenty-five percent of any Central Office net income that is in excess of $50,000, toward the remaining balance of the amount owed back to the program. To make this plan work, we request that the Department agree that the findings of the Audit will not be considered a major compliance deficiency for purposes of the stop loss provisions of 24 CFR Part 990.

The above repayment plan will enable HHA to resolve the Audit findings and continue to run the Authority responsibly. As you know, HHA does not have any source of non-Federal funds other than money derived from its central office income, which is considered non-federal funds under the new asset management regime. HHA has not undertaken extensive development or other entrepreneurial activities that would generate any other non-federal funds. After consulting with its fee accountant, Jason Casterline, and taking into account the normal and customary operating expenses and income expected and/or budgeted during the next few years, HHA determined that $50,000 is an amount that it can sensibly commit to reallocate to the public housing program on a yearly basis.

This approach will allow HHA to make the requested repayment, while still ensuring that HHA will be able to operate its central office and serve its residents. Ultimately, HHA cannot repay funds it does not have and it is not in anyone's interest to drain the central office of all available resources. Over the next few years, HHA needs to complete the management review discussed in the October 28, 2007 letter and make investments in upgraded technology that will enable the Authority to operate at a higher, more efficient level.

HHA hopes that HUD agrees that this plan presents a fair and reasonable resolution of the Audit's recommendations. HHA also requests that HUD keep open the possibility of revising this plan in the future should circumstances drastically change. Certainly if HHA finds itself in a position to accelerate its payments it would consider doing so. We hope that HUD will be as willing to discuss options should unforeseen circumstances, such as increased proration or other operating expenses, put HHA in the position of being unable to meet this repayment schedule.

The OIG Audit Report provided an extremely slanted and conclusory statement of the facts concerning the creation and funding of the GHCCU. Attached for your information are more fulsome details on the factual context for the initiation of the GHCCU. HHA feels that it is important to clear the factual record given the impression left by the Audit Report.

2

RENO&CAVANAUGH PLLC                                        renocavanaugh.com

Please let me know as soon as possible whether this proposal is acceptable to the Department.  While HHA has not received anything in writing from your office on our proposed policy and training actions, HHA moved forward on all actions proposed in its Board meeting yesterday and is implementing the proposed plan.

Sincerely,

Megan Glasheen

Attachment

Cc:     Irwin Aronson, Esq.
        Jerry Shenck
        Ivy Prout, Esq.
        Vickie Longosz, Esq.
        Eugenia Metrakas

3

RENO&CAVANAUGH PLLC                                    renocavanaugh.com

---

**The Creation of the Greater Harrisburg Community Credit Union**

It is important to understand the context under which the GHCCU was created. Harrisburg's population is mostly low income – only 2 census tracts in the City have incomes above poverty level, which means that a high percentage of the City is eligible for public and assisted housing. When planning for GHCCU started, HUD, public housing authorities, and others were actively looking at ways to assist low income people, and beneficiaries of public housing in particular, to build assets so that they could advance up the economic ladder. A number of HUD programs, including the old Tenant Opportunity Program and the HOPE VI Program encouraged the creation of community credit unions to serve public housing residents.[1] In March of 1996, the HUD Philadelphia Field Office held a half-day meeting on the formation of resident-owned credit unions that included a presentation by the Binghamton Housing Authority about a credit union it started for the benefit of its residents and staff. The Binghamton Housing Authority uses capital funds for its low-income credit union.[2] HHA was also aware that other housing authorities had created credit unions or were considering creating credit unions.[3]

**Community-Wide Effort to Bring Financial Services to Public Housing Residents.** Also in 1996, the City of Harrisburg, local business leaders, bankers, civic leaders and the religious community created a 45 member "task force" called the Community Investment Partnership to investigate the viability of a credit union to address the financial needs of low-income residents in the City of Harrisburg. HHA was not part of the original task force. In 1998, the HHA, through its executive director Dorsey Howard, became involved in the planning for the GHCCU. Mr. Howard joined the Community Investment Partnership. He saw the credit union as a potentially effective way to meet the service needs of public housing residents. Toward that end, he hired the former head of the Pennsylvania Housing Finance Agency, Carl Payne, "*to assist in securing the creation of a banking and banking related service facility such as a credit union specifically designed to serve the appropriate needs of residents of properties owned, operated, and/or superintended by HHA, as well as low income individuals and families generally who live in Harrisburg.*" HHA's contract with Payne included the following responsibilities (all of which were related primarily to the service of public housing residents):

    o      provide information and assistance to HHA in understanding credit, capital and banking related services that may be offered by a credit union for the benefit of HHA residents,

---

[1] Section 34 of the Housing Act of 1937 as amended (the "Act") contemplates HUD funding for the formation of "community credit unions."
[2] Binghamton Housing Authority Annual Plans.
[3] Based on a quick Google search, it appears that the San Antonio Housing Authority and the Stark Metropolitan Housing Authority in Ohio created credit unions, although sources of operational funding are not clear.

RENO&CAVANAUGH PLLC                                          renocavanaugh.com

> ○    provide assistance in identifying service needs of residents and
>      develop appropriate methods to deliver such services, and
>
> ○    provide guidance and assistance to HHA in securing resident
>      participation.

**Public Housing Residents Wanted the Financial Services of a Credit
Union.** Also in 1998, the Community Investment Partnership conducted a survey
of Harrisburg's low-income community to document the need for a community
credit union in accordance with rules established by the National Credit Union
Administration ("NCUA"). Of the 1,560 responses the Community Investment
Partnership received from the survey, 900 were public housing residents.[4]  The
City of Harrisburg and the Commonwealth of Pennsylvania through its
Department of Economic Development pledged to provide operating funds to the
GHCCU, as did the HHA, based on the strong showing of interest from public
housing residents and the business plan developed by the Community
Investment Partnership.

**GHCCU Opened for Business in 2001 and Recruited 1000 Members.** The
NCUA approved the low-income designation of GHCCU in June 1999, and
approved deposit insurance coverage in January 2001. The low-income
designation means that a minimum of 50.1 percent of the total membership must
have annual incomes of less than $25,000. The Pennsylvania Department of
Banking approved the "field of membership" for GHCCU in April 1999, and issued
a certificate of authorization for GHCCU to do business in February 2001. GHCCU
opened its doors for business in April 2001 with more than $2 million in start-up
capitalization from area financial institutions and business.[5]  The marketing plan
expressly targeted HHA residents. The credit union served the needs of the
community and provided meaningful access to financial services to over 1,000
members of the Harrisburg community and including a significant number of
public housing residents.  Because of privacy laws, HHA could not and cannot
gain access to information on the number of public housing residents who were
members of the GHCCU.[6] Unfortunately, in 2006, the NCUA closed the doors of
the credit union because of a number of non-performing loans and because
GHCCU was unable to meet the complicated and burdensome net worth
requirements.[7]

---

[4] This is a significant response given that the number of households served by HHA is 1,735.
[5] Note that the funds raised for capitalization were insured, but the funds pledged for
operating support from the public entities were not.
[6] HHA has requested such information from NCUA. The request is pending, but the initial
response from the NCUA is that it cannot release the information. While HHA believes that
there are other ways to track the effectiveness of economic development programs other
than lists of participants, it is important to note, however, that HUD OIG could obtain access
to this information both from NCUA and the Commonwealth Department of Banking, but did
not. Because the OIG stressed so heavily that HHA could not document specific participants,
it is clear that the OIG could have obtained this information.
[7] GHCCU had difficulty meeting the net worth requirements in large part because it was a
designated low-income credit union with a majority of low-income families as members.  In

RENO&CAVANAUGH PLLC                                              renocavanaugh.com

HHA was extremely open about its support for the credit union and publicized it widely. Newsletters and annual reports promoted the GHCCU to public housing residents. The operational support for GHCCU was in the HHA's annual budget. HHA's independent auditors, who specifically reviewed the GHCCU expenditures, did not raise any questions or issues to HHA management or the Board of Commissioners about the eligibility of the support for the credit union.  Dorsey Howard, who initiated HHA's involvement in the credit union, and the Board of Commissioners believed that HHAs financial support of the credit union was consistent with HUD guidance.[8]  It is also worth noting that the decision to fund the GHCCU was made nine years ago with an executive director who has since passed away and is unavailable to provide further information about the formation of the GHCCU and any conversations he may have had with HUD about it. Staff who were at HHA at the time believed that Mr. Howard had cleared the program with HUD, but given the passage of time, just as HUD cannot locate an agenda from a meeting it held 11 years ago, HHA cannot locate any correspondence with HUD or notes from conversations with Department.

---

addition, the non-performing loans were made by an employee that failed to follow GHCCU's internal control processes for loan approvals.

[8] In addition, Dorsey Howard had instructed an HHA employee to detail the credit union expenditure in the HHA annual plan, which the employee later forgot. When the employee realized that he had omitted the information, he reviewed the annual plan guidance and concluded that fuller details were not necessary because the expenditure was from operating funds.

3

# EXHIBIT 10

RENO&CAVANAUGH PLLC

1250 Eye Street NW
Suite 900
Washington, DC 20005

Tel  (202) 783 2800
Fax (202) 783 0550
renocavanaugh.com

November 19, 2007

Dennis B. Bellingtier
Director, Office of Public Housing
Pennsylvania State Office, 3APH
U.S. Department of Urban and Housing Development
The Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107-3380

**Re: Harrisburg Housing Authority, Audit Report 2007-PH-1013**

Mr. Bellingtier:

This letter is to confirm our conversation earlier today about above audit (the "Audit"). During that conversation, we agreed to the following resolution of the various recommendations made in the audit (listed in the same manner as in the Audit):

| Recommendation | Action/Resolution |
|---|---|
| Recommendation 1A | It was agreed that it is premature to initiate such drastic action. |
| Recommendation 1B | HUD agreed to accept the proposal outlined in the HHA's November 9, 2007 letter, except for the proposed deduction for the management and policy analysis. Therefore, the repayment term will extend to 17 years instead of the proposed 14 years. HHA being a "stop-loss" agency is essential to making the repayments. HUD agreed to work to provide HHA with needed assurances on stop loss. HHA counsel is to propose a repayment agreement by November 28, 2007. The goal is that HUD and HHA agree to terms in time for a December 13, 2007 board meeting. |
| Recommendation 1C | HUD agreed to accept the proposal outlined in the HHA's October 28, 2007 letter. HHA agreed that the management review for which an RFP was issued on November 15, 2007 will include the creation of "controls to ensure that expenditures of operating funds are eligible and supported." |
| Recommendation 1D | HHA agreed that the management review will include the creation and implementation of "controls to detect, prevent, and resolve future conflict of interest situations." |

RENO&CAVANAUGH PLLC                                    renocavanaugh.com

Please let me know as soon as possible whether the above represents your recollection of the meeting.  In the meantime, HHA will proceed forward.

In agreeing to the above, HHA is not conceding in any way that the expenditures for the Greater Harrisburg Community Credit Union ("GHCCU") were not eligible as alleged in the Audit.  However, as previously discussed, HHA believes it is in the agency's best interest to put the Audit behind it.

Sincerely,

Megan Glasheen

Cc:    Irwin Aronson, Esq.
       Jerry Shenck
       Ivy Prout, Esq.
       Vickie Longosz, Esq.
       Eugenia Metrakas

2

# EXHIBIT 11

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Washington, D.C.

---

In the Matter of:

LEON J. FEINERMAN,
EARL HARRIS, AND
CONSTANCE BUXTON,

Respondent.

DOCKET NO.  07-3441-DB
DOCKET NO.  07-3432-DB
DOCKET NO.  07-3443-DB

---

## DEBARRING OFFICIAL'S DETERMINATION

### INTRODUCTION

By separate Notices dated July 30, 2007("Notice"), the Department of Housing and Urban Development ("HUD") notified each of the respective Respondents, LEON J. FEINERMAN, EARL HARRIS, and CONSTANCE BUXTON, that HUD was proposing their debarment from future participation in procurement and nonprocurement transactions as a participant or principal with HUD and throughout the Executive Branch of the Federal Government for a period of three years from the date of final determination of this action. HUD advised each of the Respondents in the July 30, 2007 Notice that the proposed debarment action was in accordance with the procedures set forth in 24 CFR part 24[1].

The respective Notices informed each Respondent that the proposed debarment was based on the acts and omissions of the Harrisburg (Pennsylvania) Housing Authority (HHA) during Respondents' tenure on the HHA's Board of Commissioners.[2] The Notice further explained to each of the Respondents that "[t]he acts and omissions of the HHA are imputed to [them] pursuant to 24 CFR 24.630(b) because as a member of HHA's Board, [they] participated in, had knowledge of, or had reason to know of the violations."

---

[1] HUD published a final rule on December 27, 2007 (72 FR 73484) that relocated and recodified 24 CFR part 24 as 2 CFR part 2424. HUD's December 27, 2007, rule stated that the rule "adopts, by reference, the baseline provisions of 2 CFR 180," the government-wide rule published by OMB on August 31, 2005 (70 FR 51863) setting forth guidance for agencies with respect to nonprocurement debarment and suspension. However, because this matter arose before publication of HUD's final rule, for the convenience of the reader, references herein will be to the regulations in their former location at 24 CFR part 24.
[2] Respondent Feinerman has been a member of the HHA Board since 1983 to the present. Respondents Harris and Buxton became Board members in December 1999. Reverend Harris continues to serve to the present time. Respondent Buxton is no longer a member of the Board.

1

The violations were described in the respective Notices as Respondents' "allowing large sums of HHA's operating subsidy funds, which it receives annually from HUD for the purpose of developing and operating the HHA, to be used to fund . . . the Greater Harrisburg Community Credit Union (GHCCU) without obtaining HUD's authorization for such expenditures" in violation of the Annual Contributions Contract (ACC) between HUD and HHA.

The Notices specifically cited the provision in Section 9(B) of the ACC that requires the housing authority to place all funds it holds into the "General Fund." Further, the Notices set forth the restrictions in Section 9(C) on the use of the General Fund monies as including (1) "payment of the costs of development and operation of the projects under the ACC with HUD; (2) the purchase of investment securities as approved by HUD; and (3) such other purposes as may be specifically approved by HUD." The Notices also advised Respondents that "GHCCU is not an operation or function of HHA, nor is it an HHA owned property covered under the ACC."

The specific charges against each of the Respondents were that in 2003 and 2004, they voted to transfer $30,000.00 and $505,000.00, [3] respectively, of HHA's operating subsidy funds to GHCCU. Because HAA did not obtain HUD approval, the payments to GHCCU violated Section 9 of the ACC.

A hearing on Respondents' proposed debarment was held in Washington, D.C. on January 30, 2008, before the Debarring Official's Designee, Mortimer F. Coward. Respondents Feinerman and Harris were present at the hearing (Respondent Buxton was not present). Respondents were represented by Mona Lyons, Esq., and Lee Reno, Esq, and Sarah Molseed, Esq. of Reno and Cavanaugh. Brendan Power, Esq. appeared on behalf of HUD.

## SUMMARY

I have determined, pursuant to 24 CFR part 24, to debar Respondents Feinerman and Buxton for a period of three years from the date of this Determination and to debar Respondent Harris for a period of eighteen months from the date of this Determination from future participation in procurement and nonprocurement transactions, as a participant, principal, or contractor with HUD and throughout the Executive Branch of the Federal Government. My decision is based on the administrative record in this matter, which includes the following information:

1) The Notices of Proposed Debarment dated July 30 2007.

---

[3] With respect to Respondent Harris, the government notes that the "Notice of Debarment directed against Harris incorrectly states that in 2004 Harris voted to authorize HHA to transfer $505,000 to GHCC over a four-year period." The footnote states that Reverend Harris was not present at the September 9, 2004, HHA Board meeting. See Government's Brief in Support of Three-Year Debarment of Respondent Harris at n.5 (Harris Brief).

2) A letter dated August 31, 2007, addressed to the Debarring Official's Designee from Respondents' attorney.
3) The Government's Motion to Refer to a Hearing Officer, filed December 3, 2007.
4) Respondents' Opposition to Government's Motion to Refer to a Hearing Officer, filed December 21, 2007.
5) Government's Request for Leave to File Its Reply in Support of Its Motion to Refer to a Hearing Officer, filed January 11, 2008.
6) The Government's Reply in Support of Its Motion to Refer to a Hearing Officer, filed January 11, 2008.
7) 7) The separate briefs filed October 19, 2007, by the Government with respect to each of the Respondents, styled Government's Brief in Support of Three Year Debarment (including all exhibits and attachments thereto).
8) Brief of Respondents Leon J. Feinerman, Earl Harris, and Constance Buxton in Opposition to Debarment, filed November 20, 2007 (including all exhibits thereto).
9) The Debarring Official's Designee's notes from a conference call held January 18, 2008, with counsel for the parties.
10) The digital recording of the January 30, 2008, hearing.

## HUD'S ARGUMENTS

HUD argues that Respondents, who were all board members of the HHA, either participated in, knew of, or had reason to know that their actions in "diverting" monies from the HHA General Fund to fund the GHCCU, without obtaining HUD's authorization, was a violation of the ACC. Respondent Feinerman, chair of HHA's board, executed the ACC in 1997 on behalf of the board.[4] HUD notes that, pursuant to 24 CFR 968.105, the ACC describes the requirements that govern the PHA's actions with respect to the operation and management of a housing authority. HUD notes further that the GHCCU was not an HHA program or operation and did not limit its membership to HHA residents.[5]

HUD argues that in furtherance of its support for the GHCCU, HHA "improperly disbursed $841,655[6] from its General Fund to GHCCU," as shown by GHCCU's own records. Each of the respondents was a participant at various Board meetings and actively supported the funding of GHCCU from HHA's General Fund,[7] including the

---

[4] The Government's arguments summarized here generally relate to all three Respondents. Where there are specific differences in the actions of the three Respondents that bear on their alleged culpability, based on the Government's arguments, these will be noted. For the most part, however, immaterial differences in the allegations against the three Respondents, especially to the extent those differences play no part in the Determination, will not be treated at length here.

[5] The record reveals that up to the time of its closure, only a small minority of GHCCU's membership was drawn from the residents of HHA.

[6] The OIG Audit Report holds that HHA improperly disbursed $834,969.00. *See* Audit Report Number 2007-PH-1013, issued September 27, 2007.

[7] See, e.g., HUD's Brief in Support of Three-Year Debarment of Feinerman at pp.4 ff.(Feinerman Brief); HUD's Brief in Support of Three-Year Debarment of Harris at pp.5 ff (Harris Brief); and HUD's Brief in Support of Three-Year Debarment of Buxton at pp.4 ff (Buxton Brief).

signing of HHA checks therefor (Feinerman), making motions to approve contributions of HHA funds to GHCCU (Harris), and cosigning of HHA checks to transfer funds to the credit union and membership on GHCCU's Board (Buxton).

It is these actions recited above that HUD argues should result in Respondents' debarment. First, HUD argues that each of the Respondents in their capacity as an HHA Board member "is a 'person' and a 'participant' as those terms are defined by HUD regulations." Further, as commissioners of a housing authority, Respondents "are considered supervisors" of a housing authority, thus they "are participants engaged in primary covered transactions, and are subject to HUD sanctions under 24 CFR part 24."

HUD next argues that there is cause for debarment of Respondents under 24 CFR 24.800(b)(1) "because HHA contributed $841,655 of its General Fund to GHCCU without first obtaining HUD's authorization, which is a willful violation of Section 9(C) of the ACC." HUD also contends that there is cause for debarment under 24 CFR 800(b)(2)(a) based on HHA's "history of failure to perform in accordance with program requirements," citing the large "unauthorized" contributions made to GHCCU over several years.

With respect to each of the Respondents, HUD argues that "the record plainly shows that [they] knew or had reason to know" that approving the contributions from the General Fund to GHCCU "without obtaining HUD's prior authorization was prohibited by Section 9 of the ACC." Further, applicable Pennsylvania law imposes on Respondents the responsibility to make "sure that the requirements set forth in the ACC are followed." The ACC, HUD argues, "is not an obscure government publication[;]" thus, Respondents must have known that funding GHCCU "was in violation of Section 9 of the ACC."

HUD contends that there also is cause for debarment of Respondents under 24 CFR 24.800(d). Respondents' conduct was irresponsible in that they violated their obligation to safeguard federal funds by making a gift of HHA funds to GHCCU, "thereby permanently depriving HHA and its residents from those funds."

The wrongful actions of HHA detailed above, HUD argues, are imputable to Respondents under 24 CFR 24.630(b) because they "participated in, knew of, or had reason to know of the improper conduct."

HUD dismisses HHA's argument that HUD's interpretation of Section 9 of the ACC is overly restrictive. HHA was responding to the OIG's conclusion in its audit that HHA improperly disbursed its General Funds monies to GHCCU. HUD characterizes as erroneous HHA's claim that "the expenditures were appropriate as an eligible tenant service under the [U.S. Housing] Act's definition of operations, or in furtherance of a permissible arrangement under Section 13 of the [U.S. Housing] Act to enter into business relationships with affiliated entities to provide tenant services."

4

HUD argues that HHA misstates the Act's meaning of certain terms therein. According to HUD, "a plain reading of Section 3(c)(2) of the Act shows that 'operations' and 'tenant programs and services' only pertain to activities that are conducted for the sole purpose of benefiting the PHA and its tenants (or residents), and not for businesses that are open to the public at large."

Section 13 of the Act, HUD insists, "does not authorize PHAs to withdraw its General Funds monies for non-housing authority purposes without obtaining HUD's permission." HHA, HUD points out, admits that it failed to obtain HUD approval. HUD also rejects HHA's claims that it had a choice to disclose to HUD its intentions to make contributions to GHCCU or to list the contributions as a line item in its annual plan. Similarly, HUD rejects HHA's claim that it satisfied "all disclosure requirements under 24 CFR part 903" by including a statement that HHA "would continue to establish partnership agreements" etc. HUD states that "[s]uch a general statement of intent fails to satisfy 24 C.F.R. 903.7(l)(1)."

HUD concludes that Respondents did not act responsibly in their supervision of HHA, and their claim of "good faith reliance upon the advice of professionals, consultants, management, and staff is without merit." Accordingly, Respondents three-year debarment is warranted and is necessary to protect the public interest.

## RESPONDENTS' ARGUMENTS

Respondents raise as general contentions that HUD cannot dispute that the HHA residents needed the financial resources offered by a credit union. Moreover, none of the Respondents knew that the contributions to GHCCU from HHA were not approved by HUD. Consequently, "given the benign nature of the [Respondents'] alleged wrongdoing . . . HUD's proposed debarments of them are without factual and legal basis, and punitive."

Respondents note as background to the instant dispute that a mayoral task force recommended the establishment of a low-income credit union to serve the low-income residents of the city. The then-Executive Director of HHA along with the commissioners serving at the time, including Respondent Feinerman, believed that a credit union could offer HHA residents a benefit equal to other recognized resident services. Over half of the responses received to a survey canvassing the possible need for a credit union were from HHA residents. In April 1999, the responsible state agency approved the credit union's eligible membership base to include all persons who lived and worked in the City of Harrisburg, including the residents of HHA. In June 1999, GHCCU was designated by the National Credit Union Administration (NCUA) as a low-income credit union.

The Executive Director (ED) of the HHA was appointed Chair of the credit union's Board. At an HHA Board meeting in October 1999, the ED informed HHA's commissioners that $500,000.00 had been set aside to support the operations of the credit union over a five-year period. The details of this commitment, as the HHA Board understood it, were set forth in the Comprehensive Grant Program Annual Submission

("Submission") when it was approved by HUD. However, as sworn to by the responsible employee in his declaration attached to Respondents' brief as Respondents' Exhibit 5, he inadvertently omitted in the Submission to HUD a description of the planned financial support for GHCCU[8]. In his declaration, the employee swears that he informed the ED of his mistake and suggested that the credit union could be supported from an account tied to the operating subsidy. The employee admits in his declaration that he "did not inform the HHA Board that the financial support for the credit union was not included in the plan submitted to HUD."[9]

Respondents acknowledge that by 2004 the $500,000.00 set aside had been spent and the HHA Board approved a further multi-year commitment of $495,000.00. It is Respondents' position that at every HHA Board meeting at which the HHA funding of the credit union was discussed, the HHA general counsel and ED along with other senior staff were present. Moreover, the Board was never advised that funding of the credit union was improper nor of the failure to inform HUD of the financial support to GHCCU.

It is against this factual background, as described by Respondents, that Respondents reject the arguments offered by HUD to justify their debarment. First, Respondents contend that there is no basis for HUD's argument that, pursuant to 24 CFR 24.800(b), their votes to fund GHCCU, as described above, constituted "willful failure to perform" or a "willful violation of a legal or contractual obligation." HUD's argument is baseless because, Respondents claim, they did not know that HUD was not informed of the contributions to be made to GHCCU nor that the contributions were ineligible under the ACC or the Housing Act of 1937. Additionally, Respondent Feinerman argues that he knew at least one housing authority had established a credit union, that HUD facilitated meetings to accomplish that goal, and that "HHA's professional staff, and its general counsel, had no concerns about the eligibility and propriety of the expenditures for GHCCU."

Respondents argue that willfulness "denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental," or "a thing done without ground for believing it is lawful or conduct marked by a careless disregard whether or not one has the right so to act," citing United States v. Murdock, 290 U.S. 389 (1933). As such, "[a]n individual does not willfully violate a public agreement or transaction if the person does not know that he or she is violating the agreement or transaction." Moreover, "signing a document containing erroneous information is not 'willful' unless the signer has knowledge of the error." (Citation omitted) In light of these authorities, and because HUD has the burden of proving that cause for debarment exists, HUD has "wholly failed to meet it on the grounds that the HHA commissioners engaged in 'willful' wrongdoing."

Respondents also argue that it is not clear that either the Housing Act of 1937 or the ACC requires HUD approval for the use of public housing funds to support a credit union. In any event, say Respondents, even accepting HUD's interpretation of the law,

---

[8] Schenck Declaration at ¶ 5.
[9] Id., at ¶ 7.

HUD has not demonstrated that the Respondents knew that funding GHCCU was in violation of the ACC, or that they "acted with reckless disregard for the ACC when they voted to fund GHCCU."

As an additional challenge to HUD's willfulness argument, Respondents cite HUD Board of Contract cases for the proposition that a "wrongful act is not willful if it is based on a misunderstanding of the applicable law or undertaken without knowledge of the law or public agreement." So too, "willful conduct is distinguishable from a mistake." (Citations omitted) Respondents thus conclude that because they "had no reason to believe that their actions did not conform to the requirements of the ACC, they cannot be found to have acted willfully even if they were mistaken."

Respondents argue further that pursuant to applicable Pennsylvania law, HHA is empowered to hire, among others, technical experts. See 35 Pa. Cons. Stat. § 1547. Further, Respondents argue that HHA is a governmental corporation and in accordance with 42 Pa. Cons. Stat. § 8332.5(b), directors of a governmental corporation are subject to the standards and immunities that apply to non-profit organizations. Accordingly, because HHA is a governmental corporation, "its commissioners are subject to the standards applicable to non-profit directors." In this regard, Respondents argue that under 15 Pa. Cons. Stat. § 5712, a director is "entitled to rely in good faith on information [and] opinions, . . . prepared by . . . officers or employees . . . counsel . . . or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person."

Respondents thus contend that their decisions to fund the credit union that HUD now challenges as willful violations of the law or ACC were made by them subsequent to their receiving advice and information from two experienced executive directors. Furthermore, HHA's general counsel was present at the Board meetings when the funding issue was discussed and decided. Therefore, Respondents argue, they properly relied on the expertise of the professional and executive staff for guidance with respect to the law and the ACC. As Respondents see it, their reliance on their staff and general counsel for guidance on the provisions of the ACC makes a charge of willful violation untenable, because "neither bad advice nor reliance on it rises to the level of a willful violation under 24 CFR 24.800(b)."

Respondents take issue with what they view as HUD's implication that the ACC is so clear and unambiguous in its terms that they should have known that their funding decisions violated it. Respondents argue that the ACC is a generic document that does not describe in detail applicable HUD's regulations. For example, say Respondents, the ACC does not specify which expenditures are prohibited or what constitutes an eligible resident service, nor does HUD provide such guidance. Additionally, the provisions of Section 3 and Section 9 of the ACC as they relate to critical terms like "operation" and "project" seem to be in conflict. This conflict is evident, Respondents argue, in their construction of the ACC that is clearly contrary to HUD's position. Respondents' position is that because resident services are included in the definition of "operation" in

7

section 3(c)(2) of the Housing Act of 1937, the services can be funded without HUD's approval.

Respondents make the argument that because HUD "was actively promoting credit unions as a resident service at the time GHCCU was created, one might reasonably assume that HUD considered credit unions to be eligible resident services." HUD, however, disagrees. The result, as Respondents view it, is that no matter which interpretation is correct, "the provisions are at least ambiguous and arguably conflicting," thus "HUD has not established, and cannot establish", that their actions "constituted willful violations of the ACC or the law."

Respondents contend that their decision to fund the credit union is no cause for debarment because they have no history of failure to perform or of unsatisfactory performance of any public agreements or transactions. Only two acts, the two commitments in 1999 and 2004, respectively, to fund GHCCU "could even arguably warrant debarment." The other actions with respect to funding GHCCU involved implementation of the two decisions, and "the implementation of a decision over time does not constitute a history of decision-making." Respondents also note that during the time at issue here, HHA was rated by HUD as either a standard or high performer. Thus, there is no cause for debarment under 24 CFR 24.800(b)(2).

Similarly, Respondents reject HUD's contention that debarment is warranted under 24 CFR 24.800(d). First, Respondents argue that they fulfilled their duties under Pennsylvania law, and their doing so "establishes their present responsibility as a matter of law." In addition, Respondents argue that they were faithful in discharging "their fiduciary duties to the agency they serve as volunteers," and followed the advice of legal counsel and other professionals with respect to establishing and supporting GHCCU. Respondent Feinerman also knew at the time the issue of establishing GHCCU was being discussed that other housing authorities, including Binghamton Housing Authority in New York, were supporting credit unions. Respondents also note that during the relevant time period, HHA's books were audited annually, including examination of its operations to determine compliance with regulatory requirements. None of the audits questioned HHA's financial support for GHCCU.

Respondents reject, too, HUD's charge that they failed to safeguard federal funds and permanently deprived HHA residents of the use of the funds given to GHCCU. Respondents point out that, in light of the OIG audit, HHA has determined to repay the funds given to the credit union. Respondents also disagree with HUD that they failed in their supervisory responsibility with respect to HHA and use of its funds, because it is not their responsibility as commissioners to obtain prior approval of specific expenditures. Such operational details, Respondents argue, are the responsibility of the Executive Director and the staff. It is Respondents' position that to the extent they "did not act with knowledge that required HUD approval was absent, or disregard the need for such approval . . . , the failure to obtain prior approval [of the contributions to GHCCU] does not, and legally cannot, implicate their present responsibility."

8

Accordingly, Respondents argue that because they have fulfilled and continue to fulfill their fiduciary duties, and because HHA has suffered no permanent harm, HUD has failed to establish a cause so compelling that it bears on their present responsibility. In this regard, Respondents note that the contributions made to GHCCU, while substantial, were made over an eight-year period and accounted for less than one percent of HHA's budget.

Respondents cite as further mitigating factors, HHA's intent to repay the federal funds with non-federal funds, their dedicated service as public servants, their contention that the alleged wrongdoing was isolated and not pervasive, their cooperation or willingness to cooperate with HUD to resolve the OIG findings, and their commitment to implement new policies and internal controls to ensure compliance with HUD regulations, applicable law, and the ACC.

Respondents note that their conduct, which is now at issue, began over ten years ago. For that reason, their present responsibility "cannot genuinely or fairly be called into question and the only purpose served by their debarments would be punitive and contrary to law." Moreover, their debarment would be "contrary to public policy limiting the liability of directors . . . and would deter qualified and competent individuals from offering their services to" PHA's.

Respondents conclude that HUD has failed to establish adequate factual or legal grounds to debar them "and its flawed and unfair efforts to do so constitute an abuse of its debarment authority." Further, even if the evidence is considered sufficient to establish cause for debarment, "it simultaneously mitigates against debarment and demonstrates that the actions proposed by HUD are unjustified, stale and contrary to public policy." Accordingly, Respondents urge dismissal of their proposed debarment.

## FINDINGS OF FACT

1. During all relevant times in this matter, Respondents Feinerman, Harris, and Buxton served on the HHA Board of Commissioners, as unpaid volunteers.
2. Respondents, in their capacity as commissioners of HHA, determine policy and have overall supervisory authority over the operation of HHA.
3. In 1996, the Mayor of Harrisburg established a task force to consider the banking and credit needs of the low income community in Harrisburg and Respondent Harris served on the task force.
4. In 1999, the GHCCU was designated as a low-income credit union.
5. Respondent Feinerman and the other commissioners serving at that time,[10] believed that the availability of a credit union to HHA residents would be a benefit to the residents.
6. GHCCU's membership was not limited to HHA residents but included non-residents, businesses and other individuals in the city of Harrisburg.

---

[10] Respondents Harris and Buxton were not appointed to the HHA until December 1999. Ms Buxton resigned from the Board in July 2007.

9

7. The first chair of the GHCCU Board was Dorsey Howard, also the then-Executive Director of HHA.

8. Respondent Feinerman was informed by Dorsey Howard that the Binghamton Housing Authority (BHA),[11] was involved in the establishment of a credit union for its residents and staff and that HUD sponsored a training session for PHAs interested in creating credit unions; however, no information was provided to the Board confirming the establishment of a credit union by BHA, the type of training provided by HUD to support credit unions or that HUD funds were approved for the creation of the BHA or any other credit union.

9. At a HHA Board meeting in October 1999, Dorsey Howard informed Board members Feinerman, Martini and Jones that he recently became chairman of the GHCCU and that "the housing authority, in its five year plan, has set aside up to $100,000[12] a year for operating subsidy".

10. The employee responsible for preparing the Plan, Mr. Jerry Shenck did not include the set aside in the submission to HUD.

11. Section 9(B) of the ACC provides that "All monies . . . received by or held for the account of the HA in connection with the development, operation and improvement of projects . . . shall constitute the General Fund."

12. Section 9(C) of the ACC provides that the HA may withdraw funds from the General Fund only for: "(1) the payment of the costs of development and operation of the projects under the ACC with HUD; (2) the purchase of investment securities as approved by HUD; and (3) such other purposes as may be specifically approved by HUD."

13. The ACC for the HHA was executed by Respondent Feinerman on behalf of HHA and governs the use of program funds provided by HUD.

14. The benefits, composition of Board and amount of funding needed by GHCCU were discussed in HHA Board meetings, in the presence of HHA's general counsel, executive directors,[13] and other professional staff.

15. The HHA Board did not solicit, make inquiry, or receive any legal opinion or professional advice from legal counsel, professional staff or HUD as to whether the use of HUD funds for the establishment or support of a credit union was an eligible expense under section 9 of the ACC.

16. HHA did not request or receive HUD approval to fund GHCCU.

17. At the HHA Board meeting of September 11, 2003, Board members Feinerman, Buxton and Harris voted to transfer $30,000 to the GHCCU.

18. At the HHA Board meeting of September 9, 2004, Board members Feinerman and Buxton voted to transfer $495,000 to the GHCCU.

19. In FY'2006 an audit by the HUD Office of Inspector General (OIG) identified improprieties in connection with HHA's financial contributions to GHCCU.[14]

---

[11] At the hearing, neither party provided relevant details of the Binghamton Housing Authority credit union.

[12] The minutes of the meeting do not identify who in the HHA authorized or approved the set-aside or when it was approved.

[13] Mr. Dorsey died in August 2001, and was succeeded by Carl Payne as Executive Director.

[14] An OIG audit of HHA's FY 2006 operations determined that HHA "did not administrator its low-rent housing program in accordance with HUD regulations." Specifically, the OIG found that HHA "improperly disbursed $834,969.00 in operating funds from its low-rent public housing program to open and support" GHCCU.

## CONCLUSIONS

Based on the above Findings of Fact, I have made the following conclusions:

1. Respondents were participants in a covered transaction, as defined in 24 CFR part 24, and members of the Board of the HAA.

2. The ACC was executed by the Chairman of the Board of Directors on behalf of the HHA Board and the Board is aware that the terms and conditions of the Annual Contributions Contract govern the use of HUD funds.

3. Section 9(C) of the ACC prohibits the use of HUD funds except for the payment of "costs of development and operation of the projects under ACC with HUD"; the "purchase of securities as approved by HUD" and "such other purposes as may be specifically approved by HUD".

4. The HHA Board voted in 2003 to transfer $30,000 to the GHCCU and voted in 2004 to transfer $495,000 to the GHCCU in violation of Section 9 (C) of the ACC.

5. The transfer of funds to the GHCCU did not constitute costs of "development" or "operation" because the GHCCU is not a "project under ACC with HUD"; the transfer was not an "investment security" approved by HUD and the transfer as "such other purpose" under Section 9 (C) was not approved by HUD.

6. The HHA Board actions in failing to comply with the specific terms of the ACC on more than one occasion and its failure to solicit or make affirmative inquiry to determine whether funding of the GHCCU was appropriate under the ACC, and if not to obtain approval, constitutes a willful failure to perform, a history of failure to perform and unsatisfactory performance in accordance with the ACC so serious as to affect the integrity of the program.

7. The HHA Board actions resulted in a financial loss to the HHA and warrant debarment because they are so serious that they affect Respondents' present responsibility.

8. The improper conduct of the HHA Board is imputable to Respondents pursuant to 24 CFR 24.630(b) who participated in, had knowledge of, or had reason to know of the improper conduct.

9. Respondents Feinerman, Harris and Buxton voted at the September 11, 2003 HHA Board meeting to transfer $30,000 to the GHCCU in violation of Section 9 (C) of the ACC.

10. Respondents Feinerman and Buxton voted at the September 9, 2004 HHA Board meeting to transfer $495,000 to the GHCCU in violation of Section 9 (C) of the ACC.

11. Pursuant to 24 CFR 24.850, HUD "has established the cause for debarment by a preponderance of the evidence" and under 24 CFR 24.855, HUD has met its "burden to prove that a cause for debarment exists."

12. The evidence supports debarment based on 24 CFR 24.800(b) and (d).

13. The actions of Respondents Feinerman and Buxton at the Board meetings on September 11, 2003 and September 9, 2004 resulted in the unauthorized transfer of $525,000 by the HHA to the GHCCU and warrant a debarment of three years.

14. The actions of Respondent Harris at the Board meeting on September 11, 2003 resulted in the unauthorized transfer of $30,000 by the HHA to the GHCCU and warrants a debarment of eighteen months.

15. Respondents offer several factors in mitigation of their actions, all of which have been considered in the terms of the debarments. The cooperation of Respondents in resolving the audit findings is acknowledged. Although Respondents allege that they have taking certain steps to put procedures and controls in place, including the creation of a governance committee and an audit committee to avoid a repetition of a similar problem and a proposal to repay all the funds contributed to GHCCU with non-federal funds, no affirmative action have been taken by any of the respondents or the HHA Board to implement the steps, controls or repayment suggested and to avoid a reoccurrence.

16. Respondents suggest that their debarments would be contrary to public policy and would discourage qualified persons from volunteering to serve housing authorities; however HUD has a responsibility to protect the public interest and take appropriate measures against participants whose actions may adversely affect the integrity of its programs and debarment is an appropriate action.

17. HUD cannot effectively discharge its responsibility and duty to the public if participants in its programs or programs that it funds fail to act responsibly and with sufficient care for the duties entrusted to them.

## DETERMINATION

Based on the foregoing, including the Findings of Fact, Conclusions, and the administrative record, I have determined, in accordance with 24 CFR 24.870(b)(2)(i) through (b)(2)(iv), to debar Respondents Feinerman and Buxton for a period of three years and Respondent Harris for a period of eighteen months from the date of this Determination. The debarments are "effective for covered transactions and contracts that are subject to the Federal Acquisition Regulation (48 CFR chapter 1), throughout the executive branch of the Federal Government unless an agency head or an authorized designee grants an exception."

Dated: _31 March 2008_

_Henry Czauski_

Henry S. Czauski
Debarring Official

12

CERTIFICATE OF SERVICE

I hereby certify that on this ___3rd___ day of March, 2008, a true copy of the DEBARRING OFFICIAL'S DETERMINATION was served in the manner indicated.

Tammie M. Parshall
Debarment Docket Clerk

**HAND-CARRIED**
Mortimer F. Coward, Esq.
Debarring Official's Designee

Maura Malone, Esq.
Brendan Power, Esq.
Government Counsel

**FIRST CLASS MAIL**
Reno & Cavanaugh
1250 Eye St., N.W., Suite 900
Washington, D.C. 20005

13

# EXHIBIT 12

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Leon J. Feinerman | ) | Docket No. 07-3441-DB |
| Reverand Earl Harris | ) | (Feinerman) |
| Constance Buxton | ) | |
| | ) | Docket No. 07-3442-DB |
| | ) | (Harris) |
| Respondents | ) | |
| | ) | Docket No. 07-3443-DB |
| | ) | (Buxton) |
| | ) | |
| | ) | |

## GOVERNMENT'S MOTION TO REFER TO A HEARING OFFICER

The U.S. Department of Housing and Urban Development ("HUD" or "the Government"), by

its undersigned counsel, requests that the Debarring Official refer this matter to a hearing officer

in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A, because of the

existence of disputed material facts, and to discontinue the hearing scheduled for December 6,

2007. In support of this motion, the Government states as follows:

This matter involves the Harrisburg (Pennsylvania) Housing Authority's ("HHA) violation of

Section 9 of the Annual Contributions Contract ("ACC") between HUD and HHA, by

withdrawing $841,655 of its General Fund monies for the purpose of contributing the funds to a

credit union known as the Greater Harrisburg Community Credit Union ("GHCCU") without

obtaining HUD's authorization. On July 30, 2007, HUD issued notices proposing the three year

debarment of the Respondents, who are all members of HHA's Board of Commissioners, because the HHA's violation is imputed to the Respondents, under 24 C.F.R § 24.630(b), in that they participated in, had knowledge of, or had reason to know of the improper conduct. On October 19, 2007 the Government filed its briefs in support of the debarments of Respondents ("Government's briefs") and, on November 20, 2007, Respondents filed their brief in opposition to the debarments ("Respondents' brief").

Respondents' brief has raised a genuine dispute over facts material to the proposed debarment. Respondents maintain in their brief and declarations that they never knew that HUD had not authorized the disbursements for GHCCU, and that at no time did any question or suspicion of impropriety arise. (See Respondents' brief at pages 1, 6, 7, 8, 10, 18, 20; and Respondents' Exhibit 2 (Feinerman declaration) at pars. 12, 16; Exhibit 3 (Harris declaration) at par. 16; and Exhibit 4 (Buxton declaration) at par. 6).

The Government claims, however, in its notices of proposed debarment and briefs that each of the Respondents knew, or had reason to know, that the HHA's disbursements for GHCCU were not authorized by HUD and therefore violated Section 9 of the ACC. (See Government's Briefs against Feinerman (Feinerman brief) at pages 5-10, 14-17; Harris brief at pages 4-8, 12-14; and Buxton brief at pages 4-8, 13-15).

In addition, such disputed facts are material to this case because whether Respondents "knew, or had reason to know" of the improper conduct are matters to be proved under the imputation standard set forth in 24 C.F.R § 24.630(b).

HUD counsel has spoken with Respondents' counsel and Respondents oppose this motion.

Wherefore, for the above reasons, the Government requests that this case be referred to a Hearing Officer in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A for

findings of fact and recommended conclusions of law, and to discontinue the hearing scheduled

for December 6, 2007.

                                              Respectfully submitted,

                                              Brendan Power
                                              Office of General Counsel
                                              Government Counsel, HUD
                                              202-708-3856 #3543

## CERTIFICATE OF SERVICE

I hereby certify that on this **3rd** day of *December*_____, 2007 a true copy of the foregoing
Government's Motion to Refer to a Hearing Officer was served in the manner indicated to:

*Tommie Parshall*
DOCKET CLERK

HAND CARRIED
Tim Coward
Debarring Official's Designee

Brendan Power
Maura Malone
Dane Narode
Government Counsel

FAX and First Class Mail
Mona Lyons
Law offices of Mona Lyons
1666 Connecticut Ave., NW
Suite 500
Washington DC, 20009
Fax: 202-387-7116


Lee Reno
Sarah Molseed
Reno & Cavanaugh
1250 I Street, NW suite 900
Washington DC, 20005
FAX: 202-783-0550

# EXHIBIT 13



UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Leon J. Feinerman ) | Docket No. 07-3441-DB |
| Reverand Earl Harris ) | (Feinerman) |
| Constance Buxton ) | |
| ) | Docket No. 07-3442-DB |
| ) | (Harris) |
| Respondents ) | |
| ) | Docket No. 07-3443-DB |
| ) | (Buxton) |
| ) | |

## GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION TO REFER TO A HEARING OFFICER

The U.S. Department of Housing and Urban Development ("HUD" or "the

Government"), by its undersigned counsel, submits its Reply in Support of its Motion to

Refer to a Hearing Officer in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part

26, Subpart A.   In support of this motion, the Government states as follows:

### I.   HUD's motion to refer is proper.

Respondents' contention that HUD's request that this case be referred to a hearing

officer should be denied because "there is not a single fact referenced in its briefs which

demonstrates that any one of the three commissioners (Respondents) knew, or had reason

to know, that the credit union expenditures had not been authorized by HUD or were

otherwise subject to question. In short, HUD has not presented an iota of evidence which

1

creates any genuine dispute about dispositive factual issues (Respondents' Opposition to Government's Motion to Refer to a Hearing Officer ("Respondent's Opposition"), p. 3)" is without merit. First, Respondents' narrow framing of the issue is erroneous. The issue to be determined is not simply limited to whether Respondents knew that HUD had not authorized the Harrisburg Housing Authority's ("HHA") funding of the Greater Harrisburg Community Credit Union ("GHCCU"). On the contrary, the issue to be determined, as is required by 24 C.F.R. § 24.630(b), is whether Respondents participated in, had knowledge of, or had reason to know of the HHA's improper contributions of its General Fund monies to GHCCU. In this regard, HUD has produced ample evidence in its debarment briefs and exhibits which establishes that Respondents participated in, had knowledge of, or had reason to know that HHA's disbursements to GHCCU were not proper.

Nevertheless, in their brief in opposition to HUD's proposed debarments, Respondents submitted declarations in which they state that they never knew that HUD had not authorized the disbursements for GHCCU and that there was not any question or suspicion of impropriety. (See Exhibits 2, 3, and 4 of Respondents' brief in opposition to debarment). Even though HUD believes that its briefs and exhibits have satisfied its burden of proof in establishing that the debarments of Respondents are warranted, HUD filed a motion to refer this case to a hearing officer for fact finding, pursuant to 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A, because HUD is required to give Respondents the benefit of the doubt, i.e., that the declarations have raised material facts in dispute, and it must abide by the regulations it has promulgated. See Sameena Inc. v. U.S. Air Force, et. al. 147 Fed. 3rd 1148, 1153 (1998 9th Cir.) (In finding that the

2

Respondent's, a contractor, submission has raised a genuine dispute of material facts, and that the Government (U.S. Air Force) was required to provide Respondent with fact finding procedures and an evidentiary hearing which are available under its regulations. "Where a prescribed procedure is intended to protect the interests of a party before the [federal] agency, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.")

If however, Respondents do not wish to utilize the procedures which are available to them under HUD regulations for fact finding and holding an evidentiary hearing, and will concede that there are no genuine disputes over material facts, HUD will withdraw its motion to refer to a hearing officer and go forward with the hearing that is presently scheduled for January 30, 2008 before the Debarring Official's Designee.

**II. Respondents motion to dismiss this case is without merit and should be denied.**

Respondents' claim that HUD's debarment case should be dismissed is similarly erroneous and Respondents' motion should be denied.  On the contrary, HUD has presented argument and documentary evidence including, but not limited to, HHA Board meeting minutes, correspondence, HHA public housing general fund ledgers and checks, the ACC between HUD and HHA (which was executed by Respondent Feinerman), and Pennsylvania state public housing authority law which sets forth the responsibility of public housing authority ("PHA") board members, 35 Pa. Cons. Stat. § 1547, that establish a prima facie case that Respondents knew, or had reason to know, that the HHA's contribution of its General Fund monies to GHCCU was improper.

For example, although Respondent Feinerman claims, in his declaration, that since Mr. Howard (then HHA's executive director ("ED"), now deceased) told him

3

during the **October 14, 1999 HHA Board meeting**, that HHA's financial commitment to

GHCCU was mentioned in HHA's five year plan, "it did not cross my mind that there

was any impropriety in what had occurred, nor was any impropriety pointed out by the

ED or [HHA's] general counsel" (Exhibit 2, par. 16 of Respondents' Brief in Opposition

to Debarment),[1] Feinerman knew, or had reason to know, that the information provided

from Mr. Howard did not establish that HUD had authorized HHA to contribute its

General Fund monies to GHCCU, as required by Section 9(C) of the ACC. All Mr.

Howard told Feinerman was that "[t]he housing authority, in its five year plan, has set

aside up to $100,000 a year for operating subsidy." (See Exhibit 9, p. 8 of HUD's

debarment brief against Feinerman ("HUD's Feinerman brief"). Feinerman knew, or had

reason to know, that this vague statement from Mr. Howard about referring to the credit

union in HHA's five year plan,[2] did not comply with the Section 9 (C) of the ACC. To

be sure, Section 9(C) requires specific written approval from HUD, for HHA to be

allowed to give its General Fund monies to GHCCU.

 HUD regulations do not provide for PHA's to receive written approval from HUD

following their submission of five year and annual plans. Rather the PHA's five year and

annual plans are automatically approved if HUD does not submit a written disapproval

within 75 days of the plans' submission. See 24 C.F.R. §§ 903.23(b)(2) and (b)(3),

(1999). Whereas the ACC, at Section 9(C), requires PHAs to obtain HUD's specific

authorization, in writing,[3] to use its General Fund monies for purposes other than the

---

[1] Respondents Harris and Buxton were not present at the October 14, 1999 HHA Board meeting.
[2] As it turned out, HHA never even mentioned the credit union in HHA's five year plan. (See Shenck declaration, Exhibit 5 of Respondents' Brief in Opposition to Debarment.
[3] HUD approval is defined in the ACC as "prior written approval from HUD." (See Exhibit 4, p. 2, of HUD's Feinerman brief).

4

operation or development of the authority or for investing in HUD approved securities.
(See Exhibit 4 of HUD's Feinerman brief).

Given the fact that Respondent Feinerman, as an HHA board member, is
responsible for supervising and controlling the housing authority (see 35 Pa. Cons. Stat.
§§ 1545, 1547), which necessarily includes ensuring that the ACC is complied with, he
knew, or had reason to know, that the information provided to him by Mr. Howard at the
October 14, 1999 Board meeting did not constitute proper authorization from HUD for
HHA to give its General Fund money away to GHCCU.

Moreover, it was Feinerman who executed the ACC between HUD and HHA
(See Exhibit 4. p. 12, of HUD's Feinerman brief) and he most certainly knew, or had
reason to know, of the requirements set forth in the ACC. Nevertheless, Feinerman failed
to make any inquiry at the October 14, 1999 Board meeting as to whether HHA had
obtained HUD's authorization to contribute its General Fund monies to GHCCU.

The **May 10, 2001 HHA Board meeting**, which was attended by all three
Respondents, is another instance in which Respondents knew, or had reason to know, that
HHA did not have HUD's specific authorization to contribute its General Fund monies to
GHCCU. The following exchange took place at this HHA Board meeting:

> Mr. Feinerman: The treasurer's report for the period ending March 31, 2001 is
> presented for approval. The only comment I have and which always concerns me,
> is the revenue item from our actual cumulative year-to-date versus the budget, we
> are always a little bit lower, but our expenditures are almost $250,000 more than
> what we budgeted. Is that going to catch up with utilities or not?
>
> Mr. Howard: There are a couple things that are in there. Some of the stuff that is
> in here is for the credit union. We are paying it out of our operating funds. It is a
> contribution that we had decided we were going to make to the credit union and
> we are paying it out of the operating funds. Instead of passing it through to the
> credit union for them to pay, because at the time they didn't have a checking
> account, we paid it directly. (See Exhibit 11, p. 3, HUD's Feinerman brief).

5

This exchange demonstrates that HHA's contribution of its General Fund monies, which includes operating funds, to GHCCU has prevented the HHA from operating in a fiscally efficient manner and from maintaining a balanced budget. Respondents certainly knew, or had reason to know, by virtue of this exchange that HUD would not authorize the HHA to use its General Fund money for this credit union, which is open to the entire City of Harrisburg, if such contributions would jeopardize the HHA's ability to operate a financially stable housing authority. However, no Respondent ever asked at this Board meeting if HUD had approved the HHA's funding of GHCCU. More importantly, it demonstrates that Respondents knew that HHA's public housing General Fund monies were being used to fund GHCCU. It was incumbent upon them to determine if this was a permissible use those funds. Respondents, however, failed to take any action at all to assure themselves that HHA was acting in accordance with HUD requirements.

The **September 11, 2003 HHA Board meeting**, which was also attended by all three Respondents, is another example in which Respondents knew, or had reason to know, that HHA did not have HUD's specific approval to contribute its General Fund monies to GHCCU. The following exchange took place at the September 11, 2003 HHA Board meeting:

> Mr. Feinerman: How aggressively have we solicited our constituents in the neighborhoods to become members of the credit union?
>
> Mr. Payne: We haven't solicited them very aggressively for a good reason. That reason is that we just now are getting the approval of the regulations to offer ATM and a debit card. We intentionally did not solicit the elderly, who now are on electronic direct deposit because we did not have the ability to do that. Once we get that in place, then we will start. (See Exhibit 12, p. 3, HUD's Feinerman brief).

6

This exchange makes clear to the Respondents that, even though GHCCU had been open for business for almost two and one-half years (April 2001 - September 2003), little, if any, effort has been made to attract HHA residents to be customers and GHCCU has provided very little, if any, service for HHA residents. Given this information provided by Carl Payne (HHA's new ED) during the September 11, 2003 Board meeting, Respondents knew, or had reason to know, that HUD would not have authorized the HHA to give away its General Fund monies to a credit union that has no requirement for HHA residents to be GHCCU customers, and has provided virtually no benefit or service for HHA residents.[4] Again, no Respondent asked at the September 11, 2003 Board meeting whether HHA had obtained HUD's authorization to give its General Fund money to GHCCU.

Although Respondents claim that they never knew that HUD had not authorized the disbursements for GHCCU, and that at no time did any question or suspicion of impropriety arise, the October 14, 1999, May 10, 2001 and September 11, 2003 HHA Board meetings are all instances which demonstrate that Respondents knew, or had reason to know, that HUD would not have authorized HHA to contribute its General Fund monies for GHCCU. Moreover, since Respondents, as HHA board members, are responsible for supervising and controlling the housing authority, which necessarily includes ensuring that the ACC is complied with, they should have, at a minimum, inquired at these board meetings whether HHA had HUD's approval to provide funding for GHCCU. Such an inquiry would not only have been appropriate, since making these

---

[4] The fact that GHCCU had been providing hardly any service or benefit for HHA residents is supported by the HHA's own estimate which it provided to HUD's OIG. According to this estimate, HHA residents only amounted to approximately 10 per cent of GHCCU's total number of customers for the period of 2001 – 2003. No estimate was provided for any other years and GHCCU was shut down by the state due to insolvency in February 2006.

7

kind of inquiries is one of the primary reasons for holding PHA board meetings, but also would have been the Respondents' obligation in fulfilling their responsibility as PHA board members.

However, no such inquiries were made.   Rather, on September 11, 2003, April 8, 2004 and September 9, 2004,[5] Respondents voted to authorize HHA to provide additional funding for GHCCU, without any questions as to whether these contributions were authorized by HUD.

In addition, if Respondents would have inquired, as they should have, whether HUD had approved of the HHA's funding of GHCCU and learned that there was no such approval, Respondents should have voted to discontinue any further funding of GHCCU and should have immediately alerted HUD of the violations of its requirements.

Further, although Respondents maintain that they "properly and reasonably relied on HHA's management and general counsel to insure HHA's compliance with the specific requirements of the ACC and HUD" (see Respondents' Opposition, p. 3), they fail to disclose what information was provided to them by either HHA's management or general counsel regarding HHA's compliance with the ACC.  In addition, neither the declarations of HHA counsel Irwin Aronson or acting ED Jerry Shenck state that they advised any of the Respondents that the HHA's funding of GHCCU was in compliance with the ACC.  (See Exhibits 5 and 6 of Respondents' Brief in Opposition to Debarment).

Accordingly, there is ample evidence demonstrating that Respondents knew, or had reason to know, that the HHA's funding of GHCCU was improper and their motion to dismiss this debarment case must be denied.

---

[5] Respondent Harris was not present at the September 9, 2004 HHA Board meeting.

WHEREFORE, for the above reasons, the Government requests that this case be referred to a Hearing Officer in accordance with 24 C.F.R. § 24.845(c) and 24 C.F.R. Part 26, Subpart A for findings of fact and recommended conclusions of law. Alternatively, if Respondents do not wish to utilize the procedures which are available to them under HUD regulations for fact finding and holding an evidentiary hearing, and will concede that there are no genuine disputes over material facts, HUD will withdraw its motion to refer to a hearing officer and go forward with the hearing that is presently scheduled for January 30, 2008 before the Debarring Official's Designee.

Respectfully Submitted,

Brendan Power
Office of General Counsel
Government Counsel, HUD
202-708-3856 #3543

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of January_____, 2008 a true copy of the foregoing  Government's Reply in Support of its Motion to Refer to a Hearing Officer was served in the manner indicated to:

_____
DOCKET CLERK


HAND CARRIED
Tim Coward
Debarring Official's Designee


FAX and First Class Mail
Mona Lyons
Law offices of Mona Lyons
1666 Connecticut Ave., NW
Suite 500
Washington DC, 20009
Fax:  202-387-7116


Lee Reno
Sarah Molseed
Reno & Cavanaugh
1250 I Street, NW suite 900
Washington DC, 20005
FAX: 202-783-0550

# EXHIBIT 14

## DECLARATION OF JAMES G. STOCKARD, JR.

I, James G. Stockard, Jr., do hereby swear and declare that the following is true and correct to the best of my knowledge:

1. I am the Curator of the Loeb Fellowship program at Harvard University's Graduate School of Design, where I also teach graduate level courses in housing, community development and neighborhood revitalization.

2. I received a Bachelor of Arts in Architecture from Princeton University in 1964 and a Master of City Planning from the Harvard Graduate School of Design in 1968.

3. Throughout the subsequent four decades, the central focus of my professional activities has been the development, operation and management of affordable housing and, in particular, public housing. A detailed description of my professional experience, affiliations and publications is attached to this declaration.

4. I have experience with, have studied and written about, and have expertise in, the role and responsibilities of Commissioners of Public Housing Authorities (PHAs). I have served as a Commissioner of the Cambridge Housing Authority for almost 35 years, serving seven terms as its chair. I have provided consulting services to numerous other PHAs throughout the country, as well as regional and national offices of HUD. I have served as a Special Master appointed by the Superior Court of the District of Columbia to investigate and make recommendations about the future organization and governance of the District of Columbia Housing Authority, one of the most troubled in the country at the time. I have trained well

over 1000 PHA Commissioners in their role and the proper exercise of their responsibilities.

5.    The principal responsibilities of PHA Commissioners are to develop policy for their authorities, to engage Executive Directors who have the knowledge and abilities to implement that policy, and to monitor that implementation through appropriate review and oversight.  To exercise those responsibilities, Commissioners should have an understanding of, and commitment to, the mission of public housing, and a basic understanding of its proper operation and management.  Even if they are public housing professionals, Commissioners should not become involved in the day to day operations and management of their authorities and, particularly if they are not public housing professionals, Commissioners may, must, and should rely on the technical expertise and advice of the executive staff they have chosen and other carefully selected professionals such as lawyers, accountants, auditors, and architects.  Not to do so is to take the dangerous position of substituting one's own, typically amateur, judgment on technical matters for that of professionals in the field, and thereby placing the agency in jeopardy.

6.    I have reviewed a variety of documents concerning HUD's proposed debarments of Leon J. Feinerman, Earl L. Harris, and Constance Buxton, three Commissioners of the Harrisburg Housing Authority (HHA).  Those documents include HUD OIG's Final Audit Report, HHA's response to that report, HHA's proposals to HUD to resolve the audit findings, the letter from HUD proposing the debarment of Mr. Feinerman, the three Commissioners' request for a hearing,

HUD's brief in support of the debarment of Mr. Feinerman, and the declarations of Mr. Feinerman, Reverend Harris, and Ms. Buxton.

7.    I have never met or communicated with any of the three Commissioners whom HUD is proposing to debar, and I do not presently have, and have never previously had, any personal or professional affiliation with HHA.

8.    Based upon my educational and professional experience and expertise, and my review of the documents concerning HUD's proposed debarments of the three HHA Commissioners, my opinion is that the debarments are unwarranted, would be harmful to the public interest, and have the potential to cripple governance of the public housing industry.

9.    There is no evidence in the documents I have reviewed which even suggests that any one of the three Commissioners knowingly or willfully violated the Annual Contributions Contract, any other HUD requirement or regulation, or otherwise engaged in any intentional wrongdoing. In addition, there is inadequate evidence to support a finding that any one of the three Commissioners fulfilled his or her responsibilities improperly.

10.   I am unaware of any specific standards or guidance from HUD on the proper exercise of the duties of Commissioners of PHAs, and none are referenced or cited in HUD's submissions concerning its proposed debarments of the three HHA Commissioners. Based upon my training, knowledge and experience, the duties of such Commissioners are derived from state and common law, and the proper exercise of those duties is guided by the prevailing standards of care of governing bodies of both public housing authorities and other non-profit corporate

entities. Based upon my professional training and experience, none of the three HHA Commissioners breached any obligation imposed by law, or the prevailing standards of care, by the actions they took in connection with the community credit union.

11.    Based upon the information I have reviewed, Mr. Feinerman was the only one of the three Commissioners who had a role in the HHA's initial decision to support the creation and operation of a community credit union in Harrisburg in the late 1990s. Based upon my knowledge of HUD's programs and policies, and the information I have been provided about the needs and resources of HHA's residents, it is my professional opinion that HHA's decision to support the creation and operation of a community credit union was an appropriate and laudatory policy decision designed to provide an important and necessary resident service, and that, if it had been properly notified about the decision at the time, HUD would have applauded and readily approved it. The late 1990s were a period when HUD was encouraging PHAs to "think outside the box" and find new ways to support low income residents; it was the time of the beginnings of Hope VI, Moving to Work, resident self-sufficiency programs and other innovative initiatives and ideas, such as supporting credit unions to meet the financial need of public housing residents.

12.    In my professional opinion, Mr. Feinerman also cannot be faulted for his lack of knowledge that HHA's management failed to properly notify HUD of the policy decision which he and his fellow Commissioners had made. The Annual Plan in which HUD now asserts that this information should have been supplied is a

lengthy, technical document. Even if Mr. Feinerman read every page of HHA's plan, which in my professional opinion he was not obligated to do, he cannot reasonably have been expected to know which details were required to be reported and which were not. The responsibility to know and fulfill HUD's specific contractual and regulatory requirements is a responsibility of the management of a PHA, not its Commissioners.

13.    Based upon the information I have reviewed, the three Commissioners subsequently participated in HHA decisions to advance and increase its financial support of the community credit union, and to monitor the operation and management of that organization by securing representation on its separate board. In my professional opinion, and notwithstanding the ultimate failure of the credit union, those decisions were reasonable and appropriate decisions for the three Commissioners to make.

14.    In my professional opinion, Reverend Harris and Ms. Buxton were not obligated to scrutinize the earlier policy decision of their predecessors to support the community credit union, or the implementation of that decision by HHA management, before voting to advance or increase funds to the credit union. HUD policy requires that annual independent audits of PHAs be performed and forwarded to HUD, and it is my understanding that HHA fully complied with that requirement and that no findings or objections were made about the expenditures for the credit union for any of the years in which they had been made. Based upon those audits, it would have been reasonable for any PHA commissioner, including Reverend Harris and Ms. Buxton, to assume that the earlier policy decision to

support the credit union was an appropriate one, that it had been implemented properly, and that the expenditures for it were proper.

15.    I have reviewed the audit findings made by HUD's OIG about HHA's support of the community credit union, and HHA's proposals to resolve those findings.  I do not agree with all of the findings and conclusions of the audit but, in my professional opinion, HHA's proposals to address and resolve them are considerably more than adequate.

16.    I am familiar with the Annual Contributions Contract (ACC) between HUD and PHAs.  Although the ACC imposes compliance with all HUD requirements and regulations, it does not inform readers, and particularly those who are not housing professionals, about what is specifically required or allowed by those requirements and regulations.  The ACC also provides no information about whether or not a credit union is an eligible resident service or a "project."

17.    Based upon my professional experience and expertise, none of the information which I have been provided about HHA's support of the community credit union justifies the imposition of any sanction or penalty on any one of its three Commissioners whom HUD is now proposing to debar.  In my professional opinion, HUD's proposals to debar the three Commissioners are without basis, punitive, and wrong.  Furthermore, in my professional opinion, HUD's imposition of any sanction on the three Commissioners has the potential to have an immediate, and enormously negative, impact on the governance of PHAs throughout the country.

18.    After more than 35 years of service as a Commissioner of the Cambridge Housing

Authority, and notwithstanding the fact that I am a housing professional and have unusually extensive knowledge of public housing programs, policies and regulations, HUD's imposition of a sanction on any one of the three HHA Commissioners would have to cause me, and the other 15,000 plus volunteer PHA Commissioners, to give serious thought to whether we can continue in such a role. In my professional opinion, if HUD imposes any sanction based upon the facts at issue here, few knowledgeable, thoughtful and public-spirited citizens may be willing to undertake or continue voluntary service as PHA Commissioners and, as a direct and inevitable result, responsible governance of the public housing industry could be destroyed.

So sworn this 19th day of November, 2007

By: _____

James G. Stockard, Jr.

James G. Stockard, Jr.
141 Oxford St.
Cambridge, MA 02140
(617) 864-8947 at home
(617) 495-5988 at the office
stockard@gsd.harvard.edu

## Professional Experience

**1997-Present**

**Curator, Loeb Fellowship, Harvard Graduate School of Design**
Director of a fellowship program that brings 10-12 mid career
professionals concerned with the built and natural environment to
Harvard for a year of independent study. Responsible for leading
the selection process, providing assistance and advice to the
Fellows while they are in residence, and catalyzing events
involving the Fellows and the larger community.

**1997-Present**

**Lecturer in Housing, Harvard Graduate School of Design**
Responsible for all aspects of teaching graduate level courses in
housing, community development and neighborhood revitalization.

**1999-2003**

**Principal Investigator, Public Housing Operating Cost Study.**
Overall direction of a GSD study to determine for the United
States Congress the reasonable costs for administering a
well-run Public Housing program. Results of the study were used
to create a new operating subsidy formula as well as a number of
other fundamental changes in the administration of the nation's
oldest affordable housing program.

**1970-2000**

**Principal, Stockard & Engler & Brigham**
Founding principal of a small consulting firm focusing on
affordable housing and related urban concerns. Originally formed
as Justin Gray Associates, the firm assists public and private
organizations in the development of affordable housing, the
creation of programs supporting affordable housing, neighborhood
planning, property management, and organizational development
for groups with affordable housing as a part of their mission. The
following assignments are among the most significant work
undertaken as a part of the firm:

Court-appointed Special Master for the Washington, D.C. Housing
Authority. Investigation, analysis, and recommendations to Judge
Steffen Graae of the Superior Court of the District of Columbia
about the future organization and governance of the Authority, one
of the most troubled in the nation at the time.

Consultant to Public Housing Authorities (PHAs) with Hope VI
Grants. Service to a number of authorities (Boston, Richmond,
New Orleans, Philadelphia among others) regarding their
application for, or implementation of, a Hope VI grant. Particular
expertise with regard to management operations, development
strategies, and social services.

Facilitator for meetings, retreats and strategic planning sessions for
groups concerned with affordable housing issues. Assistance with
planning, development of materials and exercises, coordination of
related activities, leading of sessions, and production of material
resulting from meetings. Recent clients have included the
Millennial Housing Commission, the National Housing
Conference, the Seaside-Pienza Institute, the Local Initiatives
Support Corporation, the US Conference of Mayors, the
Neighborhood Reinvestment Corporation and the Portland (OR)
and Seattle Housing Authorities.

Author, curriculum designer, and trainer regarding asset and
property management. Author or co-author of two books about
property management. Author of a 36-module curriculum for
training non-profits about asset management. 25 of the modules
have been published. Trainer of non-profits in the fields of asset
and property management with extensive experience in cities
across the country. The client for much of this work has been the
Local Initiatives Support Corporation.

Consultant to Public Housing Authorities, resident groups, HUD,
and others concerned with quality public housing. Numerous
assignments, including policy development, program evaluation,
procedural consultation, training, and strategic planning. Service
to PHAs of all sizes in all parts of the country, as well as regional
and national offices of HUD.

Consultant in Affordable Housing Development to Community
Development Corporations, non-profits, church groups and public
agencies. Full development consultation for numerous housing
developments taking advantage of every significant assisted
housing program over the past 30 years.

Consultant to communities in the development of affordable
housing policies and procedures. Frequently asked to work with a
city or town government and a potential developer of affordable
housing to reach comfortable terms for a new development. Many
program development assignments for local communities, as well.

Teacher and trainer in the fields of affordable housing development and management, as well as strategic planning, board development and public housing policies and procedures. Numerous assignments for a wide variety of clients. Settings have varied from full graduate courses at the university level to week long executive education programs to weekend strategic planning retreats with community based organizations to one hour orientations with new board members of a non-profit neighborhood association.

## Professional Affiliations

**1973-Present**   Commissioner, Cambridge Housing Authority, Six terms as Chair

**1988-Present**   Founding Trustee, Cambridge Affordable Housing Trust

**1985-Present**   Board Member, Citizens Housing and Planning Association,
                   Member of the Executive Committee since 1990
                   President, 1994-1996

**2002-Present**   Board Member, Neville Communities, Inc., Neville Communities Home, Inc., and Neville Communities Assisted Living, Inc.
                   These are the non-profit boards that own and operate Neville Center and Neville Place, the affordable assisted living center and nursing home developed by the Cambridge Housing Authority and the Cambridge Health Alliance.

**2005-Present**   Member, Massachusetts Housing Appeals Committee
                   This is the Committee that hears appeals under Section 40B of Massachusetts law that allows overrides of local zoning decisions when the development of affordable housing is involved.

**1999-2002**      Member, Harvard Housing Advisory Committee
                   Appointed by the President of the University to serve on a Committee to provide advice and technical assistance to the University as it created a plan for increasing the amount of housing it would provide to graduate students and junior faculty, with particular reference to the growth of the University in the Allston-Brighton community of Boston.

**1998-Present**   Member, Faculty Advisory Committee, Joint Center for Housing Studies, Harvard University

| | |
|---|---|
| **1991-1993** | Chair, Mayor's Commission on University-Community Relationships, City of Cambridge |
| **1992-1993** | Member, Massachusetts Legislative Study Commission on the Leased Housing Programs |
| **1993, 1994,1995** | Testimony to the United States Senate and House of Representatives, Presentations regarding the improvement of the Public Housing program, in general, and the District of Columbia Housing Authority, in particular |

## Publications

| | |
|---|---|
| **2005** | A Study of the Appropriate Operating Costs for State-Funded Public Housing in Massachusetts, a study prepared for the Citizens Housing and Planning Association and the Massachusetts Chapter of the National Association of Housing and Redevelopment Officials, Cambridge |
| **2005** | *The Affordable Housing Imperative for America's Cities: Can Government Solve it?* in Affordable Housing in New York City, Henry Wollman and Petr Vancura, editors, The Steven L. Newman Real Estate Institute of Baruch College/ The City University of New York, New York |
| **2003** | Final Report of the Public Housing Operating Cost Study, A study prepared for the United States Congress under a Cooperative Agreement with the US Department of Housing and Urban Development, Harvard Graduate School of Design, Cambridge |
| **1998** | *Public Housing: The Next 60 Years?*, the Epilogue for New Directions in Urban Public Housing, David F. Varady, Wolfgang F.E. Preiser and Francis P. Russell, editors, Center for Urban Policy Research, New Brunswick, New Jersey |
| **1998** | Asset Management Training Curriculum, Volume I, Local Initiatives Support Corporation, New York |
| **1998** | *The Status of Nonprofit-Owned Affordable Housing: Short-term Successes and Long-Term Challenges*, with Rachel G. Bratt, Avis C. Vidal, Alex Schwartz and Langley C. Keyes, Journal of the American Planning Association, Winter 1988, Volume 64, Number 1, pages 39-51 |

| 1996 | Managing Affordable Housing: A Practical Guide to Creating Stable Communities, with Bennett L. Hecht and the Local Initiatives Support Corporation, John Wiley & Sons, New York |
| 1994 | Guide to Comprehensive Asset and Property Management, Local Initiatives Support Corporation, New York |
| 1994 | Confronting the Management Challenge: Affordable Housing in the Nonprofit Sector, with Rachel G. Bratt, Langley C. Keyes, Alex Schwartz, Avis C. Vidal, Philip L. Clay, Melvyn Colon and Judith Shapiro, New School for Social Research, New York |
| 1991 | Property Maintenance Guide: Organizational and Procedural References for Maintaining Public Housing, Executive Office of Communities and Development, Commonwealth of Massachusetts, Boston |

**Education**

| 1978 | Loeb Fellow, Harvard Graduate School of Design |
| 1968 | Master of City Planning, Harvard Graduate School of Design |
| 1965 | Rockefeller Fellow, Union Theological Seminary, New York |
| 1964 | Bachelor of Arts in Architecture, Princeton University |